**Elouise Pepion COBELL, et al. Plaintiffs,**

v.

**Gale A. NORTON, Secretary of the Interior, et al., Defendants.**

**No. CIV.A.96–1285(RCL).**

United States District Court, District of Columbia.

Sept. 25, 2003.

Keith M. Harper and Lorna K. Babby, Washington, DC, Robert Meyer Peregoy, Ronan, MT, Elliott H. Levitas, Kilpatrick Stockton, LLP, Dennis Marc Gingold and Mark Kester Brown, Washington, DC, for plaintiffs.

Robert D. Luskin, Patton Boggs LLP, Tom C. Clark, Susan Virginia Cook, Brian L. Ferrell, Andrew M. Eschen, Charles Walter Findlay, III, Sarah D. Himmelhoch, Sandra Marguerite Schraibman, Connie S. Lundgren, Edith R. Blackwell, Washington, DC, John Charles Cruden, Annandale, VA, Lewis Steven Wiener, Sutherland, Asbill & Brennan, L.L.P., J. Christopher Kohn, Mark E. Nagle, Robert Craig Lawrence, Scott Sutherland Harris, Jo–Ann Shyloski and Barry Weiner, Henry A. Azar, Jr., Washington, DC, Terry M. Petrie, Denver, CO, Seth Brandon Shapiro, Jonathan Brian New, Sandra Peavler Spooner, David J. Gottesman, Peter Blaze Miller, Cynthia L. Alexander, Mathew J. Fader, John Stemplewicz, Amalia D. Kessler, John S. Most, Jennifer R. Rivera, Phillip Martin Seligman, Michael John Quinn, Gino D. Vissicchio, John Warshawsky, John J. Siemietkowski, John R. Kresse, Timothy E. Curley, Tracy Lyle Hilmer, Dodge Wells, Daniel Gordon Jarcho, Herbert Lawrence Fenster, Christina M. Carroll and Michael James Bearman, McKenna Long & Aldridge, LLP, Elizabeth Wallace Fleming, Trout & Richards, P.L.L.C., B. Michael Rauh Manatt, Phelps & Phillips, L.L.P., Washington, DC, for defendants.

## MEMORANDUM OPINION

### ("Historical Accounting")

LAMBERTH, District Judge.

*Table of Contents*

I. *Introduction* ................................................................. 72
 A. Factual Background ................................................ 72
 1. The Removal of the American Indians ............................ 72
 2. The Allotment Process .......................................... 74
 3. The Individual Indian Money (IIM Trust) ........................ 76
 B. Procedural Background ............................................ 81
 1. The Filing of the Present Case .................................. 81

 2. The Phase I Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .82
 3. The Second Contempt Trial . . . . . . . . . . . . . . . . . . . . . . . . .83
 4. The Phase 1.5 Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .85

II. *An Overview of Institutional Reform Litigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .86
 A. A Model of an Institutional Reform Case . . . . . . . . . . . . . . . . . . . . . . . .87
 B. Major Settings of Institutional Reform Litigation. . . . . . . . . . . . . . . . . . . . . . .92
 1. Schools. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .92
 2. Prisons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .95
 3. Mental Health Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . .100
 4. Public Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .101
 5. Other Settings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .104
 C. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .107

III. *Separation of Powers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .108
 A. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .108
 B. Judicial–Executive Separation of Powers Cases . . . . . . . . . . . . . . . . . . . . . . .110
 C. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .118
 D. The Role of the Courts in Trust Cases . . . . . . . . . . . . . . . . . . . . . . . . .127
 1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .127
 2. American Trust Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .127
 E. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .134

IV. *The Mandates of the D.C. Circuit* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .136
 A. Cobell VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .136
 B. Cobell VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .140
 C. The Nature and Scope of the Court's Review . . . . . . . . . . . . . . . . . . . . . . . .141

V. *The Plans* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .147
 A. An Overview of Interior's Accounting Plan . . . . . . . . . . . . . . . . . . . . . . . .147
 1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .147
 2. The Collection Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . .148
 a. Indexing of Trust Records . . . . . . . . . . . . . . . . . . . . . . . . .148
 b. Collection of Missing Trust Records from Third Parties . . . . . . . . . . .148
 c. Compilation of Transaction Histories . . . . . . . . . . . . . . . . . . . . .149
 3. The Accounting Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . .149
 a. The Three Categories of Accounts . . . . . . . . . . . . . . . . . . . . . .149
 b. Verification of Transactions . . . . . . . . . . . . . . . . . . . . . . . . . .150
 4. The Reporting Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . .151
 5. The Quality Control Process . . . . . . . . . . . . . . . . . . . . . . . . .151
 a. Tests of the IIM Trust Systems . . . . . . . . . . . . . . . . . . . . . . .151
 b. Other Quality Control Measures . . . . . . . . . . . . . . . . . . . . . . .151
 B. Adequacies and Deficiencies of Interior's Accounting Plan . . . . . . . . . . . . . . . .152
 1. The Collection Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . .152
 a. The Availability of Adequate Records . . . . . . . . . . . . . . . . . . . .152
 b. Collection of Missing Trust Records from Third Parties . . . . . . . . . . .155
 c. Indexing of Trust Records and Compilation of Transaction
 Histories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .161
 2. The Accounting Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . .166
 a. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .166
 b. Special Deposit Accounts (SDAs) . . . . . . . . . . . . . . . . . . . . . . .166
 c. Judgment and Per Capita Accounts . . . . . . . . . . . . . . . . . . . . .168
 d. Land–Based Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .169
 (1) Proposed Termination Date of the Accounting . . . . . . . . . . . . . . .169
 (2) Proposed Start Date of the Accounting . . . . . . . . . . . . . . . . . . .172
 (3) Deceased Beneficiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . .173
 (4) Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .175
 (5) Direct Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .177
 (6) Contract/Compact/Cooperative Agreement . . . . . . . . . . . . . . . . .180

 (7) Land Escheatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .181
 e. Method of Verification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .183
 (1) Accounting Standards Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . .184
 (2) Statistical Sampling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .187
 3. The Reporting Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .198
 4. The Quality Control Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .200
 a. System Tests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .200
 b. Other Quality Control Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .204
 C. Plaintiffs' Accounting Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .207

VI. *Relief to Be Ordered* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .211
 A. The Four–Part Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .211
 1. Substantial Likelihood of Prevailing on the Merits . . . . . . . . . . . . . . . . . . . .211
 2. Irreparable Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .212
 3. Balance of Hardships . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .212
 4. Furtherance of the Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .212
 B. Structural Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .213
 C. Appointment of a Monitor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .214
 D. Timetable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .220
 E. Retention of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .224

VII. *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .224

This matter comes before the Court after a forty-four day bench trial. Having undertaken a careful review of all the evidence presented and all representations made during that trial, of the record in this case, and of the applicable law, the Court now enters a structural injunction and appoints a monitor to oversee its implementation.

This memorandum opinion is the first of two opinions issued this date. The present opinion deals solely with the further relief ordered by this Court relating to the historical accounting owed by defendants to plaintiffs. The second opinion will treat the further relief ordered by the Court relating to the obligation of the Interior defendants to bring themselves into compliance with the fiduciary duties owed to plaintiffs as the trustee-delegate of the United States for the individual Indian money trust.

A decent respect for all who will be affected by today's rulings makes it appropriate that the Court should provide a full explanation of the reasons compelling it to order such relief. Only an appreciation of the full context in which the present trial emerged will make clear precisely why this Court has determined such relief to be necessary. Part I of this opinion provides a synopsis of this litigation to date. Part II examines the tradition of institutional reform cases, and explains how the present case fits within that tradition. Part III analyzes relevant separation-of-powers issues. Parts IV and V present in detail the Court's specific findings of fact and conclusions of law. Part VI describes the relief ordered this date. Finally, in Part VII, the Court provides a brief explanation of the profound necessity for the entry of a structural injunction in this matter.

## I. INTRODUCTION [1]

### A. Factual Background

#### 1. The Removal of the American Indians

The forced removal of American indigenous peoples from their ancestral lands is

---

[1]. This Part is only meant to provide a brief summary of some of the most important events in this litigation to date, not to provide a full history of the litigation. For more

one of the darkest chapters in American history. Perhaps few today realize, however, that this forced removal did not result from isolated acts of Western settlers; rather, it was set in motion by the federal government. Moreover, few recall the clash between the executive branch and the federal judiciary over the policy of removal, in which the executive branch refused to enforce the mandate of the Supreme Court that American Indian Tribes were to be treated as sovereign entities.

In 1827, the Cherokee nation, located within the boundaries of the state of Georgia, adopted a written constitution modeled after the U.S. Constitution, which declared them to be a sovereign, autonomous nation. VINE DELORIA, JR. & CLIFFORD M. LYTLE, AMERICAN INDIANS, AMERICAN JUSTICE 28 (1983) ("*American Indians*"). At the time, the Cherokee nation possessed "a thriving agricultural economy, a written language, and a formal government, including a legislature, and courts." DAVID H. GETCHES ET AL., FEDERAL INDIAN LAW 96 (4th ed. 1998) ("*Federal Indian Law*"). The following year, the state of Georgia passed a law assimilating Cherokee lands into Georgia's northwestern counties. In 1829, the state passed a law rendering the Cherokee territory located within Georgia boundaries subject to the laws of Georgia, effectively abolishing existing Cherokee laws and customs. The Cherokee nation filed suit in federal court to enjoin the enforcement of the Georgia laws, but the matter was dismissed for lack of jurisdiction. *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831). A year after dismissing the case, however, the Supreme Court, in an opinion authored by Chief Justice John Marshall, determined the

Cherokee nation to be "a distinct community, occupying its own territory, . . . in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves. . . ." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832).

Prior to the Court's decision, however, Congress had passed the Indian Removal Act, authorizing the President to compel Indian Tribes living east of the Mississippi River to migrate westward. Additionally, in 1830, the governor of Georgia had announced that gold had been discovered on the Cherokee lands, prompting widespread trespasses onto Cherokee territory by Georgia citizens searching for gold. Therefore, the governor of Georgia, together with numerous state officials, announced that they would not obey the mandate of the Supreme Court. *Federal Indian Law* at 122. Moreover, upon learning of the *Worcester* decision, President Andrew Jackson is fabled to have retorted: "Well, John Marshall has made his decision—now let him enforce it." When they realized that the executive branch had no intention of honoring the decision of the Court, the Cherokee nation reluctantly entered into the Treaty of New Echota in 1835. *American Indians* at 33. Soon afterward, "[n]early sixteen thousand Cherokees walked 'silent and resigned' from Georgia to their new homes in what became eastern Oklahoma. This journey has been called the 'Trail of Tears' because the Indians were leaving their ancestral lands under the most harsh conditions imaginable." *Id.* at 7.

The other Tribes dwelling east of the Mississippi River, having witnessed the

comprehensive surveys of the procedural history of this case, see *Cobell v. Babbitt*, 30 F.Supp.2d 24, 27–29 (D.D.C.1998) ("*Cobell I* "); *Cobell v. Norton*, 240 F.3d 1081, 1086–

92 (D.C.Cir.2001) ("*Cobell VI* "), and *Cobell v. Norton*, 226 F.Supp.2d 1, 12–20 (D.D.C.2002) ("*Cobell VII* ").

fate of the Cherokee nation, realized that their removal to the West was inevitable, and entered into treaties with the United States promising to migrate westward. They included the remaining four "Civilized Tribes," the Choctaw, Chickasaw, Creek, and Seminole; and other Tribes, including the Kickapoo, Wyandot, Ottawa, Pottawatomie, Winnebago, Sac and Fox, Delaware, Shawnee, Wea, Peoria, Miami, Kaskaskia, and Piankeshaw. *American Indians* at 32; *Federal Indian Law* at 126–27.

2. The Allotment Process

As America expanded westward, its citizens re-encountered the Tribes that it had banished to reservations located west of the Mississippi River. Instead of forcing the Tribes to migrate further westward, however, the United States gradually adopted a new policy to deal with "the Indian problem": the Tribes would simply be assimilated into American culture. Speaking before Congress in 1881, President Chester Arthur declared that the new policy of the United States towards the Indian Tribes would be "to introduce among the Indians the customs and pursuits of civilized life and gradually to absorb them into the mass of our citizens." *American Indians* at 8. The primary method by which this policy would be executed was the allotment process.[2]

In 1887, Congress passed the General Allotment Act, 24 Stat. 388. It became popularly known as the Dawes Act, after one of its sponsors, Massachusetts Senator Henry Dawes. The Dawes Act authorized the President to divide any Indian reservation into separate plots, and assign the portions to individual tribal members, according to a prescribed formula. The head of a family was allotted a one-fourth section, or 160 acres; each single person over eighteen and each orphan child under eighteen was allotted a one-eighth section, or 80 acres; and each non-orphan child under eighteen was allotted a one-sixteenth section, or 40 acres. Any "surplus" lands that were not allotted to individual Indians were opened to settlement by non-Indians. *See Cobell v. Babbitt*, 91 F.Supp.2d 1, 8 (D.D.C.1999) ("*Cobell V*"). Section 5 of the Dawes Act provided that "the United States ... will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs" and that after twenty-five years had passed, the United States would convey full title to the land to the Indian to whom the land had been allotted. The United States was authorized to extend the twenty-five year period, in its discretion. As the D.C. Circuit has previously explained, "[d]uring the trust period, individual accounts were to be set up for each Indian with a stake in the allotted lands, and the lands would be managed for the benefit of the individual allottees. Indians could not sell, lease, or otherwise burden their allotted lands without government approval. Where tribes resisted allotment, it could be imposed." *Cobell VI*, 240 F.3d at 1087 (citation omitted).

**2.** Allotment is a "term of art in Indian law [meaning] a selection of specific land awarded to an individual allottee from a common holding, in which the allottee is the beneficial owner and the government is the trustee." *Kicking Woman v. Hodel*, 878 F.2d 1203, 1204 n. 1 (9th Cir.1989) (internal citations and quotation marks omitted). It is important to remember that allotments of Indian land did not begin with the passage of the General Allotment Act in 1887. *See* Tr., Day 27, AM session (June 12, 2003) at 87:4–6 ("According to Bureau of Indian Affairs' records, roughly 585,000 acres of Indian lands were allotted prior to 1887.") (testimony of Dr. Edward Angel).

One pair of commentators has stated that a key assumption of the government's allotment policy was that "Indians wanted to become farmers and had the capacity to do so. This policy assumed that the routine work of agriculture would provide the necessary training in thrifty habits that all 'civilized' people possessed." *American Indians* at 9–10. As one of the individual defendants testified during the first trial in this litigation,

> the thinking was that it was tribalism that held the Indians back; that what they needed to do was develop the sort of individualism that had been so beneficial for the United States in its expansion, and allotment was the way to do that.... They were so confident in this assimilation policy that there was actually a sunset in most of the allotment agreements that said after 25 years the trust patents will be withdrawn, you'll be issued a fee patent, each individual who owned this land, and you will go forth and prosper. You will own the land outright, and may do with it what you wish.

*Cobell V*, 91 F.Supp.2d at 8. In short, to quote Theodore Roosevelt, the Dawes Act was designed to be "a mighty pulverizing engine to break up the tribal mass."

By the early twentieth century, it had become evident that, as judged by its own terms, the allotment process had been an abysmal failure. It had failed to remake the American Indians in the image of the white man, and to absorb the Indian Tribes within American society. To the contrary, "[r]eservations in the early twen-

tieth century were still 'Indian country'— places where a 'measured separatism' had been maintained between Indians and the dominant society." *Federal Indian Law* at 191. A comprehensive report issued by Lewis Meriam in 1928 entitled "The Problem of Indian Administration" (commonly known as the Meriam Report) concluded that the assumptions underlying the allotment process had been flawed: "It almost seems as if the government assumed that some magic in individual ownership of property would in itself prove an educational civilizing factor, but unfortunately this policy has for the most part operated in the opposite direction" (quoted in *American Indians* at 13).[3]

Influenced by the findings in the Meriam Report, Congress in 1934 passed the Indian Reorganization Act, 48 Stat. 984 ("IRA"). Section 1 of the IRA ended the practice of allotting Indian lands. Section 2, however, provided that "[t]he existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress." In other words, any reservation lands that had already been allotted before 1934, but for which full title had not been conveyed to the Indians to whom they had been allotted, were to be held in trust by the United States indefinitely. As such, the United States continues to possess a duty to administer allotted Indian lands in trust for the benefit of the individual Indians to whom they were allotted. The income arising from the administration of those

---

**3.** It should be noted that recent scholarship has called into doubt the notion that, before the start of the allotment process, American Indians held all of their land in common and did not recognize property rights. Rather, as one scholar has observed, "Indian societies have had myriad different property systems, varying widely by culture, resources, geogra-

phy, and historical period. Many of them have recognized property rights in land and have done so in ways that provided for transfer of land, rational inheritance, and legal change." Kenneth H. Bobroff, *Retelling Allotment: Indian Property Rights and the Myth of Common Ownership*, 54 Vand. L. Rev. 1559, 1571 (2001).

lands held in trust by the United States is the subject of the present suit.

### 3. The Individual Indian Money (IIM) Trust

As a result of the allotment process that took place between 1887–1934, followed by the IRA's indefinite extension of the trust period, the United States presently holds approximately 11 million acres of land in trust for the heirs of the American Indians to whom they were originally allotted.

The United States itself is the trustee of this trust, which is known as the Individual Indian Money (IIM) trust. However, Congress has designated the Secretary of the Interior and the Secretary of the Treasury to be the trustee-delegates of the United States, and the departments run by these two cabinet secretaries are entrusted with certain trust management responsibilities. The trust responsibilities of the Treasury Department are to maintain and invest IIM funds, under the direction of the Interior Department, and to provide accounting and financial management services. The United States has entrusted most of its trust obligations, however, to the Department of the Interior. Within the Interior Department, several agencies perform particular IIM trust functions. These agencies include the Bureau of Indian Affairs (BIA), the Bureau of Land Management (BLM), the Office of Trust Funds Management (OTFM), and the Minerals Management Service (MMS). In testimony received during the most recent trial, Interior Deputy Associate Secretary James Cason estimated that since 1909, approximately $13 billion has been received and deposited into the IIM trust.[4]

A 1994 Report of the House Committee on Natural Resources provides a useful overview of the IIM trust management system:

Funds have been held in trust for American Indians by the Federal Government since 1820. The Bureau of Indian Affairs (BIA) has had the authority to invest Indian Trust Funds since 1918, however, it was not until 1966 that the BIA exercised its full range of investment authority. The Office of Trust Funds Management (OTFM) within the BIA is responsible for implementing the fiduciary responsibility of ensuring that all proper controls and accountability are maintained with regard to the Indian trust funds. OTFM, located in Albuquerque, New Mexico, oversees the trust fund operations at the 12 BIA Area Offices and 93 BIA Agency offices.

Trust fund accounts are comprised mainly of money received through the sale or lease of trust lands and include timber stumpage, oil and gas royalties, and agriculture fees. Accounts containing judgment funds awarded to tribes are also maintained. Trust funds controlled by the BIA currently total over $2.1 billion with $1.7 billion in tribal trust funds and $390 million in Individual Indian Money (IIM) accounts. Several accounts may be held for each tribe. The BIA is currently managing some 1,880 tribal accounts and nearly 337,000 separate IIM accounts.

In order to protect these funds, investments must be unconditionally secured through Federal Government deposit insurance. Funds must be deposited in interest bearing accounts within 30 days of receipt. The Feder-

---

**4.** Tr., Day 21, PM session (June 5, 2003) at 24:23—25:4 ("$13 billion is an estimate of the number of dollars received and deposited in the IIM trust fund over time since approximately 1909, as I understand it. That is basically referred to as through put of the accounts[, a]mounts received into and deposited in the accounts over time.").

al Government is responsible for lost interest if funds are not invested within that time. The responsibility for management of Indian Trust Funds by the BIA has been determined through a series of court decisions, treaties, and statutes.

H.R. REP. NO. 103–778, at 9 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3467, 3468. This committee report also discusses the long history of mismanagement of the IIM trust:

> Volumes have been written about improper management of funds within the Bureau of Indian Affairs since its inception. The Bureau of Indian Affairs was made a part of the U.S. War Department on March 11, 1824. Almost immediately there was criticism regarding the way it handled financial matters. In 1828, Henry Rowe Schoolcraft a noted negotiator of several Indian treaties and novelist wrote, "The derangements in the fiscal affairs of the Indian department are in the extreme. One would think that appropriations had been handled with a pitchfork." In 1834 during the first session of the Twenty-third Congress the House of Representatives Committee on Indian Affairs filed a report with accompanying legislation which characterized the administration of Indian Affairs as being "expensive, inefficient, and irresponsible." Although it is 160 years later, this Committee shares the concerns of its predecessor committee.

> Over the years numerous audits and reports on Indian trust funds have been published by the Inspector General of the Department of the Interior, the U.S. General Accounting Office, the Office of Management and Budget, and Congressional Committees. A 1992 report released by the House Committee on Government Operations entitled, "Misplaced

Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund" details multiple problems with the management of these funds. The report was the culmination of several years of investigation and multiple Congressional hearings on the subject.

> Among the problems outlined in the report which persist are:

> - the inability to give proper accounting of balances to each of the account holders;

> - lack of uniform written policies to govern how accounts are to be managed and under what circumstances funds can be withdrawn;

> - insufficient training of personnel needed to carry out the duties required;

> - inadequate automated and record keeping systems.

> The Office of Management and Budget has consistently, since the 1980's when such a list was first kept, placed the financial management of Indian trust funds as a high risk liability to the United States.

*Id.* at 9–10; 1994 U.S.C.C.A.N. at 3468–69. The 1992 report alluded to, entitled *Misplaced Trust,* "concluded that Interior had made no credible effort to address the problems in trust administration in a 'wide range of areas' and that Interior had disobeyed many congressional directives aimed at forcing Interior to correct trust management practices and reconcile the Indian trust accounts." *Cobell V,* 91 F.Supp.2d at 12.

Prompted in large part by the findings of the *Misplaced Trust* report, Congress in 1994 enacted the Indian Trust Fund Management Reform Act, Pub.L. No. 103–412, 108 Stat. 4239 ("the 1994 Act"). It will be useful to examine the legislative history of

the act, in order to glean the intent of Congress in passing it.

The bill was introduced in the House by Congressman Bill Richardson (D–N.M.) as H.R. 4833. On September 26, 1994, then-Congressman Craig Thomas (R–Wyo.) explained to the House Subcommittee on Environment, Energy, and Natural Resources the need for passage of such a bill:

> We have had two hearings on trust management—or, more properly, mismanagement—in the Native American Affairs Subcommittee this Congress .... Since the Government Operations Committee released its report, "Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund," I have seen precious little change in this sad state of affairs. Instead, I have seen promised deadlines come and go; I have seen promises to reform go unfulfilled. Despite statements made in the early days of the Clinton administration, two years later neither the [Interior] Department nor the BIA has brought us one step closer to resolving the trust fund problem. All we have seen is a continuation of the BIA's one unchallenged specialty: *inertia.*
>
> We have seen the pattern repeated over and over. The Department and BIA promise to act, fail to, we are forced to introduce legislation to deal with the issue, and then when passage of the legislation seems imminent they come to us and ask for more time, quote, "because we're working on the problem, really we are," unquote, or they offer their own, watered-down, legislative proposal in the hope of heading ours off....
>
> I am sure that this morning we will hear more of the same excuses and promises, more requests to just give it a little more time, from the Department that we have been hearing for the last six years. But, Mr. Chairman, shame on us, shame on this Congress, if we delay any further.
>
> The Department told us in August, and I am sure will repeat this morning, that they have everything under control. Well, Mr. Chairman, my response to that is an explicative which decorum prevents me from using here but which I will paraphrase: cow manure! .... Mr. Chairman, the Department needs to pull itself out of denial, pull itself out of its fantasy world, and come to grips with [reality]. It is clear that they are incapable of doing it themselves. I sincerely hope that we can do it for them, and will do everything I can to move a bill before Congress adjourns.

140 CONG. REC. 27,243 (1994) (emphasis in original). The bill was reported favorably to the full House on September 28, 1994. Five days later, Congressman Mike Synar (D–Okla.) addressed the full House:

> Mr. Speaker, if ever the words "It is the right thing to do," meant anything, they mean everything with respect to the legislation we consider today.... We must take this step because the Department itself refuses to adequately address the serious accounting and management problems which have plagued the trust fund program for decades.
>
> Over the years, Congress, the General Accounting Office, the Interior Department's inspector general, and the President's Office of Management all have issued directives to the Department to develop a comprehensive plan for cleaning up this mess. In many cases, those directives have simply been ignored. At other times, the Department has responded with simplistic, isolated and often ill-conceived initiatives which, even taken together, will never solve the trust fund problems repeatedly found in three separate bureaus of the Department.

*This legislation is the only way we are going to force the Department to give sustained high-level attention to this issue, and to develop the kind of comprehensive strategic plan that is essential to correcting these serious trust fund problems.* And it is the only way Congress and the trust fund account holders will ever have assurance that the Secretary of the Interior is taking the steps necessary to meet his fiduciary obligations to those for whom we are holding these funds in trust....

Mr. Speaker, my Subcommittee on Environment, Energy and Natural Resources has held five separate oversight hearings on this subject since 1989. Mr. Richardson's subcommittee has also held several hearings in the last two years. Regrettably, year after year we get the same worn-out response from the Interior Department. They tell us they're really on top of this now. They tell us they're really going to move on needed reforms now. Year after year, on and on with the same commitments. Year after year, those commitments are largely forgotten when the hearings are over.

I understand the Interior Department opposes this legislation. That is too bad; we have tried to work in good faith with the Department on correcting these problems and, failing that, on crafting an appropriate legislative measure. I want to assure my colleagues that the Department's vague last-minute arguments over the bill have no merit whatsoever. And, sadly, their promises of reform are no different, and no better, than those of their predecessors.

It is time for Congress to take matters into its own hands, and to require by statute that the Secretary and the Department do what needs to be done to fix these problems and meet the Govern-

ment's trust responsibilities to the account holders....

There is an understanding that, after [the seven subcommittee hearings], we have been unable to get the responsiveness that we need out of the BIA to perform *the basic fiduciary responsibilities which we would expect out of any trustee.* If this was done in the Social Security system, my colleagues, we would have had a war.

40 CONG. REC. 27,243—24,244 (1994) (emphasis added). The statements by the bill's sponsors demonstrate that the bill was not intended as a mild suggestion to the Interior Department to undertake minor changes. Instead, it was a bill presented by congressmen who had become exasperated by the Interior Department's repeated refusal to reform its management of the IIM trust, and who intended for the bill to implement sweeping, radical changes in the management of the trust. During a Senate hearing on the management of the IIM trust, Senator Daniel Inouye (D–Haw.) observed that "[t]he management of the Indian trust fund has been grossly inadequate in many respects .... Financial management of the trust has been neglected for decades. Many believe that the crisis which exists in the management of the trust funds can only be cured by dramatic change." 139 CONG. REC. 9586 (1993). The House Report on H.R. 4833 speaks to the broad scope of the changes intended to be set in motion by the bill:

[t]he [House Committee on Natural Resources] realizes the depth and breadth of the problems regarding Indian trust assets within the [Interior] Department. There must be an absolute long term commitment by the Department to address the problems affecting Indian allotted lands, their resources, and any receipts produced. This commitment

would affect nearly every agency in the Department and is essential for the Secretary to properly discharge his trust responsibility.

H.R. REP. NO. 103–778, at 10 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3467, 3469.

This intent is nowhere more clearly demonstrated than in the statements of Congressmen Richardson and Synar regarding H.R. 4833's immediate predecessor during an oversight hearing on trust fund management:

> Mr. RICHARDSON: ... I would like to ask my colleague a question. Some have suggested that the private sector monies for the Bureau [of Indian Affairs] be handed over to a private entity. You have suggested that the [Government Accounting Office] look into this. Would you like to share your views on this subject?

> Mr. SYNAR: I would, Bill, because the frustration that we have had in dealing with this has led us to the conclusion that unless Ada [Deer, then-Assistant Secretary for the Bureau of Indian Affairs] and her new regime at BIA can change some basic attitudes down there in mid-level management, it is going to regrettably take us to a point where a year or two from now we will be right back here with the same problem.

> I have got confidence in Bruce [Babbitt, then-Secretary of the Interior] and Ada and those now committed to this principle. I don't think there has been a Secretary of Interior we could count on more for this kind of correction. But there comes a point in time where we can't leave it up to the best intentions of those that are in charge. It may be we have to contract out and do it in a way that will ensure that our Native Americans will have more control over their own destiny, and secondly that we get

the kind of accounting we expect in any kind of financial dealings.

> So I think what we do is, let's pass the act, make these management reforms, get them in place. Let's come back here in a year, and if by then we haven't made some good improvements or we are not moving in the right direction, I think the three of us and others will have to ask the question of whether the government should continue to be involved in this or whether we should let it move into the private sector.

> Mr. RICHARDSON: That seems like a constructive suggestion.

*Oversight Hearing Before the Subcomm. on Native American Affairs of the Comm. on Natural Resources on Bureau of Indian Affairs' Management of Trust Funds; and H.R. 1846*, 103d Cong. 36–37 (Sept. 27, 1993). In other words, a full year before they sponsored H.R. 4833, these two congressmen were giving serious consideration to privatizing the management of the IIM trust if fundamental reforms were not immediately implemented. During a later oversight hearing on H.R. 4833, Congressman Thomas described the Interior Department as "the most pathetic excuse for government that we now have on the Federal level from top to bottom." *Hearing Before the Subcomm. on Native American Affairs of the Comm. on Natural Resources on H.R. 1846 and 4833*, 103d Cong. 64 (Aug. 11, 1994). During the same hearing, Congressman Richardson, the primary sponsor of H.R. 4833, declared:

> Let us not forget that the United States as a trustee for the Indian nations has solemn fiduciary duties. These duties include the duty of loyalty and the duty to make the corpus productive.

> We should hold the Federal Government to the same standard as any other trustee. This includes the principle that

a trustee should subordinate its own interests to those of the beneficiary. Hence, the status of these funds should be of paramount importance to the Department of Interior, and the needs of the Indian nations with regard to these funds should supersede other obligations the Department may have.

*Id.* at 2.

H.R. 4833 was passed by the Congress and signed into law on October 25, 1994 as Public Law 103–412.

### B. Procedural Background

#### 1. The Filing of the Present Case

On June 10, 1996, the named plaintiffs commenced the present action against the Secretary of the Interior and other federal officials, alleging that the mismanagement of the IIM trust by the Interior and Treasury departments constituted a breach of their fiduciary duty to plaintiffs. This Court certified the action as a class action on February 4, 1997, and designated the named plaintiffs as class representatives for all present and former IIM beneficiaries. *Cobell I,* 30 F.Supp.2d at 28. On May 5, 1998, the Court bifurcated this action into two distinct phases. Phase I of the litigation, also known as the "fixing the system" phase, focuses on the reforms instigated by defendants to bring the management of the IIM trust into compliance with their fiduciary obligations. This phase is forward-looking, in that it attempts to discern whether defendants have reformed the management of the IIM trust in such a way as to ensure that the United States will honor its fiduciary obligations to the Indian beneficiaries in the future. Phase II, also known as the "historical accounting phase," focuses on the performance of a formal accounting of the IIM trust, as required by the 1994 Act. This phase is backward-looking, in that it attempts to discern whether and to what extent the United States has honored its fiduciary obligations to the Indian beneficiaries from the inception of the trust until the present date.

On February 22, 1999, following a two-week bench trial, the Court found Bruce Babbitt, then-Secretary of the Interior, Robert Rubin, then-Secretary of the Treasury, and Kevin Gover, then-Assistant Secretary of Interior for Indian Affairs, to be in civil contempt for violating two of the Court's discovery orders. *Cobell v. Babbitt,* 37 F.Supp.2d 6, 9 (D.D.C.1999) ("*Cobell II*"). In its conclusion, the Court explained why the extreme step of imposing a contempt sanction was necessary:

The court is deeply disappointed that any litigant would fail to obey orders for production of documents, and then conceal and cover-up that disobedience with outright false statements that the court then relied upon. But when that litigant is the federal government, the misconduct is even more troubling. The institutions of our federal government cannot continue to exist if they cannot be trusted. The court here conducted monthly status conferences where plaintiffs complained that the government was not producing the required documents. Because of the court's great respect for the Justice Department, the court repeatedly accepted the government's false statements as true, and brushed aside the plaintiffs' complaints. This two-week contempt trial has certainly proved that the court's trust in the Justice Department was misplaced. The federal government here did not just stub its toe. It abused the rights of the plaintiffs to obtain these trust documents, and it engaged in a shocking pattern of deception of the court. I have never seen more egregious misconduct by the federal government.

*Id.* at 38. The Court directed the defendants to compensate plaintiffs for the harm suffered, and appointed a special master in this litigation. It also instructed the defendants: "Should it appear at any point that the defendants are not taking all reasonable steps to comply with the orders of this court, then harsher relief will be duly administered." *Id.*

2. The Phase I Trial

In 1999, the Court conducted a six-week bench trial addressing plaintiffs' Phase I claims. On December 21, 1999, the Court issued a *memorandum opinion containing* detailed factual findings and conclusions of law. *Cobell v. Babbitt,* 91 F.Supp.2d 1 (D.D.C.1999) (*"Cobell V "*). The Court also issued a declaratory judgment:

1. The [1994 Act] requires defendants to provide plaintiffs an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited.

2. The [1994 Act] requires defendants to retrieve and retain all information concerning the IIM trust that is necessary to render an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs.

3. To the extent that prospective relief is warranted in this case and to the extent that the issues are in controversy, it has been shown that [the Secretary and Assistant Secretary of the Interior] owe plaintiffs, pursuant to the statutes and regulations governing the management of the IIM trust, the statutory trust duty to:

 (a) establish written policies and procedures for collecting from outside sources missing information necessary to render an accurate accounting of the IIM trust;

 (b) establish written policies and procedures for the retention of IIM-related trust documents necessary to render an accurate accounting of the IIM trust;

 (c) establish written policies and procedures for computer and business systems architecture necessary to render an accurate accounting of the IIM trust; and

 (d) establish written policies and procedures for the staffing of trust management functions necessary to render an accurate accounting of the IIM trust.

4. To the extent that prospective relief is warranted in this case and to the extent that the issues are in controversy, it has been shown that defendant Lawrence Summers, Secretary of the Treasury, owes plaintiffs, pursuant to the statutes and regulations governing the management of the IIM trust, the statutory trust duty to retain IIM trust documents that are necessary to render an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs.

5. Defendants are currently in breach of the statutory trust duties declared in subparagraphs II(2)—(4).

6. Defendants have no written plans to bring themselves into compliance with the duties declared in subparagraphs II(2)—(4).

7. Defendants must promptly come into compliance by establishing written policies and procedures not inconsistent with the court's Memorandum Opinion that rectify the breaches of trust declared in subparagraphs II(2)—(4).

*Id.* at 58. The Court retained jurisdiction over the case for a period of five years, subject to enlargement, and ordered de-

fendants to file quarterly status reports with the Court "setting forth and explaining the steps that defendants have taken to rectify the breaches of trust declared today and to bring themselves into compliance with their statutory trust duties." *Id.* at 59. It denied plaintiffs' request for further prospective relief, explaining:

> The court has based much of its decision today—especially the denial of more extensive prospective relief—on defendants' plans (in both substance and timing) to bring themselves into compliance with their trust duties declared today and provided for explicitly by statute.... Should plaintiffs believe that they are entitled to further prospective relief based upon information contained in these reports or otherwise learned, they may so move at the appropriate juncture. Such a motion will then trigger this court's power of judicial review.

*Id.* Defendants appealed from this decision, arguing (1) that they possessed no judicially-enforceable duty to account, (2) that reform of the IIM trust had neither been unlawfully withheld nor unreasonably delayed, (3) that this Court lacked sufficient basis to award equitable relief and (4) that the relief awarded was unwarranted. *Cobell VI,* 240 F.3d at 1094. The D.C. Circuit affirmed, in large part, and remanded to this Court for further proceed-

ings. *Id.* at 1110.[5] Because the scope of this Court's jurisdiction on remand remains a contested issue, the Court will analyze *Cobell VI* at greater length later in this opinion.

### 3. The Second Contempt Trial

On September 17, 2002, following a twenty-nine day bench trial, this Court issued a memorandum opinion. The opinion found Interior Secretary Gale Norton and Assistant Interior Secretary of Indian Affairs Neal McCaleb to be in civil contempt of court, in their official capacities, with respect to five specifications:

(1) Failing to comply with the Court's Order of December 21, 1999, to initiate a Historical Accounting Project;

(2) Committing a fraud on the Court by concealing the [Interior] Department's true actions regarding the Historical Accounting Project during the period from March 2000 until January 2001;

(3) Committing a fraud on the Court by failing to disclose the true status of the Trust Asset and Accounting Management System project ("TAAMS") between September 1999 and December 21, 1999;[6]

(4) Committing a fraud on the Court by filing false and misleading quarterly status reports, starting in March 2000,

---

**5.** In its opinion, the D.C. Circuit clarified that

> [t]he actual legal breach is the failure to provide an accounting, not [the government's] failure to take the discrete individual steps that would facilitate an accounting. Thus, while the district court must amend its opinion on remand to account for this distinction, there is no need to alter the district court's order, as the bottom line is the same: by failing to take reasonable steps toward the discharge of the federal government's fiduciary obligations to IIM trust beneficiaries, appellants breached their duties.

*Id.* at 1106.

**6.** TAAMS was a computer system acquired by Interior in conjunction with its attempts to reform the IIM trust. Interior represented to the Court that when the TAAMS system was fully implemented, it would "allow BIA to administer trust assets, generate timely bills, identify delinquent payments, track income from trust assets, and distribute proceeds to the appropriate account holders." *Cobell VII,* 226 F.Supp.2d at 15. After spending several years and several million dollars on developing the TAAMS system, Interior abandoned the TAAMS project. *See* Tr., Day 1, PM session (May 1, 2003) at 97:6–8 (testimony of Paul Homan).

regarding TAAMS and data cleanup by the BIA; and

(5) *Committing a fraud on the Court by making false and misleading representations starting in March 2000, regarding the computer security of IIM trust data.*

*Cobell VII,* 226 F.Supp.2d at 161. The opinion also explained the necessity for considering further injunctive relief, beyond that imposed at the end of the Phase I trial:

It is ... apparent to the Court that the defendants are no closer today to discharging their fiduciary responsibilities properly than they were during the Phase I trial back in the summer of 1999. At the conclusion of that trial, after the plaintiffs proved that the defendants were in breach of the fiduciary duties that they owe to the 300,000 individual Indian trust beneficiaries, the plaintiffs requested that this Court put the IIM trust under court supervision. The Court declined to grant such relief at that time because it felt that it was its constitutional duty to allow the defendants to correct the breaches declared by the Court and those found in the 1994 Act. Thus, by declaring the trust duties of the defendants and remanding the matter back to the agency, the Court granted the least intrusive form of relief that it could fashion.

In light of the current posture of this case, it is now obvious that this relief was and is insufficient. The recalcitrance exhibited by the Department of Interior in complying with the orders of this Court is only surpassed by the incompetence that the agency has shown in administering the IIM trust. Accordingly, the Court concludes that while its factual findings and legal conclusions in the Phase I trial ruling were correct (and will therefore not be disturbed), the

relief granted by the Court at that time is no longer adequate. Consistent with this conclusion, the Court has determined that it must now consider granting further injunctive relief with respect to the fixing the system portion of the case and the historical accounting project. The Court's conclusion in this regard is in full accord with the principle that courts should exercise the least possible power adequate to the end proposed. The reason is that there is an equally established axiom that when the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable. Moreover, the D.C. Circuit even explicitly stated that "while th[is] court should (and did) remand to the agency for the proper discharge of its obligations, the court should not abdicate its responsibility to ensure that its instructions are followed. This would seem particularly appropriate where, as here, there is a record of agency recalcitrance and resistance to the fulfillment of its legal duties." At this juncture, it is crystal clear that more than a declaratory judgment is necessary to ensure that the defendants discharge their fiduciary obligations properly.

*Id.* at 147–48 (internal citations and quotation marks omitted).

In light of its conclusion to consider further injunctive relief, the Court scheduled further proceedings to determine whether such additional relief was warranted and, if so, to determine the nature and extent of such relief. Because the Court had already conducted a Phase I trial, and because the time was not ripe to conduct a hearing on Phase II of the litigation, the Court designated these proceedings "the Phase 1.5 Trial," to stress their nature as an interim stage of this litigation. It explained that this trial would "encompass additional remedies with re-

spect to the fixing the system portion of this case and approving an approach to conducting a historical accounting of the IIM trust accounts." *Id.* at 162. Specifically, the Court explained that it planned to enter a structural injunction in this case. *Id.* at 147 n. 154.

The Court directed the Interior defendants to submit two plans to the Court: (1) a plan for conducting a historical accounting of the IIM trust accounts, and (2) a plan for bringing themselves into compliance with the fiduciary obligations owed to the IIM trust beneficiaries. It stressed that these plans should "describe, in detail, the standards by which they intend to administer the IIM trust accounts, and how their proposed actions would bring them into compliance with those standards." *Id.* at 148–49. The Court also granted the Treasury Department and plaintiffs leave to file any plan or plans of their own regarding these matters. On January 6, 2003, the Interior defendants and plaintiffs each submitted two plans to this Court.[7]

On July 18, 2003, the D.C. Circuit vacated the order of this Court finding defendants Norton and McCaleb to be in civil contempt of court, and directing these defendants to bear the cost of the expenses and fees incurred by plaintiffs in litigating the second contempt trial. *Cobell v. Norton,* 334 F.3d 1128, 1150 (D.C.Cir.2003) (*"Cobell VIII"*). Because the D.C. Circuit did not set aside the findings of fact made in this Court's September 17, 2002 memorandum opinion, the Court will treat those factual findings as having been established. *See* Fed.R.Civ.P. 52(a) ("Findings of fact, whether based on oral or documentary

evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.")

### 4. The Phase 1.5 Trial

The Phase 1.5 Trial began on May 1, 2003 and ended on July 8, 2003. The Court heard forty-four days of testimony and received over 500 exhibits into evidence from both parties. Proposed findings of fact and conclusions of law were submitted by both parties on August 4, 2003. The Court has weighed all of the evidence presented and fully reviewed the arguments presented by the parties, and hereby enters these findings of fact and conclusions of law.

The Court must first confront the threshold issue of whether it possesses the remedial authority to enter structural injunctive relief against the Interior Department. In no uncertain terms, the Interior defendants have recently made clear that "their position on [this issue] remains that it is beyond this Court's jurisdiction to enter a structural injunction that dictates how the Interior Defendants must conduct trust reform or comply with their obligation to account to individual Indian money (IIM) account holders." Resp. to Court's Inquiries During Closing Arguments at 1. Additionally, the Interior defendants "do not consent to a structural injunction of any sort, to another court monitor, or to any sort of board or other entity to perform a monitoring role." *Id.* at 2.

Because the purpose of the Phase 1.5 trial was to determine whether additional

---

**7.** Interior's Plan for conducting a historical accounting was entitled "The Historical Accounting Plan for Individual Indian Money Accounts." The plaintiffs' alternative plan was entitled "Plaintiffs' Plan for Determining Accurate Balances in the Individual Indian Trust." For ease of reference, the Court will simply refer to "Interior's (or Plaintiffs') Accounting Plan."

relief, including structural injunctive relief, was warranted in this litigation, and because the Interior defendants have contested the remedial authority of the Court to afford such relief, the Court must analyze carefully the issue of whether it possesses the remedial authority to enter a structural injunction against the Interior Department. Part II of this opinion will therefore examine this litigation within its proper procedural context, namely, the long line of institutional reform cases in the federal courts. The focus of this examination will be upon the remedial measures undertaken in such cases, as well as the limitations that have been placed upon the authority of the federal courts to order such measures. Part III of this opinion will analyze other factors potentially affecting the Court's ability to enter structural injunctive relief. Specifically, the Court will examine the separation-of-powers principle, the mandates of the D.C. Circuit in its two opinions in this litigation, and the remedial authority afforded to equity courts in trust litigation. After careful consideration of each of these factors, the Court will determine the nature and extent of its remedial authority in this litigation.

## II. INSTITUTIONAL REFORM LITIGATION

As noted above, Interior asserts that this Court lacks jurisdiction to enter a structural injunction in the present case. To the Court's knowledge, this precise issue has never been submitted for adjudication by a federal court. For guidance on this issue, it will be necessary to look to cases in which such injunctions have been frequently issued—namely, the separate lines of substantive cases that collectively form the body of institutional reform litigation in the federal courts.

At least two observations may be made upon surveying the different forms that such litigation has taken. The first is that structural injunctions have been issued (or consent decrees have been entered into) against federal governmental entities in a number of different contexts. The second is that in recent years, the Supreme Court has laid down a number of precedents governing the nature and scope of relief that may be issued in institutional reform cases. It hardly warrants mentioning that, in an institutional reform case such as the present action, the Court must look to binding precedent of the Supreme Court to guide its hand. An examination of the different lines of cases that form the body of institutional reform litigation will allow the Court to examine these important precedents in the substantive context in which they emerged.

The scholarly literature on institutional reform litigation, both positive [8] and negative,[9] is vast, and the Court will not at-

8. The point of departure for all scholars of institutional reform litigation is Abram Chayes, *The Role of the Judge in Public Law Litigation,* 89 HARV. L. REV. 1281 (1976). Other seminal articles include Note, *Implementation Problems in Institutional Reform Litigation,* 91 HARV. L. REV. 428 (1977); Robert E. Buckholz, Jr., et al., *Special Project: The Remedial Process in Institutional Reform Litigation,* 78 COLUM. L. REV. 784 (1978) *("Special Project");* Owen Fiss, *Foreword: The Forms of Justice,* 93 HARV. L. REV. 1 (1979); Theodore Eisenberg & Stephen C. Yeazell, *The Ordinary*

and the Extraordinary in Institutional Litigation, 93 HARV. L. REV. 465 (1980); Owen Fiss, *The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy,* 91 YALE L.J. 635 (1982); and Susan P. Sturm, *A Normative Theory of Public Law Remedies,* 79 GEO. L.J. 1355 (1991).

9. Most commentators present a nuanced critique of such litigation, examining instances in which the courts issued relief that was arguably too broad or otherwise flawed, and offering suggestions for improvement. On the other hand, there are authors such as

tempt to discuss it here. Instead, the Court will confine itself to explaining the typical manner in which such cases develop over time, and summarizing the most prominent substantive areas that have formed the subject of institutional reform cases.

### A. A Model of an Institutional Reform Case

The necessity of institutional reform litigation arises from the problem of government monopoly. In the modern regulatory state, services provided by many institutions (such as schools, foster care facilities, mental health facilities, prisons,

and low-cost housing) are provided exclusively or almost exclusively by government entities. The nature of these services is determined by the legislative branch of government, and administered and managed by bureaucracies within the executive branch. A large number of persons may be dependent in some way upon the services provided and administered by these branches. Therefore, if these branches fail to administer these services in conformity with the Constitution or with applicable statutes, the recipients of these services may suffer injury. However, because the government possesses a monopoly or near-monopoly on

Ross Sandler and David Schoenbrod, who recently published a book-length critique of institutional reform litigation entitled *Democracy by Decree* (2003). Unlike their predecessors, Sandler and Schoenbrod simply engage in a one-note polemic characterizing all forms of institutional reform litigation as illegitimate and lacking any utility whatever. To further their polemical program, the authors choose to present only a single case study: the marginal but frequently-criticized *Jose P.* special education litigation in the Southern District of New York. By selecting this straw man, Sandler and Schoenbrod nimbly sidestep the difficult issues encountered in major substantive areas of institutional reform litigation such as school desegregation and prison reform. Additionally, although they continually attack institutional reform litigation, they fail to present any viable alternative. Instead, the authors offer the following statement:

> But what about all those people whose voices might not be heard because of poverty, ignorance, or disability? Without institutional reform litigation protecting them, won't they be left behind? We think not. Many voices previously not heard find powerful expression today in the elected and executive branches of state and local government as evidenced by the wide diversity among mayors, governors, legislators, and appointed officials—a success partly attributable to the nation's voting rights laws.

Ross Sandler & David Schoenbrod, Democracy by Decree 9. The "voices previously not heard" clearly refers to racial minorities—as evidenced by the allusion to voting rights

laws—who have served as plaintiffs in many reform cases. As for plaintiffs in other reform cases who lack the ability to vote—*e.g.*, prisoners, minors committed to foster care, persons committed to state mental health facilities—the authors' "solution" seems rather less helpful.

Perhaps sensing the lack of a viable alternative to institutional reform litigation, the authors conclude without presenting one—instead, they simply recommend imposing a more impotent version, with such limitations as ending the remedial obligation of the institutional defendant whenever a new administration enters office, reassigning cases to a new judge after eight years, and assigning all contempt trials in such cases to a separate judge. Whatever the merits of such proposals, the fact that the authors simply advocate the "reform" of institutional reform litigation, rather than its abolition, suggests that such litigation possesses value, something that the authors continuously and copiously deny. Of course, it may well be the case that although courts in many institutional reform cases issued appropriate relief, in other cases, courts imposed remedies that were arguably too broad or were otherwise inappropriate. But the authors are not interested providing such a nuanced critique. Instead, from start to finish, they insist that institutional reform litigation is per se illegitimate, while completely dodging the primary issue lying at the heart of such litigation—namely, if executive agencies defy mandates imposed by the Constitution or by the legislature, should the courts do nothing? If not, then what should they do?

the provision of these services, it is impossible for the recipients to respond by "voting with their feet." That is, if the government dispenses a service that is inadequate because it does not conform to constitutional or statutory standards, the recipients may not simply go to a competitor to receive similar services. The monopoly or near-monopoly possessed by the government thus prevents market forces from establishing the most efficient allocation of the services provided.[10]

Nor does the power of the vote necessarily furnish an adequate check on these branches to ensure that they comply with constitutional and statutory requirements. For one, the recipients of the services may be disenfranchised—*e.g.*, under the age of eighteen, imprisoned, or committed to the treatment of a mental health facility. Even if the recipients are not disenfranchised, the managers and administrators of such services might well be unresponsive to the voting power. Typically, the types of services in question are not managed directly by elected officials, but by a vast bureaucracy headed by an official who does not run for election. For example, the public does not elect a secretary of housing, an education commissioner, or a director of prisons—it elects a mayor,

governor, or president who appoints these officials, who in turn administer the bureaucracy that provides these services.

In short, if a government entity administers services in a manner that violates either the Constitution or applicable statutes, neither market forces nor the power of the vote can be relied upon to restore its compliance with the law. However, if the recipients of these services suffer injury caused by the violations of law, they may seek redress for their injury in court. This type of litigation is typically known as "institutional reform litigation" because it is initiated in order to reform a government institution by bringing it into compliance with the Constitution or other governing law. The two defining characteristics of an institutional reform case are (1) the case is founded upon a claim that the statutory or constitutional rights of a class of plaintiffs have been violated by an ongoing governmental practice, and (2) the class of plaintiffs seeks to have the trial court assume an continuing role in monitoring and enforcing structural change within the government entity. One author has presented a useful model of the manner in which such cases often develop and are resolved, dividing them into four key phases:

PHILIP J. COOPER, HARD JUDICIAL CHOICES 16

**10.** On the problem of monopoly in general, see RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 273–86 (6th ed. 2003).

(1988) ("*Hard Judicial Choices*").

The trigger phase is described by Cooper as follows: "In general, the equitable remedy cases are instituted as a reaction to a combination of historic policies or practices plus some triggering event. The cases tend to arise in situations where a number of controversial actions have been taken by one or more government units over time until a trigger level is reached." *Id.* at 17. The action is initiated in the trigger phase, and may be dismissed for a number of reasons, *e.g.*, lack of standing. If the action is not dismissed during this initial phase, it proceeds to the liability phase, "the purpose of which is to determine whether there has been a violation of law justifying some sort of remedy and, if so, what is the extent of the injury suffered by the plaintiffs?" *Id.* at 18.

If the trial court finds the defendant to be liable, the remedy phase begins. Cooper's description of this phase of institutional reform litigation warrants quotation at some length:

> [The remedy phase] consists of a remedy crafting stage and, often, a parallel appeals process. The product of this remedy phase is a core remedy in the form of a decree or detailed remedy guideline. In many cases, ... there are later interactions between the judge and the parties over requests for detailed modifications of the basic remedy, but these are really remedy refinements related to the implementation of the decrees in what is referred to here as the post decree phase rather than as part of the remedy phase.
>
> Remedy crafting consists of a plan development and negotiation stage and a formal decision stage. The judge often

plays a facilitator role during the plan development stage, calling upon the parties to negotiate some kind of agreement on how to resolve the problems identified during the liability stage. In some instances the parties will agree on the means to remedy the offending conditions and submit that agreement to the court for legal ratification. In other cases, though, the parties may either not be willing to enter into negotiations at all or, if they do bargain, may be unable to produce a mutually acceptable remedial plan. When the plan development stage reaches its limits, the process becomes more formal and the judge becomes less a facilitator and more a validator, or ratifying official, placing the court's imprimatur on specific parts of the plans submitted by the parties without regard to voluntary acceptance by the parties ....

> If the parties are unable to negotiate an agreement, the formal process for remedy crafting begins, usually with the judge calling upon the defendants to work out some kind of plan. The remainder of the formal process often centers on a remedy hearing at which proposals made by the defendants and counterproposals submitted by the plaintiffs are presented and explained. Testimony is taken to determine the appropriateness and feasibility of the plans. *Id.* at 19.[11]

If the court ratifies a negotiated agreement submitted by the parties, the agreement is known as a "consent decree." If, however, the parties fail to agree, the usual step for the court to take is to issue a "structural injunction." This term was originated by Professor Owen Fiss, who

---

11. In Cooper's model, the appeals process is treated "as a parallel process within the remedy crafting stage," not a stage occurring separate from, and later than, the formulation of the remedy primarily because "appeals are often launched while remedy crafting is under way." *Id.* at 23.

defined it as an "injunction seeking to effect the reform of a social institution." OWEN M. FISS, THE CIVIL RIGHTS INJUNCTION 9 (1978); *see also Lampkin v. District of Columbia,* 886 F.Supp. 56, 62 (D.D.C. 1995) ("The purpose of a structural injunction is to remodel an existing social or political institution to bring it into conformity with constitutional demands; e.g., restructuring a school system to facilitate equal educational opportunities. Structural injunctions are typically used as public law remedies for serious and pervasive rights violations."). In its second contempt opinion, this Court explained that "[s]tructural injunctions are somewhat different than ordinary injunctions, 'in that their goal is not merely to halt a single wrongful practice, but to halt a group of wrongful practices by restructuring a social institution such as a mental hospital, school, or prison.'" *Cobell VII,* 226 F.Supp.2d at 146 n. 154 (quoting DAN B. DOBBS, LAW OF REMEDIES § 7.4(4) (2d ed.1993)). As noted by Cooper, in choosing the form that a structural injunction should take,

> [j]udges may select from among a range of affirmative remedy options. These include process remedies, performance standards, or specified particular actions. Process remedies include such techniques as ordering formation of advisory committees, citizen participation requirements, educational programs, evaluation committees, dispute resolution procedures, or other devices that will operate to remedy past problems without mandating the particular form of action or the specific goals the government must pursue. Performance standards order specific quantities or types of remedial accomplishments, such as numbers or types of new housing units, racial attendance standards in schools, staffing levels at mental health institutions, or other targets, with the means of attainment left to the discretion of the officials who are the defendants in the suit. Specified remedial actions, such as school busing, modified school attendance zones, or required changes in the size and condition or hospital rooms or prison cells leave defendants with little or no flexibility concerning the remedial goals to be achieved or the means of attaining them.

*Hard Judicial Choices* at 20–21 (footnote omitted). A forthcoming article observes that the prevalent trend in the federal courts is to favor what Cooper labels "performance standards" over specified remedial actions. *See* Charles F. Sabel & William H. Simon, *Destabilization Rights: How New Public Law Litigation Succeeds* (forthcoming in Harvard Law Review).

Another group of authors has divided the provisions of a typical structural injunction into substantive and administrative components. Substantive components consist of "the actions ordered by the court to remove illegal conditions." *Special Project* at 814. Administrative components, on the other hand, represent "the means adopted to effect the substantive measures ordered. These means are not themselves required to remedy the wrong; their justification is to be found in the powers of a court of equity to take necessary measures in aid of its decree, not in the constitutional or statutory principles upon which the substantive aspects of the decree are based." *Id.* The administrative components of a structural injunction may include the appointment of court officials to administer the remedy, including masters, monitors, or mediators. *Id.* at 826–30.

The final stage in Cooper's model of an institutional reform case is the post-decree phase. This phase

> involves a parallel interactive relationship between remedy implementation

and evaluation and remedy refinement. In many situations the parties in the case will return to the district judge while the decree is being carried out to ask for changes based upon implementation problems. Frequently, these suggested changes are accepted. It is not a situation in which a judge issues an order and, assuming it survives any appeals, never hears of the case again.

Just as the parties to the case can shape the remedy crafting role of the judge by affording or denying role options, so the role played by the judge in the post decree phase is shaped by the core remedy. A judge who orders a process remedy in which he or she specifies neither the precise targets to be met nor the means, but who provides some committee to make such decisions, may have an arm's-length relationship with the parties during implementation. A judge who orders specified particular actions, on the other hand, may find it necessary to play a much more active and specific role in implementing the ruling.

Finally, courts do, in fact, eventually disengage from the parties in the case when they actually remedy the situation that gave rise to the suit. However, it can be a very long time between the issuance of a remedial order and the determination by the court that the problem which gave rise to the suit has been resolved.

*Hard Judicial Choices* at 23–24. If the institutional defendant refuses to comply with the structural injunction, the court possesses a variety of alternatives to enforce the decree. It may threaten the defendant with a contempt finding, or hold the defendant in contempt. *Special Project* at 838–39. The court may "tighten" the substantive provisions of the injunction, for example, making the provisions more specific. *Id.* at 841. Finally, if faced with repeated noncompliance, the court may select more intrusive means to administer the injunction. For example, it may appoint an administrator to supplement the management of the institutional defendant. *Id.* at 831–35, 841. If none of these measures suffice to effectuate compliance with the injunction, the court must consider resorting to the "most intrusive and coercive of administrative techniques," namely, the appointment of a temporary or permanent receiver. *Id.* at 835–37.[12]

Of course, if the institutional defendant chooses to cooperate with the structural injunction, the trial court may take measures to ease the administrative burden upon the defendant. For example, it may decide to "loosen" the substantive provisions of the injunction, affording the defendant a broader degree of discretion in determining the means to satisfy the provisions. Or the court may reduce the oversight role of court-appointed officials such as masters and monitors. Finally, upon a demonstration that the defendant has remedied the situation that gave rise

---

12. It would hardly seem necessary to stress that a structural injunction is a remedy fundamentally different in kind from the appointment of a receiver, were it not for the fact that Interior's counsel has advanced the notion that the issuance of *any* structural injunction by this Court would be tantamount to placing Interior in "de facto receivership." The notion of a "de facto receivership" is rather akin to the concept of "semi-pregnancy": an entity is either in *de jure* receivership or it is not. The issuance of a structural injunction against an entity is manifestly not the same as placing that entity in *de jure* receivership. *See Wright v. Council of City of Emporia*, 407 U.S. 451, 477, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) ("[T]he invocation of remedial jurisdiction is not equivalent to having a school district placed in receivership.") (Burger, C.J., and Blackmun, Powell, and Rehnquist, JJ., dissenting).

to the suit, the court will typically terminate its retention of jurisdiction over the case.

This model nicely corresponds with the present litigation. The present class action was brought to enforce the Interior and Treasury Department's compliance with the provisions of the 1994 Act and with the pre-existing fiduciary duties imposed upon these agencies in their capacities as trustee-delegates of the United States. As noted above, in passing the 1994 Act, Congress intended to effect broad, sweeping reforms within Interior. The passage of the 1994 Act constituted the triggering event that led to the initiation of the present case. Having survived dismissal motions filed by defendants, the case proceeded to the liability phase, which ended with the D.C. Circuit's affirming of this Court's 1999 liability opinion. The remedy phase began in 2001, when the D.C. Circuit issued its opinion, affirming this Court's remand of the matter to Interior and Treasury. This Court's September 17, 2002 memorandum opinion initiated a new development within the remedy phase, namely, the Phase 1.5 litigation, which was held "to determine what additional relief is warranted in this matter." *Cobell VII*, 226 F.Supp.2d at 148. During the Phase 1.5 trial, "proposals made by the defendants and counterproposals submitted by the plaintiffs [were] presented and explained" and "[t]estimony [was] taken to determine the appropriateness and feasibility of the plans." In the present opinion, the Court must determine whether the issuance of a structural injunction is appropriate, and if so, what form such an injunction should take.

### B. Major Settings of Institutional Reform Litigation

In making this determination, it will be useful to provide a brief description of each of the major settings in which institutional reform litigation has taken place: (1) schools, (2) prisons, (3) mental health facilities, and (4) public housing. The Court will also examine some of the lesser-known contexts in which institutional reform litigation has taken place, including employment discrimination and hearings on Social Security benefits.

### 1. Schools

Institutional reform litigation began with school desegregation cases. After the Supreme Court issued its landmark decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*"Brown I"*), it remanded the combined cases to the district courts, instructing them to "enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases." *Brown v. Board of Education*, 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*"Brown II"*). The Court explained that the district courts were to "consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases." *Brown II*, 349 U.S. at 301, 75 S.Ct. 753. *Brown* thus initiated several of the key elements of institutional reform litigation—the separation of the litigation into a liability phase (culminating with *Brown I*) and a remedy phase (commenced by *Brown II*); the submission of plans by the institutional defendant; and the retention of jurisdiction by district courts during the remedy phase.

As is well known, efforts by the federal district courts to desegregate primary and secondary schools were met with massive

resistance in the southern states. The Supreme Court's mounting frustration with the recalcitrance of the southern school systems was expressed in its decision in *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), in which the Court declared that

> [i]f school authorities fail in their affirmative obligations . . ., judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Id.* at 15, 91 S.Ct. 1267 (citations and internal quotation marks omitted).

The vast majority of the resulting desegregation cases involved state and local governmental entities as defendants. However, *Adams v. Richardson*, 356 F.Supp. 92 (D.D.C.1973), involved a Title VI action against the U.S. Department of Health, Education, and Welfare (HEW). In *Adams*, the district court issued a declaratory judgment that, in violation of Title VI of the Civil Rights Act of 1964, HEW had continued to advance substantial federal funds to a number of state and local educational systems, despite the fact that the states or municipalities had either submitted unacceptable desegregation plans, failed to submit any plan for desegregation, or were otherwise failing to comply with Title VI. The court also concluded

that, having learned that the states and municipalities were operating in violation of Title VI, HEW had violated its duty to commence enforcement proceedings against them in a timely manner. Having made these conclusions of law, the district court issued a structural injunction against HEW, directing the agency to

> (1) institute compliance procedures against ten state-operated systems of higher education, (2) commence enforcement proceedings against seventy-four secondary and primary school districts found either to have reneged on previously approved desegregation plans or to be otherwise out of compliance with Title VI, (3) commence enforcement proceedings against forty-two districts previously deemed by HEW to be in presumptive violation of the Supreme Court's ruling in *Swann v. Charlotte–Mecklenburg Board of Education*, (4) demand of eighty-five other secondary and primary districts an explanation of racial disproportion in apparent violation of *Swann*, (5) implement an enforcement program to secure Title VI compliance with respect to vocational and special schools, (6) monitor all school districts under court desegregation orders to the extent that HEW resources permit, and (7) make periodic reports to appellees on their activities in each of the above areas.

*Adams v. Richardson*, 480 F.2d 1159, 1161 (D.C.Cir.1973) ("*Adams I*") (internal citation and footnote omitted).

On appeal, similar to the defendants in the present case, HEW argued that the enforcement of Title VI was committed entirely to the discretion of the agency. The D.C. Circuit rejected this argument and affirmed the issuance of the structural injunction, although it directed the district court to modify the provisions relating to desegregation in higher education.

*Adams I,* 480 F.2d at 1164–65. It also rejected HEW's argument that the imposition of a duty to monitor school districts to ensure compliance with Title VI lacked a basis in law:

> Although appellants urge in their brief to this court that "it is difficult to find any legal basis for the imposition upon HEW of a monitoring duty in court-order districts," this injunctive order appears to have been responsive to testimony in the record on behalf of HEW itself. That testimony was that HEW recognized its right and authority, as the responsible disbursing agent of federal funds subject to the standards of compliance in districts under court order; that it was handicapped in this respect by inadequate personnel resources, having only some 38 or 40 inspectors which it thought could be more efficiently used in monitoring compliance with voluntary plans filed with HEW; and that, despite these limitations, whenever a court requested it to monitor compliance with an order issued by that court, it made a special effort to respond and had done so on a number of occasions.

*Id.* at 1165.

Two years later, the district court determined that HEW had demonstrated a "reluctance in recent years to use the administrative sanction process where school district[s] are known to be in non-compliance." *Adams v. Weinberger,* 391 F.Supp. 269, 271 (D.D.C.1975). It entered further injunctive relief against HEW, directing it to (1) require 125 school districts with one or more schools substantially disproportionate in their racial composition to rebut or explain the disproportion; (2) commence enforcement proceedings against 45 school districts that had failed to comply with Title VI; (3) report any findings of violations or presumptive violations of desegregation orders to the district courts

that had issued the orders; (4) administer future enforcement activities in accordance with a schedule outlined by the court; and (5) report to the court all steps taken to comply with these orders. *Id.* at 271–73. Two years after it had issued this relief, the district court determined that HEW was continuing to provide federal aid to higher education systems in six states that had not achieved desegregation or submitted acceptable desegregation plans. *Adams v. Califano,* 430 F.Supp. 118, 120 (D.D.C.1977). It therefore supplemented the injunctive relief already granted by directing HEW to submit criteria for an acceptable desegregation plan to the six states within ninety days, to require each state to submit a revised desegregation plan within sixty days thereafter, and to render a determination on each plan within 120 days thereafter. *Id.* at 121.

In the 1990s, the Supreme Court supplemented the broad standards set forth in *Brown II* and *Swann* with appropriate limits on the remedial power of the courts to achieve desegregation. In *Missouri v. Jenkins,* 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), the Court reversed a remedial order of a district court that had "set out on a program to create a school district that was equal to or superior to the surrounding [suburban school districts]" through the creation of a "magnet school" program in the inner city to attract students from surrounding districts. *Id.* at 91, 115 S.Ct. 2038. The Court explained that

> [t]he District Court's pursuit of "desegregative attractiveness" cannot be reconciled with our cases placing limitations on a district court's remedial authority.... [T]his rationale is not susceptible to any objective limitation.... Nor are there limits to the duration of the District Court's involvement.... The District Court's pursuit of the goal

of "desegregative attractiveness" results in so many imponderables and is so far removed from the task of eliminating the racial identifiability of the schools within the [inner city school district] that we believe it is beyond the admittedly broad discretion of the District Court.

*Id.* at 99, 100, 115 S.Ct. 2038. Although many commentators at the time considered *Jenkins* and similar cases to have sounded the death knell of school desegregation suits, their fears were misplaced. For while many district courts have terminated their jurisdiction over school desegregation cases, a recent empirical study has determined that "the vast majority of school desegregation litigation continues, with no hint of impending termination." Wendy Parker, *The Future of School Desegregation,* 94 Nw. U.L. Rev. 1157, 1159 (2000).[13] The article also observes that "[c]ontrary to the popular idea of judges acting as 'super school boards' or 'local superintendents,' judges have taken a remarkably minor, passive role in overseeing the implementation of remedial decrees." *Id.* at 1160.

### 2. Prisons

Prior to the 1960s, federal judges generally adopted a "hands-off" approach to prison conditions and the institutional rules to which federal and state inmates were subjected, refusing to entertain civil claims arising from such conditions or rules. *See* Margo Schlanger, *Beyond the Hero Judge: Institutional Reform Litigation as Litigation,* 97 Mich. L. Rev.1994, 2000 (1999) (*"Beyond the Hero Judge"*).[14] That approach changed with the initiation of a civil suit in 1969 alleging that conditions in Arkansas state prisons violated the Eighth Amendment's prohibition of cruel and unusual punishment. The Supreme Court later described the conditions in Arkansas prisons at the time the action was filed:

> The routine conditions that the ordinary Arkansas convict had to endure were characterized by the District Court as "a dark and evil world completely alien to the free world." That characterization was amply supported by the evidence.[15]

**13.** The Justice Department's Civil Rights Division often serves as a litigant in such actions. *See generally* Brian K. Landsberg, Enforcing Civil Rights: Race Discrimination and the Department of Justice (1997). It is no small irony that while attorneys from the Civil Rights Division are urging federal district courts across the nation to enforce compliance with the structural injunctions they have issued against state and local government agencies, their colleagues in the Civil Division are arguing that this Court possesses no authority even to issue such an injunction against a federal agency.

**14.** It need hardly be said that, despite the title of this article, this Court possesses no delusions that it is in any way a "hero judge." It would indeed be a sad reflection upon contemporary society if merely following the dictates of the law renders one "heroic."

**15.** [Footnote in original]: The administrators of Arkansas' prison system evidently tried to operate their prisons at a profit. Cummins Farm, the institution at the center of this litigation, required its 1,000 inmates to work in the fields 10 hours a day, six days a week, using mule-drawn tools and tending crops by hand. The inmates were sometimes required to run to and from the fields, with a guard in an automobile or on horseback driving them on. They worked in all sorts of weather, so long as the temperature was above freezing, sometimes in unsuitably light clothing or without shoes.

The inmates slept together in large, 100–man barracks and some convicts, known as "creepers," would slip from their beds to crawl along the floor, stalking their sleeping enemies. In one 18–month period, there were 17 stabbings, all but 1 occurring in the barracks. Homosexual rape was so common and uncontrolled that some potential victims dared not sleep; instead they would leave their beds and spend the night clinging to the bars nearest the guards' station.

The punishments for misconduct not serious enough to result in punitive isolation were cruel,[16] unusual,[17] and unpredictable.[18] It is the discipline known as "punitive isolation" that is most relevant for present purposes.

Confinement in punitive isolation was for an indeterminate period of time. An average of 4, and sometimes as many as 10 or 11, prisoners were crowded into windowless 8' × 10' cells containing no furniture other than a source of water and a toilet that could only be flushed from outside the cell. At night the prisoners were given mattresses to spread on the floor. Although some prisoners suffered from infectious diseases such as hepatitis and venereal disease, mattresses were removed and jumbled together each morning, then returned to the cells at random in the evening. Prisoners in isolation received fewer than 1,000 calories a day;[19] their meals consisted primarily of 4–inch squares of "grue," a substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs, and seasoning into a paste and baking the mixture in a pan.

*Hutto v. Finney,* 437 U.S. 678, 681–83, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (citations omitted). The Arkansas litigation "augured a nationwide flood of class-action lawsuits leading to major court orders requiring reform in such areas as housing conditions, security, medical care, mental health care, sanitation, nutrition, and exercise." *Beyond the Hero Judge* at 2004. Apart from the Arkansas litigation, the best-known prison reform case is the long-running *Ruiz* litigation, which was cited by the D.C. Circuit in its 2003 opinion in the present case. *See Cobell VIII,* 334 F.3d at 1142–43.[20]

Not all prison conditions cases involved conditions as deplorable as those in the Arkansas litigation. Moreover, although most prison conditions cases involved state jail or prison facilities, the federal prison system has been the subject of at least three such cases. In *Jordan v. Arnold,*

16. [Footnote in original]: Inmates were lashed with a wooden-handled leather strap five feet long and four inches wide. Although it was not official policy to do so, some inmates were apparently whipped for minor offenses until their skin was bloody and bruised.

17. [Footnote in original]: The "Tucker telephone," a hand-cranked device, was used to administer electrical shocks to various sensitive parts of an inmate's body.

18. [Footnote in original]: Most of the guards were simply inmates who had been issued guns. Although it had 1,000 prisoners, Cummins employed only eight guards who were not themselves convicts. Only two nonconvict guards kept watch over the 1,000 men at night. While the "trusties" maintained an appearance of order, they took a high toll from the other prisoners. Inmates could obtain access to medical treatment only if they bribed the trusty in charge of sick call. As the District Court found, it was "within the power of a trusty guard to murder another inmate with practical impunity," because trusties with weapons were authorized to use deadly force against escapees. "Accidental shootings" also occurred; and one trusty fired his shotgun into a crowded barracks because the inmates would not turn off their TV. Another trusty beat an inmate so badly the victim required partial dentures.

19. [Footnote in original]: A daily allowance of 2,700 calories is recommended for the average male between 23 and 50. Prisoners in punitive isolation are less active than the average person; but a mature man who spends 12 hours a day lying down and 12 hours a day simply sitting or standing consumes approximately 2,000 calories a day.

20. For an account of the *Ruiz* litigation, see Frank R. Kemerer, William Wayne Justice: A Judicial Biography 356–400 (1991). For case studies of both the Arkansas and Texas prison cases, see Owen M. Fiss & Doug Rendleman, Injunctions 528–804 (2d ed.1984).

408 F.Supp. 869 (M.D.Pa.1976), inmates in the U.S. Penitentiary in Lewisburg, Pennsylvania filed a class action, claiming that the conditions in the prison's administrative detention cells violated the Fifth and Eighth Amendments. The district court found that prior to the filing of the class action, the physical conditions of the cells "violated basic concepts of decency," in that "[l]ittle or no ventilation caused the cells to be stuffy and foul-smelling. Four of the cells had no sinks while the commodes and water supply in them could only be controlled from outside the cells. The cell windows were painted over so that there was inadequate light for reading and no view of the outside world." *Id.* at 876. The district court found that during the pendency of the case, prison officials had undertaken several corrective measures to remedy the situation. Nevertheless, the court noted that the facilities had never been subject to regular inspection, which was "probably why the system came to be so inadequate prior to [initiation of the] action." *Id.* The court therefore issued a structural injunction requiring the U.S. Bureau of Prisons to (1) provide proper maintenance to the ventilation system in the penitentiary, including annual inspections, (2) afford each inmate confined in disciplinary segregation the opportunity to shower at least twice a week, and to exercise at least two hours per week, (3) continue to have unpainted windows, light bulbs, and sinks and commodes capable of control inside the cells, and (4) maintain the facilities in accordance with policy statements issued by the Bureau. *Jordan v. Arnold,* 472 F.Supp. 265, 267–68 (M.D.Pa.1979).[21]

In *Bono v. Saxbe,* 450 F.Supp. 934 (E.D.Ill.1978), inmates in the maximum-security federal penitentiary in Marion, Illinois, filed a class action alleging that conditions in a particular unit within the penitentiary known as the "Control Unit" violated the Constitution. The district court determined that "[w]hile the general purpose of the control unit passes constitutional muster, as applied there are constitutional infirmities." *Id.* at 942. In particular,

[p]laintiffs' uncontroverted evidence showed the debilitating mental effect on those inmates confined to the control unit. They were locked up in a closed-front cell 23½ hours per day. Little, if no, activity was offered to relieve this boredom. Reading material, while available, was limited. Access to legal materials was limited. Outside physical exercise was sporadic, at best, and indoor exercise limited. Meaningful contact with other persons was virtually nonexistent. Rehabilitative programs were virtually nonexistent.

The most odious characteristic, however, was the closed-front cell, the box-car. An inmate would spend nearly every minute of every day in his cell, cut off from any contact with the outside world even the limited "outside world" of the incarcerated felon. The inmates' existence was limited by the space of his cell and the approximately three feet beyond the cell bars, at which point the outer wall was erected. These walls contained but a small window in the door. Even though the inmate could express a preference as to whether the outer door would be open or closed, the correctional officer had the final say in the matter.

*Id.* at 946. The district court entered a structural injunction requiring prison offi-

---

**21.** Although the named plaintiff's last name is spelled "Jorden" in the earlier opinion, the later opinion spells his last name "Jordan."

cials to (1) eliminate their use of the boxcar cell, (2) submit proposals governing the conduct of hearings to be provided before placing inmates in the control unit, (3) stop placing inmates in the unit solely because of the nature of their crimes or escape attempts, (4) provide guidelines for inmates to follow to expedite their release from the unit, (5) submit a proposal providing for increased physical exercise for prisoners in the unit, and a status report detailing the officials' compliance with the injunction. *Id.* at 947–48. The prison officials submitted the required proposals and status report, which the district court adopted over the objections of the plaintiffs, although it did increase the required amount of exercise for prisoners in the unit from four to seven hours per week. *Bono v. Saxbe,* 462 F.Supp. 146 (E.D.Ill. 1978). The court also enjoined the officials from placing an inmate in the control unit without following the procedures set forth in their proposals. *Id.* at 149.

The Seventh Circuit affirmed, in large part. *Bono v. Saxbe,* 620 F.2d 609 (7th Cir.1980). It remanded only on the issues of whether the inadequate lighting in the control unit and strip searches conducted before and after non-contact visits constituted cruel and unusual punishment. On remand, the district court ordered the prison officials to develop a reasonable procedure for providing the inmates with either a forty-, sixty-, or hundred-watt light bulb, but determined that the strip searches were constitutionally permissible. *Bono v. Saxbe,* 527 F.Supp. 1182 (S.D.Ill. 1980). A year later, the plaintiffs asked the district court to issue an order directing the defendants to show cause why they should not be held in contempt for alleged violations of the structural injunction. The plaintiffs alleged that the defendants had violated the provision forbidding the use of the boxcar cell by making use of nine closed-front cells in the control unit. The court denied the plaintiffs' motion, but ordered the defendants to submit a proposal governing the operation of certain aspects of the cells in question. The court adopted the plan submitted by the defendants, over the objections of the plaintiffs, with some modifications. *Bono v. Saxbe,* 527 F.Supp. 1187 (S.D.Ill.1981).

The third case involved allegations of discrimination in parole standards against female prisoners in federal and local prison facilities in the District of Columbia. In 1976, the Federal Bureau of Prisons entered into a consent decree, mandating that all female inmates sentenced in the District of Columbia should be paroled under local, not federal, standards, regardless of the manner of their offense or the place of their incarceration. *Garnes v. Taylor,* civil action no. 159–72 (D.D.C. Dec. 10, 1976). *See Cosgrove v. Smith,* 697 F.2d 1125, 1126 (D.C.Cir.1983).

Of course, the most frequent appearance by a federal agency in prison reform litigation has not been as an institutional defendant, but as a plaintiff or plaintiff-intervenor. As noted by one commentator,

> through the 1970s, the [U.S. Department of Justice] was asked or ordered by numerous judges to appear in various kinds of non-desegregation institutional reform cases, including jail and prison conditions cases, and it appeared in others on its own initiative. In total, prior to 1980, the Department of Justice was either plaintiff, plaintiff-intervenor, or amicus (almost always 'litigating amicus,' participating in discovery, negotiation, and presentation of evidence) in more than ten of the largest and most comprehensive prison cases (four of which had desegregation components) and in a number of jail cases. . . .

Assessment of the Department of Justice's resources, goals and strategies

aids a great deal in understanding the shape of litigated prison reform. When the Civil Rights Division was involved, general conditions cases could more easily be statewide, and more comprehensive, because the Division called upon the FBI to perform statewide investigations and paid the (very high) expenses of such comprehensive litigation, including expert fees. Even when the Division did not seek, or was not successful in seeking, to widen the issues past desegregation, the consent decrees the Division negotiated typically required the defendant jail or prison to devise a standardized scheme for assigning inmates to housing and custody and security levels.

*Beyond the Hero Judge* at 2024–25.

However, by the 1990s, a widespread perception had emerged that some of the relief awarded in prison reform cases had exceeded acceptable bounds. This prompted the passage of the Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104–134 (codified as amended in scattered titles and sections of the U.S.C.), in 1995. A year later, the Supreme Court issued its opinion in *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), reversing the issuance of a 25–page injunctive order against the Arizona Department of Corrections that "specified in minute detail the times that [prison] libraries were to be kept open, the number of hours of library use to which each inmate was entitled (10 per week), the minimal educational requirements for prison librarians (a library science degree, law degree, or paralegal degree), the content of a videotaped legal-research course for inmates," and other similar matters. *Id.* at 347, 116 S.Ct. 2174. The Court acknowledged that it was proper for a court to "grant[ ] relief against actual harm that has been suffered, or that will imminently be suffered, by a particular individual or class of indi-

viduals, orders the alteration of an institutional organization or procedure that causes the harm." *Id.* at 350, 116 S.Ct. 2174. However, it explained, the district court in *Lewis* had only identified two instances of actual injury, not a system-wide constitutional inadequacy. Additionally, the Court noted that

> [t]he order was developed through a process that failed to give adequate consideration to the views of state prison authorities. We have said that the strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.

*Id.* at 362, 116 S.Ct. 2174 (citation and internal punctuation marks omitted). In other words, the Court expressed its support of the long-held practice of affording an institutional defendant the first opportunity to propose a remedial plan to cure its statutory or constitutional violations, observing that "[t]he State was entitled to far more than an opportunity for rebuttal." *Id.* at 363, 116 S.Ct. 2174.

The passage of the PLRA, together with the Supreme Court's decision in *Lewis,* prompted many commentators to announce that prison reform litigation had been effectively ended. However, reports of the death of such cases are greatly exaggerated. Such litigation "remains a regular and consequential component of the interaction between the court system and the executive and legislative branches of state and local governments," and has evolved to encompass new concerns, such as the needs of women inmates and inmates with disabilities. *Beyond the Hero Judge* at 2033.

### 3. Mental Health Facilities

Before the 1970s, men and women afflicted with mental retardation or other mental health problems were frequently committed to state-run facilities that functioned merely as "warehouses" for such individuals. Such facilities often provided little or no medical treatment, and the individuals committed to them were often subject to appalling conditions. Perhaps the best-known litigation involving conditions within state-run mental health facilities is the suit initiated in 1974 against the Pennhurst State School and Hospital, located near Philadelphia. At the time the action was filed,

> Pennhurst was typical of large, isolated state residential institutions for persons with mental retardation. Forty-three percent of Pennhurst residents had no family contact within the past three years. Residents slept in large, overcrowded wards, spent their days in large day rooms, and ate in large group settings. There were few programs designed to increase their skills.

*Halderman v. Pennhurst State Sch. & Hosp.*, 995 F.Supp. 534, 536 (E.D.Pa.1998). Injuries to Pennhurst residents, either from other residents or self-inflicted, were common. Residents were frequently subjected to physical restraints and psychotropic drugs, not for treatment purposes, but because staff shortages made it impossible to monitor them. Living areas in the Pennhurst facility did not meet minimal standards for cleanliness, and outbreaks of infectious disease were common. Many of the residents suffered both physical deterioration and mental and behavioral regression during their residency at the facility. *See Halderman v. Pennhurst State Sch. & Hosp.*, 446 F.Supp. 1295, 1307–11 (E.D.Pa. 1977) (detailing conditions pervading the facility) (subsequent history omitted).

Having found that the treatment of the Pennhurst residents violated the Eighth Amendment, the district court issued a structural injunction requiring the state of Pennsylvania and the city of Philadelphia to provide each class member with minimally adequate habilitation according to an individualized program, and appointed a special master to monitor compliance with the injunction. *Id.* at 1326–29. Following a lengthy appeals process, the parties settled, and entered into a consent decree approved by the court. *Halderman v. Pennhurst State Sch. & Hosp.*, 610 F.Supp. 1221 (E.D.Pa.1985). A series of contempt proceedings followed, during which the court determined that the defendants had violated almost every substantive provision of the consent decree. The court's determination resulted in the appointment of additional special masters and specific requirements that, if not met by a specified deadline, would have resulted in the imposition of fines of $5000 per day that the defendants remained in noncompliance. *Halderman v. Pennhurst State Sch. & Hosp.*, 995 F.Supp. at 540–42.

By 1998, however, the court was able to commend the defendants on their compliance with the decree. It terminated its active supervision of the case, observing that

> [t]he past twenty years has seen a vast relocation of persons with mental retardation out of large, state-operated institutions like Pennhurst into small, community living environments. The *Pennhurst* case helped usher in this deinstitutionalization movement, and has brought a general awareness that persons with mental retardation have the right to minimally adequate habilitation in the least restrictive environment. Study after study has demonstrated that *Pennhurst* class members have been better off in almost every way since this Court ordered the de-

fendants to provide them with care, training, and habilitation in smaller residential settings. Today, many class members are employed in paying jobs helping contribute to society. Others are acquiring new skills and learning to reach their maximum potential development.

*Id.* at 548; *see also id.* at 542–44 (detailing conclusions of studies of the Pennhurst facility). The Pennhurst litigation provides an excellent example of an institutional reform case involving recalcitrant defendants, and of a district court that adopted successful measures addressing such recalcitrance.[22] It also demonstrates the wide-ranging public benefits that can result from institutional reform litigation, including not only benefits to the residents of the Pennhurst facility but also to society at large in the form of increased human capital.

### 4. Public Housing

"Residential housing is probably regulated more heavily than any comparably diverse, fragmented, and competitive market." Peter H. Schuck, *Judging Remedies: Judicial Approaches to Housing Segregation,* 37 HARV. C.R.-C.L. L. REV. 289, 292 (2002). At the federal level, this regulation includes the Equal Protection Clause of the Fifth and Fourteenth Amendments and the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. § 3601 *et seq.* Efforts to enforce compliance with the FHA and other federal civil rights laws have included litigation against government agencies alleged to have constructed, financed, or maintained public housing in a racially discriminatory manner. Perhaps the two best-known examples of such litigation are those involving housing in Yonkers and in Chicago.

In the former case, the Justice Department initiated an action against the city of Yonkers, alleging that the city had engaged in racial discrimination in the administration of its public housing programs. The NAACP intervened, and filed an additional claim against the U.S. Department of Housing and Urban Development (HUD). The claim against HUD was settled by the entry of a consent decree requiring HUD to make available 200 units of family and large-family public housing in East Yonkers. *United States v. Yonkers Bd. of Educ.,* 611 F.Supp. 730, 731–32 (S.D.N.Y.1985). The NAACP later filed a motion to compel HUD's compliance with the terms of the consent decree. The district court found that HUD had "pursu[ed] a course of virtually complete inaction," and issued a list of specific actions required by HUD under the decree, together with a timetable of deadlines for compliance. *Id.* at 739, 741–42.

The court also determined, following a trial on the merits, that the city of Yonkers had intentionally segregated minority residents by constructing all of its public housing in the predominantly minority-resident part of the city, in violation of the Fourteenth Amendment and the FHA. *United States v. Yonkers Bd. of Educ.,* 624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd,* 837 F.2d 1181 (2d Cir.1987). The court then issued a structural injunction requiring the city to develop a specified number of public housing units in predominantly-white

---

**22.** For other measures taken by district courts to deal with non-complying defendants in mental health reform cases, see *Dixon v. Barry,* 967 F.Supp. 535 (D.D.C.1997) (appointing a receiver to manage the District of Columbia's Commission on Mental Health Services, following 22 years of noncompliance with court orders); *Evans v. Williams,* 35 F.Supp.2d 88 (D.D.C.1999) (imposing contempt fines of $5,096,340 against the District of Columbia's Mental Retardation and Developmental Disabilities Administration for failure to comply with court orders), *rev'd,* 206 F.3d 1292 (D.C.Cir.2000).

portions of the city by a specified deadline. *United States v. Yonkers Bd. of Educ.*, 635 F.Supp. 1577 (S.D.N.Y.1986). Although the injunction was subsequently affirmed by the Second Circuit, the city decided to defy the court's orders. In 1988, the district court found both the city and several individual city council members to be in civil contempt, and imposed fines of $1 million per day of noncompliance. The Second Circuit affirmed, but the Supreme Court reversed the contempt citations as applied to the individual council members. *Spallone v. United States*, 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990). Owing to the city's continued resistance, by 2002, only five families had been moved to public housing outside of the predominantly minority-resident part of the city. Shuck, *Judging Remedies*, at 364. A recent commentator offered this concise assessment of the litigation: "The verdict in Yonkers seems clear: Everyone lost." *Id.* at 294.

The housing litigation in Chicago has been a different story. In 1966, approximately 43,000 black tenants of and applicants for public housing in Chicago filed an action seeking declaratory and injunctive relief against the Chicago Housing Authority ("CHA") and HUD, alleging that HUD had sanctioned and assisted in CHA's racially discriminatory housing practices. The district court dismissed the complaint against HUD for failure to state a claim. The Seventh Circuit reversed, finding that from 1950–1969, HUD approved and funded the CHA's family-housing projects, even though it admitted that it was aware that CHA was placing such sites solely in predominantly-minority areas of Chicago. *Gautreaux v. Romney*, 448 F.2d 731, 737 (7th Cir.1971). Although the court acknowledged that HUD's decision was based upon the agency's conclusion that "it was better to fund a segregated housing system than to deny housing altogether" to

minority families in Chicago, it nevertheless explained that "a deliberate policy to separate the races cannot be justified by the good intentions with which other laudable goals are pursued." *Id.* at 737, 738. The Seventh Circuit determined that HUD had violated both the Fifth Amendment and the Civil Rights Act of 1964, and remanded to the district court with instructions to grant summary judgment for the plaintiffs. *Id.* at 740.

On remand, the district court ordered HUD to use its "best efforts" to increase the supply of dwelling units in conformity with the applicable statutes, rules, and regulations, and with the provisions of an order issued against CHA in a companion case. However, it refused to order relief extending beyond the legal boundaries of the city of Chicago into the outlying suburban areas, because it had previously determined that the discriminatory practices had been committed solely within city limits. *Gautreaux v. Romney*, 363 F.Supp. 690 (N.D.Ill.1973). The Seventh Circuit reversed and remanded, finding that "federal involvement [was] pervasive" in the housing projects, and directed the district court to adopt "a comprehensive metropolitan area plan that will not only disestablish the segregated public housing in the City of Chicago ... but will increase the supply of dwelling units as rapidly as possible." *Gautreaux v. Chicago Housing Authority*, 503 F.2d 930, 936, 939 (7th Cir. 1974).

The Supreme Court affirmed. It expressly distinguished *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), which had reversed the issuance of a structural injunction affecting suburban areas:

The critical distinction between HUD and the suburban school districts in *Milliken* is that HUD has been found to

have violated the Constitution. That violation provided the necessary predicate for the entry of a remedial order against HUD and, indeed, imposed a duty on the District Court to grant appropriate relief. Our prior decisions counsel that in the event of a constitutional violation all reasonable methods be available to formulate an effective remedy, and that every effort should be made by a federal court to employ those methods to achieve the greatest possible degree of relief, taking into account the practicalities of the situation. As the Court observed in *Swann v. Charlotte–Mecklenburg Board of Education:* "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."

. . . . [T]he District Court's proposed remedy in *Milliken* was impermissible because of the limits on the federal judicial power to interfere with the operation of state political entities that were not implicated in unconstitutional conduct. Here, unlike the desegregation remedy found erroneous in *Milliken,* a judicial order directing relief beyond the boundary lines of Chicago will not necessarily entail coercion of uninvolved governmental units, because both CHA and HUD have the authority to operate outside the Chicago city limits.

*Hills v. Gautreaux,* 425 U.S. 284, 297–98, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976) (internal citations and punctuation omitted). The Court remanded to the district court "for additional evidence and for further consideration of the issue of metropolitan area relief," explaining that "[t]he nature and scope of the remedial decree to be entered on remand is a matter for the District Court in the exercise of its equitable discretion, after affording the parties

an opportunity to present their views." *Id.* at 306, 96 S.Ct. 1538.

What is important to note for purposes of the present litigation is that the presence of a federal agency in an institutional reform case did not prevent the Supreme Court from directing that structural relief be ordered. Indeed, the Court held that the presence of the agency as a defendant actually increased the scope of available injunctive relief that could be ordered by the district court. And in *Missouri v. Jenkins,* discussed *supra,* the Court reaffirmed the holding in *Gautreaux:*

Our decision today is fully consistent with *Gautreaux.* A district court seeking to remedy an intradistrict violation that has not directly caused significant interdistrict effects exceeds its remedial authority if it orders a remedy with an interdistrict purpose. This conclusion follows directly from [*Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) ("*Milliken II* ")], decided one year after *Gautreaux,* where we reaffirmed the bedrock principle that federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation. In *Milliken II,* we also emphasized that federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution. *Gautreaux, however, involved the imposition of a remedy upon a federal agency. Thus, it did not raise the same federalism concerns that are implicated when a federal court issues a remedial order against a State.*

*Jenkins,* 515 U.S. at 97–98, 115 S.Ct. 2038 (internal citations and punctuation omitted) (emphasis added). The Court thus not only reaffirmed that a structural remedy may be issued against a federal agency,

but also explained that such a remedy is less problematic than a similar injunction issued against a state agency, in that the former raises no potential federalism problems.

Following the Supreme Court's decision in *Gautreaux*, HUD elected to enter into a consent decree rather than submit to a structural injunction imposed by the district court. The court approved the proposed decree, noting that it included not only sweeping metropolitan-area relief, but also provisions requiring "continuing court jurisdiction to monitor the progress in fulfilling the decree while at the same time permitting the parties to modify the decree without resorting to judicial intervention" and "judicial review in five years to insure that the provisions of the decree are being faithfully implemented and to permit any necessary modification." *Gautreaux v. Landrieu*, 523 F.Supp. 665, 671–72 (N.D.Ill.1981). The decree also included provisions requiring HUD to undertake specific actions within a prescribed timeline. *See id.* at 672–82 (reprinting the consent decree).

By all accounts, the housing program initiated in response to the *Gautreaux* decree has proven to be a resounding success. Four Northwestern University professors, after completing two empirical studies in 1982 and 1989, concluded:

> The studies of the Gautreaux program suggest that residential integration can contribute significantly to the Kerner Commission's aims of improving employment, education, and social integration of low-income blacks. The suburban move greatly improved adult employment, and many adults were employed for the first time in their lives. The suburban move also improved youths' education. Compared with city movers, the children who moved to the suburbs were more likely to be (1) in school, (2) in college-track classes, (3) in four-year colleges, (4) employed, and (5) employed in jobs with benefits and better pay. The suburban move led also to a considerable amount of social integration, friendships, and interaction with white neighbors in the suburbs.

\* \* \* \* \* \*

> This study supports the basic premises behind the Kerner Commission's proposals for creating housing options outside the ghetto: Moving people to better areas can improve their opportunities. This should encourage Congress to fund housing voucher programs by supplying the resources and services needed for these programs to succeed. The Gautreaux program demonstrated that moving to better neighborhoods can improve adult self-sufficiency and opportunities for their children. Certainly, these results make housing vouchers a promising approach to housing poor families and suggest it is worthwhile to invest more in programs that can produce similar results.

James E. Rosenbaum *et al.*, *Can the Kerner Commission's Housing Strategy Improve Employment, Education, and Social Integration for Low–Income Blacks?*, 71 N.C.L. Rev. 1519, 1552–53, 1555 (1993); *see also* Leonard S. Rubinowitz & James E. Rosenbaum, Crossing the Class and Color Lines: From Public Housing to White Suburbia (2000). In 1997, the district court terminated the consent decree entered into by HUD. *Gautreaux v. Chicago Housing Authority*, 981 F.Supp. 1091 (N.D.Ill.1997).

### 5. Other Settings

Of course, institutional reform litigation does not always involve conditions as dire as those involved in the Arkansas prison litigation, and it does not always garner as much public attention as school desegrega-

tion or public housing litigation. Indeed, much institutional litigation receives little press attention, although its effects are certainly felt by the parties involved.

In *Cockrum v. Califano*, 475 F.Supp. 1222 (D.D.C.1979), a class of claimants appealing the denial, reduction, or termination of Social Security benefits sought injunctive relief against the Secretary of the Department of Health, Education, and Welfare ("the Secretary"). The plaintiffs alleged that the Secretary's failure to issue a final decision on such appeals within 120 days of the denial, reduction, or termination of benefits violated the Social Security Act, the Administrative Procedures Act, and the Fifth Amendment. The district court observed that the case "represent[ed] the local manifestation of a nationwide problem which has been treated thoroughly in other jurisdictions," and cited seven opinions from cases brought against the Secretary in the First, Second, Sixth, Seventh, and Ninth Circuits. *Id.* at 1228 & n. 2.[23] It concluded that "[t]he Secretary ... has no discretion to delay beyond a reasonable period or to deny plaintiffs their statutory and constitutional rights; his duty is in that sense mandatory. His expertise may entitle him to a role in determining [how] to get from here to there, but he must proceed and get there in a reasonable time. Nor is another adequate remedy available." *Id.* at 1231. The court rejected HEW's claim that the time for rendering its final deci-

sions was committed wholly to its own discretion:

While HEW, like the school board in a desegregation case, should in the first instance be responsible for defining compliance with its statutory and constitutional duties, the courts are given jurisdiction by Congress in order to provide an ultimate safeguard for such compliance. Avoidance of that role would neglect the Court's duty under the APA, 5 U.S.C. § 706(1), which provides that on judicial review a court "shall compel agency action unlawfully withheld or unreasonably delayed." Both under those powers granted by the APA and under general equitable powers, the Court has the authority and responsibility to insure that statutory rights are not denied through agency delay or inaction[.] As found above, many members of the class are disabled, aged or infirm and the benefits at issue constitute the principal means of subsistence for many. Delays in determinations of the lengths which are evidenced here amount to effective denial of benefits and inflict grave and irreparable harms upon plaintiffs.

*Id.* at 1239 (internal citations omitted) (emphasis added).

The court ordered the defendants "to submit a plan designed in good faith as an operational (not an advocate's) device to reduce the time for decisionmaking and ultimately to permit all decisions to be made within a reasonable time," explaining that "HEW should have the opportunity of first proposing a remedy to the Court

---

**23.** The First Circuit noted:

Under both general equitable powers and powers granted under the APA, courts can insure that statutory rights are not denied by agency inaction.... And while we agree that Congress must bear the ultimate responsibility for remedying problems in the administration of federal programs, that does not mean that a judicial role is precluded where the statutory mandate is not being followed. The fact, moreover, that

the courts seek to remedy the violation of a federal statute in no way precludes Congress from providing additional or different relief, or from clarifying or modifying the statute if the judicial interpretation is not approved. Finally, it is clear that no violence to the principle of the separation of powers arises from judicial efforts to enforce a congressional mandate.

*Caswell v. Califano*, 583 F.2d 9, 15, 16 (1st Cir.1978) (internal citations omitted).

which can then determine whether that plan meets HEW's legal responsibilities to plaintiffs." *Id.* at 1240. The court continued:

It must be emphasized, however, that the Court's exercise of deference here is based upon its presumption that the responsible HEW officials will act in good faith to carry out the Court's mandate, *which presumption will, if necessary, be validated in enforcement proceedings* .... The Secretary (who has a higher duty) has advanced some contentions which border on the insubstantial and irrelevant, and others which appear more to delay than to aid the resolution of this action on the merits, despite the human concerns which militate in favor of prompter resolution of individual claims.

*Id.* at 1240 & n. 19 (emphasis added).

The parallels with the present litigation need scarcely be noted. The plaintiffs in *Cockrum*, who were dependent upon the Secretary for the payment of benefits that served as their principal means of subsistence, sought injunctive relief in response to the Secretary's undue delay in carrying out his obligations to the plaintiffs. Noting that the Secretary possessed "a higher duty," the district court directed him to submit a remedial plan, explaining that the court would determine whether the plan satisfied the Secretary's obligations to the plaintiffs. Moreover, the court warned that if the agency's officials failed to act in good faith in carrying out the court's mandate, the court would initiate enforcement proceedings to ensure that its mandates were followed.

In another institutional reform case, *NAACP v. Brennan*, 360 F.Supp. 1006 (D.D.C.1973), migrant and seasonal farm-workers alleged that the U.S. Department of Labor had violated the Fifth Amendment, Title VI of the Civil Rights Act of 1964, and the Wagner–Peyser Act, 29 U.S.C. §§ 49–49k, by approving of and providing funding for state-run employment services that discriminated on the basis of race, national origin, sex, and age. The district court entered a declaratory judgment that the Labor Department had violated the constitutional and statutory provisions cited by plaintiffs. In a subsequent opinion, the court approved a consent decree requiring Labor to undertake a number of specified actions to provide migrant and seasonal farmworkers with employment services on a non-discriminatory basis. *NAACP v. Brennan*, 8 Empl. Prac. Dec. (CCH) 5696, 1974 WL 229 (D.D.C.1974). The decree provided for the appointment of a Special Review Committee ("SRC") to monitor the decree's implementation. The seven-member SRC was to consist of three representatives for the plaintiffs, three for the defendants, and one chairperson selected by the other six members. *Id.* at 5700, 1974 WL 229.[24]

However, as recounted by one of the attorneys in the litigation, because of the passivity of the district court, the *Brennan* case proved to be a miserable failure. The first problem was that once the implementation of the consent decree began,

the court took a passive role towards the relationships among the parties and the SRC, as evidenced by its delays in rendering supervisory orders, its failure to respond to the SRC's reports to the court, and its wish, subtly expressed during status calls, that the parties and the SRC negotiate any disputes on their own. This general attitude withdrew

---

**24.** For other cases in which a district court has ordered the Labor Department to undertake enforcement proceedings, see *NAACP*, *Jefferson County Branch v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983); *Souder v. Brennan*, 367 F.Supp. 808 (D.D.C.1973).

some judicial support from the SRC, leaving it to surmount internal and external difficulties with its own resources.

James M. Altman, *Implementing a Civil Rights Injunction: A Case Study of NAACP v. Brennan*, 78 COLUM. L. REV. 739, 750 (1978). Second, the ambiguity of the consent decree's provisions required the SRC to devote seven months to an attempt to formulate standards to measure compliance with the order. However, the partisan structure of the SRC prevented the formation of any consensus regarding adequate standards of compliance. *Id.* at 757–60. The SRC members representing Labor managed to have the SRC construe narrowly the terms of the decree, including the powers and responsibilities of the SRC itself, in order to "lay the groundwork for a finding that [Labor] had fully implemented the Order." *Id.* at 766.

The failure of the SRC led the author to address six future recommendations to judges for structuring the post-decree phase of an institutional reform case:

First, the terms of [the structural injunction] must be as precise and as operationally defined as possible.... Second, the injunction should provide realistic information sources for all its requirements.... Third, the court should appoint a non-partisan individual to monitor defendant's compliance.... There is also no benefit to be gained by using a committee .... Fourth, the capabilities of the monitoring institution must be commensurate with the scope and the nature of the relief ordered.... Fifth, the court must demonstrate by all of its post-judgment actions its commitment to ensuring implementation of its order. The defendant must remain thoroughly convinced that the court will not tolerate noncompliance.... Sixth, the court must anticipate possible future

events.... If the defendant discovers that unanticipated problems will make further court action unlikely or will hide or justify its lack of effort or results, it may not be motivated to implement the injunction.

*Id.* at 766–68.

C. Conclusion

Institutional reform litigation occurs in a variety of different settings. *See Beyond the Hero Judge* 2034–35 ("More generally, outside jails and prisons, there is a large amount of current litigation and ongoing court-ordered reform in the areas of, for example, child welfare, mental health and mental retardation facilities, juvenile correctional facilities, public housing, and public school funding. And new areas of litigation are opening up.") (footnotes omitted); *Sabel & Simon, supra.* Although the vast majority of institutional defendants in such cases have been state and local government agencies, a distinct number of institutional reform cases have been brought against federal agencies. In these cases, the courts have shown no reluctance to issue structural injunctions against federal government entities, or to approve consent decrees they have entered into. It would appear from the above survey that one of the reasons that structural injunctions have been infrequently issued against federal entities is that, rather than endure the imposition of such remedies, most federal agencies instead choose to enter into consent decrees. *See also Pigford v. Glickman*, 185 F.R.D. 82, 111 (D.D.C.1999) (approving a consent decree agreed to by the U.S. Department of Agriculture, which had allegedly engaged in race discrimination against African–American farmers); *Walker v. U.S. HUD*, 734 F.Supp. 1231 (N.D.Tex.1989) (discussing consent decree entered into HUD in public housing case).

However, the fact that the present case involves a federal defendant does add a new issue that has not been a factor in many other institutional reform cases— namely, the application of the separation-of-powers principle. It is to this issue that the Court now turns.

## III. SEPARATION OF POWERS

### A. Introduction

Although federal courts frequently examine federalism concerns when considering whether to issue a structural injunction against a state or local government entity, they do not examine the relevance of the separation-of-powers principle. The reason is that the Supreme Court has determined that "the separation-of-powers principle, like the political-question doctrine, has no applicability to the federal judiciary's relationship to the States." *Elrod v.*

*Burns,* 427 U.S. 347, 352, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). However, because the present case involves a federal agency, the Department of the Interior, the Court must analyze whether the issuance of a structural injunction against a federal governmental entity poses separation-of-powers problems.

To the Court's knowledge, this issue has been raised in only two federal cases, neither of which have resolved it.[25] The first case is the long-running *Adams* desegregation litigation, several of the earlier opinions in which are discussed *supra.* In a later opinion, the D.C. Circuit entertained an appeal of an injunction issued by the district court, together with the underlying consent decree in the case, by the secretaries of the Departments of Education and Labor, the assistant secretary for civil rights of the Department of Edu-

---

**25.** Interestingly, however, a state case analyzing a similar issue concluded that the imposition of even more intrusive relief against a state agency did not violate the state constitution's separation-of-powers provision. In *Perez v. Boston Housing Authority,* 379 Mass. 703, 400 N.E.2d 1231 (1980), after the defendant agency had refused to comply with a consent decree, the trial court placed the agency into receivership. In upholding the imposition of the receivership against a separation-of-powers challenge, the Supreme Judicial Court of Massachusetts explained:

> BHA argues that the judgment herein would offend against the principle of separation of powers which finds expression in art. 30 of the Declaration of Rights of our Constitution. But if it is a function of the judicial branch to provide remedies for violations of law, including violations committed by the executive branch, then an injunction with that intent does not derogate from the separation principle, nor, by extension, does a receivership otherwise properly instituted. To the contrary, when the executive persists in indifference to, or neglect or disobedience of court orders, necessitating a receivership, it is the executive that could more properly be charged with contemning the separation principle. A separation-of-

powers argument advanced in [*Blaney v. Comm'r of Correction,* 374 Mass. 337, 372 N.E.2d 770 (1978)] drew this remark: "Indeed, the executive's (correction commissioner's) refusal to obey such judicial orders itself seems to violate art. 30, by abrogating judicial decrees, an exclusively judicial function."

> Tied to the "separation" argument, and not too slyly, is an intimation that the courts would do well to stay out of this housing problem, for if the receivership meets with little more success than the current administration of BHA, then the courts will be substituted for BHA as the target of criticism; and the question is left not squarely stated but immanent whether that would be good for the courts. Amid these tears shed by anticipation for the courts, we acknowledge the possibility that a receivership will not succeed, but the facts of record suggest to us the certainty that the present administration has failed and would very probably continue to do so. It becomes a conscientious duty, within the law, even at the risk implied, to allow the receivership experiment to go forward as a last resort.

*Id.* at 1252–53 (footnote and internal citation omitted).

cation, and the director of the Office of Federal Contract Compliance Programs. These federal officials claimed that the injunction and decree "impermissibly intrude[d] on their statutory and constitutional authority to manage and supervise their agencies' enforcement of various civil rights laws" and "violate[d] fundamental principles of separation of powers." *Women's Equity Action League v. Bell*, 743 F.2d 42, 42–3 (D.C.Cir.1984). They also claimed that the current plaintiffs in the action lacked standing. The D.C. Circuit determined that it was "unable to decide these issues in the first instance," and remanded to the district court. *Id.* at 44. It stressed that "the 'threshold' and 'merits' issues involved are discrete" and therefore "a ruling on the threshold issue of standing does not decide the issue whether certain relief granted after reaching the merits of a controversy would adversely implicate separation-of-powers limitations." *Id.*[26]

On remand, the district court found that its prior orders violated the separation-of-powers principle and dismissed the action. *Adams v. Bennett*, 675 F.Supp. 668 (D.D.C.1987). But the D.C. Circuit reversed the dismissal. It explained that the district court had "obscured under a 'standing' headline issues properly analyzed discretely." *Women's Equity Action League v. Cavazos*, 879 F.2d 880, 886 (D.C.Cir.1989). It continued:

Plaintiffs in this action, beyond question, are the intended beneficiaries of the statutes under which they sue. *If*, as they charge, *administrative action is legally inadequate under the legislation they invoke, judicial review would serve to promote rather than undermine the separation of powers, for it helps to prevent the executive branch from ignoring congressional directives.* As stated in incisive commentary:

It *would be ironic indeed if article III were interpreted to preclude federal courts from compelling regulatory agencies to adhere to the will of Congress by undertaking enforcement action to the degree or of the nature that statutes require.*

*Id.* (internal citations and punctuation omitted) (emphasis added). After holding that the plaintiffs possessed standing, the D.C. Circuit directed that the remaining issues raised in the earlier appeal be briefed and argued, including the question of whether the district court possessed the authority "to impose procedural or enforcement requirements (timeframes, compliance monitoring, and reporting) supplementing those set out in the governing legislation[.]" *Id.* at 887. This issue was never resolved, however, because the D.C. Circuit dismissed the action on the grounds that the statutes at issue created no right of action against federal agencies, as opposed to private defendants. *Women's Equity Action League v. Cavazos*, 906 F.2d 742 (D.C.Cir.1990).

---

**26.** In an earlier opinion, the D.C. Circuit issued an opinion containing dicta purporting to constrain the remedial authority of the district court. *Adams v. Bell*, 711 F.2d 161 (D.C.Cir.1982). The holding of that case, however, was limited to a determination of whether the district court had appropriately concluded that the scope of its prior decrees did not include the capacity to issue an injunction directing the Department of Education to refrain from settling one of its enforcement proceedings. A vigorous and persuasive dissent by four judges noted that the dicta in the majority's opinion rested upon a misreading of a single footnote in an earlier opinion. *Adams*, 711 F.2d at 171–210 (Wright, Robinson, Wald, and Mikva, JJ., dissenting). This Court is persuaded that the dicta in the majority opinion was based on a misreading of a single sentence in a prior opinion, and does not control.

The sole discussion of this particular separation-of-powers issue by the Supreme Court is to be found in the concurring opinion of a single Justice in *Missouri v. Jenkins* who, after offering an originalist critique of the concept of structural injunctions, indicated some concern that such injunctions might raise separation-of-powers problems. *See Jenkins*, 515 U.S. at 131–37, 115 S.Ct. 2038 (Thomas, J., concurring). However, this concern did not lead to the adoption of any standard for determining whether such injunctions exceeded permissible bounds, but only a recommendation that "[t]o ensure that they do not overstep the boundaries of their Article III powers, ... district courts should refrain from exercising their authority in a manner that supplants the proper sphere reserved to the political branches, who have a coordinate duty to enforce the Constitution's dictates..." *Id.* at 136, 115 S.Ct. 2038.[27]

Given the lack of guidance on this specific issue, the only useful authority that this Court has found consists of previous opinions involving separation-of-powers issues raised by clashes between the executive and judicial branches. The Court must therefore analyze these cases to determine what guidance they provide.

## B. Judicial–Executive Separation of Powers Cases

In *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the President of the United States asserted that "the independence of the Executive Branch within its own sphere insulates the President from a judicial subpoena in an ongoing criminal prosecution, and thereby protects confidential Presidential commu-

nications." *Id.* at 706, 94 S.Ct. 3090. The Court recognized that the necessity for the President and his assistants to prevent from disclosure the expression of "candid, objective, and even blunt or harsh opinions in Presidential decisionmaking" justified the creation of a "presumptive privilege for Presidential communications" whose existence was "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id.* at 708, 94 S.Ct. 3090. However, the Court explained,

The right to the production of all evidence at a criminal trial similarly has constitutional dimensions. The Sixth Amendment explicitly confers upon every defendant in a criminal trial the right "to be confronted with the witnesses against him" and "to have compulsory process for obtaining witnesses in his favor." Moreover, the Fifth Amendment also guarantees that no person shall be deprived of liberty without due process of law. It is the manifest duty of the courts to vindicate those guarantees, and to accomplish that it is essential that all relevant and admissible evidence be produced.

*Id.* at 711, 94 S.Ct. 3090. The Court was thus confronted with two irreconcilable claims of coordinate branches of government, each of which were grounded in a power of that branch possessing a constitutional dimension. On the one hand, the existence of the presidential communication privilege would seem to proscribe the disclosure of confidential presidential communications on the subpoenaed tapes. On the other hand, the duty of the courts to give effect to the Fifth and Sixth Amendments by means of its subpoena power would seem to require the disclosure of

---

**27.** Justice Thomas also issued a separate concurrence in *Lewis v. Casey* reiterating the concerns he had raised in his *Jenkins* concurrence. *See Lewis*, 518 U.S. at 364–93, 116 S.Ct. 2174 (Thomas, J., concurring). As in *Jenkins*, no other Justice joined the concurring opinion.

relevant evidence in a pending criminal trial. Because it was impossible to honor both competing claims, the Court was forced to develop a means that would resolve the difficulty: "Since we conclude that the legitimate needs of the judicial process may outweigh Presidential privilege, it is necessary to resolve those competing interests *in a manner that preserves the essential functions of each branch.*" *Id.* at 707, 94 S.Ct. 3090 (emphasis added).

The Court examined the relevant interest of the judicial branch: "The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." *Id.* at 709, 94 S.Ct. 3090. It then analyzed the interest of the executive branch:

> In this case the President challenges a subpoena served on him as a third party requiring the production of materials for use in a criminal prosecution; he does so on the claim that he has a privilege against disclosure of confidential communications. He does not place his claim of privilege on the ground they are military or diplomatic secrets. As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities. . . .

> No case of the Court, however, has extended this high degree of deference to a President's generalized interest in confidentiality. Nowhere in the Constitution, as we have noted earlier, is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based.

*Id.* at 710, 711, 94 S.Ct. 3090. The Court then proceeded to weigh the competing interests, and reached its conclusion:

> In this case we must weigh the importance of the general privilege of confidentiality of Presidential communications in performance of the President's responsibilities against the inroads of such a privilege on the fair administration of criminal justice. The interest in preserving confidentiality is weighty indeed and entitled to great respect. However, we cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution.

> On the other hand, the allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts. A President's acknowledged need for confidentiality in the communications of his office is general in nature, whereas the constitutional need for production of relevant evidence in a criminal proceeding is specific and central to the fair adjudication of a particular criminal case in the administration of justice. Without access to specific facts a criminal prosecution may be totally frustrated. The President's broad interest in confidentiality of communications will not be vitiated by disclosure of a limited number of conversations preliminarily shown to have some bearing on the pending criminal cases.

> We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial

is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial.

*Id.* at 711–13, 94 S.Ct. 3090.

One of the key observations made by the *Nixon* Court is that the adjudication of separation-of-powers issues does not turn on an assumption that the branches must operate independently of one another:

> The impediment that an absolute, unqualified privilege would place in the way of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions would plainly conflict with the function of the courts under Art. III. In designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence.
>
> > "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S., at 635, 72 S.Ct., at 870 (Jackson, J., concurring).
>
> To read the Art. II powers of the President as providing an absolute privilege as against a subpoena essential to enforcement of criminal statutes on no more than a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of

"a workable government" and gravely impair the role of the courts under Art. III.

*Id.* at 707, 94 S.Ct. 3090. Instead, the *Nixon* Court concluded, the interdependence and reciprocity of a workable government will necessarily lead to situations in which the functions of one branch will conflict with the functions of another. Sometimes, the Constitution clearly dictates which branch should prevail in such a conflict—for example, the president's pardon power prevails over the judgment of courts in criminal cases, and a supermajority vote of Congress prevails over the president's veto power. In other instances, however, the decision is not so clearcut. When the courts are asked to resolve such conflicts, they must do so "in a manner that preserves the essential functions of each branch." Such a resolution turns on the nature of each branch's claim, and the degree to which that claim is related to the traditional or textually-defined purposes of that branch.

The Court concluded that a highly specific claim that is directly and persuasively related to a traditional or textually-defined purpose of one branch will prevail over a more generalized claim that is less clearly or directly related to a traditional or textually-defined purpose of another branch. ("We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the *generalized interest* in confidentiality, it cannot prevail over the *fundamental demands* of due process of law in the fair administration of criminal justice. The *generalized assertion* of privilege must yield to the *demonstrated, specific need* for evidence in a pending criminal trial."). It also concluded that courts should examine which claim, if adopted, would be less likely to result in a sustained, fundamental impairment of the tra-

ditional or textually-designated functions of one of the two branches. ("However, we cannot conclude that advisers will be moved to temper the candor of their remarks by the *infrequent* occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution. On the other hand, the allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would *cut deeply* into the guarantee of due process of law and *gravely impair* the basic function of the courts.")

The Court's opinion three years later in *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), continued and expanded upon the mode of analysis developed in *United States v. Nixon* for treating separation-of-powers claims. Former President Nixon mounted a constitutional challenge to a statute requiring an executive official to take custody of his presidential papers and tape recordings. Nixon's claims included an assertion that the statute violated the separation-of-powers principle, in that it represented an attempt by Congress to interfere with executive functions. The Court rejected this claim, observing that Nixon's argument was

> based on an interpretation of the separation-of-powers doctrine inconsistent with the origins of that doctrine, recent decisions of the Court, and the contemporary realities of our political system. True, it has been said that each of the three general departments of government must remain entirely free from the control or coercive influence, direct or indirect, of either of the others, and that the sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there.

But the more pragmatic, flexible approach of Madison in the Federalist Papers and later of Mr. Justice Story was expressly affirmed by this Court only three years ago in *United States v. Nixon* ... There the same broad argument concerning the separation of powers was made by appellant in the context of opposition to a subpoena duces tecum of the Watergate Special Prosecutor for certain Presidential tapes and documents of value to a pending criminal investigation. Although acknowledging that each branch of the Government has the duty initially to interpret the Constitution for itself, and that its interpretation of its powers is due great respect from the other branches, the Court squarely rejected the argument that the Constitution contemplates a complete division of authority between the three branches. Rather, the unanimous Court essentially embraced Mr. Justice Jackson's view, expressed in his concurrence in *Youngstown Sheet & Tube Co. v. Sawyer* ....

Like the District Court, we therefore find that appellant's argument rests upon an archaic view of the separation of powers as requiring three airtight departments of government. Rather, *in determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.*

*Id.* at 441–43, 97 S.Ct. 2777 (internal citations and punctuation omitted) (emphasis added). The Court thus reiterated that the form of analysis it had developed in

*United States v. Nixon* was the appropriate method to use in cases involving separation-of-powers claims that are not clearly and unambiguously resolved by the text of the Constitution. Rather than insisting upon a rigid separation of functions among the three branches, the Court instead stressed that such an analysis should be a pragmatic, functional inquiry. Instead of asking *whether* an action by one branch intrudes upon the actions of another, the proper question is one of *degree,* examining "the *extent to which*" such an action prevents the other branch "from accomplishing its constitutionally assigned functions." If a court determines that such an action presents the potential to disrupt the accomplishment of such functions, then it must examine "whether that impact is justified by an overriding need to promote objectives within the constitutional authority" of the other branch. In developing this functionalist analysis, the Court looked for guidance to the writings of James Madison and Joseph Story:

> Madison in The Federalist No. 47, reviewing the origin of the separation-of-powers doctrine, remarked that Montesquieu, the 'oracle' always consulted on the subject,
>
>> "did not mean that these departments ought to have no *partial agency* in, or no *controul* over the acts of each other. His meaning, as his own words import ... can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution, are subverted." The Federalist No. 47, pp. 325–326 (J. Cooke ed.1961) (emphasis in original).
>
> Similarly, Mr. Justice Story wrote:
>
>> "[W]hen we speak of a separation of the three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree." 1 J. Story, Commentaries on the Constitution § 525 (M. Bigelow, 5th ed.1905).

*Id.* at 443 n. 5, 97 S.Ct. 2777.

Though it added little to the development of separation-of-powers law, *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), did continue the Court's use of a functional approach to separation-of-powers issues. In upholding the constitutionality of the independent counsel statute, the Court observed:

> The final question to be addressed is whether the Act, taken as a whole, violates the principle of separation of powers by unduly interfering with the role of the Executive Branch. Time and again we have reaffirmed the importance in our constitutional scheme of the separation of governmental powers into the three coordinate branches. As we stated in *Buckley v. Valeo,* the system of separated powers and checks and balances established in the Constitution was regarded by the Framers as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." We have not hesitated to invalidate provisions of law which violate this principle. On the other hand, we have never held that the Constitution requires that the three branches of Government operate with absolute independence.....
>
> [W]e do not think that the Act impermissibly undermines the powers of the Executive Branch, or disrupts the proper balance between the coordinate

branches by preventing the Executive Branch from accomplishing its constitutionally assigned functions.

*Id.* at 693, 695, 108 S.Ct. 2597 (citations and internal punctuation omitted) (emphasis in original). Once again citing Justice Jackson's oft-quoted words from *Youngstown*, the Court emphasized its functional approach to separation-of-powers claims, finding that the independent counsel act neither *"impermissibly* undermine[d] the powers of the Executive Branch" nor "disrupt[ed] the *proper balance* between the coordinate branches by preventing the Executive Branch from accomplishing its constitutionally assigned functions."

Similarly, despite its high-profile nature, *Clinton v. Jones,* 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997), added little to already-existing separation-of-powers law, apart from demonstrating still another application of the Court's functional analysis. In rejecting the assertion that the separation-of-powers principle requires courts to stay all private actions against a sitting president until he leaves office, the Court explained:

> Rather than arguing that the decision of the case will produce either an aggrandizement of judicial power or a narrowing of executive power, petitioner contends that—as a byproduct of an otherwise traditional exercise of judicial power—burdens will be placed on the President that will hamper the performance of his official duties. We have recognized that even when a branch does not arrogate power to itself the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties. As a factual matter, petitioner contends that this particular case ... may impose an unacceptable burden on the President's time and energy, and there-

by impair the effective performance of his office....

> [P]etitioner errs by presuming that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions. Our system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which would preclude the establishment of a Nation capable of governing itself effectively. As Madison explained, separation of powers does not mean that the branches "ought to have no partial agency in, or no controul over the acts of each other." The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution.

*Id.* at 701–03, 117 S.Ct. 1636 (footnote omitted) (internal citations and punctuation omitted).

On the other hand, *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), which involved a separation-of-powers challenge to the operations of the U.S. Sentencing Commission, added a further element to the analysis: namely, whether a function is appropriately assigned to a particular branch because of its special knowledge and expertise. The Court began by reviewing past separation-of-powers jurisprudence in the light of Madison's principles:

> In applying the principle of separated powers in our jurisprudence, we have sought to give life to Madison's view of the appropriate relationship among the three coequal Branches. Accordingly, we have recognized, as Madison admon-

ished at the founding, that while our Constitution mandates that each of the three general departments of government must remain entirely free from the control or coercive influence, direct or indirect, of either of the others, the Framers did not require—and indeed rejected—the notion that the three Branches must be entirely separate and distinct.... Madison recognized that our constitutional system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which would preclude the establishment of a Nation capable of governing itself effectively. In a passage now commonplace in our cases, Justice Jackson summarized the pragmatic, flexible view of differentiated governmental power to which we are heir....

In adopting this flexible understanding of separation of powers, we simply have recognized Madison's teaching that the greatest security against tyranny—the accumulation of excessive authority in a single Branch—lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each Branch....

It is this concern of encroachment and aggrandizement that has animated our separation-of-powers jurisprudence and aroused our vigilance against the hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power. Accordingly, we have not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch .... By the same token, we have upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment.

In *Nixon v. Administrator of General Services,* ... we described our separation-of-powers inquiry as focusing "on the extent to which [a provision of law] prevents the Executive Branch from accomplishing its constitutionally assigned functions." In cases specifically involving the Judicial Branch, we have expressed our vigilance against two dangers: first, that the Judicial Branch neither be assigned nor allowed tasks that are more properly accomplished by other branches, and, second, that no provision of law impermissibly threatens the institutional integrity of the Judicial Branch.

*Id.* at 380–83, 109 S.Ct. 647 (internal citations and punctuation omitted).

Analyzing the first of these two dangers, the Court first noted that "consistent with the separation of powers, Congress may delegate to the Judicial Branch nonadjudicatory functions that do not trench upon the prerogatives of another Branch and that are appropriate to the central mission of the Judiciary" and that "we have never held, and have clearly disavowed in practice, that the Constitution prohibits Congress from assigning to courts or auxiliary bodies within the Judicial Branch administrative or rulemaking duties that, in the words of Chief Justice Marshall, are 'necessary and proper ... for carrying into execution all the judgments which the judicial department has power to pronounce.'" *Id.* at 388, 389, 109 S.Ct. 647 (citation omitted). It then rejected the argument that the placement of the Sentencing Commission within the judicial branch violated the separation-of-powers principle because the Commission's tasks were more properly accomplished by the two political branches:

[T]he Commission's functions, like this Court's function in promulgating procedural rules, are clearly *attendant to a central element of the historically acknowledged mission of the Judicial Branch*....

We do not believe ... that the significantly political nature of the Commission's work renders unconstitutional its placement within the Judicial Branch. Our separation-of-powers analysis does not turn on the labeling of an activity as "substantive" as opposed to "procedural," or "political" as opposed to "judicial." Rather, our inquiry is focused on the unique aspects of the congressional plan at issue and its practical consequences in light of the larger concerns that underlie Article III. In this case, the practical consequences of locating the Commission within the Judicial Branch pose no threat of undermining the integrity of the Judicial Branch or of expanding the powers of the Judiciary beyond constitutional bounds by uniting within the Branch the political or quasi-legislative power of the Commission with the judicial power of the courts.

*Id.* at 391, 392, 109 S.Ct. 647 (internal citations and punctuation omitted) (emphasis added).

The Court also rejected the notion that the creation of the Commission impermissibly threatened the institutional integrity of the judiciary, in that the judicial branch "is inevitably weakened by its participation in policymaking":

We do not believe ... that the placement within the Judicial Branch of an independent agency charged with the promulgation of sentencing guidelines can possibly be construed as preventing the Judicial Branch from accomplishing its constitutionally assigned functions. Despite the substantive nature of its work, the Commission is *not incongru-*

*ous or inappropriate to the Branch.* As already noted, sentencing is a *field in which the Judicial Branch long has exercised substantive or political judgment.* What we said in *Morrison* when upholding the power of the Special Division to appoint independent counsel applies with even greater force here: *"This is not a case in which judges are given power ... in an area in which they have no special knowledge or expertise."* On the contrary, Congress placed the Commission in the Judicial Branch precisely because of the *Judiciary's special knowledge and expertise....*

In sum, since substantive judgment in the field of sentencing has been and remains appropriate to the Judicial Branch, and the methodology of rulemaking has been and remains appropriate to that Branch, Congress' considered decision to combine these functions in an independent Sentencing Commission and to locate that Commission within the Judicial Branch does not violate the principle of separation of powers.

*Id.* at 395–96, 109 S.Ct. 647 (internal citations and punctuation omitted) (emphasis added).

*Mistretta* thus represents a further application of the functional analysis developed in the two *Nixon* cases. In *Mistretta,* the Court eschews applying formal labels such as "procedural," "substantive," "political," and "judicial" in favor of examining the "practical consequences" of the function at issue. It also notes its past approval of measures that "to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment." But in *Mistretta,* the Court enhances its functional analysis by adding a new component: an inquiry into whether the function at issue is appropriate to the branch

exercising it, either because it is one in which the branch has long exercised substantive judgment or possesses special knowledge or expertise. This new component may be understood as raising the issue of institutional competence, that is, whether a branch can be expected to utilize a particular function with skill, discretion, and care because it involves an area in which the branch possesses special knowledge or expertise.

C. Analysis

■ It is clear from the above-discussed cases that the separation-of-powers principle does not require the branches to operate with absolute independence of one another. To the contrary, the Constitution presumes, and in some cases requires, the commingling of functions between two or more branches. When the functions of one branch conflict with the functions of another, however, the courts must resolve such conflicts in a manner that preserves the essential functions of each branch. Such a resolution requires an inquiry into the nature of each branch's claim, into the degree to which that claim is related to the traditional or textually-defined purposes of that branch, and into which disputed function is less likely to result in a sustained, fundamental impairment of the traditional or textually-designated purposes of one of the branches. The nature of the court's inquiry is functional, not formalistic.

The interest identified by Interior is the ability of executive agencies to manage their affairs as they deem appropriate. This interest finds a textual basis in the admonition of the Constitution that the president shall "take Care that the Laws be faithfully executed ..." U.S. CONST. art. II, § 3. In the present case, Interior asserts that this interest would be unduly restricted by the issuance of a structural injunction, in that such an injunction would unduly interfere with its ability to direct the management of the IIM trust, including the performance of a historical accounting.

■ However, as noted by the D.C. Circuit, the Take Care Clause "does not permit the President to refrain from executing laws duly enacted by the Congress *as those laws are construed by the judiciary.*" *Nat'l Treasury Employees Union v. Nixon,* 492 F.2d 587, 604 (D.C.Cir.1974) (emphasis added). Additionally, the court concluded:

> the judicial branch of the Federal Government has the constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch.... Moreover, Judicial resolution of the issue better enables the President to perform his constitutional duty to take care that the laws be faithfully executed. No lack of respect is shown the executive merely because this Court has exercised its duty to interpret a statute differently than has the President. Indeed, failure to determine the law because the executive has spoken would seem a nonperformance of duty by the judiciary.

*Id.* at 604–05 (internal citations omitted). This understanding of the Take Care Clause was enshrined in law as early as 1861, when Chief Justice Roger Taney declared that under the authority vested in the president by the clause, the president was

> not authorized to execute [the laws] himself, or through agents or officers, civil or military, appointed by himself, but he is to take care that they be faithfully carried into execution, *as they are expounded and adjudged by the co-ordinate branch of the government to which that duty is assigned by the constitution.* It is thus made his duty to come in aid of the judicial authority, if it shall

be resisted by a force too strong to be overcome without the assistance of the executive arm; *but in exercising this power he acts in subordination to judicial authority, assisting it to execute its process and enforce its judgments.*

*Ex parte Merryman,* 17 Fed. Cas. 144, 149 (1861) (emphasis added).

█ The interest of the judiciary in the present case, on the other hand, is the interest in taking remedial measures necessary to give effect to its substantive judgments. The remedial power is an aspect of the "judicial Power of the United States" vested in the federal courts by Article III of the Constitution. *See, e.g., Muskrat v. United States,* 219 U.S. 346, 356, 31 S.Ct. 250, 55 L.Ed. 246 (1911) ("Judicial power ... is the power of a court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision.") (citation and internal punctuation omitted); *Nat'l Automatic Laundry & Cleaning Council v. Shultz,* 443 F.2d 689, (D.C.Cir.1971) ("The broad consideration involved in judicial review of agency actions ... is not merely the declaration of the rights of the private litigants but the functioning of the judicial process. In our overall pattern of government the judicial branch has the function of requiring the executive (or administrative) branch to stay within the limits prescribed by the legislative branch."); *Coffey v. Braddy,* 372 F.Supp. 116, 124 (M.D.Fla.1971) ("[T]he Courts of the United States are empowered by Congress and, moreover, have the inherent power to enter such orders as may be necessary to effectuate their judgments, decrees and orders and to prevent interference with, and obstruction to, their implementation."). Additionally, "the power of [federal courts] to apply the rules of equity in any case is derived from section 2 of article III of the Constitution,

wherein it is declared that 'the judicial Power of the United States shall extend to all Cases in Law and Equity, arising under this Constitution [and] the Laws of the United States...'" *United States v. Certain Parcels of Land,* 131 F.Supp. 65, 71 (S.D.Cal.1955).

It is clear that the nature of Interior's claim is what the Court in *United States v. Nixon* described as a "broad, undifferentiated claim." That is, Interior has not demonstrated that the issuance of a structural injunction in the present case would result in a sustained, fundamental impairment of the executive branch's ability to manage its affairs as it deems appropriate. This is because, generally speaking, the ability of the courts to issue relief in cases involving an executive agency's interpretation of a statute is limited by the doctrine outlined in *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, the D.C. Circuit has held that *Chevron* deference is not applicable in the present case. The Court therefore has no fear that the issuance of structural relief in the present case will spawn imitator suits seeking similar relief because virtually no other cases involve the unusual posture of the present case: to wit, the lack of *Chevron* deference and the status of the federal defendant as a trustee-delegate, with the concomitant limitations on discretion that such status imposes. In other words, the interest of Interior is not a specific claim that the issuance of a structural injunction in the present case will result in the undermining of the executive branch's ability to "take Care that the laws be faithfully executed." Rather, it is a generalized claim that the deference that is due all executive agencies in the management of their affairs should prevent any injunctive relief that affects Interior's management of the IIM trust. However, the level of deference due Interior in the present case is

particularly weak, as recognized by the D.C. Circuit:

> *Appellants imply that the district court did not show sufficient deference to their roles as administrative officials charged with developing and implementing policies and procedures to ensure the discharge of the federal government's obligations.* Appellants thus imply, but do not argue, that their interpretation of the 1994 Act, and the obligations that it imposes, is due deference under *Chevron U.S.A. Inc. v. NRDC.* Assuming that the 1994 Act is ambiguous, this does not enable the government to escape liability by interpreting away its fiduciary obligations. While ordinarily we defer to an agency's interpretations of ambiguous statutes entrusted to it for administration, *Chevron* deference is not applicable in this case. The governing canon of construction requires that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit. *Therefore, even where the ambiguous statute is one entrusted to an agency, we give the agency's interpretation careful consideration but we do not defer to it.* This departure from the *Chevron* norm arises from the fact that the rule of liberally construing statutes to the benefit of the Indians arises not from ordinary exegesis, but from principles of equitable obligations and normative rules of behavior, applicable to the trust relationship between the United States and the Native American people. Thus, even if the statutory language did not make clear that the government's duties predate and extend beyond those enumerated in the 1994 Act, the Interior Department would retain its fiduciary obligations to IIM trust beneficiaries.

*Cobell VI,* 240 F.3d at 1101 (emphasis added) (internal citations and punctuation omitted).

By contrast, the interest of the judicial branch in taking remedial measures necessary to give effect to its substantive judgments is intimately related to the "judicial power" vested in the federal courts by Article III. Inasmuch as Interior does not indicate why the remedial authority of the Court in the present case is unusually restricted, for this Court to conclude that it may not issue structural relief in the present case would necessarily entail it to conclude that federal district courts may never issue a structural injunction against a federal agency, regardless of the individual circumstances. Such a conclusion would cut deeply into the capacity of the courts to effect one of their primary functions—to afford relief commensurate to redressing claims that they have adjudicated. It would also require the overruling of *Gautreaux* and the host of other cases discussed in the previous section.

■ The issue, therefore, is the relative importance of the generalized need for executive agencies to manage their affairs as they deem appropriate as weighed against the importance of the demonstrated, specific need for federal courts to issue appropriate injunctive relief in their adjudication of cases. The Court simply cannot conclude that, if the latter need prevails, the executive branch will be likely to suffer a sustained, fundamental impairment of its ability to "take Care that the laws be faithfully executed." Additionally, as this Court explained in a previous memorandum opinion:

> A necessary component of this Court's jurisdiction is the ability to determine what relief to grant if the plaintiff prevails in the action. The Court undertakes this responsibility on a daily basis without even the slightest hint that it

does so in contravention to Article III. In this case, after the plaintiffs proved that the defendants were in breach of the fiduciary duties that they owe to the IIM beneficiaries, the Court found that the appropriate relief was a declaratory judgment. A later determination by this Court that more intrusive relief is necessary, whether it be in the form of an injunction or the appointment of a receiver, would not change the basic action taken by the Court. That is, the Court would still only be deciding, as it does in numerous other cases pending before it, what relief is necessary to remedy illegal conduct by the defendant.

*Cobell VII*, 226 F.Supp.2d at 142–43; *cf. Perez v. Boston Housing Authority*, 379 Mass. 703, 400 N.E.2d 1231, 1252 (1980) ("But if it is a function of the judicial branch to provide remedies for violations of law, including violations committed by the executive branch, then an injunction with that intent does not derogate from the [separation-of-powers] principle... To the contrary, when the executive persists in indifference to, or neglect or disobedience of court orders, ... it is the executive that could more properly be charged with contemning the separation principle.").

However, Interior has directed this Court's attention to several cases that (it asserts) demonstrate the existence of "well-established principles governing judicial review of agency action and the separation of powers concerns that underlie these principles" that prevent the issuance of a structural injunction in the present case. Defs.' Proposed Findings of Fact and Conclusions of Law at 238 ("Defs' Prop. Findings and Conclusions"). The Court must therefore analyze the holdings in these cases to determine whether they proscribe the issuance of structural injunctive relief in the present case.

Interior begins with two quotations from *Federal Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15 (1952). In that case, the Supreme Court reversed the decision of an appellate court that had modified a portion of a license issued by the Federal Power Commission to construct a hydroelectric plant, and then remanded to the agency with instructions to issue the license, as modified. The Court explained:

When the court decided that the license should issue without the conditions [prescribed by the Commission], it usurped an administrative function. There doubtless may be situations where the provision excised from the administrative order is separable from the remaining parts or so minor as to make remand inappropriate. But the guiding principle, violated here, is that the function of the reviewing court ends when an error of law is laid bare.... The Court, it is true, has power to affirm, modify, or set aside the order of the Commission in whole or in part. But that authority is not power to exercise an essentially administrative function.

*Id.* at 20–21, 73 S.Ct. 85 (internal citations and punctuation omitted).

However, none of the separation-of-powers cases analyzed above based their decisions on any distinction between "essentially administrative" and "essentially judicial" functions. Additionally, the leading commentator on the federal courts has noted that inasmuch as "[t]here is no formula for identifying the divide between properly judicial matters and legislative or administrative matters," in general, the federal courts have refused to recognize the existence of an "administrative question doctrine" akin to the political question doctrine. 13A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3535 (2d ed.1984). Thus, for

example, during the September 5, 2000 oral arguments on Interior's interlocutory appeal of this Court's 1999 decision, one judge on the D.C. Circuit's panel explicitly rejected Interior's assertion that because "Congress expected the reconciliation process to be done administratively," this Court lacked jurisdiction to determine the scope of a historical accounting before Interior itself had decided how and to what extent it intended to do so. The judge responded: "[W]e spend our lives reviewing judicially those things which are to be done first administratively. I am not sure why you think it advances the ball any to say Congress meant for it to be done administratively[.]" *Cobell VII*, 226 F.Supp.2d at 39 & n. 37.

Similarly, in *Heisler v. Parsons*, 312 F.2d 172 (7th Cir.1962), the Seventh Circuit rejected a mandamus petition sought against a district judge who had reviewed a determination rendered by the National Mediation Board. In response to the petitioners' argument that exclusive jurisdiction over the issue was committed to the Board, the Court explained: "The fact that legal rights may, in some respects, depend upon issues committed to administrative determination, does not exclude the courts from jurisdiction to enforce such rights. The courts have consistently taken jurisdiction of actions to settle legal rights which involved premises of an exclusively administrative nature." *Id.* at 176 (citing cases). In the present case, it will not be necessary to determine whether the "administrative question doctrine" possesses any continuing vitality. It is enough to note that this supposed doctrine possesses no relevance to the issues currently before the Court.

Interior next cites *United States v. Saskatchewan Minerals*, 385 U.S. 94, 95, 87 S.Ct. 254, 17 L.Ed.2d 192 (1966) for the proposition that "after declaring agency

action unlawful (or unreasonably delayed), courts may not seek to control the processes by which an agency fulfills its Congressionally-mandated functions on remand." Defs.' Prop. Findings and Conclusions at 103. *Saskatchewan Minerals* is a single-paragraph opinion which states, in its entirety:

These appeals are from an amended judgment of a three-judge district court, which set aside an order of the Interstate Commerce Commission dismissing appellee's complaint, and remanded the case to the Commission for further proceedings with instructions to grant relief to the appellee in accordance with the opinion heretofore entered by this court on December 8, 1965, and the Supplemental Memorandum Decision entered by this Court on March 3, 1966. Accepting the District Court's decision to set aside the Commission's order on the merits, appellants challenge that portion of the judgment which instructs the Commission to grant relief to the appellee and precludes the Commission from reopening the proceedings for the receipt of additional evidence relevant to the question whether the rates challenged by the appellee are in fact unreasonably preferential in violation of § 3(1) of the Interstate Commerce Act, 49 U.S.C. § 3(1). We agree with the appellants that, *under the circumstances present here,* this restriction is an improper limitation on the Commission's duty to reconsider the entire case. Accordingly, the judgment of the District Court is vacated and the cases are remanded to the District Court with instructions to enter an order remanding the case to the Commission for further proceedings consistent with the District Court's opinion of December 8, 1965.

*Id.* at 94–95 (internal citations and punctuation omitted) (emphasis added). Precisely how Interior deduces such a sweeping

conclusion from this brief, insignificant case, the holding in which is clearly restricted to the individual circumstances of the case under review (whatever those circumstances might be) is, admittedly, quite a mystery to this Court.[28]

Interior also directs this Court's attention to the Supreme Court's seminal decision in *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). In *Vermont Yankee*, a court reviewing the rulemaking proceedings of the Atomic Energy Commission concluded, "despite the fact that it appeared that the agency employed all the procedures required by 5 U.S.C. § 553 … and more," that the proceedings were inadequate, and remanded to the agency for additional rulemaking proceedings. *Id.* at 535, 98 S.Ct. 1197. As all students of administrative law know, the Supreme Court reversed, holding that section 553

established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures. Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them. This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute. But such circumstances, if they exist, are extremely rare.

*Id.* at 524, 98 S.Ct. 1197 (footnote omitted). The present case, however, is not a review of a rulemaking decision made by Interior. Instead, it is a determination of whether Interior's Plans for conducting an historical accounting and for bringing itself into compliance with its fiduciary duties com-

---

**28.** In a footnote, Interior also cites a law review article that includes the two sentences: "To be sure, because the essence of the executive function is the exercise of discretion, a court transgresses the separation of powers when it dictates that an agency take one particular action instead of others *within its discretionary prerogative.* Yet when a court merely orders an agency to act, leaving the choice of action to the agency's discretion, no trespass occurs." Merrick B. Garland, *Deregulation and Judicial Review*, 98 HARV. L. REV. 505, 564–65 (1985) (emphasis added) (footnotes omitted). But Interior omits the sentence immediately following: "Nor does a court violate the separation of powers when it directs an agency to take a specific action that the agency has no discretion to refuse to take—either because it has a statutory duty to take such action, or because refusal would exceed (or abuse) the discretion the agency does possess." *Id.* at 565. As explained by the D.C. Circuit, Interior's discretion as to the performance of its fiduciary duties (including the duty to account) is limited by the mandates of the 1994 Act and by its duties as a trustee-delegate, the existence of which predate the passage of the Act:

The Secretary has an overriding duty to deal fairly with Indians. This duty necessarily constrains the Secretary's discretion. When faced with several policy choices, an administrator is generally allowed to select any reasonable option. Yet this is not the case when acting as a fiduciary for Indian beneficiaries[,] as stricter standards apply to federal agencies when administering Indian programs. Summarizing federal case law on fiduciary obligations owed to Indian tribes, the Tenth Circuit concluded that where the Secretary is obligated to act as a fiduciary his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary. The federal government has charged itself with moral obligations of the highest responsibility and trust in its relationships with Indians, and its conduct should therefore be judged by the most exacting fiduciary standards.

*Cobell VI*, 240 F.3d at 1099 (citations and internal punctuation omitted).

port with its fiduciary duties, the existence of which were confirmed and supplemented (but not created) by the 1994 Act. In other words, this Court is reviewing Interior's compliance with the mandates of the 1994 Act, which, as the D.C. Circuit has already determined, makes clear that Interior possesses fiduciary duties (including the duty to account) with respect to the IIM trust, and that these duties predate the passage of the Act. *Vermont Yankee* thus possesses little relevance for a court reviewing an agency's compliance with the substantive and procedural requirements of a federal statute, as opposed to a court reviewing the decision of an agency adopted after the completion of a rulemaking proceeding performed in compliance with 5 U.S.C. § 553. Thus, for example, in *United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519 (D.C.Cir. 1978), the D.C. Circuit remanded a rulemaking decision back to a federal agency whose rulemaking proceedings had not complied with statutory mandates, explaining:

> Nor is our conclusion here inconsistent with the Supreme Court's recent decision in [*Vermont Yankee* ] In *Vermont Yankee* the Supreme Court held that, absent constitutional constraints or extremely compelling circumstances, administrative agencies should be free to fashion their own rules of procedure. The Court thus reversed a decision of this court which had held that the procedures employed by the agency in a rulemaking proceeding were inadequate.

The freedom of administrative agencies to fashion their procedures recognized in *Vermont Yankee,* however, does not encompass freedom to ignore statutory requirements. The *Vermont Yankee* Court was careful to point out that "[o]f course, the court must determine whether the agency complied with the procedures mandated by the relevant statutes."

*Id.* at 543 n. 63 (citation omitted).

Nor is *In re Barr Laboratories,* 930 F.2d 72 (D.C.Cir.1991), particularly relevant to the present case. In that case, the D.C. Circuit denied a petition seeking a writ of mandamus to compel the Food and Drug Administration (FDA) to act, either by approving or disapproving applications submitted by Barr. Although it determined that FDA had repeatedly violated the 180–day deadline for approving or disapproving such applications, it stressed that "[t]he issue before us ... is not whether the FDA's sluggishness has violated a statutory mandate—it has—but whether we should exercise our equitable powers to enforce the deadline." *Id.* at 75. Noting the "vague and secondhand character of Barr's claim," the D.C. Circuit concluded that the FDA's delay was not egregious and that the agency had not acted in bad faith. *Id.* It therefore dismissed the case, but invited Barr to refile his claim, "should circumstances arise that would change the outcome of our analysis." *Id.* at 76.

However, the present case is not before this Court on a writ of mandamus. Moreover, while the D.C. Circuit's 2001 opinion in this case quoted the statement in *Barr Laboratories* that "a finding that delay is unreasonable does not, alone, justify judicial intervention," it immediately qualified that statement in a footnote: *"But see* [*Forest Guardians v. Babbitt,* 174 F.3d 1178, 1191 (10th Cir.1999) ] ('once a court deems agency delay unreasonable, it *must compel* agency action.')" *Cobell VI,* 240 F.3d at 1096 & n. 4 (emphasis added). The D.C. Circuit then determined that Interior's delay in discharging its fiduciary obligations was both unreasonable and egregious:

> That Congress enacted its own remedial statute to address this unconscionable

delay does not mitigate the egregious amount of time plaintiffs have waited for, as discussed below, the 1994 Act is not the source of plaintiffs' rights.... Given the record before it, the district court reasonably concluded that absent court intervention, discharge of the government's fiduciary obligations may yet be far off.... [W]e find no basis for disturbing the district court's conclusion that appellants unreasonably delayed the discharge of their fiduciary obligations, nor for upsetting the district court's exercise of jurisdiction under 5 U.S.C. § 706 on this basis.

*Id.* at 1096–97. In short, the D.C. Circuit clearly did not view *Barr Laboratories* as controlling in the present case, given the very different circumstances that have given rise to the present action.

Next, Interior cites three cases in support of its assertion that "even in exceptional cases in which an agency has flagrantly disregarded a congressionally-mandated deadline for rulemaking, the appropriate judicial role is to retain jurisdiction and require periodic progress reports until the agency has completed the required action." Defs.' Prop. Findings and Conclusions at 105. It is true that in each of these cases, the respective courts did remand back to the agencies, in the first instance. But nowhere did the courts indicate that the "3 Rs" (remanding, retaining jurisdiction, and requiring progress reports) were the *only* steps that a court could take under such circumstances. For instance, in *Global Van Lines v. ICC,* 804 F.2d 1293 (D.C.Cir.1986), the D.C. Circuit reversed the issuance of a shipping permit, and remanded to the ICC for further proceedings. In a footnote, it explained its disposition of the case: "We agree with the Commission that when an agency committing an error of law has discretion to determine in the first instance how it should be rectified, the proper course is to

remand the case for further agency consideration in harmony with the court's holding." *Id.* at 1305 n. 95 (citations omitted). The D.C. Circuit never indicated that remanding was the sole relief that might be afforded by a court reviewing agency action. Additionally, as explained above, Interior's discretion in the present case is more limited than the discretion normally afforded to administrative agencies, in that it is the trustee-delegate of the United States with respect to the IIM trust.

In *In re United Mine Workers of Am. Int'l Union,* 190 F.3d 545 (D.C.Cir.1999), the court declined to issue a writ of mandamus compelling the Mine Safety and Health Administration (MSHA) of the U.S. Department of Labor to issue final regulations regarding gaseous emissions in the exhaust of diesel engines used in underground coal mines. Having explained that mandamus is an "extraordinary remedy," the court concluded that "issuance of a writ of mandamus at this time could do more harm than good," and decided to retain jurisdiction in lieu of issuing such a writ. *Id.* at 549, 556. However, the court concluded: "Prior to final agency action, [petitioners] may petition this court to grant additional appropriate relief in the event MSHA fails to adhere substantially to a schedule that would ... constitute a good faith effort by MSHA to come into compliance with the Mine Act." *Id.* at 556. The Court first notes that, unlike *United Mine Workers,* the present action involves neither rulemaking proceedings nor consideration of a mandamus writ. However, it is also noteworthy that the D.C. Circuit indicated its willingness to afford "additional appropriate relief" beyond the mere retention of jurisdiction, if MSHA failed to demonstrate good-faith compliance with the applicable statutory requirements.

Nor is this the only case in which the D.C. Circuit, in denying a mandamus peti-

tion against an agency, has demonstrated its willingness to afford relief beyond merely remanding to the agency. In *In re Monroe Communications Corp.*, 840 F.2d 942 (D.C.Cir.1988), the court declined to issue a mandamus writ against the Federal Communications Commission (FCC) directing the agency to act on certain matters related to a license renewal hearing, explaining that "the delay at issue here is not so great as to justify that response." *Id.* at 943. However, it explained, "the unusual circumstance of an unrebutted allegation of bad faith leads us to retain jurisdiction over the case until the license is awarded to ensure the kind of progress promised at oral argument." *Id.* at 947 (footnote and citations omitted). It also warned: "We hope that the FCC will resolve this matter in the way it has indicated, ... and that we will not be called on to *intrude on its internal processes.*" *Id.* (emphasis added). Thus, in at least two recent cases, the D.C. Circuit has expressly stated that remanding to an administrative agency that has unreasonably delayed final agency action is not the sole relief that may be afforded against the agency.

Finally, in support of its assertion that its status as a fiduciary "do[es] not authorize judicial intervention in the initial process by which a coordinate branch of the government decides on a plan of action and executes that action," Defs.' Prop. Findings and Conclusions at 105–06, Interior cites *Lincoln v. Vigil,* 508 U.S. 182, 195, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993). In *Lincoln,* the Indian Health Service (IHS) of the U.S. Department of Health and Human Services decided to terminate a program for treating handicapped Indian children in the Southwest, and reallocate its funding to support a nationwide effort to assist handicapped Indian children. Handicapped Indian children in the Southwest responded by seeking declaratory and injunctive relief under the APA. The Court first noted that IHS received funds in the form of lump-sum appropriations from Congress under two acts that authorized IHS to "expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians" for the "relief of distress and conservation of health" and to receive expenditures for "therapeutic and residential treatment centers" for Indians. *Id.* at 185, 113 S.Ct. 2024 (citations omitted). It then observed that

> [t]he allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion.... [A] fundamental principle of appropriations law is that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on the agency.

*Id.* at 192, 113 S.Ct. 2024 (citations and internal punctuation omitted). Because the relevant appropriations acts did not even mention the program for Indian children in the Southwest, the Court concluded that the decision to terminate the program and reallocate the money towards a nationwide program was committed to IHS's discretion, and was precluded from judicial review pursuant to 5 U.S.C. § 701(a)(2).

The Court observed that under section 701(a)(2), "review is not to be had in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 191, 113 S.Ct. 2024 (citation and

internal quotation marks omitted). It also explained:

> Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes ... And, of course, we hardly need to note that an agency's decision to ignore congressional expectations may expose it to grave political consequences.

*Id.* at 193, 113 S.Ct. 2024 (internal citation omitted).

The present case involves a program that is not funded by lump-sum appropriations to Interior, but rather is specifically mentioned in the appropriations acts that provide for its funding. This is because appropriations for the management of the IIM fund and for the completion of a historical accounting are made in accordance with the mandates of the 1994 Act. Additionally, the 1994 Act is not so narrowly drawn that this Court possesses no meaningful standard against which to judge Interior's exercise of discretion. Instead, Interior's duty to account, like its other fiduciary duties, are to be administered in accordance with the well-established body of American trust law.

In sum, Interior has failed to direct this Court to any case law that would preclude the issuance of a structural injunction in the present case on separation-of-powers grounds. The Court will therefore proceed to examine the final component of the separation-of-powers analysis that has been developed by the Supreme Court: namely, whether the authority to issue a structural injunction is appropriate in the present case because the particular substantive area of this case is one in which the judicial branch has long exercised substantive judgment or possesses special knowledge or expertise. Specifically, the Court must examine whether, in cases involving the nature and scope of a trustee's fiduciary duties, the courts have issued wide-ranging injunctive relief to compel a trustee's compliance with such duties.

## D. The Role of the Courts in Trust Cases [29]

### 1. Introduction

The addition of this component to the functional separation-of-powers analysis requires the Court to clarify the nature of the present analysis. The Court is not attempting to determine whether, under any given set of circumstances, a federal district court may issue a structural injunction against a federal agency. Such a determination is far broader than required. Rather, the Court is presently attempting to determine whether the circumstances of the *present* case, in which a federal agency is a defendant, somehow preclude the issuance of a structural injunction. In the present case, the United

---

**29.** The purpose of the following section should not be misconstrued. The Court is not making a determination of all remedies that are available in the present case. Rather, it is simply analyzing the remedial authority typically afforded to courts in trust cases, in the course of a separation-of-powers analysis, to determine whether the issuance of a structural injunction to compel a trustee's compliance with its fiduciary duties is consistent with that remedial authority. Thus, for example, although courts in trust cases routinely remove trustees, that authority is not available to the Court in the present case. Because Congress designated Interior as the trustee-delegate of the United States, only Congress may reverse that designation. On the other hand, this Court has previously determined that it does possess the authority to appoint a receiver to manage the IIM trust. *See Cobell VII*, 226 F.Supp.2d at 135–46. However, the Court considers itself to be bound by precedent to first consider the issuance of structural injunctive relief before considering the option of appointing a receiver.

States has delegated to a federal agency the responsibility to manage and administer a trust. This delegation thereby charges the federal agency with the fiduciary duties of a trustee, and therefore any legal determination of whether the agency has complied with those duties must first look to the law of trusts. Therefore, in the course of the present inquiry, the Court must look to the law of trusts to examine the remedial authority exercised by courts in trust cases, and to determine whether that remedial authority is consistent with the imposition of a structural injunction.

## 2. American Trust Law

"Just as the colonists of the thirteen original states adopted substantially entire the common law of England, so they took over with little change the English scheme of equity jurisprudence, a part of which was the system of trusts." GEORGE T. BOGERT, TRUSTS 14 (6th ed.1987). The definitive statement of the American law of trusts is to be found in the official Restatements promulgated by the American Law Institute. In 1957, the Restatement of Trusts, Second (*"Restatement, Second"*) was completed, superseding The Restatement of the American Law of Trusts, which had been published in 1935. In 2003, the first two volumes of the third Restatement of the Law of Trusts (*"Restatement, Third"*) were issued, superseding the applicable portions of the *Restatement, Second.*

The fact that the remedial tradition in the American law of trusts has been one based in equity is nowhere more clearly seen than in the *Restatement, Second,* which notes that "questions of the administration of trusts have always been regarded as of a kind which can adequately be dealt with in a suit in equity rather than in an action at law, where questions of fact would be determined by a jury and not by

the court." *Restatement, Second* § 197 cmt. b; *see also id.* § 197 (providing, with a single exception, that "the remedies of the beneficiary against the trustee are exclusively equitable"). An equitable remedy is defined as "a remedy given by a court of chancery or a court having and exercising the powers of a court of chancery." *Id.* § 197 cmt. a. *Cf. Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 154, 105 S.Ct. 3085, 87 L.Ed.2d 96 n. 10 (1985) ("Trust-law remedies are equitable in nature, and include provision of monetary damages.") (Brennan, White, Marshall, Blackmun, JJ., concurring) (citations omitted).

The equitable remedies available to a beneficiary against a trustee are listed in section 199 of the *Restatement, Second:* "The beneficiary of a trust can maintain a suit (a) to compel the trustee to perform his duties as trustee; (b) to enjoin the trustee from committing a breach of trust; (c) to compel the trustee to redress a breach of trust; (d) to appoint a receiver to take possession of the trust property and administer the trust; (e) to remove the trustee." Explaining the nature of the first three types of suit, the *Restatement, Second* provides:

> The beneficiary of a trust can maintain a suit to compel the trustee to perform his duties as trustee. It is immaterial that there is an adequate remedy at law. The beneficiary can in a proper case bring a bill to have the court declare what the duties of the trustee are and to enforce them. The beneficiary can maintain a suit to enjoin a breach of trust, if there is a reasonable likelihood that the trustee will commit such a breach. If the trustee has committed a breach of trust, the beneficiary can maintain a suit to compel the trustee to redress the breach of trust.

*Id.* § 199 cmts. a-c (internal citations omitted). As this Court has previously observed,

> "there is a long history of equitable supervision of trusts and trustees by courts, which, at the behest of beneficiaries, routinely compel trustees to perform duties, enjoin breaches of trust, compel redress of breaches of trust, remove faithless trustees, and appoint receivers to administer trust property." *First Fiduciary Corp. v. Office of Commissioner of Banks,* 43 Mass.App.Ct. 457, 459 n. 2, 684 N.E.2d 1 (1997). *See also Morrison v. Doyle,* 582 N.W.2d 237, 243 (Minn.1998) (noting that "[t]he beneficiary of a trust may maintain a suit ... to appoint a receiver to take possession of the trust property and administer the trust[.]"); *Carstens v. Central Nat'l Bank & Trust Co.,* 461 N.W.2d 331, 333 (Iowa 1990) (same); *Boyce v. Wendt,* 305 Mich. 254, 9 N.W.2d 531, 533–34 (1943) (same).

*Cobell VII,* 226 F.Supp.2d at 136. Additionally, the preeminent treatise on the law of trusts has explained that

> [t]he beneficiaries of a trust can maintain a suit in equity to compel the trustee to perform his duties as trustee.... The beneficiary of a trust ... is entitled specifically to enforce the trust, even though the subject matter of the trust is an ordinary chattel. Normally, as has been stated, the beneficiary's remedies are exclusively in equity, and even though he may have a remedy at law he is not compelled to pursue it but is entitled to relief in equity. And in equity the court will not merely give him damages, but will compel the trustee specifically to perform his duties under the trust.
>
> As has been stated, the trustee is under a duty to the beneficiaries to make an accounting with respect to his administration of the trust. *The court will specifically enforce this duty, and compel the trustee to render a proper accounting to the court, and thereupon will give such relief, if any, as the beneficiaries may be entitled to receive.* The trustee himself is entitled to have his accounts settled by the court.
>
> *Where there is doubt as to the extent or scope of the duties of the trustee, the beneficiaries can maintain a suit in equity in order to obtain the instructions of the court to the trustee as to his duties.*

3 Austin W. Scott & William F. Fratcher, the Law of Trusts § 199.1 (4th ed.1988) (emphasis added) ("*Scott on Trusts*")

Generally speaking, trust law is state law. Therefore, until relatively recently, the federal courts have had little occasion to interpret the nature and scope of trust remedies. One noteworthy exception is *Beckett v. Air Line Pilots Ass'n,* 995 F.2d 280 (D.C.Cir.1993). In *Beckett,* the parties had entered into a consent decree under which the Air Line Pilots Association was to administer a trust account for the benefit of a number of pilots. The pilots later filed a claim to enforce the consent decree, asserting that the decree had created an enforceable trust, and that the Association had administered the trust in a manner inconsistent with its duties as a trustee. The D.C. Circuit reversed the district court's award of summary judgment for the Association, holding that the court possessed subject-matter jurisdiction over the pilots' trust claim "pursuant to the well-established principle that a trial court retains jurisdiction to enforce consent decrees and settlement agreements." *Id.* at 286 (citations omitted). Turning to the question of whether the pilots could maintain a suit for specific performance of the consent decree, the D.C. Circuit first noted: "Just as an intended third party bene-

ficiary may sue to enforce a contract, it is equally fundamental that the beneficiary of a trust may maintain a suit to compel the trustee to perform his duties as trustee or to redress a breach of trust." *Id.* (citing *Restatement, Second* § 199). It then determined that "a trust was indeed created. And because appellants are beneficiaries of that trust, they may sue to enforce the duties owed to them by [the Association] as trustee." *Id.* at 287. The D.C. Circuit also determined that the Association had breached its duty of loyalty, and remanded to the district court. In sum, the D.C. Circuit recognized, as a matter of federal common law, that trust beneficiaries may maintain a suit in equity to compel the performance of a trustee's fiduciary duties.

Additionally, since at least 1989, the federal judiciary has been developing a federal common law of trusts in conjunction with the interpretation of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), which governs the administration of pension and employee benefit plans. As explained by Professor John Langbein, "Both in substance and in remedy ERISA is, *in its* most important dimension, federal trust law." John H. Langbein, *What ERISA Means by "Equitable": The Supreme Court's Trail of Error in Russell, Mertens and Great–West* (forthcoming in Columbia Law Review).[30] Rather than devise a new regulatory framework for eliminating abuse in the administration of pension and employee benefit plans, Congress instead simply adapted the well-established law of trusts by mandating that "all assets of an employee benefit plan shall be held in trust by one or more trustees." *Id.* (quoting 29 U.S.C. § 1103). In *Firestone Tire*

*& Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court honored the intent of Congress by prescribing that "courts are to develop a federal common law of rights and obligations under ERISA-regulated plans." *Id.* at 110, 109 S.Ct. 948 (citations and internal quotation marks omitted). It further stated that "[t]he extent of the duties and powers of a trustee is determined by the rules of law that are applicable to the situation, and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust *as the court may interpret them,* and not as they may be interpreted by the trustee himself or by his attorney." *Id.* at 112, 109 S.Ct. 948 (emphasis in original) (quoting 3 *Scott on Trusts* § 201); *see also Eddy v. Colonial Life Ins. Co. of Am.,* 919 F.2d 747, 750 (D.C.Cir.1990) ("Rather than explicitly enumerate all of the duties of ERISA fiduciaries, Congress invoked the common law of trusts to define the general scope of their responsibility.") (citation and internal punctuation omitted).

The federal courts responded to the Supreme Court's mandate in *Bruch* by creating a federal common law of trusts, to be drawn upon in interpreting the rights of beneficiaries of pension and employee benefit plans. They were also obliged to create a body of remedial trust law, in that ERISA authorized a plan beneficiary (1) to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan" and (2) "to enjoin any act or practice which violates any provision of . . . the terms of the plan, or to obtain

---

**30.** Professor Langbein testified during the Phase 1.5 trial that "[ERISA] is federal trust law. [One of its provisions] imposes a condition of mandatory trusteeship on all pension employee benefit plans apart from those that take the form of insurance contracts, and that brought in basically a large body of trust law into the employee benefits arena." Tr., Day 19, AM session (June 2, 2003) at 27:5–10.

other appropriate equitable relief to redress such violations" in suits against a fiduciary. 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3). Of course, if a court states only that it is determining which remedies are available under a specific provision of ERISA, that determination cannot necessarily be taken as a statement of federal trust law. On the other hand, if a federal court presiding over an ERISA case renders a determination about the requirements of trust law, including a determination about remedies available under the law of trusts, that determination should be considered to be statement of the federal common law of trusts.[31]

Regarding remedial trust law, the D.C. Circuit has explained: "Trust law contemplates the use of broad and flexible equitable remedies as means for dealing with breaches of fiduciary duty, and it imposes

---

**31.** *See, e.g., Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 156–57, 157–58, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) ("ERISA's legislative history also demonstrates beyond question that Congress intended to engraft trust-law principles onto the enforcement scheme, and a fundamental concept of trust law is that courts will give to the beneficiaries of a trust such remedies as are necessary for the protection of their interests. . . . in resolving this and other questions concerning appropriate relief under ERISA, courts should begin by ascertaining the extent to which trust and pension law as developed by state and federal courts provide for recovery by the beneficiary above and beyond the benefits that have been withheld; this is the logical first step, given that Congress intended to incorporate trust law into ERISA's equitable remedies") (Brennan, White, Marshall, and Blackmun, JJ., concurring) (citations, internal punctuation, and footnote omitted); *Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir.1985) ("We thus look to principles developed under the common law of trusts, which in large measure remain applicable under ERISA."); *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir.1978) ("In developing a law of remedies, the Congress intended the federal courts to draw on principles of traditional trust law. Traditional trust law provides for broad and flexible equitable remedies in cases involving breaches of fiduciary duty.") (internal citation omitted); *Maher v. Strachan Shipping Co.*, 817 F.Supp. 43, 45 (E.D.La.1993) ("The Supreme Court has upheld the development of a federal common law of rights and obligations under ERISA plans by federal courts. As stated by the Supreme Court, courts should adopt general principles of trust law, in developing a federal common law.") (internal citations omitted); *Emmons v. Equitable Life Assurance Society of United States*, 799 F.Supp. 1123, 1125 (D.N.M.1992) ("Analysis of legislative intent persuades the Court that a fiduciary's right to indemnification under appropriate circumstances is both implicit in ERISA and a part of the federal common law of trusts."); *Cummings by Techmeier v. Briggs & Stratton Retirement Plan*, 606 F.Supp. 659, 664 (E.D.Wis.1985) ("There exists a federal common law of trusts, and this body of law is fully applicable to actions for benefits under ERISA.") (citing *Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962)), *rev'd on other grounds*, 797 F.2d 383 (7th Cir.1986); Rodina Cave, Comment, *Simplifying the Indian Trust Responsibility*, 32 Ariz. St. L.J. 1399, 1419, 1399 (2000) (advocating the enforcement of the common law of trusts in the present litigation and observing that "[c]enturies of common law trust doctrine have shaped the federal common law of trusts.") (citation omitted); Jack F. Fuchs, *Federalizing State Law Tort and Contract Claims: The Scope of ERISA Preemption*, 39 Fed. B. News & J. 582 (1992) ("The federal common law of trusts to be developed to implement ERISA must seek to resolve the tension between the interests of plan beneficiaries and participants in obtaining quality benefits, and the interests of the plan and its fiduciaries in preserving plan funds and assets to compensate all (or at least other) beneficiaries and participants. In particular, the federal common law of trusts must provide incentives for plan fiduciaries to provide quality benefits without imposing such onerous benefits as to excessively increase administrative costs or to diminish the extent of benefits available to other participants and beneficiaries. The developing federal ERISA common law is likely to inform trust law. State courts not only will rely on federal decisions to resolve those ERISA disputes which are not removed to federal courts, they are likely to clarify the ERISA issues in terms of their own analyses of trust law.").

the obligation upon the courts to use the remedy that is most advantageous to the participants and that will most closely effectuate the purposes of the trust." *Crawford v. La Boucherie Bernard Ltd.*, 815 F.2d 117, 120 (D.C.Cir.1987) (citation omitted). In applying the remedial provisions of ERISA, the federal courts have drawn upon the traditionally wide remedial discretion afforded to courts in trust cases. For example, they have appointed receivers to manage plans, and removed fiduciaries. *See, e.g., Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir.1987) ("If the Secretary [of Labor] can prove to a court that certain trustees have acted imprudently, even if there is no monetary loss as a result of the imprudence, then the interests of ERISA are furthered by entering appropriate injunctive relief such as removing the offending trustees from their positions.") (citation omitted); *Katsaros v. Cody*, 744 F.2d 270 (2d Cir.1984) (affirming the removal of trustees of pension funds); *Marshall v. Snyder*, 572 F.2d 894 (2d Cir.1978) (affirming the appointment of a receiver to manage an employee benefit plan); *Corley v. Hecht Co.*, 530 F.Supp. 1155 (D.D.C. 1982) (removing the trustee of an employee benefit plan). The federal courts have also utilized less intrusive equitable remedies, such as the appointment of plan administrators or investment managers. *See Katsaros*, 744 F.2d at 281–83 (affirming the appointment of a plan asset manager); *Donovan v. Mazzola*, 716 F.2d 1226, 1238–39 (9th Cir.1983) (affirming the appointment of a plan investment manager).

Additionally, the federal courts have recognized that a permanent injunction is one of the remedies available to federal courts adjudicating trust cases:

> Although we have never ruled that permanent injunctions are available as a remedy under ERISA, it is self-evident that such a remedy may be appropriate where individuals participate in the kind

of egregious self-dealing proved in [*Lowen v. Tower Asset Management*, 829 F.2d 1209 (2d Cir.1987) ]. Congress intended to make the full range of equitable remedies available. ERISA's legislative history confirms that the Act's fiduciary responsibility provisions codify and make applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts. Permanent injunctions are among the remedies available under the law of trusts. To deny the power in federal courts to issue permanent injunctions would, therefore, fly in the face of both precedent, Congressional intent, and common sense.

*Beck v. Levering*, 947 F.2d 639, 641 (2d Cir.1991) (internal citations and punctuation omitted). Thus, federal courts have enjoined individuals and entities from serving as a fiduciary in any plan governed by ERISA. *See id.* at 642 (affirming the issuance of an order permanently enjoining defendants from serving as fiduciaries or service providers to any ERISA plan); *Reich v. Lancaster*, 55 F.3d 1034, 1054 (5th Cir.1995) (same); *Martin v. Feilen*, 965 F.2d 660, 673 (8th Cir.1992) (same); *Martin v. Rutledge*, 807 F.Supp. 693, 697 (N.D.Ala.1992) (same); *Whitfield v. Tomasso*, 682 F.Supp. 1287, 1306–07 (E.D.N.Y.1988) (enjoining defendants from serving as fiduciaries or service providers to any ERISA plan, either permanently or for a ten-year period).

In the present case, Interior serves as the trustee-delegate of the United States with respect to the IIM trust. Accordingly, Interior's discretion with respect to the administration of the IIM trust is more restricted than the discretion normally granted to executive agencies in the management of their own affairs. Its own former Solicitor has acknowledged that "[a] number of court decisions hold that the federal trust responsibility constitutes

a limitation upon executive authority and discretion to administer Indian property and affairs," and proceeded to cite three Supreme Court decisions and four decisions by the U.S. Court of Claims. Letter from Interior Solicitor Leo Krulitz to Assistant Attorney General James Moorman 7 (Nov. 21, 1978) (Pls.' Ex. 88).[32] Additionally, the D.C. Circuit has explained:

> The Secretary has an overriding duty to deal fairly with Indians. This duty necessarily constrains the Secretary's discretion. When faced with several policy choices, an administrator is generally allowed to select any reasonable option. Yet this is not the case when acting as a fiduciary for Indian beneficiaries[,] as stricter standards apply to federal agencies when administering Indian programs. Summarizing federal case law on fiduciary obligations owed to Indian tribes, the Tenth Circuit concluded that where the Secretary is obligated to act as a fiduciary his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary. The federal government has charged itself with moral obligations of the highest responsibility and trust in its relationships with Indians, and its conduct should therefore be judged by the most exacting fiduciary standards.

*Cobell VI,* 240 F.3d at 1099 (internal citations and punctuation omitted).

The Court therefore determines that the issuance of a structural injunction is consistent with the broad remedial authority afforded to courts in trust cases, including federal courts applying the common law of trusts in ERISA cases. It also concludes that the issuance of structural relief against a trustee is an appropriate function for the judicial branch to exercise, in that the judiciary has long exercised substantive judgment in the area of trust law, and has frequently issued broad-ranging injunctive relief to compel a breaching trustee to comply with its fiduciary duties. Put another way, making determinations as to the nature and scope of appropriate equitable relief against a trustee has been a traditional judicial function, one in which the judicial branch possesses special knowledge and expertise. It is true that the Court has not located any ERISA case involving the issuance of a structural injunction. However, given the willingness of federal courts to appoint receivers to manage ERISA plans and even to order the removal of ERISA plan trustees, the ·obvious conclusion is not that structural relief is not within the authority of federal courts applying trust law, but that the appointment of a receiver or the removal of a trustee is considered to be a more appropriate measure to remedy the widespread violation of fiduciary duties by a trustee.

Finally, it is noteworthy that one of the most frequently-cited articles on institutional reform litigation notes the continuity between the broad remedial authority that has long been available in trust cases and the remedial authority afforded courts presiding over institutional reform cases:

> The law of trusts has long recognized that the wealthy find it useful to divest

---

**32.** The cases were *United States v. Creek Nation,* 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935); *Seminole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1480, 1777 (1942); *United States v. Payne,* 264 U.S. 446, 448, 44 S.Ct. 352, 68 L.Ed. 782 (1924); *Coast Indian Community v.* *United States,* 213 Ct.Cl. 129, 550 F.2d 639 (1977); *Cheyenne–Arapaho Tribes v. United States,* 206 Ct.Cl. 340, 512 F.2d 1390 (1975); *Menominee Tribe v. United States,* 101 Ct.Cl. 10, 18–19 (1944); and *Navajo Tribe v. United States,* 176 Ct.Cl. 502, 364 F.2d 320, 322–24 (1966).

themselves—at least partially—of control of their assets even before death forces them to do so. The courts have played a significant role in supervising the management of these trust assets. Trusts rest on the assurance that courts will be willing to step in to supervise the disposition and management of property by trustees who may be tempted to divert resources to themselves. To prevent trustee improprieties, courts have developed a body of substantive law designed to force the trustee to manage the assets at least as carefully as if they were his own. Courts enforce this fiduciary duty rule by insisting that the trustee render periodic accountings, and by requiring judicial approval of certain unusual or inherently suspicious transactions. These procedures involve the courts in the administration of complex and large bodies of assets on a continuing basis, and require judicial evaluation of the loyalty of the trustee, the prudence of an investment, and the propriety of self-dealing that the trustee claims will benefit the beneficiary.... In short, it appears that the courts have been far more willing to supervise the trustees of funds than of souls.

\* \* \* \* \* \*

Courts have developed and administered, almost entirely on their own, significant bodies of remedial law requiring them to engage in continuing supervision of enterprises. Perhaps the best example of this judicially developed supervisory remedy is the law of trusts.

The beneficiary's interest in the use was a wholly unique form of ownership which the chancellor had developed from a conscientious obligation of a very personal kind. The Chancellor stood ready to enforce the duties created by a trust, including the quite common duty of establishing and faithfully running religious institutions. It can scarcely be said that a modern exercise of equitable power to correct conditions in a prison, hospital, or school is a new-fangled addition to the judicial arsenal.

Theodore Eisenberg & Stephen C. Yeazell, *The Ordinary and the Extraordinary in Institutional Litigation*, 93 HARV. L. REV. 465, 483–84, 485, 489 (1980) (footnotes and internal punctuation omitted).[33]

E. Conclusion

The stereotypical picture that comes to mind when one hears the phrase "trust fund" is a fund created by a wealthy patrician to maintain his heirs' extravagant lifestyle. However, the IIM trust fund is far removed from such images of affluence. A large portion of its beneficiaries depend on their fund disbursements in order to live at a subsistence level. For many, their disbursements represent their sole means of purchasing food for themselves and their families. *See Cobell VI*, 240 F.3d at 1097 ("Given that many plaintiffs rely upon their IIM trust accounts for their financial well-being, the injury from delay could cause irreparable harm to plaintiffs' interests as IIM trust beneficiaries. Thus it seems that the interests at stake are not merely economic interests in an adminis-

---

**33.** *See also* Sabel & Simon, *supra* ("[T]here is substantial traditional precedent for public law litigation. [Professor Abram] Chayes exaggerated the discontinuity between traditional private law adjudication and actions for structural relief. Moreover, there is obvious precedent for structural cases in the traditional public law practice of enjoining administrative officials to perform mandatory legal duties—a core feature of the 'rule of law' in the Anglo–American tradition. To be sure, such injunctions were narrower and less frequent in the past, but so was the executive activity they were designed to check. Some expansion of remedies seems necessary to give meaning to the rule-of-law principle in a context of vastly changed and expanded government activities.").

trative scheme, but personal interests in life and health.") (citation and internal punctuation omitted). The IIM beneficiaries thus embody the very definition of institutional reform plaintiffs, in that they are dependent upon a service provided exclusively by a government entity to satisfy a fundamental need. The plaintiffs in the prison reform and mental health cases sought adequate treatment by the public facilities that confined them. The plaintiffs in the school desegregation cases sought the provision of an adequate public education. *Gautreaux* and its progeny involved the provision of adequate public housing. And in the present litigation, many of the IIM beneficiaries depend on disbursements from the IIM trust fund to support their very existence.

The circumstances of the present case make it particularly appropriate that the court issue a structural injunction. One of the most controversial aspects of institutional reform litigation has been the ambiguity surrounding the source and scope of the newly-created substantive rights that courts have recognized and enforced in such litigation. Often, such rights are founded upon constitutional provisions. For example, courts in prison reform litigation usually rely upon the Cruel and Unusual Punishments clause of the Eighth Amendment as the basis for their jurisdiction, and courts overseeing desegregation cases typically look to the Equal Protection Clause of the Fourteenth Amendment. The open-ended nature of such rights has often made it difficult to fashion appropriate standards for granting relief. By contrast, in the present case, the rights sought to be enforced by plaintiffs are the traditional fiduciary duties of trust law, as affirmed and supplemented by the 1994 Act. As explained above, courts have developed a well-defined body of substantive and remedial law to govern the enforcement of such rights.

A second controversial aspect of institutional reform litigation has been the issue of federalism. The Supreme Court's institutional reform jurisprudence, especially in the area of school desegregation, frequently urges the federal courts to consider the importance of state and local control over public services. But federalism concerns are absent where, as here, the institutional defendant is a federal agency rather than a state or local entity. And, as noted above, in *Jenkins*, the Court observed that the issuance of a structural injunction against a federal agency is not only permissible, but is also less problematic than the issuance of such an injunction against a state or local entity, in that it does not raise federalism concerns.

Additionally, the issuance of a structural injunction in this case will not violate the principle of separation of powers. In the present case, the demonstrated, specific interest of the judicial branch in affording injunctive relief to the extent necessary to give effect to its substantive judgments outweighs Interior's generalized interest in exercising untethered administrative discretion regarding the management of issues over which Congress has vested it with jurisdiction. The issuance of structural relief will not result in a sustained, fundamental impairment of Interior's ability to "take Care that the laws be faithfully executed." Nor has the Court been directed to any caselaw indicating that the issuance of a structural injunction under the present circumstances will violate the separation-of-powers principle.

Moreover, the issuance of a structural injunction is appropriate in the present case because the particular substantive area of this case—the law of trusts—is one in which the judicial branch possesses special knowledge or expertise. The judiciary has long exercised substantive judgment in

this area, and has routinely issued broad-ranging injunctive relief to compel a trustee's compliance with its fiduciary duties, including permanent injunctive relief and the appointment of receivers to manage trusts.

■ The Court must stress the limited nature of its holding. The Court holds only that where the United States is the settlor of a trust, and has been adjudicated to possess the fiduciary duties of a trustee, the presiding court may issue a structural injunction against the agency to which the United States has delegated its responsibility to administer the trust, if the court deems it to be necessary to compel the trustee-delegate's performance of its fiduciary duties. Nothing in the present opinion should be construed as authorizing the issuance of a structural injunction against a federal agency under any other circumstances. It is only the extremely unusual circumstances surrounding the present case, in which Interior's discretion is unusually restricted by reason of its fiduciary status as the trustee-delegate of the United States, that compels this Court to reach the conclusion that structural injunctive relief is appropriate.

## IV. THE MANDATES OF THE D.C. CIRCUIT

The final preliminary issue to be addressed is whether the issuance of a structural injunction is inconsistent with the mandates of the two D.C. Circuit opinions issued in the present case, *Cobell VI* and *Cobell VIII*.

### A. *Cobell VI*

Ever since the February 23, 2001 decision of the D.C. Circuit in the present litigation, it has been the frequent practice of both parties to cite isolated sentences from this opinion in their respective briefs, marshaling them forth in support of their varying positions. By isolating individual phrases or sentences from their surrounding context, the parties have fostered a misleading impression of the D.C. Circuit's holding. Thus, in order to prevent any further misunderstanding of the D.C. Circuit's conclusions in *Cobell VI*, the Court will excerpt that opinion at some length.

In 1999, this Court determined that Interior and Treasury had breached their fiduciary duties to the IIM beneficiaries. It remanded to these agencies, directing them to take steps to bring them promptly into compliance with their fiduciary duties. To ensure that defendants would act with diligence to rectify their continuing breaches of trust, the Court retained jurisdiction for a five-year period, subject to enlargement. It also directed defendants to file quarterly status reports setting forth and explaining the steps they had taken to rectify these breaches and to bring themselves into compliance with their fiduciary duties. The Court concluded by noting that it had "based much of its decision today—especially the denial of more extensive prospective relief—on defendants' plans (in both substance and timing) to bring themselves into compliance with their trust duties declared today and provided for explicitly by statute." *Cobell V*, 91 F.Supp.2d at 59. It also directed that if, at some future date, "plaintiffs believe that they are entitled to further prospective relief based upon information contained in these reports or otherwise learned, they may so move at the appropriate juncture. Such a motion will then trigger this court's power of judicial review." *Id.* It then certified its decision for interlocutory review.

The D.C. Circuit affirmed. It summarized its decision in an introductory paragraph:

Appellants challenge the district court's delineation of their trust obligations and

assert that the district court exceeded its authority in ordering equitable relief for plaintiffs. We find that the district court had before it ample evidence to support its finding of ongoing material breaches of appellants' fiduciary obligations. Notwithstanding the fact that appellants have taken significant steps towards the discharge of the federal government's fiduciary obligations, appellants clearly have yet to fulfill their trust duties. The relief ordered was well within the district court's equitable powers. While we order the district court to modify the characterization of some of its findings, we generally affirm its judgment and order.

*Cobell VI*, 240 F.3d at 1086. It is noteworthy that the D.C. Circuit characterized the relief awarded as "well within the district court's equitable powers," and neither stated nor implied that, in affording such relief, this Court had reached the outer bounds of its remedial authority.

The D.C. Circuit continued:

[I]t is beyond question that the government has delayed fulfilling its trust obligations for many years. The district court specifically found that IIM trust beneficiaries have been denied their rights—in particular their right to an accounting—for decades. That Congress enacted its own remedial statute to address this unconscionable delay does not mitigate the egregious amount of time plaintiffs have waited for, as discussed below, the 1994 Act is not the source of plaintiffs' rights. Rather, it is designed to help rectify the government's longstanding failure. Given the record before it, the district court reasonably concluded that absent court intervention, discharge of the government's fiduciary obligations may yet be far off.

Appellants note that the 1994 statute provides no deadlines for the reforms at issue. Failure to provide a statutory timetable may indicate that Congress sought to leave the timing of reform to agency discretion. But the lack of a timetable does not give government officials carte blanche to ignore their legal obligations. This is particularly true where, as here, the act of outlining specific steps toward reform was enacted against a background of agency delay dating back many years.

*Id.* at 1096–97 (internal citation omitted). This passage is noteworthy in several respects. First, the D.C. Circuit recognized that "the 1994 Act is not the source of plaintiffs' rights"; rather, such rights predate the passage of the Act. Later in the opinion, the D.C. Circuit fully explained this conclusion. Second, it rejected defendants' assertion that the time frame for compliance with their fiduciary duties was committed wholly to their discretion. Third, it agreed with this Court that "absent court intervention, discharge of the government's fiduciary obligations may yet be far off." The D.C. Circuit never indicated that it considered the minimal relief awarded by this Court in 1999 to represent the outer limit of permissible court intervention to ensure the discharge of the defendants' fiduciary obligations. Indeed, it subsequently observed that "the district [court] acted well within its power to provide modest equitable relief, requiring appellants to do little more than develop plans to ensure proper discharge of their duties within a reasonable time. The district court did not exceed its powers with this order, nor with its decision to maintain jurisdiction over the case." *Id.* at 1098. The characterization of the relief ordered in 1999 as "modest equitable relief" strongly indicates that the issuance of additional, more intrusive equitable relief

was well within the bounds of this Court's authority.

The most definitive statement on the subject of this Court's remedial authority in *Cobell VI*, however, is to be found in the section entitled "Relief":

Appellants maintain that there is no basis in law for the district court to provide the relief granted in its decision, even if legal violations of appellants' fiduciary obligations occurred. Specifically, insofar as plaintiffs sought relief under the APA, the district court exceeded its power by ordering the Interior and Treasury Departments to take the specific actions toward fulfilling their fiduciary obligations. Moreover, insofar as the court's injunctive commands resemble mandamus, they are precluded given the lack of a clear, ministerial duty that could be enforced in such a fashion. Appellants' arguments are unavailing.

Federal courts have repeatedly recognized the right of Native Americans to seek relief for breaches of fiduciary obligations, including suits for monetary damages under the Tucker Act where prospective remedies would be inadequate. It is fundamental that an action for accounting is an equitable claim and that courts of equity have original jurisdiction to compel an accounting. . . .

More importantly, *the district court acted well within its broad equitable powers in ordering specific relief. If a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order any appropriate relief. As this court has concluded in other contexts, courts are presumed to possess the full range of remedial powers—legal as well as equitable—unless Congress has expressly restricted their exercise. This means that the district court has substantial ability to order that relief which*

*is necessary to cure the appellants' legal transgressions:*

The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *see also Brown v. Board of Education ("Brown II"),* 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." (footnote omitted)).

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Because the agencies involved delayed performance of their legal obligations, the court was justified in fashioning equitable relief that would ensure the vindication of plaintiffs' rights. *That this case involves decades-old Indian trust funds rather than segregated schools does not change the nature of the court's remedial powers.*

*Id.* at 1108 (emphasis added) (citations and internal punctuation omitted). In this remarkable passage, the D.C. Circuit recognized that in effecting Interior's compliance with its fiduciary duties, this Court possesses "broad equitable relief." It fur-

ther directed that this Court may order "any appropriate relief" within its "full range of remedial powers" that it deems "necessary to cure the appellants' legal transgressions." The D.C. Circuit expressly recognized that "courts are presumed to possess the full range of remedial powers—legal as well as equitable—unless Congress has expressly restricted their exercise," a principle that has been repeatedly recognized. *See, e.g., Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 66, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) ("[W]e presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise. This principle has deep roots in our jurisprudence."); *Crocker v. Piedmont Aviation,* 49 F.3d 735, 749 (D.C.Cir.1995) ("But the Supreme Court has made clear that even with respect to implied causes of action, courts are presumed to possess the full range of remedial powers—legal as well as equitable—unless Congress has expressly restricted their exercise.") (citation omitted); *SEC v. First City Fin. Corp., Ltd.,* 890 F.2d 1215, 1230 (D.C.Cir.1989) ("Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction.") (quoting *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946)).

As may be observed in its choice of citations, the D.C. Circuit included within the scope of relief available to this Court the issuance of a structural injunction. *Brown II* and *Swann* are Supreme Court decisions analyzing the nature and scope of relief that federal district courts may award in school desegregation cases. The D.C. Circuit expressly determined that the fact that this case "involves decades-old Indian trust funds rather than segregated schools does not change the nature of the court's remedial powers." As noted above,

institutional reform litigation began with the initiation of school desegregation cases, and structural injunctions are routinely awarded by district courts in such cases.

The D.C. Circuit further observed:

The level of oversight proposed by the district court may well be in excess of that countenanced in the typical delay case, but so too is the magnitude of government malfeasance and potential prejudice to the plaintiffs' class. Given the history of destruction of documents and loss of information necessary to conduct an historical accounting, the failure of the government to act could place anything approaching an adequate accounting beyond plaintiffs' reach. This fact, combined with the longstanding inability or unwillingness of government officials to discharge their fiduciary obligations, *excuse court oversight that might be excessive in an ordinary case.*

*Id.* at 1109 (emphasis added).

It is only after making such sweeping statements of this Court's remedial authority that the D.C. Circuit included the following two paragraphs under the heading "Future Proceedings":

This case is on appeal from the first of two trial phases. In its initial scheduling order of May, 5, 1998, the district court announced its intention to hold a second phase of the trial for the purpose of "correcting the accounts." In its opinion, the district court explained what this entails: "In general terms, the second phase will involve the government bringing forward its proof on IIM trust balances and then plaintiffs making exceptions to that proof." The district court also identified significant legal issues to be resolved in the second phase, such as whether relevant statutes of limitations preclude some of plaintiffs' claims, the use of statistical sampling,

and the precise scope of the certified class. Presumably, the district court plans to wait until a proper accounting can be performed, at which point it will assess appellants' compliance with their fiduciary obligations.

Although appellants object to the second phase of the trial, they do so largely on the grounds that IIM beneficiaries have no judicially enforceable right to an accounting at all—a claim with which we dispose above. Until the district court has undertaken the second phase of the trial, and specific objections to its actions or jurisdiction are brought, it is premature for this court to rule on the precise scope of the district court's planned proceedings. *Nonetheless, we expect the district court to be mindful of the limits of its jurisdiction. It remains to be seen whether in preparing to do an accounting the Department takes steps so defective that they would necessarily delay rather than accelerate the ultimate provision of an adequate accounting, and the detection of such steps would fit within the court's jurisdiction to monitor the Department's remedying of the delay; beyond that, supervision of the Department's conduct in preparing an accounting, may well be beyond the district court's jurisdiction.* Again, however, until these proceedings have begun, and specific objections are brought, these are questions we cannot address.

*Id.* at 1109–10 (emphasis added) (citations and internal punctuation omitted). In filing after filing in the present case, Interior has quoted the two underlined sentences from *Cobell VI*, or portions thereof, as though it were a phonograph needle stuck in a groove. Such filings invariably fail to include any other quotations to or citations from the remainder of the D.C. Circuit's opinion. It is as if, in Interior's collective mind, *Cobell VI* consists of only two individual sentences in the Federal Reporter.

Moreover, Interior has both overestimated and misrepresented the importance of these two sentences, which fall at the tail end of the D.C. Circuit's opinion. First, the court twice emphasized that in neither of these two sentences was it attempting to make any conclusive determination as to the scope and nature of this Court's authority to review plaintiffs' claims. Instead, the D.C. Circuit specifically observed that it would be "premature ... to rule on the precise scope of the district court's planned proceedings." Then, following its statement about what "may" lie outside the scope of this Court's jurisdiction, the D.C. Circuit again reiterated that "until these proceedings have begun, and specific objections are brought, these are questions we cannot address." Second, the statement that this Court be "mindful of the limits of its jurisdiction" comes at the very end of an opinion in which the D.C. Circuit made clear that the jurisdiction of this Court included the authority to award "any appropriate relief" within its "full range of remedial powers" that it deems "necessary to cure the appellants' legal transgressions." In other words, the D.C. Circuit was not admonishing this Court to recall that its remedial authority was somehow artificially constrained; rather, it was urging this Court to be "mindful" that, given the "broad equitable relief" at its disposal, it should proceed with careful deliberation if it were to decide to issue such relief.

In sum, nothing in *Cobell VI* is inconsistent with the issuance of a structural injunction in the present case. The Court therefore turns to the D.C. Circuit's most recent opinion in this case.

### B. *Cobell VIII*

As noted above, on July 18, 2003, the D.C. Circuit vacated the contempt sanc-

tions imposed by this Court against defendants Norton and McCaleb. It also vacated the order appointing the Special Master–Monitor, and directed this Court to enter an order granting the defendants' motion to revoke the appointment of Joseph Kieffer as Court Monitor. However, it discussed only briefly the completed Phase 1.5 trial, alluding to it in the course of rejecting Interior's argument that this Court "overstepped the bounds of judicial authority," and that relief was therefore warranted pursuant to 28 U.S.C. § 1292(a)(1). *Cobell VIII*, 334 F.3d at 1137. Specifically, the D.C. Circuit explained:

> The Contempt Order compels the Department only to prepare for the Phase 1.5 proceedings by making certain filings with the court. As such, we think it more akin to an order relating only to the conduct or progress of litigation than to an injunction.

> The Department also points to the district court's statement that it will order new relief following the Phase 1.5 trial rather than simply remanding the matter back to the agency as evidence that the court intends to take over the management of trust reform. Such a claim is premature. To be sure, the district court stated it "has determined that it will grant further injunctive relief," specifically, "a structural injunction,"—presumably upon completion of the Phase 1.5 trial. Any such injunction, once issued, would be appealable under § 1292(a)(1). But no such injunction has yet issued. At worst, the district court has threatened to take action that, according to the Department, would violate the separation of powers. Until the district court takes such action, however, we are without power under § 1292(a)(1) to review its decisions.

> Anticipating that the court might lack jurisdiction to hear the present appeal, the Department asks us in the alternative to issue a writ of mandamus providing equivalent relief. But we may not do that, either. The Department's challenge does not meet the criteria for the writ; in particular, the Department has not shown that an appeal from the district court's eventual entry of an injunction, if and when that occurs, would not provide it with adequate relief.

*Id.* at 1138 (internal citations and punctuation omitted).

Thus, while it acknowledged the possibility that the Phase 1.5 trial might conclude with the issuance of a structural injunction, the D.C. Circuit said nothing about the propriety or impropriety of such relief. Instead, the court simply observed that, if such an injunction were issued, it would be appealable under section 1292(a)(1). The Court therefore concludes that nothing in *Cobell VIII* is inconsistent with the issuance of a structural injunction in this litigation.

## C. The Nature and Scope of the Court's Review

Of course, having determined that this Court possesses the authority to enter structural injunctive relief in the present case does not resolve the issue of whether such relief is warranted. The Court must analyze Interior's accounting plan to determine whether, if implemented, it would satisfy Interior's duty to account to the IIM trust beneficiaries.

It must be clearly stated at the outset that the Court's approval of Interior's Plan, or of any portion thereof, does not mean that the Court is bound to approve the ultimate accounting that will be provided. The Court's approval is limited to the Plan, which merely sets forth the framework by which the accounting shall be provided. After the accounting has taken

place, and any objections are made, final judicial review of the accounting will be available in the Phase II trial.

■ Applying the Supreme Court's decisions in *Brown II* and *Lewis v. Casey*, the Court has concluded that an institutional defendant must be afforded the initial opportunity to present a plan to the presiding court to satisfy its obligations to the plaintiff class. The court should accept the defendant's plan unless it concludes that the provisions of the plan, if implemented, will not satisfy the legal obligations to the plaintiffs that were determined in the liability phase of the case. *See Cockrum v. Califano*, 475 F.Supp. 1222, 1240 (D.D.C.1979) (ordering defendants "to submit a plan designed in good faith as an operational (not an advocate's) device to reduce the time for decisionmaking and ultimately to permit all decisions to be made within a reasonable time," and explaining that defendant HEW "should have the opportunity of first proposing a remedy to the Court which can then determine whether that plan meets HEW's legal responsibilities to plaintiffs."). If the court does make such a conclusion, it may decide to modify the institutional defendant's plan, adopt a plan submitted by another entity, or formulate a plan of its own that will satisfy the defendant's liability. Although the plan devised by the institutional defendant is entitled to considerable weight, in that the defendant will be the entity responsible for implementing the decision of the court, the court should reject the institutional defendant's plan if it plainly appears to the court that the plan will not satisfy the defendant's legal obligation to the plaintiff class.

It will thus be necessary to state precisely the duty owed by Interior to plaintiffs, as it relates to the performance of an historical accounting. In *Cobell VI*, the D.C. Circuit explicated the nature of this duty under the heading "Duty to Account":

Holding that appellants' fiduciary duties predate the 1994 Act does not dispose of all their claims. Having determined the source of appellants' obligations, we must now consider what those duties entail, at least with respect to the claims at hand. Specifically, we must consider the nature and extent of the fiduciary duty to account appellants owe to IIM trust beneficiaries.

Appellants' challenge focuses on the district court's conclusion that the IIM trust beneficiaries are entitled to a complete historical accounting of their trust accounts. The government maintains that no such right is conferred by the 1994 Act. Rather, the Act delegates responsibility for determining the nature and scope of an accounting to the Interior Department. The accounting required by Section 102 of the Act is merely a prospective right and, according to appellants, "does not speak to the extent to which the Secretary must inquire into the correctness of past transactions." While appellants concede that "some type of review of past transactions may indeed be necessary to accurately state opening balances," this does not mean that the plaintiffs have a judicially enforceable right to a complete historical accounting. Even were the plaintiffs entitled to such an accounting, appellants contend that the Interior Department, and not the court, would have the authority to determine the nature and scope of the accounting.

Contrary to appellants' claims, Section 102 of the 1994 Act makes clear that the Interior Secretary owes IIM trust beneficiaries an accounting for "*all*" funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24,

1938." 25 U.S.C. § 4011(a) (emphasis added). "All funds" means *all funds*, irrespective of when they were deposited (or at least so long as they were deposited after the Act of June 24, 1938). Therefore, the 1994 Act reaffirms the government's preexisting fiduciary duty to perform a complete historical accounting of trust fund assets. . . .

[The 1994 Act] supports plaintiffs' claims, as it requires the [Special Trustee] to "ensure" that BIA "provides the account holders, with a fair and accurate accounting of all trust accounts." *Id.* § 4043(b)(2)(A) (emphasis added). Appellants never explain how one can give a *fair* and *accurate* accounting of *all* accounts without first reconciling the accounts, taking into account past deposits, withdrawals, and accruals. Indeed, the government's own expert acknowledged that one could not determine an accurate account balance without confirming historical account balances. . . .

Not only does the 1994 Act plainly reaffirm the government's preexisting duty to provide an accounting to IIM trust beneficiaries, but it is plain that such an obligation inheres in the trust relationship itself. The obligation of a trustee to provide an accounting is a fundamental principle governing the subject of trust administration.

The 1994 Act requires that the Interior Department perform an "adequate" accounting. This indicates that the accounting must be sufficient to serve the purposes for which a trust accounting is typically conducted. By this standard, the district court's conclusion that the management of a trust and rendering of an adequate accounting requires the locating and retention of records, operational computer systems, and adequate staffing was, in plaintiffs' words, "self-evident." Anything less would produce an inadequate accounting.

This conclusion is reinforced by basic common law trust principles. It is black-letter trust law that an accounting necessarily requires a full disclosure and description of each item of property constituting the corpus of the trust at its inception. Under traditional equitable trust principles, the trustee's report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out.

Appellants maintain that even if an accounting is required, the district court overstepped its bounds by defining the nature of the accounting required. This argument both misrepresents the district court's opinion and misconstrues the relevant trust law principles. The district court made clear that it was not ruling upon what specific form of accounting, if any, is required by the 1994 Act or the government's preexisting fiduciary obligation. Rather, it noted that an accounting is, in fact, required, and that such an accounting must be of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited. The district court explicitly left open the choice of how the accounting would be conducted, and whether certain accounting methods, such as statistical sampling or something else, would be appropriate. Such decisions are properly left in the hands of administrative agencies.

Claiming the role of administrator, however, does not absolve the government of its enforceable obligations to the IIM trust beneficiaries. As noted above, appellants may not escape from their fiduciary obligations by appealing to their roles as administrators of a federal program. In those capacities, they are trustee delegates of the federal government who owe substantial fiduciary

duties to IIM trust beneficiaries. If the Secretary is obligated to act as a fiduciary then his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary.

Cobell VI, 240 F.3d at 1102–04 (emphasis in original) (internal citations and quotation marks omitted).

Unsurprisingly, Interior has repeatedly cited certain sentences from the penultimate paragraph in this excerpt, setting them forth as an alleged demonstration that the nature and scope of the historical accounting is committed entirely to its discretion. In so doing, it has misstated the D.C. Circuit's holding. The D.C. Circuit provided only that the initial decision "of how the accounting would be conducted, and whether certain accounting methods, such as statistical sampling or something else, would be appropriate" was "properly left in the hands of administrative agencies." In other words, the D.C. Circuit found that Interior retains discretion, in the initial instance, to select the particular methods it intends to employ in conducting an historical accounting. The D.C. Circuit did not conclude, however, that Interior possesses the authority to determine whether its proposed historical accounting complies with the provisions of the 1994 Act or with "the government's preexisting fiduciary duty to perform a complete historical accounting of trust fund assets." Indeed, it is "emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Therefore, in the words of the D.C. Circuit, it is the task of this Court to determine, inter alia, whether Interior's Plan will provide a "fair and accurate accounting of all trust accounts," an accounting for "all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938," an "adequate" accounting, "sufficient to serve the purposes for which a trust accounting is typically conducted," one that "contain[s] sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out." It follows that if the Court determines that the initial selection of any particular method by Interior would result in the performance of an accounting that does not comport with these standards, it may reject the use of such a method as inconsistent with discharging Interior's duty to account.

Nor is the task of the Court limited to the determination of whether Interior's Plan comports with the specific provisions of the 1994 Act. The D.C. Circuit made clear that Interior's duty to account is not limited by the specific requirements contained in the 1994 Act:

[T]he government is incorrect to the extent that it assumes that the 1994 Act forms the basis for its fiduciary obligations. The 1994 Act did not create these obligations any more than it created the IIM trust accounts. As noted above, the 1994 Act was a remedial statute designed to ensure more diligent fulfillment of the government's obligations. It recognized and reaffirmed what should be beyond dispute—that the government has longstanding and substantial trust obligations to Indians, particularly to IIM trust beneficiaries, not the least of which is a duty to account.

\*　　\*　　\*　　\*　　\*　　\*

The fundamental problem with appellants' claims is the premise that their duties are solely defined by the 1994 Act. The Indian Trust Fund Management Reform Act reaffirmed and clari-

fied preexisting duties; it did not create them. It further sought to remedy the government's long-standing failure to discharge its trust obligations; it did not define and limit the extent of appellants' obligations. While appellants are right to quibble with some of the district court's specific findings, the premise upon which much of their appeal rests is unsustainable.

The trust nature of the federal government's IIM responsibilities was recognized long before passage of the 1994 Act. As early as 1831, the Supreme Court recognized that the relationship between Indians and the federal government was like "that of a ward to his guardian." Half a century later, in upholding a statute placing certain crimes between Indians under federal jurisdiction, the Court again noted that "Indian tribes are the wards of the nation" and reaffirmed that the federal government owes Indians a "duty of protection." The fiduciary nature of the government's duty was made explicit in *Seminole Nation v. United States,* [316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942), in which] the Court applied the "most exacting fiduciary standards" of the common law in assessing the government's discharge of its duties. And in [*United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II*"),] the Court reiterated the existence of a "general trust relationship" which imposes "distinctive obligation[s]" in addition to those established by statute.

Enactment of the Indian Trust Fund Management Reform Act in 1994 did not alter the nature or scope of the fiduciary duties owed by the government to IIM trust beneficiaries. Rather, by its very terms the 1994 Act identified a portion of the government's specific obligations and created additional means to ensure

that the obligations would be carried out. Indeed, the 1994 Act explicitly reaffirmed the Interior Secretary's obligation to fulfill the "trust responsibilities of the United States." From this express language, we must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary.

Section 101 of the 1994 Act states that the Interior Secretary's "proper discharge of the trust responsibilities *shall include (but are not limited to )*" eight enumerated actions (emphasis added). In other words, the government has other trust responsibilities not enumerated in the 1994 Act. Moreover, applicable canons of statutory construction counsel *against* interpreting a statute creating a new remedy to eliminate prior remedies and *in favor* of construing a statute affecting Indians in a manner favorable to Indians.

Section 101 of the 1994 Act does not *create* "trust responsibilities of the United States." Rather it lists some of the means through which the Secretary shall discharge these preexisting duties. For instance, the first listed duty is "[p]roviding adequate systems for accounting for and reporting trust fund balances." This would not be necessary to discharge the government's trust responsibilities were not the government *already* obliged to account for and report trust fund balances. Rather than exhaust the list of duties owed by the federal government to IIM trust beneficiaries, the 1994 Act clarified and augmented aspects of the government's preexisting obligations to facilitate their fulfillment.

This view of the federal government's fiduciary duties is supported by *Mitchell II* which held that "a fiduciary relation-

ship necessarily arises when the government assumes such elaborate control over ... property belonging to Indians"—in particular where, as here, "[a]ll of the necessary elements of a common-law trust are present." The general "contours" of the government's obligations may be defined by statute, but the interstices must be filled in through reference to general trust law. While *Mitchell II* involved a claim for damages, nothing in that decision or other Indian cases would imply that appellants are not entitled to declaratory or injunctive relief. Such remedies are the traditional ones for violations of trust duties. *Cobell VI,* 240 F.3d at 1098, 1100–01 (emphasis in original) (internal citations and punctuation omitted).

Because this Court "must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary," the question arises whether Interior possesses the traditional fiduciary duty to account. The *Restatement, Second* provides that "[t]he trustee is under a duty to the beneficiary to keep and render clear and accurate accounts with respect to the administration of the trust." *Restatement, Second* § 172 (1957). The comments to section 172 provide a fuller explanation of the nature and scope of this duty:

a. *Duty to keep accounts.* The trustee is under a duty to keep accounts showing in detail the nature and amount of the trust property and the administration thereof.

b. *Effect of failure to keep accounts.* If the trustee fails to keep proper accounts, he is liable for any loss or expense resulting from his failure to keep proper accounts. The burden of

proof is upon the trustee to show that he is entitled to the credits he claims, and his failure to keep proper accounts and vouchers may result in his failure to establish the credits he claims.

c. *Duty to render accounts.* The beneficiary may by a proper proceeding compel the trustee to render to the proper court an account of the administration of the trust.

*Id.* § 172 cmts. a–c; *see also* 2A *Scott on Trusts* § 172, at 452 ("The term 'duty to account' may have any one of three different meanings: (1) a duty to keep records; (2) a duty to report to the beneficiaries or to a court the course of administration of the trust; (3) a duty to pay amounts that the trustee should pay to the beneficiaries. Ordinarily a trustee has all three of these duties.").

As explained at length in the companion memorandum opinion issued this date, Interior has failed to demonstrate to this Court that Congress has unequivocally expressed an intent not to impose upon Interior, as the trustee-delegate of the United States, this traditional fiduciary duty to account. Accordingly, this Court holds that the United States, as the trustee of the IIM trust fund, possesses the traditional fiduciary duty to account, as defined by the *Restatement of Trusts, Second;* and that the United States has delegated this duty to the Interior Department, as the trustee-delegate of the IIM trust fund.[34] To the extent that any specific provision of the 1994 Act *actually conflicts* with the traditional fiduciary duty to account, as defined at common law, such a provision would supersede. However, to the extent that the 1994 Act is silent as to Interior's duty to account, or its provisions

---

**34.** Of course, portions of the forthcoming volumes of the third *Restatement of the Law of* *Trusts* will supersede the applicable portions of section 172 of the *Restatement, Second.*

do not actually conflict with the common-law duty to account, "the interstices [of the Act] must be filled in through reference to general trust law."

Put simply, it is the task of Interior to make the initial selection of the particular methods it plans to employ in conducting an historical accounting. It is the task of the Court to determine whether the accounting plan comports with both the specific provisions of the 1994 Act and with "the government's preexisting fiduciary duty to perform a complete historical accounting of trust fund assets." Such a determination may include a conclusion that the selection of a particular method, in and of itself, that Interior plans to employ in its performance of an historical accounting will result in an accounting that does not comport with the 1994 Act or with Interior's preexisting fiduciary duties. Such a conclusion is tantamount to a determination that the use of such a method will necessarily delay, rather than accelerate, the performance of an adequate accounting. In this context, the D.C. Circuit has pointed out that the Interior Secretary has an overriding duty to deal fairly with Indians. This duty necessarily constrains the Secretary's discretion. When faced with several policy choices, an administrator is generally allowed to select any reasonable option. Yet this is not the case when acting as a fiduciary for Indian beneficiaries as stricter standards apply to federal agencies when administering Indian programs. Summarizing federal case law on fiduciary obligations owed to Indian tribes, the Tenth Circuit concluded that where "the Secretary is obligated to act as a fiduciary ... his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary." The federal government has charged itself with mor-

al obligations of the highest responsibility and trust in its relationships with Indians, and its conduct should therefore be judged by the most exacting fiduciary standards.

*Cobell VI,* 240 F.3d at 1099 (internal citations and quotation marks omitted). Thus, it is emphatically the province of this Court, and not Interior, to judge whether its accounting plan, if implemented, would satisfy "the most exacting fiduciary standards" required of a trustee.

The Court now turns to Interior's Accounting Plan to determine whether, if implemented, it will satisfy "the government's preexisting fiduciary duty to perform a complete historical accounting of trust fund assets," as reaffirmed by the specific requirements of the 1994 Act relating to Interior's duty to account.

## V. THE PLANS

### A. An Overview of Interior's Accounting Plan

#### 1. Introduction

It will be useful to analyze the accounting plan proposed by Interior as taking place in a series of stages. Any formal accounting of a trust conducted by a trustee must include at least four basic processes. First is the collection process, which entails the collection of all documents and records that must be analyzed in order to prepare the accounting. Second is the accounting process proper. In this stage, the trustee analyzes the documents and records it has collected. Utilizing the information contained in such documents, the trustee creates a detailed report describing the trustee's conduct during the relevant time period, including a description of each item of property within the trust corpus, all items of property received into or disbursed from the

trust, all income earned by the trust, and all expenses paid by the trust. This report is the "accounting statement." Third is the reporting process, which entails the delivery of the accounting statement to the beneficiaries of the trust. These three processes occur sequentially. However, there is also a fourth process that occurs simultaneously with the other three: the quality control process. During the collection process, the quality control process consists of measures taken by the trustee to ensure that it is collecting all documents and records necessary to perform an accounting, and that the information contained in the documents and records it collects are reliable and accurate. During the accounting process, the quality control process consists of measures taken by the trustee to ensure that the accounting statement it prepares accurately reflects all of the relevant information contained in the documents and records it has collected. Finally, during the reporting process, the quality control process consists of measures taken by the trustee to ensure that all beneficiaries of the trust receive the accounting statement prepared by the trustee, and that they are furnished with all the information they need to make sense of the statement.

Although Interior's Accounting Plan, as submitted to the Court, is not organized according to this scheme, the Accounting Standards Manual it has prepared does utilize this scheme.[35] Accordingly, the Court will present a brief overview of the Plan employing this four-part analytical scheme. Following this presentation, the Court will critically analyze Interior's Accounting Plan in some detail.

## 2. The Collection Process

The collection process consists of two steps. First, Interior proposes to establish an index of the trust records within its possession or control. Second, Interior proposes to fill "gaps" in its records by requesting trust records from third parties.

### a. Indexing of Trust Records

Interior estimates that the federal government holds approximately 195,000 boxes or containers of Indian trust records, containing an estimated 300 to 500 million pages. Interior's Accounting Plan at app. E–2 (Defs.' Ex. 55). However, Interior acknowledges that the existing inventories and indexes of the trust records are neither consistently detailed nor accurate enough to permit these records to be easily searched. The indexing approach proposed by Interior consists of creating an electronic database for the trust records, "much like transforming a traditional library catalog card index for books into an electronic reference database." *Id.* Interior has engaged the firm of Labat–Anderson, Inc. to index the approximately 93,000 boxes of records contained in government facilities in Albuquerque and Lee's Summit, Missouri. It estimates that the indexing project will be completed by fiscal year 2004 (which ends on September 30, 2004).

### b. Collection of Missing Trust Records from Third Parties

Interior acknowledges that there may be gaps in the trust records that must be

---

**35.** *See* Accounting Standards Manual at III-i ("The Historical Account Reconciliation process involves three principal activities: (1) *document collection, identification and indexing,* (2) accounting for transactions, and (3) reporting to IIM account holders"), III-ii (presenting an "Accounting Process Overview" divided into three steps, "Document Collection," "Accounting Process," and "Quality Control and Reporting.") (Defs.' Ex. 59).

filled prior to undertaking a full accounting. It proposes to seek records from the IIM beneficiaries themselves and from third parties such as oil and timber companies. With respect to the former, Interior proposes, with the Court's permission, to distribute a mass mailing to the IIM beneficiaries requesting information about trust records in their possession. With respect to the latter, Interior has published a Federal Register notice and distributed a mass mailing aimed at energy companies requesting that any parties who possess IIM trust records contact the Interior Department. Interior has also engaged private contractors and consultants, including professional historians, to try to identify potential sources of Indian trust records.

### c. Compilation of Transaction Histories

After the collection process has been completed, Interior proposes to create an electronic account transaction history for transactions occurring in the Paper Records Era (1887–1985). As for the Electronic Records Era (1985–2000), Interior proposes to compile another electronic account transaction history using data retrieved from two Interior computer systems: the Integrated Records Management System ("IRMS") and the Trust Funds Accounting System ("TFAS").

### 3. The Accounting Process

### a. The Three Categories of Accounts

In its Plan, Interior states that it will "conduct a historical accounting of all IIM accounts that were open as of December 31, 2000, and all IIM accounts that were open as of October 25, 1994, or opened thereafter, but closed as of December 31, 2000." *Id.* at III–1. For these accounts,

Interior plans to provide an account transaction history dating back to June 24, 1938 (the date the Indian Reorganization Act was passed) or the inception date of the account, whichever date is later. If an account was opened before June 24, 1938, the balance on June 24, 1938 will be considered to be the opening balance of the account.

Interior has estimated that, as of December 31, 2000, the IIM trust fund contains over 257,000 accounts with an aggregate balance of over $416 million. It has identified and defined three distinct types of accounts existing within the IIM trust fund: [36]

(1) *Land–Based Accounts*. These accounts were established to receive revenues derived from the approximately 11 million acres held in trust by the United States for individual Indians.

(2) *Special Deposit Accounts ("SDAs")*. These accounts were initially intended to be temporary accounts to hold funds that could not be immediately credited to the proper IIM trust account holder or other owner of the funds. However, as Interior concedes, "[f]unds held in SDAs have not always been distributed in a timely fashion, nor have funds always been distributed with the interest earned while on deposit in the SDA." *Id.* at III–15.

(3) *Judgment and Per Capita Accounts*. These accounts were established for IIM beneficiaries to receive funds from tribal distributions of litigation settlements and tribal revenues, respectively. During this litigation, these accounts have been described as "the low-hanging fruit" because, in

---

**36.** A fourth type of account in the IIM trust fund—Other Administrative Accounts—are described by Interior as "used for internal operations." *Id.* at III–1. Interior's Accounting Plan will not account for these funds.

contrast to the other two types of accounts, they are "usually established from a common source and have an identical initial balance," making it relatively easy to account for the funds they hold. *Id.* at III–1.

The "low-hanging fruit," the judgment and per capita accounts, are most easily dealt with. Interior's Plan represents that its accounting for these accounts will be completed in fiscal year 2004 (which ends on September 30, 2004), at an estimated cost of $2.5 million. Interior also estimates that all SDAs will be accounted for (and, presumably, closed) in the early part of fiscal year 2007 (which ends on September 30, 2007). It also estimates that the cost of this portion of the accounting will be approximately $27 million. *Id.*

As stated above, Interior estimates that, as of December 31, 2000, the trust fund contained approximately 194,000 land-based accounts containing an aggregate balance of about $198 million, or about 48% of the total aggregate balance. Interior estimates that the process of ascertaining values for the transactions in the land-based accounts will take place in two stages. With respect to the Electronic Records Era (1985–2000), the process is expected to be completed late in fiscal year 2005 (which ends on September 30, 2005). With respect to the Paper Records Era, the process is expected to be completed in fiscal year 2006 (which ends on September 30, 2006). This portion of the accounting is estimated to cost $200 million. *Id.* at III–14.

b. Verification of Transactions

Of course, when performing an accounting, it does not suffice simply to produce a history of transactions—a trustee must provide adequate supporting documentation to demonstrate that each recorded transaction did, in fact, take place. Interi-

or has provided the following summary of the verification process:

The verification process for each transaction examined involves reconciling the amount of the recorded transaction to both supporting financial documents and ownership information. Interior intends to trace each collection transaction back to the original source of the revenue, usually a lease or contract. At the point of collection, the revenue is a gross payment that must be allocated to the IIM accounts. To reconcile an individual transaction, the lease or contract would be examined to determine the allotment or allotments related to the payment. The ownership interests in the allotment would then be used as the basis for verifying that the transaction under review was correctly divided and properly allocated to the IIM account.

*Id.* at III–9.

For special deposit accounts, and judgment and per capita accounts, Interior represents that it will employ a transaction-by-transaction accounting; in other words, it plans to verify each individual transaction within these accounts by reconciling each transaction with supporting financial documents and ownership information. Interior has developed an Accounting Standards Manual that identifies the types of supporting documentation that will be considered adequate to support the existence of a given transaction. Additionally, if supporting documentation is missing with respect to a transaction occurring on a periodic basis (e.g., a monthly lease payment), Interior indicates that it might try to identify similar transactions occurring within the period, identify supporting documentation for those transactions, and then project the anticipated amount of the missing transaction. *Id.* at III–13.

However, for the land-based accounts, Interior proposes to undertake a transac-

tion-by-transaction accounting only for transactions with a value of $5,000 or more. As for all remaining transactions in the land-based accounts, Interior plans to rely upon statistical sampling to verify these transactions. Although the number of transactions with a value of less than $5,000 during the Paper Records Era is not known, Interior estimates that during the Electronic Records Era, approximately 26.4 million transactions with a value of less than $5,000 were posted to the IIM trust fund. *Id.* at III–12. This represents 99% of the total estimated number of transactions—approximately 26.5 million— that were posted during that period. *Id.*

### 4. The Reporting Process

After the completion of the collection and accounting processes, Interior proposes to provide each IIM account holder with a statement of account for the period for which the accounting was performed. This statement of account will include "an opening balance, the transaction history of income or receipts and disbursements and balance and ending balance, along with explanatory materials of what the process was all about and any findings that [Interior possesses that are] related to the verification process." Tr., Day 21, AM session (June 4, 2003), at 20:7–11 (testimony of James Cason).[37] Also, following the completion of the collection and accounting processes, Interior intends to provide each IIM account holder ("with information regarding [his or her] land assets as of December 31, 2000)."[38] Interior's Account-

ing Plan at 2. At some unspecified future date, Interior also "intends to provide a listing of trust assets along with a report on the management of the funds generated from those assets and from other sources with each quarterly statement." *Id.*

### 5. The Quality Control Process

#### a. Tests of the IIM Trust Systems

Interior's Accounting Plan proposes to conduct a number of tests designed to ascertain the extent to which the information contained within the management system of the IIM trust fund can be relied upon as the basis to conduct an accounting of the IIM trust fund. Interior represents that the purpose of these tests is to determine whether (1) a significant amount of data is missing in its electronic systems; (2) accounts or balances were lost or inappropriately "dropped" from the system during conversions from paper records into the IRMS system, or from the IRMS system into the TFAS system; (3) Interior accurately calculated interest for the IIM accounts; (4) the monies collected by Interior were actually deposited into the IIM trust fund; and (5) Interior's land ownership records are accurate. *Id.* at III–18. Interior estimates that the cost of these tests will be approximately $25 million, and estimates they will be completed by fiscal year 2006 (which ends on September 30, 2006).

#### b. Other Quality Control Measures

Interior also represents that it is implementing quality control checks at each

---

**37.** *Cf. id.* at 21:16–20, 23–24 ("The statement of account is designed to show the opening balance, transaction history and ending balance on an individual beneficiary's account, along with any findings that we have of errors identified through the verification process. [The purpose of reporting findings of errors is] basically to fully inform the beneficiaries of our review of their accounts and any errors that we found.") (testimony of James Cason).

**38.** The nature of this information was somewhat clarified during the trial. *See id.* at 22:2–5 ("In the plan, what the Department plans to do, when it sends a statement regarding the status of the IIM funds, it would also send a statement of land ownership as of December 31, 2000.") (testimony of James Cason).

phase of the historical accounting process. Interior's Plan includes an appendix containing a brief description of five categories of quality control checks: (1) a basic approach to quality, (2) an overall quality check process, (3) record collection / record imaging, (4) accounting results, and (5) information systems. *Id.* at app. C. Interior's Plan does not include a cost estimate of these checks.

B. Adequacies and Deficiencies of Interior's Accounting Plan

1. The Collection Process

Plaintiffs have challenged Interior's Accounting Plan, alleging that the extant IIM trust records are insufficient to form the basis of an accounting. The Court must therefore examine Interior's representations as to the state of existing records to determine whether, in fact, such records will suffice as the foundation for an accounting.

a. The Availability of Adequate Records

As noted above, Interior's Office of Trust Records (OTR) has estimated that the federal government presently holds approximately 195,000 boxes or containers of Indian trust records. The estimated breakdown of these records is as follows: 64,000 boxes or containers located in the National Archives in Washington, D.C.; 51,000 located at OTR facilities in Albuquerque; 42,000 at the Federal Records Center in Lee's Summit, Missouri; 20,000 at the General Service Administration's facility in Lanham, Maryland; and 18,000 at storage facilities maintained by the Treasury Department and the General Accounting Office.

During the Phase 1.5 trial, Interior presented the testimony of two historians who concurred with its assessment that approximately 195,000 boxes or containers of Indian trust records were held by the government.[39] One historian, Dr. Edward

39. In response to defense counsel's question as to how Interior's Office of Historical Trust Accounting (OHTA) had arrived at the estimate of 195,000 boxes, Dr. Edward Angel testified:

They looked at various record centers for the very things I have been describing for the last few minutes, and made an estimate based on volume of documentation.

Q. Have you had a chance to satisfy yourself about how they calculated that figure to come up with your own sense of whether or not that is a fairly good estimate or not?

A. Actually, I did it independently. Actually, I shouldn't say I did it independently. We sat down with Historical Research Associates at one point, a member of HRA, and we came up in the same ballpark, roughly, just using finding aids and attempting to figure these things out.

Q. Then would it be fair for us to understand that in your estimation this is a fairly reasonable estimate of the volume of records that may be available out there for use?

A. Fairly reasonable, yes.

Tr., Day 27, PM session (June 12, 2003), at 63:20—64:10. Later, historian Alan Newell testified:

I guess I buy into [the estimate of 195,000 boxes] to some degree, because we helped in preparing that. We worked with OHTA people, who have a lot of experience also working in some of these records, a couple of individuals, particularly, and with Morgan, Angel. And we came up with the best estimate that we could at the time.

So I think it is a fairly good estimate. When you say boxes and you start—I don't know what they use for their multiplier on the pages out of those, but I think that some of those boxes are probably not full banker boxes. They are what we call archival boxes, which are smaller, longer, and there is generally about three of those to a banker's box. So pages may be a little overstated, the page counts, there, but when you are dealing with millions, I mean it is certainly within the ballpark.... I think it is probably overinclusive of records that probably are not germane to this issue.

Angel, reported that his firm "had found that documents relevant to an accounting of individual Indian moneys have been lost or destroyed." Expert Report of Edward Angel (Defs.' Ex. 60) at 45.[40] But Angel testified at trial that the loss or destruction of these records does not, by itself, preclude the completion of an accounting:

Quite often, and I mentioned this briefly earlier in my testimony, one document will spawn subsidiary documents. That is to say that maybe a lease is missing, but maybe there are documents that are spawned by that lease for the collection of money, for example, that will give us information regarding that lease.

Of course leases are typically made in triplicate by the Bureau of Indian Affairs, too, so that is a bit of a help. But the issue is that quite often documents are made in duplicates, and quite often documents spawn other documents.

I just want to make myself crystal clear here. I am not trying to downplay or ignore the volume of records that have been destroyed, and believe me, I think I know as well as anyone some of the inability we face to precisely identify, or to identify precisely what has been destroyed or disposed of.

But also, this is not an unusual problem. This is history. This is a part of history.

Tr., Day 30, PM session (June 18, 2003), at 121:9–14, 122:20–22.

**40.** A number of reasons supported this finding: "Inadequate storage facilities at government agencies handling Indian records have been a continuing problem since the nineteenth century. Additionally, there were many instances of Federal records being destroyed in fires during the nineteenth and twentieth centuries. It is unclear whether any Indian trust fund records were destroyed in those fires." *Id.* at 20. Additionally, in 1889, Congress passed "An Act to Authorize and Provide for the Disposition of Useless Papers," which resulted in the destruction of records relating to IIM transactions; howev-

Tr., Day 27, PM session (June 12, 2003) at 66:19—67:11. While acknowledging that he "[could not] speak as an accountant, and [did] not intend to speak as an accountant," Angel nevertheless testified that "we have located a great many documents that would be useful to a historical accounting." Tr., Day 29, PM session (June 17, 2003) at 31:22–23, 10:1–3.

In his expert report, Angel identified a number of different trust-related records he had found while reviewing BIA records at the National Archives in Washington, D.C., regional branches of the National Archives, and various Federal Records Centers, including

IIM ledgers; leases; audits; reports on timber; grazing, oil and gas, mining, and other natural resources on Indian lands; reports on the banking and investment of individual Indian moneys; vouchers; bills of collection, annuity and per capita payment records, and other financial documents from the nineteenth and twentieth centuries that could be used in an historical accounting.

Expert Report of Edward Angel at 46. Similar types of documents were located at the Office of Trust Records facility in Albuquerque and the GSA facility in Lanham, Maryland.[41] The Court would cer-

er, some of the records destroyed were described as duplicates or copies. *Id.* at 20–21.

**41.** At the Albuquerque facility, Angel and members of his firm located "IIM ledgers; IIM posting and control records; leases; investment reports; per capita payment data; journal vouchers, bills of collections, deposit tickets and other financial records; contracts; audit reports; savings bond transactions; disbursement data; interest posting data; royalty reports; and other documents that could be used in an historical accounting to individual Indian account holders." *Id.* at 47. At the Lanham, Maryland facility, Angel reported finding "leases, finance and trust records, au-

tainly have preferred it if Angel had presented some indication of the *quantity* of trust-related records that he had located. Nevertheless, his testimony does indicate that a significant quantity of records that would be relevant to an accounting of the IIM trust funds exist in federal government facilities.

Angel's testimony is corroborated by the testimony of Alan Newell, a professional historian with the firm of Historical Research Associates, Inc. ("HRA"), located in Missoula, Montana, which has been retained by defendants' litigation team:

> The Records of the Bureau of Indian Affairs [Record Group (RG) 75] contains a vast quantity of textual and cartographic records relating to relations with Native American people in the United States. The various series in this record group encompass the full span of American history from the early federal period to the present. A substantial number of these records, particularly those created after 1887, address the history of allotment policy, the generation of revenue from natural resources on Indian reservations and financial matters affecting those reservations, including the establishment and management of Individual Indian Money (IIM) accounts....
>
> Since beginning work on this project in December 1999, HRA historians have researched in seven regional repositories of [the National Archives and Records Administration], as well as the National Archives facilities in Washington DC. We also have reviewed records at the Office of Trust Records in Albuquerque. Currently, we are examining records for possible non-federal sources of information at various state and private reposi-

tories. In the course of these investigations, we have collected, imaged and coded approximately 19,000 documents.

> It is impossible to estimate the number of record boxes that our historians have examined. The number certainly ranges in the thousands. The time period for our investigation has been, generally, from the 1880s through early 1980s—what has been labeled by OHTA as the "Paper Records Era."
>
> In examining these records, HRA historians focused on documents addressing the major sources of revenue from reservation lands. These included oil and gas and other mineral development, timber production, agriculture and grazing leases, land sales and various miscellaneous types of income. The specific types of documents found include journal vouchers, records documenting special deposit accounts, receipts, contracts and leases, and correspondence and reports describing various lease activity. Historians also collected a variety of IIM records including some of the earliest reservation financial ledgers, as well as ledger cards and other types of more formal, reservation-specific IIM reporting tools.
>
> In the course of our research, we have discovered numerous gaps in federal record keeping.... As I mentioned in my declaration filed with the court on January 31, 2003, historians are seldom surprised to find gaps in archival records.... The unevenness in federal Indian records can be attributed to a variety of causes including, a lack of central control until the early twentieth century; poor facilities for the maintenance of records on isolated reservations; established retention schedules and a lack of

dits, correspondence, materials relating to receipts and disbursements to Native Americans, vouchers, and other documents that

could be useful in an historical accounting to individual Indian account holders." *Id.* at 48.

uniformity in what documents should be kept and, as noted by many reports from the period, an absence of adequate funding for personnel. One often overlooked but important explanation for gaps in records is a long standing congressionally mandated policy of Indian assimilation that anticipated that, following a trust period, allotted lands and, by implication, reservations would be converted to fee status.

The gaps in federal Indian records, however, do not diminish the importance of the remaining documents. While often quite complete and other times frustratingly fragmented, the records of Indian lease and financial activity are essential to the kind of IIM reconciliation proposed by OHTA.

Expert Report of Alan S. Newell at 14–16 (footnotes omitted) (Defs.' Ex. 141). Like Angel, Newell acknowledged the fact that "numerous gaps" exist in the state of the record, and that at times the record is "frustratingly fragmented." However, again like Angel, Newell maintains that, despite gaps in the records, he and his fellow historians have located a number of extant trust-related records.

Based on the testimony of Angel and Newell, the Court finds that Interior has demonstrated that a substantial number of IIM trust-related records are held by the federal government. It also finds, on the basis of the testimony of these two historians, that significant and substantial gaps exist in the records held by the federal government. The Court now turns to Interior's proposals to fill these gaps by obtaining trust records that are not held by the federal government.

b. Collection of Missing Trust Records from Third Parties

As noted above, Interior has identified two major potential sources of trust records—the IIM beneficiaries and third-party entities such as oil and timber companies. With respect to the beneficiaries, Interior represents that it

intends to seek the Court's permission to send out a mass mailing requesting account holders to review their records about their IIM accounts, and voluntarily respond by identifying any known issues with their accounts and indicate the types and dates of records in their possession. This request for information is intended to supplement—not supplant—Interior's historical accounting efforts. It may alert Interior to problems or issues that the accountings should address.

Interior's Accounting Plan at III–8. It will be necessary to seek the Court's permission for such a mass mailing because on December 23, 2002, the Court entered an order pursuant to Federal Rule of Civil Procedure 23(d) directing the defendants not to contact any of the plaintiffs without first obtaining leave from the Court. However, generally speaking, the Court discerns no problem with permitting Interior to generate such a mass mailing in order to obtain information from the IIM beneficiaries about trust records in their possession. The only dangers are those that are always present whenever a defendant in a class action contacts the plaintiffs—namely, that the defendant might attempt to use such contacts to obtain information that it could not obtain through ordinary discovery, or might attempt to coerce plaintiffs, outside the presence of class counsel, into compromising their claims. However, the Court's review and approval of any proposed mailing before it is sent out should be sufficient to minimize such dangers.

The next issue is Interior's requests for records from third parties. In its most recent quarterly report to the Court, Inte-

rior announced that between April and June of 2003,

two actions were taken to develop the Department of the Interior's (Interior) policy for the collection of third-party records. On April 30, 2003, the "Collection of Missing Indian Trust–Related Records" was published in Part 303, Chapter 5 of the Departmental Manual. On May 5, 2003, the "Policy and Procedures for Collection of Missing Indian Trust–Related Records from Third Parties" was published as a notice in the Federal Register, 68 F.R. 23756—23759. In summary, the policy states that Interior intends to collect records from third parties if a data gap is discovered that cannot be addressed with existing Federal records.

Status Report to the Court Number Fourteen (Aug. 1, 2003) at 33. The Federal Register notice mentioned by Interior asserts that "[s]earching for third-party data before knowing whether these data are necessary is neither efficient nor effective. The relevance and importance of third-party data will be determined by information gaps identified. Thus, it is important to know what information gaps exist and then develop an approach to fill those gaps." Policy and Procedures for Collection of Missing Indian Trust–Related Records From Third Parties, 68 Fed.Reg. 23,-756, 23,758 (May 5, 2003) ("Policy and Procedures"). The approach developed by Interior entails waiting until an information gap in trust records has been discovered, and then taking steps to attempt to fill the gap:

Once an information need has been identified and it has been confirmed that the necessary trust-related data are not under Federal control, the next step is to identify a potential source from an entity other than a Bureau within DOI, *i.e.,* a third party. . . . Once a potential data

need has been identified and a possible records source has been recognized, OHTA will undertake prudent action to contact the source, review available documents, and attempt to secure a copy of relevant data. The availability of inactive records held by individual entities will vary since experience indicates there is no "industry standard" document retention policy. In some instances, entities may request that DOI take custody of relevant documents. In appropriate cases, DOI will identify a suitable secure storage site (e.g., a Federal Records Center) and take possession of the records. Appropriate security and access strategies will be employed to ensure that the documents are available for the historical accounting effort.

*Id.* at 23,758–23,759.

The Court is concerned that the wait-and-see approach to filling data gaps will unduly delay the completion of an adequate historical accounting. There is, after all, no question that substantial gaps in the trust records held by the federal government do, in fact, exist. As noted above, both of the professional historians proffered as expert witnesses by Interior acknowledge that numerous gaps exist in the historical record. Additionally, one historian, Alan Newell, expressed concern about waiting until gaps had been identified before attempting even to identify trust records being held by third parties:

Q: But let's get back to my original question, and that is, the court was focused on whether passage of time causes you any concern that a company will destroy records unless a subpoena or some other adequate measure is put in place to prevent them from doing it, and that was the concern[ ], I am interpreting it, that [Dr. Edward] Angel had, and you can cor-

rect me if you disagree with that interpretation.

But my question is, do you share that concern as I phrased it?

A. I am concerned that over time, you know, records may either be not preserved, may be destroyed, may be, you know, just not become available. So I think we need to make every effort we can to identify these records, and to inform the parties of what is going on here so that we can preserve them.

You know, ultimately how useful they are, I really don't know. I guess we just have to wait and see.

Q. And that may include subpoenaing the records, right? We talked about that. Not just sending out notices?

A. It may include that, yes.

\* \* \* \* \* \*

Q: In your professional opinion, and based on your experience in this industry, is there any possibility that the giving of this federal records notice, without taking steps to subpoena or preserve these documents, would actually increase the likelihood that they would be destroyed?

A. Well, I guess in all fairness it is possible that they could, but I think what I would be more concerned about is the fact that I suspect that these documents are sort of embedded in their general works, and I suspect that they are just not going to do much about it unless, you know, we can be more targeted and more focused with them about what it is that we want, and would help and assist them in terms of identifying these things. I guess that that would be my concern, and that is why I talked about this earlier.

Tr., Day 31, PM session (June 18, 2003) at 95:12—96:7, 97:6–19 (testimony of Alan Newell).

The Court is also concerned that Indian trust-related records might well be "embedded in [the] general works" of third parties, such as oil or timber companies doing business on allotted lands. Certainly, if these third parties are unaware of any need to preserve these records, "over time, [they] may either be not preserved, may be destroyed, [or] may . . . just not become available." The Court agrees that with Newell's assessment that Interior "need[s] to make every effort [they] can to identify these records, and to inform the parties of what is going on here so that we can preserve them."

To date, however, Interior's efforts to identify third-parties possessing trust-related records and to prevent the destruction of the records have been wanting. As for actual searches conducted of third-party facilities, Interior's efforts have been limited to a two-day search of a single facility. Specifically, Interior reports that on February 5–6, 2003, it completed a review of documents at the American Heritage Center at the University of Wyoming. Based on this two-day visit, it determined that although the center's collections "appear[ ] to contain some documents that may relate to IIM and/or Tribal historical accounting issues[, t]he collection is not likely to be a primary source of documents for the historical accounting effort since only a small percentage of the records appears to be directly applicable." Status Report to the Court Number Thirteen at 31 (May 1, 2003). Interior says nothing about which types of documents were found or the basis for its conclusion that "only a small percentage of the records appear[ed] to be directly applicable." More importantly, Interior says nothing about any plans to visit any other facilities,

despite that fact that during the Phase 1.5 trial, one of Interior's own expert historians testified to the existence of at least one other potential archive of trust records:

> Finally, another very important resource for study of Indian affairs in general, and also Indian financial matters is the Oklahoma Historical Society in Oklahoma City. The Oklahoma Historical Society is actually an affiliated branch of the National Archives, meaning that it has to operate by Archives rules. According to their website, they hold 3½ million documents relating to Indian affairs of Indians of Oklahoma.

Tr., Day 27, PM session (June 12, 2003), at 59:18–25 (testimony of Edward Angel). Despite this testimony, Interior has not reported that it has any plans to determine whether the Oklahoma Historical Society archives—or any other facility—contains trust-related documents. Nor has Interior reported any plans to determine whether any banks contain trust-related documents, despite the fact that one of its contractors, the National Opinion Research Center, "concur[s] with the policy that asks third parties to notify the Department of the Interior before destroying potentially relevant records—notably, small local banks in Indian Country that may have kept canceled checks for longer than the now standard seven years." Interior's Accounting Plan at D–8 to D–9. Nor does Interior's Plan include any attempt to obtain trust-related records from Tribes managing portions of the IIM trust fund pursuant to contract, compact, or cooperative agreement. *See* B.2(7), *infra*.

Interior also reports that over a year ago, one of its contractors "completed a pilot study to search and identify oil and gas records on allotted lands and submitted a report with its findings." Department of the Interior Fiduciary Obligations Compliance Plan at 74 (Defs.' Ex. 1). But although this study allegedly "successfully demonstrated a methodology for collecting records from third parties, particularly oil and gas companies," the only action reported by Interior in response consists of a presentation to a petroleum industries conference "asking for assistance in identifying potential sources of relevant records within the oil and gas industry." *Id.* at 74, 75.

It is true that, apart from actual searches, Interior has taken some indirect steps to attempt to locate potential sources of trust records. On February 6, 2002, Interior published a Federal Register notice "requesting that anyone who possesses records related to the Individual Indian Money (IIM) trust funds to notify the Department, and to preserve and maintain such records indefinitely until further notice." Office of Historical Trust Accounting; Historical Accounting of Individual Indian Money Accounts; Collection of Documents Related to Oil and Gas Production on Allotted Lands, 67 Fed.Reg. 5607 (Feb. 6, 2002). However, as the Court noted during Newell's examination, nothing in the title of the notice would have put any entity except oil and gas producers that Interior was requesting any action:

> THE COURT: Well, if you just look at the title you notice it just says oil and gas, contrary to the summary [portion of the notice].
>
> THE WITNESS: Yes, it does say oil and gas, that is correct.
>
> THE COURT: The summary has timber and the things you are concerned with?
>
> THE WITNESS: Yes.
>
> THE COURT: The title only has oil and gas.
>
> THE WITNESS: You are right, Your Honor, it does.

THE COURT: So a timber company, if they happen to see that notice, might skip right over it, isn't that right?

THE WITNESS: They might. And I don't know how you get farming and grazing operations, which are cooperatives usually to—I think it is a big problem. But I do think that there are ways in which we can do this we can approach it.

Tr., Day 31, PM session (June 18, 2003), at 51:8–24 (testimony of Alan Newell). Since the filing of the notice, a year and a half ago, only three companies have contacted Interior to report that they might possess Indian trust-related data. *See* Department of the Interior Fiduciary Obligations Compliance Plan at 74. Interior has only managed to inspect the records of one of these companies; as for the other two, it reports only that it is "in discussions" with them. *Id.*

More importantly, however, the notice merely "request[s]" any third party possessing trust-related documents "to notify the Department, and to preserve and maintain such records indefinitely until further notice." This makes the preservation of trust records in the possession of third parties contingent upon the good will of those third parties not only to preserve them but to incur maintenance and storage costs until some time in the indefinite future when Interior might request them. Questioning among similar lines evoked the following response from Newell:

> I guess on the basis of what I am reading here, I would be concerned, too. Again, I don't think they have done nothing, but we are concerned in terms of just as historians that records, if they are not preserved over time, they are destroyed—not destroyed. They will deteriorate.

Q. Well, we are not talking about deterioration. We are talking about private companies destroying their records which they apparently have a property right to do, right?

A. Well certainly there is nothing preventing them from doing it that I know of.

*Id.* at 92:6–17 (testimony of Alan Newell).

Certainly, there is nothing that the Court knows of that would prevent third parties from destroying trust-related records. But Interior has taken no steps to prevent such destruction. Following the publication of the February 6, 2002 notice, Interior did distribute a letter to "approximately 4,200 addresses derived from the *Oil and Gas Journal* subscription list" asking the recipients if they possessed trust-related records. Policy and Procedures, 68 Fed.Reg. at 23,757. Again, however, the letter merely "requested that the company preserve and maintain these documents [and] asked for a copy of the company's records retention policy." *Id.*

Interior's fiduciary responsibilities to the IIM beneficiaries requires more than this. In its 1999 opinion, this Court stated: "Making the two (correct) assumptions for the moment that defendants owe plaintiffs an accurate accounting and that defendants are missing a share of necessary documents to reach that end, then it follows that defendants must retrieve documents from outside sources, also referred to as third-party documents." *Cobell V*, 91 F.Supp.2d at 16. Having stressed the need to retrieve third-party records, the Court concluded that Interior possessed a duty "to establish written policies and procedures for collecting from outside sources missing information necessary to render an accurate accounting of the IIM trust." *Id.* at 58. Although the D.C. Circuit expressed some disagreement as to this conclusion, it nevertheless explained that

while appellants may not have breached a specific duty to perform the particular tasks identified by the district court, such as implementing a IIM trust management computer system, appellants' failure to take such steps provides ample support for the district court's ultimate conclusion that appellants have *unreasonably delayed the discharge of their fiduciary obligations to IIM beneficiaries, and that there is little reason to believe that, absent court intervention, these duties will be discharged any time soon.*

The government's broad duty to provide a complete historical accounting to IIM beneficiaries necessarily imposes *substantial subsidiary duties* on those government officials with responsibility for ensuring that an accounting can and will take place. In particular, it imposes obligations on those who administer the IIM trust lands and funds to, among other things, maintain and complete existing records, *recover missing records where possible, and develop plans and procedures sufficient to ensure that all aspects of the accounting process are carried out.*

*Cobell VI,* 240 F.3d at 1105 (emphasis added).

The Court does not mean to disparage the efforts that Interior has taken. But its duties as a trustee require more. Interior's duty to "recover missing records where possible" necessarily entails taking reasonable steps to ensure that those missing records are not destroyed. Placing full reliance on the good graces of third parties not to destroy those records, while simultaneously refusing to incur any of the cost of maintaining or storing those records (or even to indicate any end date past which Interior no longer intends to request such records) is not reasonable. Moreover, the failure to take such steps risks inflicting irreparable harm upon plaintiffs, in that it subjects third-party trust records—which might well constitute the sole extant documentation that could fill gaps in the record maintained by the government—to an unreasonable risk of destruction or deterioration.

 Therefore, the Court concludes that the omission of reasonable measures to ensure the preservation of trust-related records in the possession of third parties from Interior's Plan renders it a Plan that would necessarily delay rather than accelerate the ultimate provision of an adequate accounting of the IIM trust fund. As stated in the companion opinion issued this date, Interior's fiduciary duty to keep and render accounts includes the duty to retain records that are necessary to the performance of an accounting. The loss of such necessary records—the "gaps" in the records maintained by the government—renders it necessary for Interior to take all reasonable steps to reconstruct such records, and to ensure that no further destruction of records possessed by third parties occurs. Accordingly, the Court will direct Interior to submit a plan to determine which trust-related records are likely to be possessed by third parties, to identify the records maintained by those parties, and to issue subpoenas, where appropriate, to ensure that such records will be preserved.[42]

---

**42.** As Interior's own expert has testified, there appears to be no reason to wait until all 195,000 boxes of trust records held by the government have been fully analyzed and indexed:

Q: As you testify, you are not going to know whether there is a gap in Interior's records until you have looked, and I think your words were to some degree, analyze all of those 195,000 boxes of documents, right?

c. Indexing of Trust Records and Compilation of Transaction Histories

As noted above, Interior has estimated that various federal facilities hold approximately 195,000 boxes or containers of Indian trust records. However, it notes, "the inventories and indexes of these records, essential to locating needed records effectively and efficiently, are not consistently detailed and accurate for this purpose." Interior's Accounting Plan at app. E–2. In order to create such an index, Interior reports that after trust-related records have been located, they will be "electronically imaged and coded," permitting the accounting firms it has engaged "to quickly access the images needed." *Id.* at III–8. Specifically, Interior explains:

> [The Office of Trust Records] has engaged the firm Labat–Anderson, Incorporated to index all of the trust-related records that are currently stored in its facilities in Albuquerque and at Lee's Summit. This endeavor will require the contractor to examine every file contained within a box or container of records, and accurately enter key information about the records into a database.
>
> The indexing is working at a "file level," meaning that every file title will be entered, verbatim, into the database. Where there are no file folders for the contents in a box, the entire box will be considered [to be] the folder and the contractor will indicate such as an "im-

plied folder" in the database. In addition, the contractor will include the following information in the index:

A. *Data Appearing on the Exterior of a Box*—This will allow searchers to identify the physical location of the boxes based on earlier inventory records. Also, where tribal names are identified on the exterior of boxes, that information will be captured in the database[.]

B. *Source Agency*—This will denote the agency or regional office to which the records belong and the originators of the records.

C. *Document Type and Date Range*—This information will enable users who are searching for a specific document with a known or approximate date to identify the appropriate box containing the document without having to request an unnecessarily large number of boxes.

*Id.* at apps. E–2, E–3. Interior also reports that the electronic database it describes "will be created by entering data on the contents of each box in the collection onto a data-entry screen that will be integrated into a database for access by the users. Information in the database can then be sorted and indexed for easy access by document types, dates, collections, agency, etc." *Id.* at app. E–2. Although it is not perfectly clear,[43] it appears

---

A. That is correct, but what I said is there are various levels of analyses that you would do. It would not necessarily be down to the document level. For instance, the [Labat] Anderson index may, down to the photo level, may [sic] be sufficient for us to make informed estimates as to where some broad gaps may occur in particular jurisdictions.

And so if that were to occur, then perhaps we could begin working in that area trying to fill those gaps while we are still, you know, beginning—or working with the

analysis of the documents in more depth. So I don't think it is a—it doesn't have to be as starkly sequential as I think you are suggesting[,] in my mind.

Tr., Day 31, PM session (June 18, 2003), at 58:7–23 (testimony of Alan Newell).

**43.** The Court's uncertainty stems from a brief colloquy with defense counsel during closing arguments:

> THE COURT: [So Interior's plan is t]o create the historical accounting with, in ef-

to the Court that the proposed electronic database will function similar to the Virtual Ledger created by the accounting firm of Ernst & Young, which was demonstrated during the Phase 1.5 trial. The Virtual Ledger is an electronic database of IIM trust transactions for the five named plaintiffs in this action and twenty of their predecessors-in-interest.[44]

In January or February of 2001, Interior retained the accounting firm of Ernst & Young ("E & Y") to "create a listing of transactions for each of the [twenty-five past and present beneficiaries], to then compare the transactions to the document database to try to find supporting evidence that those transactions occurred, and then also to try to identify whether or not there were any missing transactions." Tr., Day 24, AM session (June 9, 2003), at 56:1-6 (testimony of Joseph Rosenbaum). Specif-

ically, Interior provided E & Y with a database of electronically-imaged versions of trust documents related to the five named plaintiffs and their predecessors, together with an index of the documents and some initial ownership information from Interior's computer systems. *Id.* at 55:9-16, 19-21. According to one of the accountants who worked on the Virtual Ledger, Joseph Rosenbaum, the documents provided consisted of "accounting type information, which would include ledgers, statements of account, journal vouchers, those sorts of things, transactional documents like bills for collection, checks and the like, and also contractual information like leases, for example." *Id.* at 55:2-6.[45]

Between February of 2001 and March of 2002, "somewhere between twelve and fif-

---

fect, the virtual ledger, and then the verification, except some would be verified only by statistical sampling.
MR. STEMPLEWICZ: I would caution Your Honor—my understanding is the same. The virtual ledger was sort of a term of art that was applied to the Paragraph 19 ... document collection.
THE COURT: What will be the terminology here?
MR. STEMPLEWICZ: Well, I think it will be there will be a database that will be used that—the documents themselves, some will be imaged, but the main records that will be used for the accounting will be the hard copies of the records or the electronic records, depending on which era they are working in. But what [Labat] Anderson is working on right now is the indexing of those files in those boxes so that when the accountants who are doing the accounting and putting the transaction listings together and doing the verification and sampling and so forth, when they need to go to look for something, they can punch information into the computer and try to find it easier because they have been electronically indexed.
Tr., Day 44, AM session (July 8, 2003), at 81:4—82:1. It therefore appears that Interior

will be using a method similar to the Virtual Ledger for indexing and imaging the trust documents, but that the accountants will consult the actual trust documents themselves, rather than their digital images, when they perform the actual accounting.

44. Strictly speaking, Interior designated the database itself "the Document Database." The "Virtual Ledger" refers to the software tool used to view the account transaction histories in the database and to create hyperlinks to documents supporting the existence of the individual transactions. *See* Expert Report of Joseph R. Rosenbaum (Defs.' Ex. 156) at 1–2. However, throughout the Phase 1.5 trial, counsel for both parties referred to both the document database and the software used to view the database as "the Virtual Ledger." The Court will follow this practice in this opinion.

45. The documents were gathered in what has come to be known as the "Paragraph 19 document search" because it was undertaken in response to paragraph 19 of one of plaintiffs' requests for production, which sought production of any materials relating to the five named plaintiffs and their predecessors in interest.

teen" individuals worked on this project.[46] During the Phase 1.5 trial, Rosenbaum presented the findings that the E & Y team had arrived at:

Q. Could you tell us what the overall results of your work were?

A. I think they really can be summarized into three points, and that is, first of all, that the documents that had been gathered in the Paragraph 19 search were, in fact, sufficient to allow us to create a listing of the transactions for certain of the accountholders, certain of the named plaintiffs and predecessors.

In addition to that, the documents were able to support the transactions and, in fact, we have found documentation that support 86 percent of the transactions representing some 93 percent of the dollar value of those transactions.

Thirdly, with the exception of one transaction that I mentioned in my report, and I can get into a little later here, we did not find any indication that there were any documents or any ... transactions that had not been recorded in the available ledgers that we had.

*Id.* at 56:15—57:7. The Court admits to some degree of skepticism as to the results of the project undertaken by E & Y, given that "[a]ll information provided by Interior and Justice was accepted as accurate, and was not independently verified, except where noted. This includes the contents of the document collection, the IIM account ledgers and statements, the ownership information, and all other data provided as part of this engagement." Expert Report of Joseph R. Rosenbaum at 10.

Additionally, certain documentation, such as ledgers maintained by government superintendents of Indians, should be viewed with considerable skepticism, given past reports indicating that such superintendents "cooked the books" to hide the fact that they were defrauding the Indians they were supposed to have been "supervising."

■ But these factors should not be permitted to overshadow the primary issue, namely, whether the completion of the Virtual Ledger provides the Court with evidence that, in fact, Interior will be able to produce an index of trust-related documents adequate to support an accounting. Keeping in mind the above qualifications, the Court nevertheless concludes that the completion of the Virtual Ledger does provide such evidence.

During the Phase 1.5 trial, Rosenbaum demonstrated to the Court how the Virtual Ledger works. Simply put, the Virtual Ledger software divides a computer screen into three sections: Ledger Pages, Transactions, and Supporting Documents. Each section, in turn, consists of a series of rows. Each row in the Ledger Pages section represents an individual page in the original paper ledger maintained by Interior. Each row in the Transactions section represents an individual transaction, such as a collection or disbursement of funds. Finally, each row in the Supporting Documents section represents a digital image of a document that provides evidence that an individual transaction, in fact, took place.

When a user inputs an IIM account number and a given time period into the Virtual Ledger, it retrieves information related to that account and time period, and

---

**46.** Tr., Day 26, PM session (June 11, 2003), at 16:18–19 (testimony of Joseph Rosenbaum). However, Rosenbaum also testified that by August of 2001, "the basic system was set up,

absolutely[, consisting of t]he methodology that we were employing and how to go about entering the data." *Id.* at 12–14.

organizes that information in the three sections. Each row in the Ledger Pages section thus contains a number representing each individual page of the original paper ledger containing transactions within the selected IIM account, and for the selected time period. Each row in the Transactions section, in turn, represents each individual transaction (within that account, for the given time period) recorded in the original paper ledger. Specifically, each row lists the date of each individual transaction, a brief description of the type of transaction, the amount of the transaction, and the resulting balance after the transaction was credited to the IIM account. Finally, each row in the Supporting Documents section contains a date and description of a document evidencing one or more of the transactions listed in the Transactions section.

The three sections function as an index to the trust-related documents contained in the Virtual Ledger. For example, assume that the user has inputted an IIM account number and a given time period, and has retrieved the information listed above. If, while in the Ledger Pages section, the user selects the first page listed, the Transactions section will display all transactions contained on that page relating to that account, within that time period. For each transaction listed in the Transactions section, the Supporting Documents section will list documents supporting those transactions. Additionally, the Ledger Pages and Supporting Documents sections contain hyperlinks to each of the documents represented in their rows. In other words, each ledger page listed in the Ledger Pages section contains a link to a digital image of the actual page, and each supporting document listed in the Supporting Documents section contains a link to a digital image of the actual supporting document.[47]

Using the Virtual Ledger, the E & Y team was able to index documents supporting 12,617 transactions from thirty-seven IIM accounts, representing twenty-five beneficiaries. Expert Report of Joseph R. Rosenbaum at 2, 5. As noted above, Rosenbaum testified that this work was completed within a year by twelve to fifteen individuals. It is true that Rosenbaum was not able to provide a precise cost estimate of constructing the Virtual

---

**47.** Rosenbaum did testify, however, that it was necessary for his team to reconstruct 556 transactions that were evidenced by supporting documentation, but were not recorded in the paper ledgers:

> We did note that there are instances where we did not have transaction ledgers for some of the accounts.... [I]f we located documentation that would indicate that a transaction *might* have occurred *within* a time period for which we did not have a transaction ledger, we recreated the transaction, included that into the virtual ledger or the listing of the transactions, and noted that it had been a reconstructed transaction....
>
> [I]n a matter of a collection, for example, if we had a bill for collection that indicated a certain amount of money had been received and was being allocated to a particular account, and we would look at that account listing to try to find the transaction, if it wasn't there, we would investigate as to whether or not there had been a transaction ledger at the time or whether we were missing information during that time period.
>
> If we could determine by looking at beginning and ending balances that there was, in fact, a missing ledger during that period, we would record a collection amount, the appropriate collection amount, and label it a reconstructed transaction.

Tr., Day 24, AM session (June 9, 2003) at 68:8–9, 12–17, 68:20—69:7.

Rosenbaum explained that any reconstructed transactions were notated as such in the Virtual Ledger. *Id.* at 70:18–19. Of course, it will be necessary to designate any reconstructed transactions as such in the indexing to be undertaken by Interior.

Ledger or a precise estimate of how much time it would take to index, for example, documents relating to a thousand accounts, instead of thirty-seven.[48] Nevertheless, the Court finds that Interior has presented sufficient evidence to demonstrate that it will be able to establish, within a reasonable time period, an adequate index for the approximately 195,000 boxes of trust-related documents held by the federal government.[49]

What troubles the Court, however, is that Interior has presented no plan to index documents other than those held at the Albuquerque and Lee's Summit facilities. Although it observes that all 195,000 boxes of records are "vital to conducting a historical accounting directed by the Court" in this case, only about 93,000 boxes are located in these two facilities, representing approximately 47% of the total number of boxes. During the Phase 1.5 trial, defense counsel informed the Court:

> MR. STEMPLEWICZ: [T]here was some discussion this morning about the number of boxes and so forth. We weren't able to get too many details, but I just did want to clarify one

thing for the court. As I understand it, the 2004—fiscal year 2004, which would end next September, 30 September, 2004[—] refers to approximately half of the 195,000. That is the [Labat] Anderson contract.

> Those are ones that are in, I believe, Albuquerque, and at Lee Summit. The other boxes are at various agencies, and that is the estimated remaining approximately 100,000, and contracts are being worked for those—being developed for the indexing of those boxes.

> I think the best way to keep the court informed of that would be through the quarterly reports, the OHTA section of that.

Tr., Day 44, PM session (July 8, 2003), at 6:8–22.[50]

The Court appreciates defense counsel's clarification of this issue. The difficulty, however, is that without knowing whether the remaining 102,000 boxes will be indexed in the same manner as the boxes located in Albuquerque and Lee's Summit, it is impossible to evaluate the Plan pre-

---

**48.** Rosenbaum explained that Ernst & Young had been paid $3.6 million to date for its work on the present litigation, but he could not provide an estimate of the proportion of that amount that was allocable to the creation of the Virtual Ledger, because Ernst & Young's records were correlated to "where the moneys were coming from, and not necessarily strictly related to the efforts we were doing." See Tr., Day 26, PM session (June 11, 2003), at 69:20—70:14. As for a time estimate, although Rosenbaum admitted that his team "had done some estimates of how long [it] would take" to prepare a Virtual Ledger for one thousand accounts, he ultimately concluded that it would depend on how geographically interspersed the accountholders were. See id. at 70:15—71:18.

**49.** The Court is not unmindful of the apparent errors in the Virtual Ledger pointed out by plaintiffs' expert witness Dwight Duncan dur-

ing his last day of testimony. See Tr., Day 42, AM session (July 3, 2003). However, the Court concludes that the errors attested to represent errors in the *execution* of the Virtual Ledger, rather than fundamental design defects that would weigh against the potential efficacy of modeling an indexing plan on the Virtual Ledger.

**50.** *Cf.* the testimony of Edward Angel:

> THE COURT: And does the indexing include more than Lee['s] Summit and the OTR records?
> THE WITNESS: Those are the two principal locations, and those are the two that I know of for sure.
> THE COURT: So you don't know if it includes the universe?
> THE WITNESS: I do not.

Tr., Day 29, PM session (June 16, 2003): 123:11–17.

sented by Interior. Even assuming that they will be indexed in the same manner, the fact that contracts have not yet been made to provide for such indexing makes it impossible to determine a time frame for the completion of the collection phase of the accounting process. Performing a proper indexing of all trust-related records held by the federal government is not only an essential preliminary step before undertaking the accounting process proper; it is also a necessary step in determining which records are missing and must be sought from third parties. Accordingly, the Court cannot properly evaluate Interior's accounting plan without some understanding as to when it anticipates that all trust records held by the federal government will be indexed. The Court will therefore direct Interior to submit a timetable for the completion of the entire indexing process, as well as an explanation of whether the indexing methods proposed in its accounting plan for indexing the Albuquerque and Lee's Summit records will also be applied to the remaining 102,000 boxes of records.

### 2. The Accounting Process

#### a. Introduction

As explained above, Interior's Accounting Plan proposes different methods for treating each of the three types of accounts within the IIM trust fund: land-based accounts, special deposit accounts (SDAs), and judgment and per capita accounts. The Court will therefore sepa-

rately analyze Interior's proposed methods for treating each of these accounts. Following this analysis, the Court will examine the methods proposed to verify the accuracy of each transaction in each type of account.

#### b. Special Deposit Accounts (SDAs)

Unlike the other types of accounts in the IIM trust fund, special deposit accounts, or SDAs, were never intended to be permanent accounts. Instead, Interior explains, they were

designed to be temporary accounts for the deposit of trust funds that cannot immediately be credited to the rightful account holders. For example, a payment may be received by the BIA for farming and grazing on tribal lands and allotted lands. The payment is deposited in an SDA so that interest can be earned until the funds can be allocated to the proper IIM and tribal accounts. Once the farming and grazing payment funds and associated interest earned have been transferred to the IIM and Tribal accounts, the SDA should have a balance of zero. The account can then be closed or reused to temporarily hold other payments.

Interior's Accounting Plan at III–15.[51] Interior has thus explained that the goal underlying its treatment of the SDAs differs from its treatment of the other types of funds, "in that the end result is to properly distribute the funds remaining in the inactive SDAs and close the accounts,"

51. *See also* Tr., Day 21, AM session (June 4, 2003) at 28:10–20 ("Special deposit accounts are accounts that are designed to be temporary when it's not clear who has the ownership of the funds that are involved in the account. So the monies are placed in the special deposit account to allow a period of time to identify clearly who the money should be given to. They are also accounts that involve funds that are intended to be re-

turned. For an example, if somebody bids on a timber sale and they are the unsuccessful bidder, ... their funds would be in an account like this and they are designed to be returned.") (testimony of James Cason). Interior's Inspector General has determined that this latter use of special deposit accounts constitutes a misuse of these accounts. Interior's Accounting Plan at III–15.

rather than the preparation of statements of account for IIM beneficiaries. *Id.*[52] Accordingly, the process of dealing with the funds is more accurately designated a "cleanup project" rather than an accounting.

The amount of money held in the SDAs is not insubstantial. As of December 31, 2000, Interior estimates that 21,5000 inactive SDAs were held within the IIM trust fund, containing almost $68 million. *Id.* at III–16. This number represents approximately 16% of the total value of the IIM trust fund. Interior's Accounting Plan represents that the Office of Historical Trust Accounting (OHTA) will work with BIA and with the Office of the Special Trustee (OST) to distribute funds held in inactive SDAs that were opened on or before December 31, 2000 to their rightful owners. *Id.* Its Plan also describes the planned "cleanup process" for the SDAs:

> To perform this work, accountants look to the history of the SDA, as contained in related financial records and documents. From these records, the accountants ascertain the source and purpose of the original funds, understand what, if any, portion of the funds and interest have already been distributed, determine why funds remain in the SDA, and make a recommendation for allocation of the funds and closure of the SDA. This is the current accounting method being used to resolve the ownership and proper allocation of funds in inactive SDAs.

The final determination of funds in SDAs is made jointly by BIA and OST. The transfer of funds is processed by OST, and any transfers to IIM accounts (as well as tribal accounts) would be made as a current deposit to the respective accounts. Account holders would be notified of the transfer in their regular quarterly statements. In the case of third-party funds, the funds would be disbursed directly to the third party. Thus, while the funds would be properly allocated, the transfer of funds would be posted in a year after 2002 and would not appear as part of a Historical Statement of Account.

*Id.* at III–17.

Interior reports that, working with the accounting firm of Chavarria, Dunne & Lamey, BIA and OST have identified the proper owners of funds within SDAs totaling approximately $22 million. *Id.* at III–16. Additionally, in its most recent quarterly report to the Court, it stated that it had closed sixty-five SDAs in the Alaska Region, and expected to close the three remaining SDAs in the region by the end of September 2003. Interior represents the total value of all sixty-eight accounts to be approximately $800,000. Status Report to the Court Number Fourteen (Aug. 1, 2003) at 36.

Interior expects to complete the cleanup process for all 21,500 inactive SDAs opened on or before December 31, 2000 by the early part of fiscal year 2007 (which ends on September 30, 2007). The estimated cost of the entire cleanup process is $27 million, a figure arrived at "based on the number of accounts, value of accounts, and difficulty of analyzing accounts." Interior's Accounting Plan at III–17.

---

**52.** *See also* Tr., Day 21, AM session (June 4, 2003), at 29:3–9 (explaining the methodology Interior will follow in accounting for the SDAs as "one of identifying the proper recipient for the money in the account as opposed to a broad accounting like land-based accounts, and . . . to determine the initial deposit and any interest that is owed on the account and who the rightful recipient is and, once that determination is made, to distribute the account and vacate it") (testimony of James Cason).

The Court concludes that Interior's proposed cleanup process represents a reasonable approach to distributing the funds in the special deposit accounts to their rightful owners, except for the limitation of the cleanup process to accounts opened on or before December 31, 2000. Interior's Comprehensive Trust Management Plan does not provide any specific explanation of measures it will take to clean up SDAs opened after December 31, 2000. Accordingly, until Interior has demonstrated to this Court that it will take specific measures within a prescribed time period to clean up SDAs opened after that date, it will not be appropriate to designate December 31, 2000, or any other date, as a cutoff date for the cleanup process. Additionally, as explained *infra* in section IV(C), the Court's approval of this portion of Interior's Plan does not mean that the Court is bound to approve the ultimate accounting provided in accordance with this portion of the Plan. Instead, as explained above, the Court's approval is limited to the portion of the Plan itself; after the accounting has taken place, and any objections are made, final judicial review of the accounting will be available in the Phase II trial.

c. Judgment and Per Capita Accounts

Interior describes the judgment and per capita accounts in the IIM fund as follows:

When a tribe receives money as part of a legal judgment or negotiated settlement, the tribe may elect or be required to pass along some, or all, of the money to its enrolled members or their [descendants]. Similarly, other income to the tribe may be distributed as per capita payments to its members. In these instances, funds are distributed to tribal members in accordance with a tribal resolution specifying the amount of the payment and the eligibility of members to receive payment. In most cases, money is distributed directly to tribal members; however, for minors or other tribal members who are not eligible to receive a direct payment, the money is deposited on their behalf into an IIM account.

*Id.* at III–2. As noted above, these two types of accounts are referred to by the parties as "low-hanging fruit" because the fact that groups of these funds are frequently established from a common source, and have an identical initial balance, make them relatively easy to perform an accounting for. The IIM trust fund contains 33,205 judgment accounts, with a combined value of $80.8 million, representing approximately 19% of the total value of the entire fund. The trust fund also contains 9013 per capita accounts, with a combined value of $69.5 million, representing approximately 17% of the total value of the entire fund.

The method of verifying each transaction within the judgment and per capita accounts is discussed below. In its Plan, Interior represents that accounting statements for approximately 13,000 judgment accounts "will soon be completed." *Id.* at III–4. As for the remaining judgment and per capita accounts, Interior represents that its accounting for approximately 13,000 of both types of account will be completed in fiscal year 2003 (which ends on September 30, 2003) and that its accounting for all remaining judgment and per capita accounts will be completed in fiscal year 2004 (which ends on September 30, 2004). Interior estimates that this portion of the accounting will cost approximately $2.5 million. Id.

The Court concludes that Interior's proposed accounting process for the judgment and per capita accounts represents a reasonable accounting process. As explained above in section IV(C), however, the Court's approval of this portion of Interior's Plan does not mean that the Court is

bound to approve the ultimate accounting provided in accordance with this portion of the Plan. Rather, the Court's approval is limited to the portion of the Plan itself; after the accounting has taken place, and any objections are made, final judicial review of the accounting will be available in the Phase II trial.

#### d. Land–Based Accounts

Land-based accounts are accounts within the IIM trust fund belonging to individual Indians who possess ownership interests in some portion of the 11 million acres of land held in trust by the United States for their benefit. Revenues from activities associated with these lands are supposed to be distributed to the Indians who possess ownership interests in them by means of these accounts. The primary sources of revenue from activities associated with these lands include "surface leases from farming and grazing, sale of timber, subsurface leases (e.g., mining, oil and gas exploration and production), and rights-of-way for roads, power lines, and other utilities." *Id.* at III–4 to III–5.

Land-based accounts are the most numerous accounts in the IIM trust fund. Interior has estimated that as of December 31, 2000, the trust fund contained approximately 194,000 land-based accounts containing an aggregate balance of about $198 million, or about 48% of the total aggregate balance. The relationship between the number of accounts and the number of individual Indian beneficiaries of the trust fund is difficult to unravel. One of the primary reasons for this difficulty is the problem of fractionated interests in allotted lands, explained infra at B.2.d(7). Another difficulty with accounting for land-based accounts is the state of the records that record the transactions within the land-based accounts. The Interior Department only began utilizing com-

puter systems to record these transactions in approximately 1985, the beginning of the "Electronic Records Era." Before this date, in the "Paper Records Era," records of transactions are located only in paper-based documents: e.g., books, ledgers, or even cards. *Id.* As Interior explains,

> [t]he paper transaction records must be located, scanned, coded, and the account information digitized to compile an electronic account transaction history for the [land-based accounts]. Until the electronic transaction histories are compiled, it will not be possible to determine relevant account information, including how far back in time IIM accounts go, and how many transactions occurred in each account included in the historical accounting.

*Id.*

In short, the land-based accounts are the most difficult to perform an adequate accounting of. It therefore comes as no surprise that Interior has attempted to place stringent limits upon its duties to account for the land-based accounts. The Court will analyze each of these proposed limits to determine whether they accord with Interior's duty to account to the IIM beneficiaries.

#### (1) Proposed Termination Date of the Accounting

Interior's Accounting Plan does not state that it intends to include all accounts within its accounting, only "IIM accounts that were open as of December 31, 2000, and all IIM accounts that were open as of October 25, 1994, or opened thereafter, but closed as of December 31, 2000." *Id.* at III–1. In other words, no accounts that were closed on October 24, 1994 or before will be included in the proposed accounting. Presumably, this limitation applies not only to land-based accounts, but also to

special deposit accounts, judgment accounts, and per capita accounts.

Interior argues that this chronological limitation on the scope of its duty to account is provided in the 1994 Act. Specifically, it points to the provision of the 1994 Act mandating that the Interior Secretary "account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to" the Indian Reorganization Act of 1938. 25 U.S.C. § 4011(a). Interior asserts that this provision of the Act

> does not say that the Secretary shall account for all funds that "have ever been" or "were" deposited or invested pursuant to 25 U.S.C. 162a [the 1938 Act]. Instead, Congress specifically used the present tense and limited the requisite accounting to funds "which are deposited or invested pursuant to the Act of June 24, 1938." If Congress had intended the 1994 Act's accounting requirements to apply to funds previously deposited or invested, or to closed funds, it would have "directed with the requisite clarity that the law be applied retrospectively" to those funds or those closed accounts.

Defs.' Prop. Findings and Conclusions at 133–34 (citation omitted).

Interior's retroactivity argument is easily dispensed with. An intent to include IIM accounts predating the passage of the 1994 Act within the scope of the historical accounting is manifestly not the same as directing that the 1994 Act be applied retroactively. Rather, the cited provision consists of a *prospective* command to the Secretary of the Interior: account for the daily and annual balance of all funds held in trust by the United States for the benefit of an individual Indian that were deposited or invested pursuant to the 1938 Act. The fact that, in the performance of such an accounting, the Interior Secretary must consider funds deposited in the past does not change this provision into one that applies retroactively.

When its purported grounding in the retroactivity doctrine is thus removed, Interior's argument comes down to this: by employing the present rather than the past tense in the verbs that it used in the 1994 Act, Congress meant to say: "Notwithstanding any other portion of the present Act, Interior possesses no duty to account for any accounts within the IIM trust fund that closed on or before October 24, 1994." The Court cannot recall any case involving statutory interpretation in which so much purportedly hinged on the question of verb tense. It is extremely difficult, to say the least, to believe that Congress intended, merely through its choice of grammatical construction, to circumscribe Interior's duty to account.[53]

Even if the language were ambiguous (which it is not), the Court would nevertheless conclude that the better interpretation would be the one expanding, not contracting, the government's duties. This is in accord with the mandate of the D.C. Circuit:

> Even were the language of the 1994 Act ambiguous, this would not redeem appellants' position, as we follow the same

---

**53.** Also without merit are Interior's arguments based on the "legislative history" of the 1994 Act. All three of its examples are drawn from the 1992 House Government Committee on Government Operations entitled, "Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund." Although the findings in this report did prompt Congress to take action regarding the IIM trust, in no sense can "Misplaced Trust" be described as part of the legislative history of the 1994 Act, in that it predates the introduction of the bill that became the 1994 Act by two years.

rules of construction with regard to Indian trust expectations discussed above. Courts must be guided by that eminently sound and vital canon that statutes passed for the benefit of Indian tribes are to be liberally construed, doubtful expressions being resolved in favor of the Indians. Again, as we noted above, the canon of liberality of construction in favor of the Indians acts with its special strength even where a federal agency would in other cases enjoy the implied authority to implement ambiguous statutory language supporting a competing interpretation.

*Cobell VI*, 240 F.3d at 1102–03 (internal citations and quotation marks omitted). Immediately preceding this passage, the D.C. Circuit issued its binding interpretation of the very portion of the statute at issue here:

> Even were the plaintiffs entitled to [a complete historical accounting], appellants contend that the Interior Department, and not the court, would have the authority to determine the nature and scope of the accounting.

> Contrary to appellants' claims, Section 102 of the 1994 Act makes clear that the Interior Secretary owes IIM trust beneficiaries an accounting for "*all* funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a) (emphasis added). "All funds" means *all funds*,

irrespective of when they were deposited (or at least so long as they were deposited after the Act of June 24, 1938). Therefore, the 1994 Act reaffirms the government's preexisting fiduciary duty to perform a complete historical accounting of trust fund assets.

*Id.* at 1102 (emphasis in original).

█ In short, if emphasis should be placed on any individual word in the statutory provision at issue, it is properly placed on the word "all," not the word "are." Therefore, the Court concludes that Interior is required by the 1994 Act to account for *all* funds held in trust by the United States for the benefit of an individual Indian which were deposited or invested pursuant to the Indian Reorganization Act of 1938, regardless of whether they were deposited or invested before or after October 25, 1994.[54] *Cf. American Indians Residing on Maricopa–Ak Chin Reservation v. United States,* 229 Ct.Cl. 167, 667 F.2d 980, 1004 (1981) (*"Ak Chin"*) (reporting the ruling of the Indian Claims Commission requiring the government to perform an accounting that "[i]dentifies all IIM accounts opened in the name of the plaintiffs ... together with the opening and closing date of each such account," the opening balance, and all withdrawals). The Court further concludes that by omitting such a requirement, Interior's Plan will necessarily delay, rather than accelerate, the performance of an adequate his-

---

**54.** Interior's Accounting Plan proposes a cutoff date of December 31, 2000 for its historical accounting of the transactions in the land-based accounts of the IIM trust fund. However, Interior's Comprehensive Trust Management Plan does not include any specific measures to account for transactions occurring in the land-based accounts after December 31, 2000. The 1994 Act required Interior to transmit quarterly statements of account to the IIM beneficiaries. To date, no evidence

has been presented to this Court that Interior has complied with this requirement. Accordingly, until Interior has demonstrated to this Court that it has a system in place to transmit quarterly statements of account reflecting the current state of the IIM trust fund, it will not be appropriate to designate December 31, 2000, or any other date, as an end date for Interior's historical accounting of the transactions in the land-based accounts.

torical accounting of the IIM trust fund.[55]

### (2) Proposed Start Date of the Accounting

██ Interior also asserts that it possesses no duty to account for any funds in the IIM trust fund that were deposited or invested before the passage of the Indian Reorganization Act on June 24, 1938. Accordingly, its Accounting Plan explains that its proposed accounting will provide only "a history of all transactions in [IIM beneficiaries'] accounts back to the inception of their accounts or to the passage of the Act of June 24, 1938, whichever is later." Interior's Accounting Plan at II–2. In short, Interior's proposed accounting will not include any transactions occurring between the commencement of the allotment process in 1887 and June 23, 1938. This proposed restriction is based on a sentence from the passage from the D.C. Circuit's 2001 opinion just quoted: " 'All funds' means *all funds*, irrespective of when they were deposited (or at least so long as they were deposited after the Act of June 24, 1938)."

But the sentences immediately preceding the quoted sentence make clear that the D.C. Circuit was referring only to Interior's obligations under section 102 of the 1994 Act, not to the full scope of Interior's fiduciary obligation to account. It is impossible to reconcile the argument that the D.C. Circuit only recognized a duty to account for funds deposited after June 24, 1938 with its clear holding that Interior's duty to account is not bounded by the provisions of the 1994 Act:

> [T]he government is incorrect to the extent that it assumes that the 1994 Act forms the basis for its fiduciary obli-

gations. The 1994 Act did not create these obligations any more than it created the IIM trust accounts. As noted above, the 1994 Act was a remedial statute designed to ensure more diligent fulfillment of the government's obligations. It recognized and reaffirmed what should be beyond dispute—that the government has longstanding and substantial trust obligations to Indians, particularly to IIM trust beneficiaries, not the least of which is a duty to account.

*Id.* at 1098. The D.C. Circuit went on to explain:

> The fundamental problem with appellants' claims is the premise that their duties are solely defined by the 1994 Act. The Indian Trust Fund Management Reform Act reaffirmed and clarified preexisting duties; it did not create them. It further sought to remedy the government's long-standing failure to discharge its trust obligations; it did not define and limit the extent of appellants' obligations.... Enactment of the Indian Trust Fund Management Reform Act in 1994 did not alter the nature or scope of the fiduciary duties owed by the government to IIM trust beneficiaries. Rather, by its very terms the 1994 Act identified a portion of the government's specific obligations and created additional means to ensure that the obligations would be carried out.

*Id.* at 1100. And in the context of Interior's duty to account, the D.C. Circuit declared: "Not only does the 1994 Act plainly reaffirm the government's preexisting duty to provide an accounting to IIM trust beneficiaries, but *it is plain that such an obligation inheres in the trust relationship*

---

**55.** It bears mentioning that it is very difficult, to say the least, for the Court to believe that Interior takes its fiduciary obligations seriously when it attempts to sidestep one of its clearly-mandated duties with an argument tantamount to "It depends on what the meaning of the word 'are' is."

*itself.* The obligation of a trustee to provide an accounting is a fundamental principle governing the subject of trust administration." *Id.* at 1103 (emphasis added) (citations and internal quotation marks omitted).

If Interior's obligation to account inheres in the trust relationship itself, then its obligation to account arose at the very moment that the trust relationship was created. Accordingly, its duty to account is not satisfied until it has performed an adequate accounting for all funds deposited in the IIM trust fund, regardless of whether they were deposited in 1887, 1938, 1994, or 2003. The 1994 Act did not place any limitation on this pre-existing duty to account to IIM beneficiaries whose funds were being held for their benefit. *See id.* at 1104 ("In 1996 (prior to the filing of the initial complaint in this case) the Interior Department's Solicitor issued an opinion that government trustees have an 'affirmative duty ... to make a *full and proper accounting.*' Nothing in the 1994 Act, nor any other federal statute, acts to limit or alter this right.") (emphasis added); *Ak Chin*, 667 F.2d at 1003 (requiring the United States to perform an accounting of IIM funds "extend[ing] from the earliest date any such fund existed" until the cutoff date of the court's jurisdiction).

The Court therefore concludes that, because Interior possesses both a statutory duty to account for all funds deposited or invested in the IIM trust fund pursuant to the Indian Reorganization Act of 1938, and a fiduciary duty to account that predates the passage of the 1994 Act, Interior must perform an accounting of *all* funds deposited or invested in the IIM trust fund since the passage of the General Allotment Act in 1887. The Court further concludes that the failure of Interior's Plan to recognize the full consequences of its duty to account renders it a Plan that will necessarily delay, rather than accelerate, the performance of an adequate historical accounting of the IIM trust fund.

(3) Deceased Beneficiaries

Interior's Plan also "does not contemplate performing historical accounting work for the closed accounts of deceased predecessors of current IIM account holders." Interior's Accounting Plan at II–3. Its Plan discusses its rationale for this exclusion:

> General trust law principles support the assumption of correctness of any property distribution made to a current account holder through the distribution of a probated estate. In other words, in providing a full accounting to a current account holder, a trustee is not also required to provide an accounting of the account from which the property was inherited. The reasons for this are well-established. Traditionally, a trustee provides an accounting to current beneficiaries in order to state "what property has been received ... and what funds have been paid out and for what purpose;" a trustee should not be obligated to prove the validity of each underlying transaction in the account for the previous beneficiary.
>
> This is particularly the case where the underlying transaction is a probate order. With respect to probate, there are typically procedures for both notice to interested parties and a hearing, and resulting probate orders are presumptively valid. Moreover, once the probate order is issued, there are established rehearing and appeal rights and procedures for seeking to reopen the probate proceeding even after these rights have been exhausted or have expired. For these reasons, it is reasonable for a trustee to rely on the probate order as a correct statement of the

property due the beneficiary, and the trustee is not required to conduct an accounting of the decedent's trust account in order to provide a full account of the trust account of the current beneficiary. If a current IIM account holder has questions about the correctness of a property distribution, they can be raised in the appropriate proceeding, but not through a request for an accounting of the trust account.

*Id.* at II–3 to II–4 (footnote omitted).

This explanation conflates two issues—whether Interior may treat the results of an Indian probate proceeding as presumptively valid, and whether Interior must account for transactions occurring in the accounts of deceased IIM beneficiaries. The Court will analyze these two issues separately.

28 U.S.C. § 372 provides, in relevant part:

When any Indian to whom an allotment of land has been made, or may hereafter be made, dies before the expiration of the trust period and before the issuance of a fee simple patent, without having made a will disposing of said allotment as hereinafter provided, the Secretary of the Interior, upon notice and hearing, under the Indian Land Consolidation Act or a tribal probate code approved under such Act and pursuant to such rules as he may prescribe, shall ascertain the legal heirs of such decedent, and his decisions shall be subject to judicial review to the same extent as determinations rendered under section 373 of this title.[56]

Section 373 establishes similar procedures for determining the validity of a will issued by an IIM beneficiary. Interior has published regulations governing the direct review of probate proceedings involving IIM beneficiaries. *See generally* 25 C.F.R., pt. 15. Once a person has exhausted the administrative remedies provided for appeals of an heirship determination or will contest involving an IIM beneficiary, he or she may seek review in federal district court. The federal courts also possess jurisdiction to entertain claims that an Indian probate proceeding violated the Constitution, which is not subject to an exhaustion requirement. *Anderson v. Babbitt,* 230 F.3d 1158, 1162 (9th Cir.2000).

■■■ Thus, the federal courts may review challenges to an Indian probate proceeding in one of two ways: (1) on direct appeal, after all administrative remedies have been exhausted or (2) on a collateral challenge to the constitutionality of the proceeding. Apart from these two avenues, the federal courts may not review the validity of such proceedings. Inasmuch as such proceedings are foreclosed from review by the federal courts, unless one of these two requirements is satisfied, the Court concludes that it is appropriate for Interior to treat the final determination made in such proceedings as presumptively valid.

However, it does not follow from the fact that Interior may presume final determinations in Indian probate proceedings to be valid that Interior is thereby not required to account for any transactions in deceased beneficiaries' IIM accounts. A simple example will illustrate why the conclusion does not follow from the stated premise. Suppose Beneficiary X died intestate in 1990. Following an heirship proceeding conducted by Interior, X's property was divided equally among four persons determined to be X's heirs, all IIM beneficiaries, who are still living. Now suppose that during X's life, X never

---

**56.** In 1990, Congress amended the final clause of this sentence, which had previously provided "and his decision thereon shall be final and conclusive."

received $500 that was supposed to have been disbursed to him from the IIM trust fund, and that the available records make clear that X never received this sum.

In such an instance, it would be appropriate for Interior to treat the heirship proceeding as presumptively valid, and to conclude that the four persons designated as X's heirs were entitled to equal portions of X's property upon his death. But if the transactions occurring in X's account during X's life were to be excluded from Interior's proposed accounting, X's heirs would not receive the $500 to which they are entitled, in equal portions, as X's heirs. In other words, if these transactions were to be excluded from Interior's proposed accounting, then X's heirs—who are living IIM beneficiaries—would never discover that the balances of their respective trust accounts are $125 lower than they presently should be.

■ Plainly, then, no adequate historical accounting can exclude transactions that occurred during the life of IIM beneficiaries who are now deceased. The Court has already concluded that Interior's historical accounting must account for all funds within the IIM trust since the date of inception of the trust. Consistent with this conclusion, the Court also concludes that Interior must include in its historical accounting all transactions that occurred during the lives of IIM beneficiaries who are now deceased. The Court further concludes that the failure of Interior's Plan to include such transactions renders it a Plan that will necessarily delay, rather than accelerate, the performance of an adequate historical accounting of the IIM trust fund.

(4) Assets

■ Interior's Plan also excludes from its accounting any assets held by the IIM trust, as opposed to funds within the trust. It is true that section 102 of the 1994 Act

mandates only that "[t]he Secretary shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to section 162a of this title." 25 U.S.C. § 4011(a). However, as explained above, both this Court and the D.C. Circuit have determined that the scope of Interior's duty to account is not limited by the terms of the 1994 Act. Additionally, in its 2001 opinion, the D.C. Circuit explained:

> The 1994 Act requires that the Interior Department perform an "adequate" accounting. This indicates that the accounting must be sufficient to serve the purposes for which a trust accounting is typically conducted. By this standard, the district court's conclusion that the management of a trust and rendering of an adequate accounting requires the locating and retention of records, operational computer systems, and adequate staffing was, in plaintiffs' words, "self-evident." Anything less would produce an inadequate accounting.
>
> This conclusion is reinforced by basic common law trust principles. It is black-letter trust law that "[a]n accounting necessarily requires a full disclosure and description of each item of property constituting the corpus of the trust at its inception." *Engelsmann v. Holekamp*, 402 S.W.2d 382, 391 (Mo.1966); see also BLACK'S LAW DICTIONARY (7th ed.1999) (defining accounting as "the report of all items of property, income, and expenses" prepared by the trustee for the beneficiary).

*Cobell VI*, 240 F.3d at 1103. Inasmuch as black-letter trust law mandates that an accounting include a full disclosure and description of each item of property constituting the corpus of the trust at its inception, Interior's historical accounting must

include such a full disclosure and description. *See Ak Chin,* 667 F.2d at 1003 ("The Government has no obligation to administer Indian assets (other than money) for profit, but if it has undertaken so to do, it must account. Where the Government has used reservation land itself, or permitted third parties such use, or has permitted trust assets to be exploited for nontrust purposes, accounting is required.").[57]

Interior argues, however, that the corpus of the trust consists only of funds, not of the allotted lands themselves:

> The IIM trust contains only *funds;* it does not contain all assets held in trust for the benefit of individual Indians. Not all trust assets generate monies that are placed in IIM accounts. Nor are the trust assets that do generate

monies themselves transferred into the IIM trust. The corpus of the IIM trust is the money that is deposited in the accounts, not the underlying trust assets that generate those funds.

Defs.' Prop. Findings and Conclusions at 121 (emphasis in original). Interior cites no case law for its curious proposition that the law of trusts draws a distinction between the "corpus" and "assets" or a trust, nor for its statement that the IIM trust contains only "funds" but not "assets." Indeed, the available case law supports the converse of both propositions.[58] Additionally, neither the *Restatement of Trusts* nor *Bogert on Trusts* provides support for either proposition.[59]

This should not be surprising, because Interior's statements represent a misappli-

---

**57.** Moreover, it is arguable that section 101 of the 1994 Act also mandates the inclusion of an accounting of assets within the historical accounting, in that it provides: "The Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following: (1) Providing adequate systems for accounting for and reporting trust fund balances." 25 U.S.C. § 162a(d)(1). It is difficult to understand how an adequate system for accounting for and reporting trust balances could be maintained without an understanding of how the assets in the trust—the allotted lands—were affected over time.

**58.** *See, e.g., United States v. Mitchell,* 445 U.S. 535, 547, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*"Mitchell I"*) ("The structure created by the [Dawes] Act has all the necessary elements of a common-law trust—a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (the designated allotment lands).") (White, Brennan, and Stevens, JJ., dissenting); *United States v. Mitchell,* 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*"Mitchell II"*) (observing that "a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United

States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds)." (citing *Restatement (Second) of Trusts* )).

**59.** *See Restatement (Third) of Trusts* § 40, Introductory Note (2003) (explaining that "the expression 'trust property' (or 'trust assets' or 'trust estate') denotes things or interests in things that are held in the trust, while the term 'subject matter of the trust' refers to the things themselves, some or all interests in which are held in the trust. Thus, if S transfers an undivided interest in a fund or fungibles, or a remainder interest in Blackacre, to T as trustee, the trust property held by T is the undivided interest, or the remainder, but the fund or fungible property, or Blackacre, is the subject matter."); GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 1, at 4 (1984) ("BOGERT ON TRUSTS") ("The *trust property* or *res* is the interest in property, real or personal, tangible or intangible, which the trustee holds, subject to the rights of another. It should first be noted that an interest in property is always an element of the trust .... [T]he trust presupposes described, ascertained or ascertainable property, a defined interest in which is to be owned or held by the trustee .... The trust property is sometimes called the trust res, the corpus, the capital, the subject or the subject matter of the trust.").

cation of the law of trusts. The allotted lands themselves are the "trust corpus" or "trust assets" or "trust property," which are held in trust by the United States. Not only does the IIM trust contain these lands, they are an indispensable element of the trust. These lands generate income, which Interior (as trustee-delegate) must distribute to the IIM beneficiaries. The IIM accounts are the means by which this income is distributed to the beneficiaries. In short, the monies deposited into the IIM accounts represent the *income* generated by the allotted lands held in trust by the United States, not the *corpus*, which is made up of the lands themselves.

Therefore, Interior's argument that it has no duty to account for the assets held in trust, as opposed to the funds (income) generated from these assets, is without merit. The Court concludes that the accounting conducted by Interior must include an accounting of all assets held in the trust, from the inception of the trust in 1887 until the present. The Court further concludes that the failure of Interior's Plan to include an accounting of assets renders it a Plan that will necessarily delay, rather than accelerate, the performance of an adequate historical accounting of the IIM trust fund.

### (5) Direct Pay

■ Another issue that received considerable attention during the Phase 1.5 trial was the issue of direct-pay leases and contracts. During his direct examination, historian Edward Angel provided a useful brief description of the concept:

Q. Let's talk about direct pay. Do you understand what that term is as it is used in this litigation?

A. I believe so, yes.

Q. Would you tell us what your understanding is?

A. My understanding of direct pay is money paid by a lessor or when an allotment is sold directly to the Indian and not passing through the IIM system.

Q. Can you think of any examples?

A. In 1916, and this is the earliest instance I have seen of it, farming and grazing lease regulations concerning farming and grazing leases. Indians who were deemed, and this is the term that was used at the time, competent, were permitted to lease their lands, and they were permitted to receive money from the lease directly.

It is interesting to note that they were also allowed to lease their children's land, but with minors the money had to go into the IIM system[.]

Q. Other examples that you know of that reflect the operation of direct pay?

A. Well, I know that in a couple of instances, the General Accounting Office reports in the 1950s, . . . the General Accounting Office urged the Bureau of Indian Affairs to encourage direct pay, so it would reduce its bookkeeping load.

Tr., Day 27, PM session (June 12, 2003) at 24:13—25:11.

Yale law professor John Langbein defined the concept of direct pay as the "ability on the part of beneficiaries of certain of the land interests to, in effect, withdraw the trust assets from the direct management of the trustee, and have the beneficiary do its own leasing or other management decisions with respect to the trust property." Tr., Day 19, PM session (June 2, 2003), at 72:22—73:2. Professor Langbein observed that "what is so special [about the IIM trust] as I understand it is that the [withdrawn] asset continues to be treated as a part of the trust corpus, and some level of trustee duties will apply,

[n]otwithstanding that it has escaped the management control of the fiduciary." *Id.* at 73:13–17.

Indeed, a 1965 opinion issued by Interior's Office of the Solicitor affirms that "[i]t is settled beyond debate, of course, that the direct income from a trust allotment partakes of the character of the corpus of the allotment itself and is subject to all the authorities and responsibilities of the trust undertaking relating to the allotment itself." Lease of Restricted Land—Federal Supervision Over Rentals Payable Directly to Lessor, 72 Interior Dec. 83 (Feb. 17, 1965), *available at* 1965 WL 12755 (citing *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956)). A 1960 opinion from the same office made clear that Interior possessed a duty to verify the accuracy of a lessee's payments made under a direct-pay lease:

> You have requested advice as to the responsibility of the Secretary for the accuracy of payments made to individual Indians pursuant to 25 CFR 172.14, which provides for selected Indian landowners to receive rental and royalty payments directly from the oil and gas lessee.
>
> The Secretary of the Interior has a duty to verify the accuracy of the lessee's rental and royalty payments when administering oil and gas leases on allotted Indian lands under the Act of March 3, 1909, 39 Stat. 781, 783, as amended in the Act of August 9, 1955, 69 Stat. 539, 540, 25 U.S.C. 396. This duty arises because of the trust or restricted character of the leased lands and the relationship between the Indian landowner and the United States which has been likened to that of a guardian and ward. The Act of March 3, 1909, as amended, *supra,* does not refer to any specific duty but contains broad language authorizing the Secretary of the Interior

> " * * * to perform any and all acts and make such rules and regulations as may be necessary* * *."
>
> Accordingly, the regulations of this Department pertaining to oil and gas leasing on Indian land provide that the lessee furnish statements containing information from which the accuracy of the lease payments may be determined, whether the payment be transmitted to the Department or directly to the Indian landowner. In the event payment is inaccurate and the amount due is not paid by the lessee, then appropriate action must be taken to cancel the lease and/or take such other suitable action against the lessee and his bondsman as is provided for in the lease or in the applicable regulations.
>
> From the record before us, it appears the United States Geological Survey concludes from its experience with direct payment at the Five Tribes Agency that the procedures presently employed by the Department do not enable Survey accountants to verify the accuracy of payments made directly to the individual Indians. The Bureau of Indian Affairs takes a contrary position. Consequently, it appears that an administrative decision in this regard may involve a change in the present accounting procedure as well as a realignment of accounting responsibility within the Department to accommodate the change.

Regulation Authorizing Lessees of Allotted Indian Land to Pay Rental and Royalty Directly to the Indian Owner (Nov. 1, 1960), *available at* 1960 WL 12652 (Pls.' Ex. 251) (internal citations omitted).

Additionally, the Federal Circuit in *Brown v. United States,* 86 F.3d 1554 (Fed.Cir.1996), held that the Interior Department acts as a fiduciary to allottees with respect to commercial leases. The plaintiffs in *Brown* were allottees who had

collectively entered into a direct-pay lease for the use of their land as a commercial golf course pursuant to 25 U.S.C. § 415(a), which provides in relevant part:

> Any restricted Indian lands, whether tribally, or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential, or business purposes, including the development or utilization of natural resources in connection with operations under such leases, for grazing purposes, and for those farming purposes which require the making of a substantial investment in the improvement of the land for the production of specialized crops as determined by said Secretary.

Although the Court of Federal Claims subsequently dismissed the plaintiffs' action for breach of fiduciary duties against Interior, the Federal Circuit reversed. It acknowledged that "the Secretary lack[ed] ongoing management responsibility over the day-to-day administration of commercial leases concerning allotted lands," but nevertheless determined that Interior possessed an enforceable fiduciary duty with respect to such commercial leases under the "control" portion of the "control or supervision" test created in *Mitchell II,* 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Specifically, the court explained:

> It is plain that the allottees do not control the leasing of their lands. First, they can only grant those leases of which the Secretary approves. Second, they can grant leases only on terms and forms that the Secretary dictates. Third, an allottee cannot cancel a lease without the Secretary's prior approval under 25 C.F.R. § 162.14. Fourth, the Secretary can cancel a lease without the allottee-lessor's consent.... Nor may

the Secretary's power be considered a mere oversight power, inasmuch as its exercise is a necessary prerequisite to the execution of a valid and binding lease. Oversight power is an after-the-fact power to review transactions that have been negotiated and executed by others. The Secretary's approval power over leases, by contrast, must be exercised *before* any valid leasing transaction can occur.

*Brown,* 86 F.3d at 1561–62 (emphasis in original) (internal citations omitted). Accordingly, the court concluded that "by virtue of the control they place in the hands of the Secretary, section 415(a) and the implementing regulations of part 162 impose upon the government a fiduciary duty in the commercial leasing context." *Id.* at 1563.

To his credit, during his Phase 1.5 trial testimony, Associate Interior Deputy Secretary Cason did not attempt to sidestep the fiduciary responsibilities that Interior owes to IIM beneficiaries with respect to direct-pay leases:

> It has become clear to me that trust law and the application of trust duties is a complicated matter, and that I think certainly the Department has some trust responsibilities in direct pay situations.
>
> As a person who is not an attorney, I have not been in a position to fully explore all of the possible circumstances and fact sets regarding direct pay to say, here it is, and here it is not, and here are the limitations. So at best I could suggest that in some circumstances we do, but I don't know the limitations of those.

Tr., Day 21, PM session (June 4, 2003), at 29:1–4. Cason also noted his understanding that the United States bears responsibility for enforcing direct-pay leases. *Id.* at 27:20–23. Indeed, the available case law demonstrates that on at least one occa-

sion, the United States has canceled a direct-pay lease and brought a damages action against the lessee. *See Montana Eastern Ltd. v. United States,* 95 F.2d 897, 899 (9th Cir.1938) ("Appellant contends that since the United States was not a party to the leases, and had no interest in the rents and royalties, it was not entitled to bring the action, because it was not the real party in interest. We think that the United States properly brought the action.").

In sum, Interior's Solicitor has concluded that "the direct income from a trust allotment partakes of the character of the corpus of the allotment itself and is subject to all the authorities and responsibilities of the trust undertaking relating to the allotment itself" and that Interior possesses a duty to verify the accuracy of a direct-pay lessee's rental and royalty payments; the Federal Circuit has held that Interior possesses a fiduciary duty to Indian beneficiaries with respect to commercial leases, including direct-pay commercial leases; and both the present Interior Associate Deputy Secretary and available case law agree that the United States bears responsibility to enforce direct-pay leases. The Court therefore concludes that Interior's fiduciary duty to account, which predates the 1994 Act, mandates that any adequate historical accounting of the IIM trust must include an accounting of all monies paid to IIM beneficiaries in conjunction with direct-pay leases and contracts. The Court further concludes that the failure of Interior's Plan to include an accounting of such monies renders it a Plan that will necessarily delay, rather than accelerate, the performance of an adequate historical accounting of the IIM trust fund.

(6) Contract / Compact / Cooperative Agreement

██ The Indian Self–Determination Act and Education Assistance Act of 1975, Pub.L. No. 93–638, 88 Stat. 2203, as amended, "creates a mechanism for the transfer to Indian tribes of programs previously carried out by the Bureau of Indian Affairs ... or by other agencies within the Department of the Interior." Memorandum from John D. Leshy, Office of the Solicitor to Ken Rossman, Director, Office of Trust Litigation Support and Records 2 (Nov. 28, 2000) (Pls.' Ex. 259). These programs include the management or administration, at a local level, of certain aspects of IIM trust management. However, "the fact that a tribe takes over federal duties by entering into one or more contracts or a compacting program does not extinguish the federal trust responsibility." *Id.* at 3. Indeed, Interior's Office of the Solicitor has acknowledged that the 1994 Act

> unequivocally requires the Secretary to "account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian ...." Nothing in the [1994] Act suggests that this mandate would be waived if the records relating to that trust responsibility were generated in the context of an Indian self-determination contract or compact program, or if the records were simply being held by a tribe.

*Id.* at 5 (footnote omitted). When this portion of the 2000 memorandum was read into the record during the Phase 1.5 trial, Associate Deputy Secretary Cason affirmed that it was "consistent with [his] understanding." Tr., Day 22, PM session (June 5, 2003) at 52:12–14.[60] Indeed, noth-

---

**60.** *Cf.* Tr., Day 21, PM session (June 4, 2003), at 40:17–25:

> A: So I don't know specific circumstances here, but as a general rule, or a general perception on my part, that whether are

ing in Interior's Accounting Plan represents that its proposed historical accounting will not include IIM accounts whose assets are administered or managed by Tribes pursuant to contract, compact, or some other form of agreement. Given the above testimony, the Court concludes that Interior's historical accounting must include an accounting of IIM accounts whose assets are administered or managed by Tribes pursuant to contract, compact, or other form of agreement. The Court further concludes that the failure of Interior's Plan to specifically include an accounting of such assets renders it a Plan that will necessarily delay, rather than accelerate, the performance of an adequate historical accounting of the IIM trust fund.

### (7) Land Escheatment

█ In a provision of the Indian Land Consolidation Act, 96 Stat. 2519, *as amended*, 25 U.S.C. § 2206 ("ILCA"), Congress provided for the "escheatment," or transfer of title, to Indian tribes of certain property interests within the IIM trust fund upon the death of the owner of the property interest. To explain the relevance of the ILCA provision to the present case, it is first necessary to introduce the reader to the problem of fractionated interests in allotted lands.

In its Phase I opinion, this Court explained that

fractionated interests arose out of the history of the allotments. The original allotments were generally made about one-hundred years ago, and virtually all of the original allottees died intestate, resulting in a distribution of interests in the allotment among all the decedents'

children. This process has continued for nearly seven generations, resulting in numerous owners of some of these allotments. As a result of this fractionalization, the average land allotment has forty or more owners, complicating both asset and financial trust management. The fractionated interests are further complicated by allotments leaving trust status by virtue of non-Indians ownership. Most tribes have blood quantum requirements. For instance, the Pawnee Tribe of Oklahoma requires that an individual be one-quarter or more Pawnee blood in order to be a member of the tribe. If an individual Pawnee is one-quarter and his or her spouse is not Indian, then their children will be one-eighth Pawnee and therefore not members of the Pawnee Tribe. At that point, when the children inherit the allotment, the land comes out of trust because the United States only has a trust responsibility to Indians.

*Cobell V*, 91 F.Supp.2d at 17 n. 14 (internal citation omitted).

A simple example will perhaps best illustrate this difficulty. As explained above, when Indian reservation lands were parceled out to individual Indians between 1887 and 1934, heads of families were allotted land parcels of 160 acres. Thus, if a head of family for whom 160 acres of land was being held in trust died, leaving four children as his heirs, each of the four children might receive a one-quarter interest in his parcel. As such, each child would be entitled to 25% of the revenues generated from the use of that parcel. If one of the children then died, leaving four

---

trust duties are contracted, or compacted, or managed directly by the Department, our duties would generally be the same without regard to mechanism.

Q. Have you ever been informed in that regard that, in fact, a contract or compact does not diminish the duties of the United States?

A. That is my general understanding of the process.

(testimony of James Cason).

children as her heirs, each of the four children might then receive a one-quarter interest in her parcel. As such, each child (the grandchild of the head of family to whom the 160 acres was allotted) would be entitled to 1/16 (1/4 × 1/4) of the revenues generated from the use of that parcel. Thus, with the passage of two generations, the number of persons with an interest in the 160–acre parcel has increased, but the percentage of their interest diminishes in proportion to the number of generations they are removed from the original allottee of the parcel. And with the passage of almost six generations since 1887, the result has been an ever-increasing number of descendants of the original allottees, each of whom possess an ever-decreasing percentage of interest in the revenues generated from the allotted lands.

"Fractionation" is the name given to this phenomenon, namely, "the increasing partition of ownership as allotments are divided among heirs in each generation." Interior's Accounting Plan at III–5. As Interior recognizes, at present, "revenue receipts may be divided among dozens to more than 1,000 individual owners of a single allotment. Further, many IIM account holders have ownership interests in allotments in several locations, processed by different BIA agencies, the revenue from which must be examined when relevant account transactions are reconciled." *Id.*

In 1983, Congress attempted to address the problem of fractionation in section 207 of the ILCA, which mandated that the title of small fractionated property interests— those that constituted two percent or less of the total acreage in an allotted land tract, and that had earned less than $100 in the preceding year—would escheat, or transfer, to the Tribe that owned the allotment upon the death of the owner of the fractionated interest. However, four years

later, the Supreme Court held that section 207 constituted a taking without just compensation, in violation of the Fifth Amendment. *Hodel v. Irving,* 481 U.S. 704, 716– 18, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987). Although Congress amended the statute in 1984 to attempt to remedy the constitutional infirmity, the Supreme Court struck down the amended statute on the same grounds in 1997. *Babbitt v. Youpee,* 519 U.S. 234, 243–45, 117 S.Ct. 727, 136 L.Ed.2d 696 (1997). Between 1983 and 1997, however, a number of fractionated interests were transferred, upon the death of their owners, to various Tribes.

The issue for the Court to decide, then, is whether Interior must account for the interests that were transferred to Tribes during this fourteen-year period. In an April 6, 1999 filing with the Special Master, the United States explained the steps that Interior was taking in response to the two Supreme Court decisions:

> As a result of the *Youpee* decision, the Department of the Interior is reopening the pre-*Youpee* estates to redistribute to individuals those land interests that had escheated to the Tribes. This redistribution project is a substantial undertaking. Based upon the information gathered by the Department of the Interior in November 1998, the redistribution project will entail the modification of the probate orders for approximately 64,955 fractionated interests and create 774,749 fractionated interests using about 36 employees over a 24–30 month period at a cost of almost $3 million. This amount does not include costs associated with the redistribution of proceeds derived over a 10–year period from the escheated interests and paid to the Tribes.

United States' Statement on Predecessors in Interest for Purposes of Document Production (Pls.' Ex. 258) at 2 (internal citation omitted). Interior's Eighth, Ninth,

Eleventh, and Thirteenth Quarterly Reports have included updates on this redistribution process.

Because of this ongoing process, Interior asserts that the escheated lands should not be included in its proposed accounting:

> If and when Interior resolves an escheatment that is determined to have been invalid, the impact, if any, on an IIM account will depend upon a number of factors, including: whether the property interest was revenue-producing; whether restoration of the interest is possible; and what form of compensation, if any is owed, will take and how and when it will be paid. . . . If and when that process results in funds being deposited in an IIM account, Interior must determine how to account to the account holder for those funds pursuant to the 1994 Act and the Orders of this Court.

Defs.' Prop. Findings and Conclusions at 9. During closing arguments in the Phase 1.5 Trial, this Court stated that the resolution of the *Irving* and *Youpee* decisions lies outside the scope of its mandate.[61] The Court adheres to that statement, with the sole caveat being, as Interior acknowledges, that if the redistribution process results in funds being deposited into an IIM account, or escheated land interests being returned to the IIM trust fund, Interior must account for those funds and those property interests. The reason is that when interests escheated to the Tribes under the ILCA, they no longer represented interests of an individual Indian in allotted lands; rather, at that point, they became Tribal interests.

Of course, if an escheated interest is returned to an IIM beneficiary pursuant to the distribution process, it once again represents a property interest by an IIM beneficiary in allotted lands, and must therefore be accounted for. But whether the interest will fall within the scope of the historical accounting or a later accounting to be performed by Interior depends on whether the interest is returned to the beneficiary by the time that Interior completes the historical accounting project. For example, if an escheated interest is restored to Beneficiary X before the completion of the historical accounting project, it must be included within the historical accounting, because it is once again a property interest maintained by an IIM beneficiary. But if an escheated interest is restored to Beneficiary Y after the historical accounting project is completed, then Interior must include an accounting for that interest in one of its subsequent accounting reports to that beneficiary, the issuance of which is mandated by the 1994 Act.

In sum, the Court concludes that Interior must include within its historical accounting project all interests that escheated pursuant to ILCA and that reverted back to IIM beneficiaries during the historical accounting process. Additionally, all interests that escheated pursuant to ILCA and that reverted back to IIM beneficiaries after the historical accounting process is completed must be accounted for in subsequent accounting reports to those beneficiaries.

### e. Methods of Verification

As observed above, a proper accounting does not consist merely of a list of transac-

---

**61.** *See* Tr., Day 44, PM session (July 8, 2003), at 31:7–13 ("[F]rom the testimony I have heard, I agree that there are problems about compliance with what the Supreme Court said [in *Youpee* ], but I don't think that that is an issue for me to resolve[;] it is an issue for

whatever court has that case in whatever posture it is after the Supreme Court's decision I suppose, enforcement of judgment, or whatever the proceeding that would be brought there.")

tions; rather, the trustee must provide supporting documentation that is adequate to demonstrate that each listed transaction actually took place. In its Plan, Interior has proposed two methods by which it intends to verify the existence of transactions within the IIM accounts. For each transaction recorded as occurring within a special deposit account, judgment account, or per capita account, Interior intends to "reconcil[e] the amount of the recorded transaction to both supported financial documents and ownership information." Interior's Accounting Plan at III–9. Specifically, Interior has developed an Accounting Standards Manual identifying the types of documentation that will be considered adequate to verify the existence of a particular transaction.

Interior intends to employ the same reconciliation method for each transaction occurring within the land-based accounts with a value of $5000 or more. For all transactions within the land-based accounts with a value of less than $5000, however, Interior proposes to verify their existence using a statistical sampling method. Each method is analyzed separately below.

(1) Accounting Standards Manual

The version of the Accounting Standards Manual ("the Manual") filed with the Court is dated May 9, 2003. The Manual represents the result of a collaboration between five accounting firms (Chavarria, Dunne & Lamey LLC; Deloitte & Touche LLP; Ernst & Young LLP; Grant Thornton LLP; and KPMG LLP), the National Opinion Research Center at the University of Chicago, and Interior. Manual at preface (Defs.' Ex. 59). It "identifies the key documents to be used and briefly outlines the policies and procedures to be followed in performing the Historical Accounting of

IIM accounts in the IIM Trust Fund." *Id.* at I–1. Michelle Herman, a director with the accounting firm of KPMG, LLP, testified that the Manual was developed based on information collected during the Paragraph 19 process.[62] Tr., Day 23, AM session (June 6, 2003) at 17:17–24. She also testified that, although it is anticipated that the Manual will be continually revised during the accounting process, the Manual presently includes a listing of all major revenue sources for the IIM trust. *Id.* at 18:4–9.

The Manual contains chapters corresponding to each revenue source, and each chapter includes two sets of tables. A summary table provides a list of document types and designates each as "Level One" or "Level Two." For each document type, a detailed table is provided in the chapter containing a physical description of the document, its title and form number (if applicable), its primary data elements, and a reference to a page in the Manual appendix containing a photocopy of a sample of the document.

"Level One documents" are defined as documents that the accounting teams conducting the verification process should use first to support individual transactions. Manual at I–iv. "Level Two documents" are defined as documents that should be used to support individual transactions if no Level One documents are available.

Thus, for example, chapter 2 (Disbursements—General) begins with a summary table listing one Level One document type—negotiated checks and the equivalent documentation for electronic funds transfers—and three Level Two document types—non-negotiated checks, disbursement schedules, and supplemental disbursement documents—that may be used

---

**62.** *See supra* n. 40.

to verify the existence of an individual general disbursement.[63] Id. at 2.0–1. Each document type, in turn, is the subject of a detailed table within the chapter describing each document contained within the document type. For example, the first row of the table for negotiated checks and the equivalent documentation for electronic funds transfers is as follows:

| Appendix Reference | Form Number | Document Title | Description | Key Data Elements | Comments |
|---|---|---|---|---|---|
| 2.1.1.1 | Negotiated: Treasury Check Stock Manual 3–Part | Negotiated: United States Treasury Check 15–51 000 | This is a 3–part heavyweight paper check printed on Treasury stock like those disbursed by Treasury, but these are produced manually within Interior. | Payee name Amount of payment Check number | A manual check is not the normal method under the current process, but it is valid when used. |

Id. at 2.1–2. The "Document Title" and "Form Number" columns inform a user of the Manual that the document in question is a type of negotiated U.S. Treasury check. The "Appendix Reference" column lists the page of the Manual's appendix on which the user may find a photocopy of such a check. The "Description" and "Comments" columns provide descriptive information allowing the user to discern whether the document he or she possesses is, in fact, this type of check. Finally, the "Key Data Elements" column identifies the elements of information on the check that are most relevant to the verification process.

The Manual affords the accountants performing the verification process a significant degree of discretion. For example, its definition of Level Two documents provides that "[a]ccounting teams will need to use professional judgment to determine the sufficiency of Level Two documents for meeting the purposes of the Historical Accounting." Id. at I-iv. The Manual further provides that

[t]o help determine sufficiency of the documents used, the accounting teams should consider the nature of the evidence. Although the Historical Accounting is not an audit engagement, the American Institute of Certified Public Accountants ("AICPA") Statement of Auditing Standards Number 31 (AU 326) should be considered. In the case of a financial statement audit, the auditor obtains evidence to support financial statement assertions. The measure of validity of such evidence for audit purposes lies in the judgment of the auditor. The competence of the evidence includes an assessment of the pertinence of the

---

**63.** Actually, two other Level One documents are identified for specific types of disbursements, namely, disbursement authorizations if the payee is someone other than an IIM account holder and a negotiated check is not available, and limited payability documentation if the check was never cashed and the funds were returned to the Office of Trust Fund Management. Id. at 2.0–1 to 2.0–2.

evidence, its objectivity, its timeliness, and the existence of other corroborating evidential matter. Third-party documentation supporting the transaction provides greater objectivity than internally generated documentation.

*Id.* However, the fact that the accountants who will perform the verification process are permitted, to some degree, to rely on their professional judgment to determine whether available documents adequately support an individual transaction does not, of itself, mean that the Manual provides no meaningful constraints. It is by no means unusual for an accountant to rely upon his or her best professional judgment, rather than a fixed set of rules, at a particular juncture in the performance of an accounting.

Plaintiffs object that the types of documentation authorized by the Manual to verify individual transactions are insufficient. For example, plaintiffs imply that unless a negotiated check is located with respect to an individual disbursement, such a disbursement should not be accepted as verified. *See* Pls.' Proposed Findings of Fact: Defendants' Accounting Plan at 56. However, it is premature for this Court to make such a determination, which can only be made at the completion of the accounting process. For the present, it will suffice for the Court to find that a verification process conducted by professional accountants utilizing the standards outlined in the Manual may provide an adequate verification process for individual transactions. As discussed below, having conducted such a verification process, Interior will be in a position to proceed to the reporting stage of the historical accounting.

It is important to remember that although Interior's historical accounting will end with the completion of the reporting process, Interior's fiduciary duties to the beneficiaries do not thereby come to an end. Thus if, after receiving his or her accounting statement, an IIM beneficiary has questions about any individual transaction, he or she may request Interior to provide all documentation in its possession that support that transaction. In accordance with its fiduciary duty to furnish information, Interior must provide such documentation to the beneficiary upon request. If the beneficiary still believes that the transaction is not adequately supported, he or she may initiate a claim against Interior in the U.S. Court of Claims. In such an action, the burden of proof would then be upon the trustee to demonstrate that the payment was made, because all doubts are to be resolved in favor of the beneficiary. *Rainbolt v. Johnson,* 669 F.2d 767, 769 (D.C.Cir.1981) ("Under established principles of trust law, if the former trustee has not kept adequate accounts, the benefit of the doubt is to be given to the beneficiary. Once the accounting is completed, the District Court shall provide such additional relief for plaintiff-appellant as may be appropriate.") (citing *Bogert on Trusts* § 962); 2A *Scott on Trusts* § 172 ("If the trustee fails to keep proper accounts, all doubts will be resolved against him and not in his favor.") (footnote omitted). It is, in part, the threat of such liability that compels a trustee to maintain adequate documentation for all of its trust-related actions, and to provide an accounting that adequately reflects all of the information at the trustee's disposal.

In sum, having reviewed the Accounting Standards Manual, the Court finds that a verification process conducted by professional accountants using the representations in the Manual to verify the existence of each individual transaction occurring during the life of each individual account within the IIM trust fund may constitute an adequate process to verify the existence of such transactions. As noted above, the

Court will reserve its final determination of the adequacy of this process until the accounting has been completed.

### (2) Statistical Sampling

■ Interior does not propose to utilize the above-mentioned process to verify all transactions within the IIM accounts. Rather, for all transactions within the land-based accounts whose value is less than $5000, Interior proposes to utilize statistical sampling to verify that such transactions actually occurred. Because the adequacy of the proposed sampling process represents one of the most contested issues raised during the Phase 1.5 trial, the Court must analyze this issue in some detail, and at some length.

It is not known how many transactions were posted to land-based accounts before 1985. However, Interior reports that between 1985 and 2000, approximately 26.5 million transactions occurred in these accounts, representing over $3.3 billion of "throughput." Interior's Accounting Plan at III–12. It also reports that approximately 26.4 million of these transactions had a value of $5000 or less. *Id.* These transactions represent approximately $1.8 billion, or 55% of the total throughput between 1985 and 2000. *Id.*

Interior has divided the 1985–2000 transactions into two "strata," the first containing transactions with a value between $0 and $500, and the second containing transactions with a value between $500 and $5000. *Id.* It represents that it has hired a contractor, the National Opinion Research Center ("NORC") at the University of Chicago, to develop a method of conducting a statistical sampling of these two strata. *Id.*

"Statistical sampling is best understood as using information derived from a portion of a population to infer information on the population as a whole." *U.S. House of Representatives v. U.S. Dep't of Commerce,* 11 F.Supp.2d 76, 80 (D.D.C.1998), *aff'd,* 525 U.S. 316, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999). As described by Interior, the sampling method developed by NORC involves conducting a verification of 80,000 transactions from each strata, a total of approximately 160,000 transactions. *Id.* As for pre–1985 transactions—which are recorded only in paper-based media, not in electronic databases—Interior reports that it intends to employ a similar method of statistical sampling after the paper-based account transaction histories are electronically imaged. *Id.* at III–13.

No member of NORC testified during the Phase 1.5 trial, however. Instead, the only expert witness presented by Interior to testify about the statistical sampling plan was Dr. David Lasater, an accountant at KPMG LLP. Dr. Lasater testified that he did not know why Interior had not called any member of NORC to testify during the Phase 1.5 trial:

Q. And it is NORC's plan basically, isn't it?

A. The sampling portion of it is, yes, sir.

Q. By the way, did you review the testimony of anyone from NORC during this trial?

A. I am not sure that anyone from NORC has testified.

Q. Any particular reason that the people who created the plan didn't testify[,] to your knowledge?

A. I don't know.

Tr., Day 23, PM session (June 23, 2003) at 55:3–10.

In its Trial I opinion, this Court expressly declined to rule on the issue of "whether an accounting accomplished through a sampling technique will satisfy the requirements of the [1994] Act." *Cobell V,* 91

F.Supp.2d at 32 n. 22. However, because this issue was squarely presented in the Phase 1.5 trial, it will be necessary for the Court to resolve it.

The primary difficulty the Court has with authorizing the use of statistical sampling techniques is that although sampling may be an accepted method in *audit* practice, no evidence has been presented to the Court that statistical sampling has ever been considered to be an appropriate method to use in conducting an *accounting*. The terms "accounting" and "audit" are by no means synonymous. In an earlier opinion, this Court distinguished the two by noting that an "accounting" in the trust context represents the preparation of "a detailed report provided by a trustee for a beneficiary describing the trustee's conduct during the relevant time period, including a description of each item of property within the trust corpus, all items of property received into or disbursed from the trust, all income earned by the trust, and all expenses paid by the

trust." [64] *Cobell v. Norton,* 260 F.Supp.2d 110, 127 (D.D.C.2003). On the other hand, "[a]n 'audit' is a review of accounting records conducted by a person or entity other than the person or entity who prepared the records." [65] *Id.* at 123. *Cf. RLI Ins. Co. v. Berry, Dunn, McNeil and Parker, LLC,* 2003 WL 21210297 at n. 5 ("For example, the proper scope of an accounting review, as distinct from an audit, is very much in dispute.") (D.Me. May 11, 2003); *Arthur Andersen v. Superior Court,* 67 Cal.App.4th 1481, 79 Cal.Rptr.2d 879, 894 (distinguishing between "conduct[ing] an audit" and "participat[ing] in the preparation of ... inaccurate accounting records"). In other words, an accountant verifies a list of financial transactions by matching them with supporting documentation and producing an accounting report; an auditor reviews the work performed by the accountant to ensure that it was performed properly.

Appendix D to Interior's Accounting Plan, prepared by NORC, notes that

---

**64.** *See Cobell VI,* 240 F.3d at 1103 ("It is black-letter trust law that '[a]n accounting necessarily requires a full disclosure and description of each item of property constituting the corpus of the trust at its inception.' *Engelsmann v. Holekamp,* 402 S.W.2d 382, 391 (Mo.1966); *see also* BLACK'S LAW DICTIONARY (7th ed.1999) (defining accounting as 'the report of all items of property, income, and expenses' prepared by the trustee for the beneficiary).''); *Kelly v. Sassower,* 52 A.D.2d 539, 382 N.Y.S.2d 88, 89 (N.Y.App.Div.1976) ("*Inter alia,* a proper accounting, should state in clear and understandable terms the nature and value of the trust corpus when received; any realized increases or decreases on principal; any income received; any disbursements and distributions to beneficiaries; any commissions paid; and the amount and location of any balance on hand."); *State ex rel. King v. Harvey,* 214 So.2d 817, 819 (Miss.1968) ("An accounting is by definition a detailed statement of the debits and credits between parties arising out of a contract or a fiduciary relation. It is a statement in writing of debts and credits or of receipts and payments.

Thus an accounting is an act or a system of making up or settling accounts, consisting of a statement of the account with debits and credits arising from the relationship of the parties.") (citation omitted); *Rothschild v. Village of Calumet Park,* 262 Ill.App. 96, 104, 1931 WL 3041 (1931) ("Where a trust relation exists between parties, the cestui que trust is entitled to a complete accounting from the trustee, in which all data in the trustee's accounts, which it is his duty to keep, should be furnished, ... An accounting is a statement of receipts and payments by a trustee concerning the estate intrusted to his care, the detailed statement of its administration while in his hands, what has been received and from what sources, and the balance, if any, remaining.") (citation omitted).

**65.** *See* BLACK'S LAW DICTIONARY 126 (7th ed.1999) (defining "audit" as a "formal examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards").

"[s]tatistical sampling is routinely used in audit practice, as described in texts such as [DAN M. GUY, AUDIT SAMPLING: AN INTRODUCTION (1994)] and [ARTHUR J. WILBURN, PRACTICAL STATISTICAL SAMPLING FOR AUDITORS (1984)]. See also [AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, AUDIT SAMPLING (2001)]." As the titles of these texts make clear, they discuss the use of sampling in the performance of an audit, not an accounting. Nor does the appendix prepared by NORC represent that statistical sampling has ever been used in the performance of an accounting. Additionally, Interior's sole expert witness on the sampling plan acknowledged that he was unaware that statistical sampling had ever been used in the preparation of an accounting:

> Q. Okay. So isn't it true that the statistical sampling is not an accounting, correct?
>
> A. Statistical sampling in this case can be an important part of the testing of the transactions that will be a part of the disclosure that I understand will be called an accounting.
>
> Q. Right. But the statistical sampling is not an account, is that correct?
>
> A. That is correct.
>
> Q. Thank you. And you are not—
>
> THE COURT: You have never heard of an accounting statement being pre-

sented to the account holder based on statistical sampling, isn't that right?

THE WITNESS: That is correct, Your Honor.

Tr., Day 34, PM session (June 23, 2003) at 40:3–16 (testimony of Dr. David Lasater).[66]

Additionally, Paul Homan, the first Special Trustee, testified that although sampling methods might be appropriate for testing internal controls systems, "[y]ou can't use sampling techniques to account for money." Tr., Day 7, AM session (May 9, 2003) at 54:14–15. Homan further explained that

> the only way that I believe all funds can be accounted for historically or currently is by following a transaction-by-transaction approach, which would directly verify through documentation ownership information, followed by accounts receivable and lease and contract information, followed by a deposit, proof of deposit information, proof of investment information, and finally proof of disbursement information, all of which require various approvals, and legal contracts, legal surveys, and the like.

Tr., Day 1, PM session (May 1, 2003) at 8:6–15.[67]

Interior has cited a number of cases for the proposition that the federal courts have "approved of the use of statistical sampling as a means for auditing records and establishing adjudicative facts."

---

**66.** *See also* Tr., Day 33, PM session, at 53:1–8:
> Q. . . . Have you ever used the statistical sampling in lieu of an accounting for a trust before this case?
> A. No, sir.
> Q. Have you ever used statistical sampling in lieu of an accounting for a trust department of a bank in any of your experience for all of these years?
> A. No, sir.

(testimony of Dr. David Lasater). Moreover, a manual prepared by the American Institute of Certified Public Accountants, a portion of which was introduced by Interior into evi-

dence, discusses the auditing procedures utilized by bank trust departments in a wholly separate section from its discussion of the accounting of trust departments. *See* AM INST. OF CERTIFIED PUBLIC ACCOUNTANTS, AUDITS OF BANKS 101–07 (2d ed. 1984) (Defs.' Ex. 303).

**67.** *Cf.* Tr., Day 3, AM session (May 5, 2003) at 72:18–20 (remarking that Interior's proposed sampling method was "not an appropriate sampling technique, as I understand it, as a bank examiner or as would be performed by a CPA") (testimony of Paul Homan).

Defs.' Prop. Findings and Conclusions at 142. But none of these cases provide support for the use of sampling methods in the performance of an accounting, which is the issue presently before the Court.

Three of the cases cited by Interior involved challenges to sampling methods used by federal or state health officials in auditing Medicaid payment claims. In *Georgia v. Califano*, 446 F.Supp. 404 (N.D.Ga.1977), the U.S. Department of Health, Education and Welfare (HEW) conducted an audit of Medicaid reimbursements it had made to the Georgia Department of Human Services (DHR). The audit, which was conducted on the basis of random statistical samples of claims made by DHR, revealed that Georgia had overpaid some Medicaid claims. Extrapolating from the sample results, HEW demanded a refund of some of the reimbursements it had made to DHR. DHR filed suit under the APA, claiming that HEW's actions were arbitrary and capricious. The district court granted summary judgment for HEW, finding that HEW had utilized a "valid audit technique" in its audit of DHR's payment claims. *Id.* at 409. In *Illinois Physicians Union v. Miller*, 675 F.2d 151 (7th Cir.1982), the state department of public aid conducted an audit, involving the use of statistical sampling, of a physician participating in the state Medicaid program. Having determined that it had overpaid the physician, the state filed a claim for recoupment. The physician mounted a due process challenge to the use of statistical sampling in the performance of a Medicaid audit. Citing the *Califano* decision, the Seventh Circuit affirmed the district court's judgment in favor of the state. *Id.* at 155. Finally, in *Yorktown Medical Laboratory v. Perales*, 948 F.2d 84 (2d Cir.1991), a clinical laboratory mounted a due process challenge to the state's use of sampling in an audit of the laboratory's Medicaid payment claims.

Citing *Miller*, the Second Circuit affirmed the district court's award of summary judgment to the state, finding that the sampling technique used satisfied the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

A fourth case cited by Interior, *Michigan Dep't of Education v. U.S. Dep't of Education*, 875 F.2d 1196 (6th Cir.1989), involved an audit of a state department of education that had received federal funds for use in a vocational rehabilitation program. The audit, which was conducted by the Education Department's inspector general, determined that the state had made unallowable expenditures in thirteen out a random sample of 259 expenditures. Extrapolating from the sample results, the Education Department disallowed a portion of its future funding to the state program. The state filed suit, asserting that the reliance upon the sampling results was arbitrary and capricious. Citing *Califano*, the Sixth Circuit determined that the reduction in funding was neither arbitrary nor capricious. *Id.* at 1205–06.

Each of these four cases involves either a due process challenge to an administrative agency's use of sampling in the performance of an audit, or a claim that the agency's action was arbitrary and capricious. Unlike the present case, however, none of these cases involve the performance of an accounting. More importantly, in none of the cases did the agency in question possess the status of a trustee or a trustee-delegate, bestowing upon it the fiduciary duty to account. The precedential value of these cases is thus minimal, given that fiduciary standards represent a much higher threshold to satisfy than either the *Mathews* balancing test or the arbitrary and capricious standard.

The fifth case cited by Interior, *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996), was a class action involving 9541 claims for damages against Philippines President Ferdinand Marcos for human-rights abuses.[68] The district court heard the testimony of a statistics expert, who represented that "the examination of a random sample of 137 claims would achieve a 95 percent statistical probability that the same percentage determined to be valid among the examined claims would be applicable to the totality of the claims filed." *Id.* at 782 (internal quotation marks omitted). Proceeding upon the expert's recommendations, the district court held a jury trial on compensatory damages for 137 claimants whose claims had been randomly selected. The jury awarded damages for 135 of the claimants, and the court utilized the expert's calculations to determine an aggregate damages award for the entire class. On appeal, the defendants mounted a due process challenge to the sampling method used by the district court. While acknowledging that defendants' due process claim "[did] raise serious questions," the Ninth Circuit affirmed, finding that the procedure adopted by the district court satisfied the balancing tests set forth in *Mathews* and in *Connecticut v. Doehr*, 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991). *Id.* at 785.[69] Unlike in *Hilao*, however, Interior's proposed sampling method has not been approved by this Court. Additionally, for the reasons stated above, the relevant to the present case of a case involving a due process challenge to a procedure utilizing a sampling method is limited, at best.

Finally, the sole case cited by Interior from this Circuit demonstrates only that a reliance upon sampling methods is appro-priate in the performance of an audit be-cause an audit presupposes that individual-ized determinations of transactions have already been made. In *Chaves County Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914 (D.C.Cir.1991), health care pro-viders receiving Medicare payments chal-lenged a decision by the U.S. Department of Health and Human Services (HHS) to utilize statistical sampling in the perform-ance of an audit of their Medicare payment claims. The D.C. Circuit concluded that the use of sampling in the performance of the audit was appropriate because the au-dit merely supplemented HHS's individual-ized review of each claim for payment:

> The difficulty with [appellants'] argu-ment is that HHS has not, in fact, sus-pended individualized determinations and substituted sample adjudication on initial review of payment claims (a deci-sion that would be inconsistent with the [Medicare] statute); instead, the De-partment has supplemented individual-ized pre-payment review of claims with a sampling procedure on post-payment re-view of providers suspected of overbill-ing. We cannot find a statutory preclu-sion to such post-payment auditing nor to the method used to accomplish such objective.

*Id.* at 917. In *Chaves*, HHS had contract-ed with private entities to review individu-ally each payment claim submitted by a provider to determine whether the claim represented appropriate services rendered to an eligible Medicare beneficiary. *Id.* at 915. Claims that were approved were paid by HHS. After payments had been made, HHS audited groups of claims from each provider, using statistical sampling meth-

---

**68.** Although 10,059 claims were originally brought, the district court determined 518 of the claims to be facially invalid. *Id.* at 782.

**69.** Judge Rymer dissented, explaining that "due process dictates the choice: a real tri-al." *Id.* at 789.

ods, to determine whether it had overpaid that provider. *Id.* at 916. The D.C. Circuit determined that this "post-payment review," which utilized sampling methods, was appropriate because it served merely as a supplement to the individualized "pre-payment review" performed by HHS's contractors. *See id.* at 919 ("[W]e agree with HHS that the statutory scheme of individualized review of claims on pre-payment review can be reconciled with a sample adjudication procedure on post-payment review.").

The pre-payment review and post-payment audit conducted in *Chaves* are analogous to, respectively, an accounting and an audit performed on a trust fund. It is necessary for an accountant to make individualized determinations that each transaction during the life of the trust fund is supported by adequate documentation. By contrast, an auditor may make use of sampling methods because he or she is merely conducting a test to determine whether the accountant has rendered a proper accounting. The auditor's reliance upon sampling methods is justified because it is predicated upon the assumption that the accountant has already conducted an individualized determination of all transactions and found them to be supported by adequate documentation.

In sum, none of the cases cited by Interior provide support for the use of sampling methods in the performance of a trust accounting. Instead, they simply demonstrate that, in some instances, the use of sampling techniques in the performance of an audit will withstand due process challenges and claims that such techniques represent arbitrary and capricious action. But the holdings in these cases have little to do with the present issue—whether Interior's fiduciary duty to account is satisfied by an accounting that makes use of sampling methods for its verification of

transactions, rather than matching each transaction with supporting documentation.

It is also worth observing that the courts have forbidden the use of statistical sampling in the performance of the U.S. census, which the Constitution requires to be based upon an "actual Enumeration" of the U.S. population. *See Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 335, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) ("From the very first census, the census of 1790, Congress has prohibited the use of statistical sampling in calculating the population for purposes of apportionment."). Although the lower court decision affirmed in *Commerce* was based on statutory interpretation, not constitutional interpretation, a plurality of the Supreme Court concluded that "[f]or reasons of text and tradition, fully compatible with a constitutional purpose that is entirely sensible, a strong case can be made that an apportionment census conducted with the use of 'sampling techniques' is not the 'actual Enumeration' that the Constitution requires." *Id.* at 349, 119 S.Ct. 765 (Scalia, Thomas, Rehnquist, and Kennedy, JJ., concurring). Though far from an exact analogy to the present context, the plurality's decision nevertheless underscores the fact that in situations where individualized determinations of facts are required, statistical sampling methods do not furnish an adequate substitute for such determinations.

Interior, however, cites two sentences from the D.C. Circuit's 2001 opinion that seem to imply that the decision whether to employ statistical sampling in its historical accounting is committed to its discretion. The Court will quote these sentences in their surrounding context within the D.C. Circuit's opinion:

Appellants maintain that even if an accounting is required, the district court

overstepped its bounds by defining the nature of the accounting required. This argument both misrepresents the district court's opinion and misconstrues the relevant trust law principles. The district court made clear that it was "not ruling upon what specific form of accounting, if any," is required by the 1994 Act or the government's preexisting fiduciary obligation. Rather, it noted that an accounting is, in fact, required, and that such an accounting must be "of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited. The district court explicitly left open the choice of how the accounting would be conducted, and whether certain accounting methods, such as statistical sampling or something else, would be appropriate. Such decisions are properly left in the hands of administrative agencies."

Claiming the role of administrator, however, does not absolve the government of its enforceable obligations to the IIM trust beneficiaries. As noted above, appellants may not escape from their fiduciary obligations by appealing to their roles as administrators of a federal program. In those capacities, they are trustee delegates of the federal government who owe substantial fiduciary duties to IIM trust beneficiaries. "If the Secretary is obligated to act as a fiduciary ... then his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary."

*Cobell VI,* 240 F.3d at 1103–04 (citations omitted).

There are two reasons why the Court understands that a determination that the statistical sampling method proposed by Interior will not result in an adequate accounting of the land-based accounts will be consistent with the D.C. Circuit's opinion. The first reason is that, as noted above, absolutely no evidence has been presented to the Court that statistical sampling methods have ever been employed in the performance of an accounting, as opposed to an audit, much less that such methods are accepted by professional accountants as part of an accounting. Indeed, Interior's sole expert witness on its sampling plan admitted that he had never heard of statistical sampling being used in an accounting. The Court does not understand the D.C. Circuit's cursory reference to "statistical sampling or something else" as "accounting methods" to represent a determination that statistical sampling is an accepted method of accounting utilized by professional accountants.

The second reason is that the D.C. Circuit has made clear that "[c]laiming the role of administrator ... does not absolve the government of its enforceable obligations to the IIM trust beneficiaries" and that "appellants may not escape from their fiduciary obligations by appealing to their roles as administrators of a federal program." The task of this Court is to determine whether the accounting proposed by Interior will satisfy its fiduciary duty to account. *See Ak Chin,* 667 F.2d at 1002 ("The adequacy of defendant's general accounting, however, remains an issue in this case."); *Chisholm v. House,* 183 F.2d 698, 703 (10th Cir.1950) ("Under the mandate of the court, the duty rested upon the trustees to account, and the burden was upon them or their sureties to establish the correctness thereof; to disclose fully and fairly the nature of each and every challenged transaction, and to satisfy the court that the administration of the trust was in accordance with the provisions of the trust instrument and the honor and integrity of a fiduciary.") (citations omitted); *In re Heubach's Will,* 165 Misc. 196, 300 N.Y.S. 802, 811 (N.Y.Sur.1937) ("It is a

uniform principle of accounting that the account is required to reflect only the acts and transactions of the parties who are seeking a judicial approval of their fiduciary performances. Its primary purpose is to enable the court to determine whether or not they have complied with their duties respecting the assets entrusted to their charge.") (citations omitted); *Conover v. West Jersey Mortgage Co.,* 96 N.J. Eq. 441, 126 A. 855, 861 (1924) ("Whether or not accounts are excepted to, it is the duty of the court to scrutinize them and pass and confirm them only when, after proper vouching and auditing, it appears that they are correct and ought to be confirmed.").

In *Ak Chin,* the issue determined by the Court of Claims was whether the United States had rendered "a full and complete accounting of its administration of plaintiff's funds, assets and property." *Ak Chin,* 667 F.2d at 985. It determined that the United States had "failed to account, in accordance with the fiduciary standards applicable to Indian funds and property, for funds received and held for plaintiff's benefit and for property it managed." *Id.* at 983. Specifically, the court found that "the information that defendant did produce is incomplete, inconsistent, and *insufficient to enable the Indians to ascertain whether defendant's obligations as a fiduciary have been faithfully discharged." Id.* at 1001 (emphasis added).

In the present case, it will be impossible for both the beneficiaries and this Court to determine whether Interior has properly discharged its fiduciary duty to account if transactions within the accounts are not verified by supporting documentation, but instead verified only with the use of statistical sampling methods. One of the leading treatises on trust law makes clear that

It is the duty of the trustee to keep full, accurate, and orderly records of the status of the trust administration and of all transactions thereunder. He cannot comply with his duty ... to give a formal statement of trust affairs on an accounting proceeding, without laying a foundation therefor by setting up a bookkeeping system and preserving receipts, vouchers or other similar documents.... If he claims that he received less than the beneficiaries allege he received and has no written records to back his claim due to his own faulty system of keeping accounts, the court will be strongly inclined to charge him with the sum he is alleged to have received. If he claims that he made payments to creditors or beneficiaries, these disbursements are disputed, and the trustee has no written evidence to substantiate his position due to a faulty record system, the court will tend to disallow the item. Had the trustee performed his duty by taking receipts or vouchers, he could have made a clear case for the disbursements. His failure to present such evidence casts suspicion on the claim and renders the court unwilling to hold that he has borne the burden of proving the payment by a preponderance of the evidence.

*Bogert on Trusts* § 962 (footnotes omitted). *See also id.* § 970 ("[A] trustee to sell real property and distribute the proceeds should show in his account the dates of the sale of the several properties, to whom sold, the prices received from each and when, payments which he has made, with the dates, amounts, purposes, and names of the payees, and he should present vouchers or other evidence to back his assertions as to payments."); *Red Lake Band v. United States,* 17 Cl.Ct. 362, 369, 370–71 (1989) (finding that "[i]t is the Government's duty to account for those disbursements by documenting them," and listing "backup documents that would normally have formed the support for an accounting," including "vouchers, invoices,

bills, receipts, memoranda, or other documents"); *In re Martin's Estate,* 21 Wis.2d 334, 124 N.W.2d 297, 302 (1963) ("The final account of a trustee should show in detail the items expended and show when, to whom and for what purposes the payments were made so the beneficiaries can make a reasonable test of the accuracy of the accounts."); *Hill v. Roberts,* 311 S.W.2d 569, 571–72 (Ky.1958) (concluding that trustee had failed to provide adequate documentation of disbursements and explaining that "[a] voucher means, when used in connection with the disbursement of money, a written or printer instrument, in the nature of a bill of particulars, account, receipt, or acquittance, that shows on its face the fact, authority and purpose of the disbursement. . . . The cancelled checks appellee has filed do not fulfill this requirement. As before noted, many of them failed to show what the disbursement was for, and those that show the nature of the claim paid do not on their face appear to be authorized."); *In re McCabe's Estate,* 98 Cal.App.2d 503, 220 P.2d 614, 616, 618 (1950) ("Trustees are also under the duty to prove every item of their account by satisfactory evidence; the burden of proof is on them and not on the beneficiary; and any doubt arising from their failure to keep proper records, or from the nature of the proof they produce, must be resolved against them. . . . All of these matters have a bearing on whether such charges are established by satisfactory evidence, in the absence of any vouchers or records of any kind, and when all presumptions are against the trustee.") (internal quotation marks omitted); *In re Strickler's Estate,* 354 Pa. 276, 47 A.2d 134, 135 (1946) ("Where a fiduciary claims credit for disbursements made by him the burden rests upon the fiduciary to justify them. Proper vouchers or equivalent proof must be produced in support of such credits. Accountant's unsupported testimony is generally insufficient."). The burden is on Interior to demonstrate that each transaction is properly supported. *See Davis v. Jones,* 254 F.2d 696, 699 (10th Cir.1958) ("[T]he burden rested upon the trustee to show the nature of each challenged transaction; to show that the trust was administered in accordance with the trust instrument; and to show that the trustee acted honestly and with fidelity to the trust reposed in him.") (citation omitted); *Garrett v. First Nat'l Bank & Trust Co.,* 153 F.2d 289, 292 (5th Cir.1946) ("The burden is upon the trustee to show that it has performed its trust and the manner of its performance.").

In sum, on the one hand, the sole evidence before this Court regarding the adequacy of Interior's sampling methodology is the testimony provided by a single expert witness retained by Interior, who has acknowledged that he has "never heard of an accounting statement being presented to [an] account holder based on statistical sampling." On the other hand, the Court has before it a plethora of case law demonstrating that, when performing an accounting, a trustee must satisfy the court that it has discharged its duty to account in accord with its duties as a fiduciary. Generally speaking, this entails providing adequate documentary support for each transaction. The Court also has before it no evidence that statistical sampling methods have ever been used in the performance of an accounting. Nor does it have before it the testimony of any employee of the contractor hired by Interior to develop its statistical sampling procedure.

The Court must conclude, therefore, that the statistical sampling method proposed by Interior to verify certain transactions within the land-based accounts will not be adequate to demonstrate that such transactions, in fact, occurred. The Court further concludes that Interior's utilization of such a method as part of its Accounting

Plan renders it a Plan that will necessarily delay, rather than accelerate, the performance of an adequate historical accounting of the IIM trust fund. Therefore, Interior will be required to verify the existence of such transactions through the use of supporting documentation, in the same manner as it plans to verify all other transactions within the IIM trust fund.

The Court is mindful that this determination will increase the cost and time required for the completion of the accounting. Such factors are by no means irrelevant. However, weighing against these factors is the fact that the beneficiaries themselves have overwhelmingly rejected the use of statistical sampling in the performance of Interior's historical accounting, even when confronted with the fact that such a rejection would substantially increase the time necessary to complete the accounting.

On April 3, 2000, Interior published a Federal Register notice entitled "Historical Analysis of Individual Indian Money Accounts." 65 Fed.Reg. 17521. The summary portion explained that the purpose of the notice was to "initiate[ ] an information gathering process with IIM account beneficiaries, and the public, to comply with Congressional directives to determine the most reasonable methods for providing accountholders with information to evaluate their accounts and to determine whether there are discrepancies due to past management practices." *Id.* at 17521. The notice presented examples of alternative approaches to provide beneficiaries with such information, including a transaction-by-transaction reconciliation of accounts, limited reconciliation of accounts, and an approach involving the use of statistical sampling. *Id.* at 17526–17527. Regarding the transaction-by-transaction accounting proposal, the notice asserted that such an approach "would be the most time consum-

ing and expensive" of the alternatives listed, and that "it is unlikely to expect that the Congress would provide the Department with the staggering appropriations needed to fund such a process." *Id.* at 17526.

Despite such caveats, the vast majority of comments received by Interior in response to the Federal Register notice favored the transaction-by-transaction approach. *Cobell VII,* 226 F.Supp.2d at 37 ("[I]t was generally known that the results across the board from the senior managers was that ... the beneficiaries were asking for a transaction-by-transaction accounting."). Indeed, an August 11, 2000 memorandum prepared by Jim Pace, Interior's primary project officer from the Office of American Indian Trust, observed that

> more than one thousand individuals attended the public meetings (sixty percent of whom identified themselves as IIM account holders), and that most of the participants provided their comments orally. [Pace] also observed that in addition to the seven written comments submitted at the public meetings, the Department received [146] written comments by mail. In summarizing the comments to the notice, Pace found that eighty-one of the respondents who wrote in, and an overwhelming majority of those who voiced their preferences at the public meetings wanted to see a transaction-by-transaction reconciliation, in spite of the discouraging language contained in the Federal Register Notice stating that such a solution was not very likely since Congress had already dismissed such a solution.

*Id.* at 38 (internal citations omitted). In sum, when offered a choice between a transaction-by-transaction accounting of the IIM trust fund and an alternative procedure relying upon statistical sampling techniques, the overwhelming consensus of

the IIM beneficiaries was that a transaction-by-transaction accounting should be undertaken, despite the fact that it would be a time-consuming endeavor. Given the choice, in other words, between an actual accounting and an accounting alternative that would take much less time, the beneficiaries decided that it was better to have the job done right than to have it done quickly.

It is also important to note that, despite the language in the Pace memorandum, Congress has by no means "already dismissed such a solution." Indeed, the legislative history to the 1994 Act makes clear that Congress anticipated that, due to the sorry state of IIM trust fund management, the performance of a historical accounting would require a considerable investment of time and resources:

> The [House Committee on Natural Resources] realizes the depth and breadth of the problems regarding Indian trust assets within the [Interior] Department. There must be an absolute long term commitment by the Department to address the problems affecting Indian allotted lands, their resources, and any receipts produced. This commitment would affect nearly every agency in the Department and is essential for the Secretary to properly discharge his trust responsibility.

H.R. REP. No. 103–778, at 10 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3467, 3469. Congress, in other words, clearly recognized that a proper accounting would necessarily be a long-term endeavor, given the "depth and breath of the problems regarding Indian trust assets." [70]

It is true that one current Member of Congress, and two former Members, have apparently voiced some concerns about time and cost estimates for a transaction-by-transaction accounting contained in a July 2, 2002 report to Congress from Interior. It should be noted at the outset, however, that the report underscored the highly tentative nature of these estimates:

> There is a high level of uncertainty in the cost estimates for any multi-year project. For the historical accounting, over 60% of the cost of the project is driven by an estimated number of transactions and an estimate for the amount of time required to perform each transaction analysis. An incorrect assumption in either or both of these estimates could drive cost lower or higher.... The cost estimate for the project is evolving, and is a work-in-progress. All cost estimates should be considered tentative and preliminary. As intelligence is gathered, pilot programs and tests are performed, and we learn more about what needs to be accomplished in the historical accounting, the cost estimate will change and the residual uncertainty about the numbers will shrink.

Report to Congress on the Historical Accounting of Individual Indian Money Accounts, July 2, 2002 (Defs.' Ex. 56).

Additionally, the issue is not whether one current Member (and two former Members) might have expressed concerns about Interior's July 2002 report to Congress. The issue is whether the statistical sampling method proposed by Interior to verify the existence of millions of transac-

---

**70.** Interior cites a portion of the 1992 *Misplaced Trust* report that it represents as providing support for its statistical sampling proposal. However, as noted above, this report was not a part of the legislative history of the 1994 Act. Moreover, the cursory cost-benefit analysis contained in the report was apparently based on the assumption that only $440 million had been deposited in the IIM trust fund as of September 30, 1991. As noted above, however, between 1985 and 2000, there was approximately $3.3 billion of "throughput" in the IIM trust fund.

tions in the land-based accounts will result in an adequate accounting, as mandated by the 1994 Act and by Interior's pre-existing fiduciary obligation to account. The Court does not discount the statements made by the Members, but such statements are not determinative of the issue presently before the Court.[71] Additionally, the Court does not equate the opinions of a single current House Member (and two former Members) with the intent of the full House of Representatives, much less with the intent of the full Congress.

In sum, the Court finds that the statistical sampling method proposed by Interior to verify certain transactions within the land-based accounts does not represent an adequate method of demonstrating that such transactions, in fact, occurred. Nor will the utilization of such a method satisfy Interior's fiduciary duty to account for all funds within the IIM trust fund. Interior will therefore be required to verify the existence of such transactions through the use of supporting documentation, in the same manner as it plans to verify all other transactions within the IIM trust fund.

### 3. The Reporting Process

The end stage of the performance of an accounting consists of (1) the preparation of a detailed report describing the trustee's conduct during the relevant time period, including a description of each item of property within the trust corpus, all items of property received into or disbursed from the trust, all income earned by the trust, and all expenses paid by the trust and (2) the delivery of this report to the beneficiaries of the trust. The D.C. Circuit has stated that "[u]nder traditional equitable trust principles, the trustee's report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out." *Cobell VI*, 240 F.3d at 1103 (citation and internal quotation marks omitted). The Court will therefore review Interior's representations as to the report it intends to deliver to the beneficiaries at the end of the historical accounting process.

During the Phase 1.5 trial, Associate Deputy Secretary Cason testified regarding the intended end product of the historical accounting:

Q. What is the end product projected to be when this project has done its work?

A. What we are planning to provide is a detailed statement to individual beneficiaries that includes the kind of information that the Court has suggested is appropriate, and what I mean by that is we want to be able to provide an all-funds accounting from the IIM trust for the funds that were in the trust, and that we would examine each of the accounts that were in the trust

---

**71.** It is worth pondering, moreover, whether the objections of the current Member and one of the former Members stem less from fiscal considerations and more from opposition to the claims advanced by plaintiffs in the present litigation. In July of 2002, these two Members sponsored H.R. 5093, a bill limiting the obligation of Interior to perform an accounting of the IIM trust fund to transactions occurring after the year 1985. The bill was defeated, 281–144. More recently, the same two Members successfully inserted a provision into the omnibus appropriations for fiscal year 2002, authorizing the Secretary of the Interior to use discretionary funds to pay private attorneys to represent current and former Interior employees in connection with the present litigation. *See Cobell v. Norton*, 263 F.Supp.2d 58 (D.D.C.2003). As of July 2003, this provision has resulted in the expenditure of taxpayer funds in the amount of $4.5 million to pay private attorneys for government employees. *See* Opp. to Pls.' Mot. to Compel Compliance with this Court's May 21, 2003 Mem. and Order (July 21, 2003) at 8.

consistent with this plan and provide an opening balance, the transaction history of income or receipts and disbursements and balance and ending balance, along with explanatory materials of what the process was all about and any findings that we had related to the verification process.

\* \* \* \* \* \*

Q. And what exactly will these individual statements of accounts show?

A. The statement of account is designed to show the opening balance, transaction history and ending balance on an individual beneficiary's account, along with any findings that we have of errors identified through the verification process.

Q. What is the purpose of the description of errors or findings?

A. It's basically to fully inform the beneficiaries of our review of their accounts and any errors that we found.

Q. Is there any information going to be provided about the underlying assets?

A. Yes. In the plan, what the Department plans to do, when it sends a statement regarding the status of the IIM funds, it would also send a statement of land ownership as of December 31, 2000.

Tr., Day 21, AM session (June 4, 2003) at 19:23—20:11, 21:14—22:5. *See also id.* at 76:25—77:7 ("It's my understanding that the all-funds are the funds that were actually in the IIM trust fund, that we would trace backwards on an individual-by-individual basis to the origin of each individual account and, through the posting of transaction history, both income and disbursements, provide the beneficiaries with a detailed statement of funds that passed through the IIM trust fund on an individual basis.") (testimony of James Cason).

Cason's testimony is consistent with Interior's Accounting Plan, which represents that

[u]pon completion of the historical accounting, Interior will be in a position to provide each IIM account holder a Historical Statement of Account detailing the account transaction history. Interior will also be in a position to provide each IIM account holder with its conclusions about the accuracy of the account transaction history and the account balance as of December 31, 2000.

Interior's Accounting Plan at I–1. The Plan includes an appendix containing examples of redacted quarterly account statements provided to IIM account holders, which are presumably similar in form to the Historical Statements of Account that Interior proposes to send to each IIM account holder at the end of the historical accounting. The quarterly statements include an opening balance; a description of receipts, disbursements, and other changes to the account; a closing balance; and a telephone number for the account holder to call if he or she has questions about the statement.

Generally speaking, the Court finds that the Historical Statements of Account that Interior proposes to send to each IIM account holder at the end of the historical accounting process will satisfy its obligation to provide "sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out." Of course, in light of the Court's determination that the historical accounting must include an accounting of the assets of the IIM trust, it will be necessary to include in the Historical Statements of Account more than just a statement of land ownership as of December 31, 2000. Instead, the statement must include a description of the assets in the account at the inception of the account, all

changes to the assets, and a description of the assets presently in the account, *e.g.*, land and leases. However, with this addition, the Court finds that the format proposed by Interior for the accounting statement to be delivered to each IIM account holder following the completion of the historical accounting process to be consistent with its fiduciary obligations to the IIM beneficiaries.

### 4. The Quality Control Process

#### a. System Tests

The first type of quality control process that Interior proposes to undertake in its Plan consists of a series of system tests on the IIM trust fund. Its Plan states:

> Interior intends to perform various tests on the IIM Trust Fund at the aggregate level in addition to those tests performed at the individual transaction or account level. These aggregate, high-level system tests will enable Interior to assess the underlying reliability of the IIM Trust Fund system. These aggregate tests are intended to determine whether significant systematic flaws, which might have allowed for gross or repeated error, exist within the historical accounting system.
>
> These tests will examine key points of vulnerability in the historical ledgers that will serve as the basis for the historical accounting by assessing whether:
>
> A. Significant data are missing;
>
> B. Accounts or balances were lost or inappropriately "dropped" from the system during conversions from paper records into IRMS, or from IRMS into TFAS;
>
> C. The calculation of interest was performed accurately;
>
> D. The monies collected by Interior were actually deposited into the IIM Trust Fund; and

> E. The land ownership records are accurate.

*Id.* at III–17 to III–18.

The stated purpose of these system tests is to "show whether there was integrity in the overall processes and systems used to administer the IIM Trust Fund for the period at issue." *Id.* at III–18. During the Phase 1.5 trial, Associate Deputy Secretary Cason testified:

> In developing statements for individual beneficiaries, we will be assembling ledgers for those individuals and that will tell part of the story, and we wanted to also look at the system overall because of the concerns that have been voiced about other possible problems within our accounting environment. So the experts that we have involved in the process as well as the OHTA team looked at the overall accounting environment that has been in place over time and identified certain places or certain activities which they think may also be possible sources of problems or they want to verify that one should not be [concerned] about those areas, so we designed system tests to take a look at those areas.

Tr., Day 21, AM session (June 4, 2003) at 22:20—23:7. Regarding the planned system tests, Special Trustee Ross Swimmer explained:

Q. Do you have any understanding of what the historical accounting plan provides for in terms of trying to make sure that the IIM system itself has integrity?

A. Generally I do. In addition to the information we described that is related specifically to individual Indian accounts, there will be tests done for the system overall, and I don't know if I can recite all of them, but one, for

instance, is what I call a document test.

In the verification of the transaction, one will go to the money and they will see a deposit or a disbursement and they will track back to the appropriate documents. In the proof of system, one of the ways of reviewing that will be to pull a number of documents themselves—in other words, just randomly at the different agencies go in and pull documents—and use the document then to trace back to the money to see if that lease, for instance, was one that was pulled. They would take that lease and they would trace it back to the owner and to the events that happened on those transactions and verify that that document was properly handled.

Another systemwide test would be—I believe it's—I forget the exact term, but I call it [a] product-specific test where they would go in and look at, say, forestry, oil and gas payments, land leases, farm rentals, and different sources of income and pull representative samples from those—in other words, look at a number of forestry sales, look at a number of leases and oil and gas—and then again verify those on a sample basis.

Tr., Day 41, AM session (July 2, 2003) at 54:21—55:23. The Court will analyze Interior's descriptions of the five proposed system tests.

First, to test whether significant amounts of data are missing from its electronic systems, Interior plans to test for gaps in the systems. As described above, Interior will "search for other records of the transactions posted to accounts in an attempt to close identified gaps." Interior's Accounting Plan at III–18. Additionally, Interior explains:

A gap in the transaction can be identified in several ways—(1) an account for which the system balance does not equal the transaction balance (i.e., the previous balance plus the sum of the transactions should equal a subsequent balance), (2) an account for which interest cannot be appropriately recalculated, or (3) a BIA agency for which there are no available transactions for a given month. Interior plans to review information for BIA agencies that have no electronic data for a given month to determine whether the agency processed transactions for the month in question. Additionally, Interior plans to compare historical electronic account balance files and electronic account transaction files to identify gaps. Identified gaps will be researched to determine if the account transaction history is missing historical transactions. The identification and resolution of gaps will provide IIM account holders with assurances that a "loss" of transactions did not occur system-wide.

*Id.*

Second, Interior will test whether accounts or transactions were lost during two major records system conversions that occurred recently:

System conversions—moving from one system to another—represent the largest potential opportunity for "loss" of transactions or accounts from the IIM accounting systems in the modern era. Two system conversions have taken place in connection with the Electronic Records Era. The first conversion occurred in the late 1970s into the 1980s when the BIA regions and agencies were converting from maintaining IIM accounts on paper ledger cards to maintaining IIM accounts on the IRMS. The second conversion occurred in the late 1990s through early 2000 when the electronic data in IRMS was transferred to

the TFAS. Interior has electronic data available for the conversion from IRMS to TFAS, which was contemporaneously reviewed at the time of the conversion. Interior will verify that account balances in IRMS were properly transferred to TFAS and that the balances in the transferred accounts remained the same before and after conversion. This process will determine whether monies were lost or whether accounts were inappropriately "dropped" in the conversion process.

A statistical sample of the transfer of accounts and balances from the paper-based records to IRMS in the mid–1980s is planned to determine whether accounts and balances were correctly converted. If accounts are identified that were not transferred from one system to the subsequent system or any accounts are identified whose balance was incorrectly transferred, the issue will be researched and resolved.

*Id.* at III–19.

Third, Interior will perform a system test to determine whether its calculation of interest for the IIM accounts was performed accurately:

> After the centralization of investment activities in the late 1960s and early 1970s, Interior computed interest factors that were utilized to calculate and apply interest earnings to all IIM accounts in the IIM Trust Fund. An analysis of the IIM Trust Fund's rate of return and the calculation of interest factors is planned. These factors will be applied to all accounts according to Interior's policies in effect at the time to recalculate expected interest payments in each account subject to the historical accounting. The recalculated amounts will then be compared to the amounts posted. Recalculating interest is expected to reconcile almost half of the transactions in IRMS

and TFAS as well as the majority of the transactions in each IIM account. This process should also facilitate Interior's identification and resolution of data gaps in the electronic records.

*Id.* During the Phase 1.5 trial, Michelle Herman, a director with the accounting firm of KPMG, LLP, further described this system test:

> Q. Are you familiar with [Interior's Office of Historical Trust Accounting's (OHTA)] interest recalculation test?
>
> A. I am.
>
> Q. What is that test?
>
> A. OHTA will be recalculating interest that was posted to each one of the individual Indian money accounts through time based on the policies and procedures that were in place and the interest factors at that point.
>
> Q. And what is the significance of recalculating interest in this way?
>
> A. There are two reasons we're recalculating interest. One is in an attempt to identify missing data, and the second is to ensure that the policies that were in place at the point in time were applied correctly.
>
> Q. And if interest as recalculated doesn't match up with the interest actually listed, how do you determine if it's A) because of missing data or B) because of [a] policy that wasn't implemented? . . . .
>
> [A.] In general, if a policy was applied incorrectly, you would expect that all of the accounts in that given period would be impacted by that incorrect policy, whereas if you had missing information for a particular account, you would not expect that all of the accounts would be impacted.

Q. And if you determine the reason that the interest doesn't match up is due to missing data, what are you going to do?

A. Similar to the missing months that we described earlier, depending on the number of accounts impacted, we would first look for the transaction registers and then turn to the jacket files.

Q. And has OHTA initiated this interest recalculation test?

A. The firm of [Chavarria, Dunne & Lamey LLC] has begun designing the program, but the test itself has not been implemented yet.

Tr., Day 23, AM session (June 6, 2003) at 41:17—42:9, 42:13—43:6.

Fourth, in order to determine whether monies collected by Interior as trustee-delegate were actually deposited into the IIM trust fund, Interior will conduct what it calls a "posting test":

The historical accounting process verifies transactions in an IIM account by reconciling the reported transaction with the supporting documentation. This might be called an "upstream" reconciliation, checking that the information and calculations that led to the transaction posting are accurate. However, by checking IIM accounts upstream from the transactions Interior would not learn if transactions are missing, i.e., never posted to the electronic systems or paper ledgers.

Further testing may be performed to confirm that the amounts reported by Interior as documented by collection or disbursement documents were posted to the accounting system. This would be a "downstream" test, tracing the information from the documents to verify that a posting was made to an account. This test would determine whether transaction postings that should be present ac-

tually appear in the system or in the ledgers.

Interior's Accounting Plan at III–20. This test was described by Herman during the Phase 1.5 trial as a "document-to-transaction test." *See* Tr., Day 23, PM session (June 6, 2003) at 45:6–12 ("OHTA has created a test to attempt to determine if there were transactions that were not recorded in the system, and that test is essentially referred to as a document-to-transaction test, so you sample documents and then you determine whether or not there is a transaction that was recorded in the system for those documents.").

Fifth, Interior will conduct a system test to determine the accuracy of the IIM trust fund's land ownership records:

Interior intends to verify, via a statistical sample of allotments, that land-based receipts were appropriately distributed. This process will involve checking that ownership records at [one of BIA's Land Title and Records Offices (LTRO)] agree with the electronic ownership modules, and that surface or subsurface lease revenue is allocated in accordance with these ownership data, regardless of whether the allotment was owned by a single individual or, more likely, multiple individuals. Confirming ownership interests will involve selecting a statistical sample of land parcels to test ownership records. Title information recorded on paper records in [an] LTRO will be compared to [Land Record Information System (LRIS)] electronic title records and the IRMS ownership module. Completion of these tests will allow Interior to determine whether its ownership records are accurate and appropriately serve as a basis for the allocation of receipts at the allotment level.

*Id.*

Interior estimates that these system tests may cost as much as $25 million, and

plans to complete them by fiscal year 2006, which ends on September 30, 2006. *Id.* Generally speaking, the Court has no quarrel with these five system tests described by Interior. Moreover, the fact that some of them utilize statistical sampling techniques does not necessarily render them invalid. As explained above, the Court's objection is not to the use of statistical sampling methods *per se*, but to the use of such methods as a *substitute* for individualized determinations of the accuracy of each transaction within the IIM trust accounts. However, when used as a *supplement* to such individualized determinations—for example, in the performance of aggregate system tests—the use of statistical sampling techniques may well be appropriate.

However, the descriptions of these tests in Interior's Plan are so cursory that it is impossible for the Court to determine whether they will function as adequate quality control measures for their stated purposes. They may, or they may not—it is impossible to determine from the evidence before the Court. As compared to the other processes discussed during the Phase 1.5 trial, the quality-control process received relatively little attention. The Court is by no means lamenting that the Phase 1.5 trial was too short—far from it. But the Court will require more detailed information from Interior before it can render any determination as to whether its five system tests represent adequate quality-control measures. The fact that Interior's Plan includes only cursory descriptions of these tests renders it a Plan that will necessarily delay, rather than accelerate, the performance of an adequate historical accounting of the IIM trust fund. Therefore, the Court will direct Interior to submit a plan describing in detail each of the five above-described system checks, including a time and cost estimate for its implementation. If a system check will involve the use of sampling techniques, Interior should provide a detailed description of the technique to be applied, including the sample size and sampling method to be relied upon. Following Interior's submission of its detailed plan, the Court will afford plaintiffs an opportunity to respond to the plan.

### b. Other Quality Control Measures

Interior states that, in addition to the five system tests it will conduct, it is currently implementing other quality control measures. Specifically, it states, OHTA is currently "implementing quality control (QC) checks to achieve best practices at each phase of the historical accounting process, including data inputs, systems and infrastructures, processing, and outputs." *Id.* at C–2. Interior's Plan includes an appendix describing "five areas of OHTA's quality control plan." *Id.* The Court will analyze those descriptions below.

The first area of OHTA's quality control plan is described as ensuring a "basic approach to quality." Interior explains:

High standards intended to result in high quality results are central to conducting an adequate historical accounting. Another key factor is appropriately focusing quality efforts. The overall quality focus is risk-based, i.e., determining what major risks significantly impact the quality of results and what strategies can minimize these risks.

One risk is inconsistent results. OHTA is striving for consistency through standardization on common systems, procedures, and processes across the various organizations involved. For example, OHTA is centrally developing an historical accounting support system, which will be used by the accounting firms to produce accounting results. Another example is OHTA's issuance of

guidance, such as demonstrated by OHTA's *Accounting Standards Manual* (*Manual*). OHTA conducts training programs to obtain common understandings and has implemented centralized issue tracking to resolve issues timely and appropriately.

Besides establishing a common infrastructure for the various firms involved, OHTA is conducting QC checks and tracking results. Trends will be analyzed to determine whether additional guidance, training or other action is necessary to achieve quality objectives. OHTA senior management receives statistical information regarding the quality of work packages along with other key performance data, such as transactions and accounts reconciled. Performance data gathered will be used to refocus QC testing strategies. For example, the data may indicate increased or decreased QC testing is desirable in selected activities.

Quality objectives are being achieved through both internal and external quality checks. Each team involved with producing inputs or outputs of the historical accounting bears primary responsibility for the quality plan for its products, such as responsibility to maintain internal quality processes, staff the project with appropriately skilled personnel, conduct staff training, and perform supervisory review. Additionally, certain subject-matter consultants are conducting independent quality checks on their performance.

Id. at C–2 to C–3.

The second area of OHTA's quality control plan is described as an "overall quality check process." Interior states that "[a]n OHTA external QC check typically involves six steps." *Id.* at C–3. These steps are described as (1) developing a plan, (2) conducting an analysis, (3) drafting a report, (4) resolving the report's findings, (5) issuing a final report, and (6) conducting a follow-up quality check, if necessary. *Id.*

The third area of OHTA's quality control plan deals with records collection and imaging. Interior states that it

plans to implement QC checks at each phase of the records collection and imaging process. This includes checks on the design of processes, procedures, and systems to conduct the collection and imaging. For example, a QC check will be performed on the document imaging and coding structure. Once implemented, periodic QC checks will be conducted to verify [that] the design is being implemented as per management's intent. QC checks are anticipated to cover the following areas:

- Imaging and coding structure;
- Completeness of documents collected, imaged, and returned to storage;
- Legibility of images;
- Accuracy of coding;
- Record/box inventory;
- Security; and
- Document preparation and re-assembly (pre- and post imaging).

*Id.* at C–4.

The fourth area of OHTA's quality control plan deals with the accounting results produced by the accounting firms hired by Interior:

The accounting results produced by the accounting firms undergo QC checks by another accounting firm. The QC firm samples results for consistency with the *Manual.* The *Manual* provides guidance, such as documentation standards. For transactions sampled, the QC firm assesses the judgment made by the accounting firm as to adequacy of supporting documentation, classification of the reconciliation results, and calculation of

errors (if any). Additionally, the QC firm assesses historical accounting results in light of professional standards established by the American Institute of Certified Public Accountants. These standards include professional competence, due professional care, planning and supervision, and sufficient relevant data.

*Id.*

The fifth area identified in Interior's Plan involves a quality check of Interior's information systems:

The support system under development for the historical accounting is focused on meeting OHTA and its stakeholder[s'] requirements for account reconciliation. This will be accomplished by following a structured development life cycle approach. This approach encompasses trust requirements that are clearly defined and traced throughout the life cycle of the historical accounting project. At each life cycle milestone, products are tested against requirements and communicated with the users for their information and feedback. To further assure that OHTA has an information system that answers its needs, a contractor has been engaged to provide independent verification and validation that deliverables meet the needs of the users.

Key system life cycle deliverables include:

● Requirements documentation— What the system is to provide;

● Design documentation—How the system works;

● Implementation—Installation of the system;

● Test plans / results—Periodic verification of system reliability;

● Data conversion—Processes used for conversion of data from other information systems; and

● Training—Ensure[s] that system users understand this tool.

Additionally, once systems are in operation, periodic post-implementation reviews will be conducted to verify they are meeting management objectives, such as data security.

*Id.* at C–4 to C–5.

As with the five system tests described above, generally speaking, Interior's descriptions of these quality control measures sound promising, but are rather short on details. This is all the more curious given that Interior has described each of these measures as currently being implemented. Presumably, it would not be difficult to describe in detail which measures have already been implemented, and which are in the process of being implemented. The fact that Interior's Plan includes only cursory descriptions of these measures renders it a Plan that will necessarily delay, rather than accelerate, the performance of an adequate historical accounting of the IIM trust fund. Therefore, the Court will direct Interior to submit detailed descriptions of each of the quality control measures described above that have already been implemented. It will also direct Interior to submit detailed descriptions of quality control measures that Interior will undertake, in conjunction with the historical accounting process. Interior should include a detailed description of all proposed quality control measures, not just those in the five areas listed above. After reviewing these descriptions, the Court will determine whether Interior's quality control measures will provide an adequate control process, one that will satisfy Interior's duty to account for the IIM trust fund.

Given the deficiencies in Interior's Plan, it is worth examining the accounting plan presented by plaintiffs to determine whether it provides an approach that better satisfies Interior's duty to account. The Court now turns to Plaintiffs' Accounting Plan.

### C. Plaintiffs' Accounting Plan

The Plan advocated by plaintiffs is premised upon the notion that "the accounting owed by the United States government and ordered by this Court is impossible." Pls.' Accounting Plan at 3 (Pls.' Ex. 50). Specifically, plaintiffs assert that a proper accounting is impossible, given that numerous gaps exist in the record of IIM trust documents maintained by the government, and that the extant records cannot be presumed to be reliable. Accordingly, plaintiffs have presented the Court with an alternative method for determining the correct balance in IIM trust accounts.

Plaintiffs' Plan relies heavily on the use of Geographic Information System ("GIS") data overlays. Simply put, GIS is a type of "computer software that links geographic information (where things are) with descriptive information (what things are)." ENVIRONMENTAL SYSTEMS RESEARCH INSTITUTE, GEOGRAPHY MATTERS: AN ESRI WHITE PAPER 1, *available at* http://www.gis.com/whatisgis/geography-matters.pdf. In other words, GIS permits the creation of "smart maps" linked to a computer database. *See* http://www.gis.com/whatisgis/whatisgis.pdf. As explained by plaintiffs, their Plan

> included the development of a GIS database of historical boundaries for all reservations that contained Allotted Lands. Next, other commercially available databases containing information about natural resources (such as oil and gas well locations and production data) derived from all lands were integrated into the GIS database. The combination of this data in the GIS database allowed for the estimation of natural resources extracted from the reservations containing Allotted Lands. Historical pricing data, royalty rates and owner charge back statistics were used to estimate the monies generated from natural resource extraction, and the monies were then allocated to the Allotted Lands.

Pls.' Accounting Plan at 39–40 (footnote omitted).

Thus, for example, plaintiffs purchased an oil and gas industry database entitled "PI/Dwights," which "provides cumulative oil and gas production for each well drilled in the United States through 1972, with annual and monthly data thereafter," a database that is "generally used by industry participants to forecast future oil and gas production volumes." *Id.* at 42–43. As explained by plaintiffs' financial modeling expert, Richard Fasold:

> This database contains the latitude and longitude data for each one of those wells. It contains production data, and then a lot of other data that is incomprehensible to the average layman. The core sample data and so forth. . . .

> So what we did is we took that database, and in essence, in GIS techniques, [took] those latitude and longitude dots and place them on a map of, in essence, the Western United States.

> We took those databases and overlaid in GIS format, which means only one thing, digitized, map boundaries. We took the map boundaries of Indian Reservations which we knew through research were allotted.

> So we could tell you the production data for oil and gas, as an example, that exists on an Indian reservation. So we

had, in theory, the history of all of the production from each of those wells.

Tr., Day 10, PM session (May 14, 2003), at 26:25—27:3; 27:9–20. However, although plaintiffs had managed to construct a history of production data of oil and gas for all wells on Indian reservations that had been subject to allotment, trying to determine which wells were located on allotted lands proved more difficult. As plaintiffs observe,

> as a matter of record, surveys for most Allotted Lands cannot be located are outdated or were never performed. . . .
>
> [Therefore,] Plaintiffs' Plan created a database of Allotted Lands based on research of over 100 books, reports, studies and periodicals. The data defin-

ing the Allotted Lands were plotted on each reservation by year. Missing data were interpolated on a straight-line basis and outlier data were eliminated. Based on the calculated data, Allotted Land percentages were estimated by dividing allotted acres by total reservation acres for each year from 1887 to 2001. The Allotted Land percentages were then used to allocate estimated monies collected from royalty payments, rents, sales and bonus data.

Pls.' Accounting Plan at 41–42. In other words, to estimate the total revenues produced from oil and gas wells located on allotted lands in a particular reservation, plaintiffs performed the following calculation:

| Total production of oil and gas on reservation | x | (IIM land/ total reservation land) | x | Payment rate for royalties, rents, sales, bonus data |
|---|---|---|---|---|
| = | **Estimate of total revenue from production of oil and gas on allotted lands on reservation** | | | |

Plaintiffs employed a similar method to estimate the total revenue from the production of hard rock minerals on allotted lands. However, plaintiffs were unable to locate a national database of timber production similar to the databases of oil and gas and mineral production that they had located. Therefore, plaintiffs retained an expert on timber production, Dr. Alan McQuillan, to calculate the total revenue from the production of timber on allotted lands. Finally, no national database could be found representing sales or leases of land. Accordingly, to estimate the total revenue from land sales or leases of allotted lands, plaintiffs made use of data maintained by Interior.[72]

Plaintiffs' Plan represents an impressive use of technology in an attempt to solve a very difficult problem. However, as plaintiffs concede, while their Plan does produce an estimate of total revenue from allotted lands, it does not contain a method for allocating that revenue among beneficiaries of the IIM trust. Rather than determine such a method, plaintiffs have proposed instead that this Court develop an appropriate method of allocation through a series of fairness hearings conducted to determine what disbursements were actually made to beneficiaries. See Tr., Day 11, AM session (May 15, 2003) at 71:11–20 (testimony of Richard Fasold). During

72. Plaintiffs also estimated the total amount of revenue from other sources by taking the reported amount of "throughput" received into the IIM trust fund (approximately $13 billion) and subtracting from that figure the total revenues that they had identified and estimated. See Tr., Day 10, PM session (May 14, 2003) at 33:1–20 (testimony of Richard Fasold).

the Phase 1.5 trial, plaintiffs' financial modeling expert explained:

The only approaches that I am aware of is to test [reasonableness] by maybe one or more, I guess you would call them indicia, of what truly happened in history. And those methodologies certainly would not withstand the test of reliability at all.

So you would look for some relatively objective or historical data that may give you an idea of what actually happened. And from my experience, those data points, as I might call them, are few and far between.

Virtually all of them would test what we call gross distributions, and that is what checks got written, presumably, to the correct beneficiaries, in the presumably right amount. It would be gross numbers.

And then you would have to give maybe a credit or an adjustment to that that says some of those gross disbursements did, indeed, go to the wrong persons or to the wrong amount.

That is, I think, the dilemma left to the court as I see it, that from, you know, a non-legal—that is[,] a business approach. What are we leaving this court to decide. That, as I see it, is what we are doing.

Tr., Day 12, PM session (May 16, 2003) at 18:15—19:10.

The bottom line is that to constitute a historical accounting, the Plan advocated by plaintiffs would require significant modifications—namely, the addition of (1) a methodology to determine what disbursements were made from the IIM trust fund, in what amounts they were made, and whether they were distributed to the proper beneficiaries and (2) a means of allocating funds that were not properly disbursed in the correct amount to the correct beneficiaries. But the addition of these measures to plaintiffs' Plan would necessitate directing Interior to perform many of the same tasks required in Interior's own Plan. That is, a determination of which disbursements were made, in what amount, and to which beneficiaries would necessarily entail indexing the available trust records, collecting additional trust records from third parties, and matching transaction ledgers with supporting documentation.

In sum, the Court must conclude that neither plaintiffs' Plan nor Interior's Plan, as they now stand, will satisfy Interior's duty to account. Both Plans will require substantial modification before they can be accepted by this Court as adequate to discharge that duty. Having made this conclusion, the Court must also conclude, based on *Brown II*, *Lewis v. Casey* and similar precedents, that it should choose Interior's Plan as the basis for the relief it intends to order. The Supreme Court has made clear that courts are to afford institutional defendants the opportunity, in the first instance, to present a proposal to satisfy their legal obligations to the plaintiffs. It follows that, if both plaintiffs and an institutional defendant submit plans that a court has determined to be inadequate to satisfy these obligations, the court should select the institutional defendant's plan as the foundation upon which it formulates relief, because of the presumed administrative expertise of the institutional defendant.

It does not follow, however, that this Court should simply discard Plaintiffs' Accounting Plan. During cross-examination by plaintiffs, one of Interior's expert historians, Alan Newell, indicated that a production database might be useful to Interior to help fill in gaps in trust record data:

Q. Okay. Now, let's talk very briefly, last subject, your Cobell natural resources database.

A. Yes.

Q. That was developed in response to the plaintiffs' resource database that was discussed in settlement.

A. That was what initiated it, yes, as I remember. I didn't have the initial discussions on that; Morgan Angel did. We were just—we ended up doing just part of that.

Q. ..... If the government decided to utilize that production database as part of its accounting efforts, you would have no objection to that, correct?

A. I think it may form—may be a useful element in it eventually.

Q. And you would be comfortable with doing that so long as it supplemented—it was supplemented with the data you analyzed or, I'm sorry, that you gathered, with the historic documentation.

A. Yes. The key there is that we begin with the reservation specific and the information that we have on the reservations and on the accounts. If at some point we have gaps, we have problems in that and we want to use—we want to look at the revenue side and see, well, how much did come in over time, that may be one way to address filling those gaps. I can see that as a possibility.

Tr., Day 33, AM session (June 20, 2003) at 63:7—64:8. Additionally, during closing arguments, defense counsel acknowledged that use of a production database (such as those utilized by plaintiffs in their Plan) might provide a useful supplement to the methods utilized in Interior's Plan:

THE COURT: Okay. Now, Newell also testified that although he didn't agree with the plaintiffs' plan, he thought the GIS data might be useful as a means of verifying the defendants' plan. Has any exploration of that been made by the defendants?

MR. STEMPLEWICZ: Not as of this time, although it might well be one of the projects that the historians should be looking at or will be, but I can't say for sure, Your Honor. It would certainly seem to make sense to use that as a—

THE COURT: I mean, it might be a secondary way—

MR. STEMPLEWICZ:—as a test.

THE COURT:—of testing what gaps you really have if the plaintiffs' plan was not adopted by the Court to at least see what the GIS data would show, right?

MR. STEMPLEWICZ: I think that makes a lot of sense, Your Honor.

THE COURT: But you can't commit the Department will do it.

MR. STEMPLEWICZ: Right now, I can't say whether it will or not.

THE COURT: Okay.

MR. STEMPLEWICZ: I can say from dealing with them that the OHTA people are receptive to ideas that will help the reliability and the accuracy of the product they are trying to achieve.

Tr., Day 44, AM session (July 8, 2003) at 86:19—87:19.

The Court recognizes that defense counsel was not making any commitment on behalf of Interior to examine the utility of production databases or the use of GIS in Interior's accounting. Additionally, the Court realizes, given the strained relationship between the parties, that Interior may be loath to acknowledge the usefulness of any idea advanced by plaintiffs. But the testimony presented at trial about the potential usefulness of production data-

bases has piqued the Court's interest. Given Newell's testimony that the use of a resources database might be useful in attempting to fill in data gaps, and defense counsel's observation that OHTA is receptive to ideas that will assist it in improving the reliability and accuracy of their proposed accounting, the Court believes that the use of production databases such as PI/Dwights in conjunction with software such as GIS certainly warrants further study. The Court will therefore direct Interior to analyze the use of such production databases and software as a potential means of gap-filling, and to analyze the potential usefulness of such databases and software as a test or verification of the completeness of its accounting. In other words, Interior should consider whether the use of such databases and software will serve as a useful quality control measure for the historical accounting process. The Court will direct Interior to submit its analysis when it submits its plans for conducting other quality control measures, as described above. If Interior decides not to utilize such databases and software, it should explain, in detail, which measures it has already implemented or will implement that will function as an adequate means of gap-filling and verifying the completeness of its historical accounting. It should also explain why the use of production databases such as PI/Dwights and software such as GIS will not serve as an appropriate supplement to such measures.

## VI. RELIEF TO BE ORDERED

In one sense, a structural injunction issued at the present stage of this litigation represents a permanent injunction, in that this Court has already held a trial on the merits—namely, the Phase I trial. In another sense, however, a structural injunction issued this date may be considered to be a preliminary injunction, in that the Phase II trial has not yet been conducted.

In any event, the Court will apply the standard four-part test relating to the issuance of injunctive relief, which is the same test that would apply to this Court's analysis of a motion seeking a stay of its structural injunction pending an appeal. The Court's conclusions with respect to the four-part test will make clear why this Court will neither grant any stay of the structural injunction to be issued this date nor entertain any motion seeking such a stay.

### A. The Four–Part Test

When considering a request for injunctive relief, a court must analyze four factors: (1) whether the movant has demonstrated a substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable injury if the requested relief is not granted; (3) whether the injury to the movant if the injunction is not granted outweighs the injury to other interested parties who will be affected by the injunction; and (4) whether the issuance of the preliminary injunction would further the public interest. *See Al–Fayed v. CIA,* 254 F.3d 300, 303 (D.C.Cir. 2001); *George Washington Univ. v. District of Columbia,* 148 F.Supp.2d 15, 17 (D.D.C.2001). The Court will analyze these factors separately.

### 1. Substantial Likelihood of Prevailing on the Merits

The leading commentators on the federal courts have explained that the relevance of the first factor is that "the need for the court to act is, at least, in part, a function of the validity of the applicant's claim." 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.3, at 184 (2d ed.1995). By its very nature, a preliminary injunction is entered before a full trial on the merits has occurred. The district court

must therefore make some determination as to whether the movant has demonstrated a substantial likelihood that it will prevail on the merits, in order to minimize the risk of unwarranted injury to the party against whom the injunction will be issued. However, the degree of likelihood of success is not a determinative factor.

Plaintiffs have already prevailed on the merits in the first phase of the present litigation. Therefore, in light of their previous success on the merits, the Court finds that plaintiffs have demonstrated a substantial likelihood that they will prevail on the merits.

### 2. Irreparable Injury

This Court has already determined that the implementation of Interior's Plan, as is, will necessarily delay rather than accelerate the ultimate provision of an adequate accounting for the IIM beneficiaries. The D.C. Circuit has previously declared that "[g]iven that many plaintiffs rely upon their IIM trust accounts for their financial well-being, the injury from delay could cause irreparable harm to plaintiffs' interests as IIM trust beneficiaries. Thus it seems that the interests at stake are not merely economic interests in an administrative scheme, but personal interests in life and health." *Cobell VI*, 240 F.3d at 1097 (citation and internal punctuation omitted). The Court therefore finds that the delay of an adequate accounting—that is, one that will fully discharge Interior's fiduciary duty to account—that will be caused by the implementation of Interior's Plan, as is, will result in irreparable harm to plaintiffs.

### 3. Balance of Hardships

In determining whether to grant preliminary injunctive relief, this Court must weigh the potential harm to plaintiffs if the injunction is not granted against the potential harm to other interested parties who will be affected by the injunction. The issuance of a structural injunction will add to Interior's administrative workload and result in an increased expenditure of public funds. The imposition of additional tasks to be performed by administrative agencies is not a matter to be taken lightly. Nor is directing an increase in the expenditure of public moneys an insignificant hardship.

On the other hand, the hardship to the IIM beneficiaries that would result from a further delay of the long-promised accounting of their trust fund is simply beyond the pale. Many of the beneficiaries live at a subsistence level, and depend on their IIM trust fund checks in order to purchase basic necessities such as food and drink. The delay of an adequate accounting of their funds therefore directly affects their basic ability to survive. Although neither the imposition of additional tasks upon an administrative agency nor the requirement that taxpayer funds be made available to fund such tasks represent insignificant hardships, both of these must be weighed against the personal interests in life and health of an estimated 300,000 to 500,000 American Indians. The Court thus concludes that the potential harm to these hundreds of thousands of beneficiaries that would result if an injunction is not issued outweighs the potential harm to Interior if such an injunction is issued.

### 4. Furtherance of the Public Interest

The final factor to be examined is whether the issuance of an injunction in the present case would further the public interest. The Court has determined that the issuance of a structural injunction is necessary in the present case in order to compel Interior's compliance with its legal obligations to the IIM beneficiaries. When a government agency has unreason-

ably delayed action in a manner that affects not only the property rights of hundreds of thousands of American citizens, but also undermines their fundamental rights of survival, the issuance of an order that will compel the agency to comply with its legal obligations to those citizens in a reasonable manner directly advances the public interest. Moreover, if executive branch officials can defy legal obligations imposed by Congress and the courts with impunity, the American public will respond with increased cynicism regarding its elected representatives. The public interest is advanced whenever the American public sees that federal officials are not above the law, but are instead governed by the rule of law just as the average American citizen is. As the Supreme Court famously declared: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803).

Only a structural injunction will furnish an adequate remedy for Interior's violations of the vested legal rights of the plaintiffs in this action. The Court will therefore issue a structural injunction to compel the compliance of the Department of the Interior with its duty to account for the IIM trust fund.

### B. Structural Injunction

As noted above, generally speaking, structural injunctions may take one of two forms: identifying performance standards or ordering specific remedial actions. A performance-standard injunction orders specific types of remedial accomplishments, with the means of accomplishment left largely up to the discretion of the institutional defendant. On the other hand, a structural injunction may simply direct that particular remedial actions be taken, and leave the institutional defendant with little or no flexibility concerning the remedial goals to be achieved or the means of attaining them. The prevailing trend in the federal courts is to favor the use of performance-standard injunctions. Moreover, the most recent D.C. Circuit opinion in this case indicated a general disinclination towards "court decrees that are as thick as phone books," which are typical of specific-remedy injunctions. *Cobell VIII,* 334 F.3d at 1143 (citation and quotation marks omitted). Accordingly, the Court will model its injunction as a performance-standard injunction.

The issuance of a structural injunction in any litigation invests the parties with opposing incentives. The institutional defendant has an incentive to interpret the provisions of the injunction as narrowly as possible, in order to render compliance with those provisions a minimal endeavor. On the other hand, the plaintiffs have an incentive to interpret the provisions as broadly as possible, in order to make it easier for the court to invoke its contempt powers, which might thereby include the granting of further relief to the plaintiffs. There are two ways for a court to deal with such competing incentives. One is to make its injunction as specific as possible, and to state precisely the individual tasks that are expected of the institutional defendant. As already explained, the Court has decided against formulating its injunction in such a manner. The other way is to take steps to ensure that the injunction is not interpreted by the parties either too narrowly or too broadly. Such a method not only helps preserve the discretion of the institutional defendant, but also eliminates the necessity of issuing an injunction as thick as a phone book.

Accordingly, if at any time, (1) Interior's implementation of the injunction is affected by the existence of a provision that is susceptible to more than one reasonably plausible interpretation, or (2) it appears to the plaintiffs in this action that Interior is interpreting a provision of the injunction too narrowly or incorrectly, then either of the parties may file a motion for the Court to clarify the provision or provisions at issue. In order to increase Interior's incentive to file timely motions for clarification, the Court will direct that if Interior's implementation of the injunction is affected by the existence of a provision that is susceptible to more than one reasonably plausible interpretation, Interior should adopt the interpretation that is most consistent with the "most exacting fiduciary standards" demanded of a trustee. *See Cobell VI*, 240 F.3d at 1099 ("The federal government has charged itself with moral obligations of the highest responsibility and trust in its relationships with Indians, and its conduct should therefore be judged by the most exacting fiduciary standards."). The Court's inclusion of such a provision is unfortunately necessary, given Interior's demonstrated tendency to evade its legal obligations by interpreting applicable statutes and court orders in an unduly narrow manner. *See, e.g., Cobell v. Babbitt*, 37 F.Supp.2d 6, 16–17 (advancing the argument that a discovery order to produce "[a]ll documents ... relat[ing] to IIM accounts of the five named plaintiffs or their predecessors in interest" meant only that Interior was required to produce either documents relating to the five named plaintiffs or documents relating to their predecessors in interest); *Cobell v. Norton*, 260 F.Supp.2d 110, 127 (D.D.C. 2003) (asserting that Interior could not answer the question "Whether, at any time, the GAO has conducted a final comprehensive audit of individual Indian trust accounts" because plaintiffs had not defined the term "final comprehensive audit"); Defs.' Prop. Findings and Conclusions at 133–34 (arguing that "Congress's use of forward-looking language in [section 102 of the 1994 Act] confirms that Congress did not intend that Section 102 apply to accounts closed prior to the enactment of the 1994 Act" because the Act "does not say that the Secretary shall account for all funds that 'have ever been' or 'were' deposited or invested pursuant to 25 U.S.C. 162a. Instead, Congress specifically used the present tense and limited the requisite accounting to funds 'which are deposited or invested pursuant to the Act of June 24, 1938.' "). The inclusion of such a provision is in accordance with the D.C. Circuit's admonition in *Cobell VI*:

> Even were the language of the 1994 Act ambiguous, this would not redeem appellants' position, as we follow the same rules of construction with regard to Indian trust expectations discussed above. Courts must be guided by that eminently sound and vital canon that statutes passed for the benefit of Indian tribes are to be *liberally construed, doubtful expressions being resolved in favor of the Indians.* Again, as we noted above, *the canon of liberality of construction in favor of the Indians acts with its special strength even where a federal agency would in other cases enjoy the implied authority to implement ambiguous statutory language supporting a competing interpretation.*

*Cobell VI*, 240 F.3d at 1102–03 (emphasis added) (internal citations and quotation marks omitted).

## C. Appointment of a Monitor

█ It is routine for courts issuing a structural injunction to appoint a monitor to report on the defendant's compliance with the injunction and on the progress achieved by the defendant towards

achievement of the goals of the injunction. The necessity of making such an appointment has been neatly summed up by another district court:

> There is an ancient saying, "Quis custodiet ipsos custodes?" "Who is guarding the guards?" which is peculiarly applicable to this kind of litigation. The answer to the question is, "Nobody." The experience of this and other courts has demonstrated that it is not enough to make an order, no matter how detailed and explicit. Unless somebody checks the order against the defendants' performance, they do not perform. When someone watches them, they squirm, but they comply, or get out of the way for someone else to do so. Thus, rather than using the classical, simple, and entirely appropriate remedy of sending the defendants to jail with the keys in their pockets, this Court will undertake to monitor the defendants' future performance of its order.

*Jones v. Wittenberg*, 73 F.R.D. 82, 85 (N.D.Ohio 1976). The D.C. Circuit recently alluded to this practice in its most recent opinion in this litigation, noting its awareness of

> the practice of a federal district court appointing a special master pursuant to Rule 53 to supervise implementation of a court order, especially a remedial order requiring major structural reform of a state institution. *See, e.g., Ruiz v. Estelle*, 679 F.2d 1115, 1161–62 (5th Cir.) (prison reform), *amended in part, reh'g denied in part on other grounds*, 688 F.2d 266 (5th Cir.1982); *Halderman v. Pennhurst State Sch. & Hosp.*, 612 F.2d 84, 111 (3d Cir.1979) (en banc) (reform of institution for the mentally retarded), *rev'd on other grounds*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Gary W. v. State of Louisiana*, 601 F.2d 240, 244–45 (5th Cir.1979) (same); *id.* (col-

lecting cases); Ross Sandler & David Schoenbrod, Democracy by Decree 55–57 (2003).

*Cobell VIII*, 334 F.3d at 1142. Before determining whether it should appoint a monitor to oversee the structural injunction issued this date, the Court will examine each of the cases cited by the D.C. Circuit.

*Ruiz v. Estelle* was one of the decisions in the Texas prison reform litigation discussed *supra*. In issuing a structural injunction, the district court had concluded that "the relief to be ordered in this case cannot effectively and completely be performed without the appointment of one or more special masters to monitor and supervise defendants' compliance efforts." *Ruiz v. Estelle*, 503 F.Supp. 1265, 1390 (S.D.Tex.1980). It therefore directed:

> In order effectively to perform his duties, a special master must be given complete access to [defendants'] facilities and to all information relevant to the fulfillment of the decree, so as to be made cognizant of any failures to comply with its mandates. In connection with this power, a special master shall, *inter alia*, evaluate inmate charges relevant to the issue of defendants' compliance with the court's decree. Reports containing a special master's findings and conclusions with respect to defendants' compliance with the decree, as well as recommendations regarding its modifications or enforcement, shall be submitted to the court for evaluation on a periodic basis, and when specially requested by the court or deemed necessary by the special master.

*Id.* The Fifth Circuit affirmed the district court's appointment of the special master and "several monitors" to observe and report upon the defendants' compliance with the structural injunction. It first noted that the district court had

stated several reasons for its decision to make the appointment: the difficulty of superintending the implementation of "a comprehensive, detailed plan for the elimination of the unconstitutional conditions found to exist in the Texas prison system"; [defendants'] "record of intransigence toward previous court orders requiring changes in [their] practices and conditions"; the "strained" working relations between [defendants'] lawyers and the plaintiffs' lawyers; [defendants'] failure to acknowledge even "completely evident" constitutional violations; and [defendants'] failure to conform its actual practices to its written policies and procedures. The district court did not, as [one defendant] implies, simply rely on the "mere complexity" of the case. Moreover, the court was not required to await the failure or refusal of [defendants] to comply with the decree before appointing an agent to implement it. Noncompliance may constitute one "exceptional condition" under rule 53 [of the Federal Rules of Civil Procedure], but it is not exclusive.

*Ruiz*, 679 F.2d at 1160–61 (footnotes omitted). The Fifth Circuit then explained that

rule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy. The power of a federal court to appoint an agent to supervise the implementation of its decrees has long been established. Such court-appointed agents have been identified by a confusing plethora of titles: receiver, Master, Special Master, master hearing officer, monitor, human rights committee, Ombudsman, and others. The function is clear, whatever the title.

The district court's opinion stated the reasons for the appointment of the spe-

cial master and his monitors. As it noted, we have previously approved the appointment of such agents to oversee compliance with continuing court orders. Insofar as the special master is to report on [defendants'] compliance with the district court's decree and to help implement the decree, he assumes one of the plaintiffs' traditional roles, except that, because he is the court's agent, he can and should perform his duties objectively.

*Id.* at 1161–62 (footnotes and internal punctuation omitted). It observed, however:

To fulfill his responsibilities, the special master is given sweeping powers, including unlimited access to [defendants'] premises and records as well as the power to conduct confidential interviews with [defendants'] staff members and inmates, and to require written reports from any [defendant] staff member. These powers are unconfined save by the following instructions: he is not to intervene in the administrative management of either [the prison] or any of its units and he is not to direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance.

The order of reference does not make clear that, in conducting investigations and hearings, the special master and the monitors are not to consider matters that go beyond superintending compliance with the district court's decree. Such an express constraint is appropriate because of the danger that the special master or the monitors may entertain inmate complaints that convert the remedial process into a surrogate forum for new § 1983 actions. In the interests both of prison administration and sound judicial procedure, it should be made clear to the plaintiffs, the special master,

the monitors, and the [defendants'] staff that the special master is not an inmate advocate or a roving federal district court. As we have pointed out before, the powers of the court's appointed agents should not intrude to an unnecessary extent on prison administration.

*Id.* at 1162 (footnotes and internal punctuation omitted). Accordingly, the Fifth Circuit directed that the special master's order of reference be amended to clarify (1) that neither he nor the monitors possessed the "authority to hear matters that should appropriately be the subject of separate judicial proceedings, such as actions under § 1983, and that their duties are restricted to those set forth in the order of reference"; and (2) that the reports, findings, and conclusions of the special master were not to be afforded the presumption of correctness nor be subject to a "clearly erroneous" standard of review. *Id.* at 1163.

*Halderman v. Pennhurst State Sch. & Hosp.* is one of the opinions in the Pennhurst litigation discussed *supra.* The district court in *Halderman*, having determined that the implementation of a structural injunction would be "impossible without the appointment of a Special Master," appointed a master "with the power and duty to plan, organize, direct, supervise and monitor the implementation of this and any further Orders of the Court." *Halderman v. Pennhurst State Sch. & Hosp.*, 446 F.Supp. 1295, 1326 (E.D.Pa.1977). It directed the defendants to provide the master with "access to all premises, records, documents and personnel and residents and with every other cooperation and service necessary to the discharge of the Master's duties." *Id.* The Third Circuit affirmed the appointment of the master, rejecting the defendants' argument that "any use of a master for implementation purposes intrudes excessively into the proper domain

of local autonomy." *Halderman*, 612 F.2d at 111. It explained:

Were we to preclude the trial court from resorting to a master, ·we would help make self-fulfilling the frequently made prophecy that courts are institutionally incapable of remedying wholesale violations of legally protected rights. Masters have been used in a wide variety of remedial contexts. These include cases involving handicapped children, as well as cases remedying various other statutory or constitutional violations. Masters are peculiarly appropriate in the implementation of complex equitable decrees which require ongoing judicial supervision. Moreover, by use of a master, the judge can minimize his personal participation in the details of implementation without sacrificing direct control or efficacy.

*Id.* (footnotes omitted). Therefore, the Third Circuit stated:

We hold that the trial court chose correctly in ordering the appointment of a master. We are confident that the court will exercise appropriate supervision over the operations of the Master in order to minimize the expenditure of funds in the administration of his responsibilities and the manner in which he discharges his responsibilities under the decree in particular, the manner in which individualized habilitation programs are developed for each class member. As we understand the role of the Master under the decree, he is to supervise all implementation efforts with the aid and assistance of all parties to the lawsuit. The defendants will thus have an opportunity to participate in the structuring of relief.

*Id.*

Finally, *Gary W. v. State of Louisiana,* 601 F.2d 240 (5th Cir.1979), is another institutional reform case involving mental

health institutions. The defendants appealed the district court's appointment of a special master to monitor the implementation of a previously-issued structural injunction. The Fifth Circuit affirmed. First, it rejected the defendants' argument that the district court was required to conduct an evidentiary hearing before appointing such an official. Second, it deemed the defendants' assertion that the authority afforded the special master exceeded that authorized by Federal Rule of Civil Procedure 53(c) to be "without basis":

> The Special Master's functions as fact finder, monitor and hearing officer are clearly spelled out. He is to make reports and recommendations to the District Court. Each party then has the right to object to these recommendations and be accorded hearings on objections, complete with the right to present evidence of a documentary and testamentary nature and to cross-examine adverse witnesses. The order specifically provides, "The Court retains the authority to reject or modify any recommendation by the Master regardless of whether any party has filed an objection." The authority given the Special Master by the District Court comports with Rule 53(c).

*Id.* at 245 (citations omitted).

The appointment of a monitor to report on Interior's compliance with the Court's structural injunction will be appropriate. First, as in *Ruiz*, Interior has demonstrated its intransigence towards previous orders in the present case requiring changes in its practices and conditions; the relations between plaintiffs' counsel and defense counsel is strained (to put it mildly); and Interior has both repeatedly failed to acknowledge even "completely evident" violations of its fiduciary duties to the IIM beneficiaries, and failed to conform its actual practices to its written policies and procedures. Second, as noted above, the Court has invited plaintiffs to file a motion for clarification if it appears at any time that Interior is interpreting the provisions of the structural injunction in an unduly narrow fashion. In order for plaintiffs to be able to determine whether Interior is interpreting the injunction in such a manner, it will be necessary to provide a means for the generation of regular reports of the injunction's implementation by a detached, neutral observer. It has become apparent to the Court that the quarterly reports issued by Interior will not satisfy this need.

The reason that the quarterly reports will be inadequate for such a purpose is that Interior is necessarily an interested party in the implementation of the injunction. As a defendant in this litigation, it cannot be expected to be an objective reporter of events related to the implementation process. Because it possesses a natural incentive to view the process with rose-colored glasses, it must be expected that any reports of the various stages of implementation will tend to err on the side of over-optimism. Moreover, the D.C. Circuit has acknowledged that a number of Interior's quarterly reports have "painted an overly sunny picture of the status of the TAAMS project and were misleading about the progress being made in ways painstakingly identified by the district court." *Cobell VIII*, 334 F.3d at 1149. Additionally, as noted during the Phase 1.5 trial, the extent to which the goals of the quarterly reports have been hindered by the use of bureaucrat-speak have become painfully clear. For example, prior to Interior's filing of its ninth quarterly report, it had decided to prioritize its efforts to "clean up" IIM trust data. As testified by Special Trustee Ross Swimmer, there was an effort to "pull back from the nationwide effort at trying to do data cleanup, and [we were] again trying to focus our efforts on

developing [a] database type warehouse that can house data and ensure the capability of keeping it clean and organized." Tr., Day 41, PM session (July 2, 2003) at 25:16–20. However, the Court observed the near-impossibility of discerning this policy shift from simply reading the Ninth Report:

> THE COURT: So you're saying that was a change because we're going to do it this way. I understand if you had said this approach will be better than whatever the approach was in the past, but I understand your argument is I should have figured out from this wording this is a new approach, this analysis will focus on these things, and therefore we're not going to do what we did in the past.
>
> I guess the problem I have with that, if that's the way these quarterly reports work, then I don't really think they fulfill the function I originally thought, so there may have to be some other system than quarterly reports, because you really have to parse every word in every sentence of these when the report is working that way. I don't see how I'm supposed to figure out you had a complete change in approach from that information there.

*Id.* at 36:7–21.

The Court is mindful of the D.C. Circuit's holding in *Cobell VIII* that "the district court does not have inherent power to appoint a monitor—at least not a monitor with the extensive duties the court assigned to [the Special Master–Monitor]—over a party's substantial objection, here the Government's objection that the appointment violated the separation of powers." *Cobell VIII*, 334 F.3d at 1141. However, the D.C. Circuit immediately thereafter clarified this holding by explaining: "As the foregoing sentence conveys,

our holding is a narrow one, tethered to the peculiar facts recounted below." *Id.* Additionally, the D.C. Circuit specifically distinguished the issue before it from cases in which district courts have appointed monitors to supervise the implementation of a structural injunction, such as *Ruiz, Halderman,* and *Gary W.* It explained that

> *Ruiz* illustrates the limits of the mandate a district court may permissibly give its agent. There the district court, having found the defendant state department of corrections subjected inmates to cruel and unusual conditions, entered an injunction and appointed a special master, assisted by several monitors, to monitor implementation of the relief ordered. The special master was given unlimited access to the defendants' premises and records as well as the power to conduct confidential interviews with staff members and inmates. On appeal, the State argued the appointment was improper because there was no exceptional condition warranting it, as required by Rule 53. In rejecting that argument, the court of appeals approved the special master's mandate, namely, to report on the department's compliance with the district court's decree and to help implement the decree, thereby assuming one of the plaintiffs' traditional roles....
>
> [In *Ruiz,*] the master was specifically instructed not to intervene in the administrative management of the department and not to direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance. Most important, the court of appeals clarified that the special master and the monitors were not to consider matters that go beyond superintending compliance with the district court's decree, thereby assuring the

special master would not be an advocate for the plaintiffs or a roving federal district court.

*Cobell VIII*, 334 F.3d at 1142–43 (citations and internal punctuation omitted).

This Court will abide by the limits set forth by the D.C. Circuit. Accordingly, the Court will appoint a monitor, to be assisted by several subordinate officials, to monitor the implementation of this Court's structural injunction. It will direct Interior to provide the monitor and his or her agents with unlimited access to Interior's premises and records, as well as the power to conduct confidential interviews with Interior officials and employees. It will also direct Interior to compensate the monitor and his or her agents for all expenses incurred in connection with their appointment. Interior shall bear these expenses because the inadequacy and misleading nature of the quarterly reports submitted by Interior has necessitated the appointment of the monitor. The Court will instruct the monitor and his or her agents not to intervene in the administrative management of Interior, and not to direct the Interior defendants or any of their subordinates to take or refrain from taking any specific action to achieve compliance. It will further direct the monitor and his or her agents not to consider matters that go beyond superintending compliance with this Court's injunction.

### D. Timetable

In order for the Court to determine the extent of Interior's progress in implementing the structural injunction, it will be necessary to establish a specific timetable for the completion of specific endeavors, and for the completion of the historical accounting as a whole. As noted above, the Court has concluded that Interior's proposals for accounting for the judgment, per capita, and special deposit accounts

represent reasonable approaches. But whether the proposals are reasonable as a whole depends on whether they will be implemented within a reasonable amount of time. Without a definite timetable, it is impossible for the Court to make such a determination. The same is true for the performance of the historical accounting as a whole.

Interior's Accounting Plan represents that "the work described in this Plan is expected to take five years to complete ..." *Id.* at 1. However, testimony presented during the Phase 1.5 trial made clear that the five-year figure does not represent a firm estimate. For example, Associate Deputy Secretary Cason testified:

Q. Approximately how long is it expected that the completion of the historical accounting will take?

A. As provided, the plan envisions approximately five years to undertake the accounting.

Q. Would you consider this a firm estimate?

A. I would consider it to be a best guesstimate based upon some assumptions.

Q. What sort of factors might affect the duration of the project?

A. Congressional funding and pace of funding, the relative difficulty that we encounter in compiling the records and indexing the records would be two variables that could dramatically influence the timeline.

Tr., Day 21, AM session (June 4, 2003) at 13:3–15. Certainly, the anticipated end date of any multi-year undertaking must necessarily be somewhat speculative. Nevertheless, it will be necessary to establish a timetable in order to determine whether Interior is, in fact, complying with the structural injunction issued this date. It is well-established that a court may

establish a timetable or order deadlines when agency action has been unreasonably delayed. In *Natural Resources Defense Council v. Train*, 510 F.2d 692 (D.C.Cir. 1974), an environmental group sought to compel the EPA to publish a set of guidelines mandated by provisions in an environmental statute. The district court ordered the EPA to publish the guidelines in accordance with a detailed timetable established by the court. In affirming the district court's establishment of the timetable, the D.C. Circuit explained:

> The District Court acted reasonably in using a publication schedule as a means of implementing its order. . . . In light of the failure of the agency to meet its acknowledged duty under the Act, the District Court's decision to incorporate a timetable into the order constituted a reasonable step to facilitate supervision of the decree and to assure early efforts by the delinquent defendant toward eventual discharge of its statutory responsibility. Sound principles counsel resort to a structured type of order where the court seeks to compel completion of a task which will necessarily extend over a substantial period. Requiring the courts to rely on mere exhortation to move with expedition toward compliance within a "reasonable time" would undercut their ability to spur reticent defendants to render the performance to which the plaintiff and public are entitled. The authority to set enforceable deadlines both of an ultimate and an intermediate nature is an appropriate procedure for exercise of the court's equity powers to vindicate the public interest.

*Id.* at 704–05 (footnotes omitted). It also expressed its approval of the procedures adopted by the district court in establishing the timetable:

The procedure employed in formulating and applying the Group I timetable also represented a proper exercise of the District Court's discretion. The District Judge's reliance upon the parties to draft a proposed timetable provided a measure of assurance that the order would be workable. In addition to this initial receptivity to the views of the parties, the court demonstrated a willingness to accommodate objections by EPA and amici curiae to certain publication deadlines by modifying the timetable.

*Id.* at 705 (footnotes omitted). The D.C. Circuit explained the circumstances under which the district court should consider modifying the deadlines it had established:

> Should the Administrator conclude that manpower or methodological constraints threaten to delay guidelines for particular categories beyond December 31, he may attempt to demonstrate to the courts that such conditions require an extension of the deadline for specific categories. Contentions relating to particular point source categories are to be presented as an initial matter before the District Court charged with supervision and enforcement of this court's order. *The District Court will, in essence, be called on to separate justifications grounded in the purposes of the Act from the footdragging efforts of a delinquent agency.*
>
> Similar considerations apply after the issuance of an order when the defendant petitions for modification or the court considers the propriety of resorting to contempt to coerce compliance. Flexibility rather than rigidity has distinguished equity jurisprudence. It would be unreasonable and unjust to hold in contempt a defendant who demonstrated that he was powerless to comply. An equity court can never exclude claims of

inability to render absolute performance, *but it must scrutinize such claims carefully since officials may seize on a remedy made available for extreme illness and promote it into the daily bread of convenience.*

*Id.* at 713 (emphasis added) (footnotes and internal quotation marks omitted).

Similarly, in *Farmers Union Central Exchange v. FERC,* 557 F.Supp. 34 (D.D.C.1982), a district court in this circuit ordered FERC to issue a decision within sixty days that had been pending before the agency for four years. In rejecting FERC's application for a stay of the order, the court explained:

the FERC alleges that the Court's selection of a fixed date for the issuance of a decision raises serious legal questions. The Commission suggests that the appropriate remedy was to establish a timetable for decision in consultation with the FERC. Initially, the Court notes that the cases defendant cites in support of this proposition merely state that establishing a timetable in conjunction with the agency is an appropriate remedy—not *the only* appropriate remedy. *MCI Telecommunications Corp. v. FCC,* 627 F.2d 322, 345 (D.C.Cir. 1980); *Nader v. FCC,* 520 F.2d 182, 207 (D.C.Cir.1975); *Natural Resources Defense Council v. Train,* 510 F.2d 692 (D.C.Cir.1974). Indeed, in *Train,* the Court stated: "The authority to set enforceable deadlines ... is an appropriate procedure for exercise of the Court's equity powers to vindicate the public interest." 510 F.2d at 705. Thus, defendant has further failed to demonstrate that establishing a 60 day deadline was an abuse of the Court's discretion.

*Id.* at 36–37 (emphasis in original). And in *Pulido v. Heckler,* 758 F.2d 503 (10th Cir. 1985), the Tenth Circuit rejected the argument of the Secretary of Health and Human Services that "even if she is under a duty to promulgate regulations [mandated by the Social Security Act], it is within her discretion to decide when those regulations should be proposed." *Id.* at 507. The court explained:

The relevant provisions of the Social Security Act were enacted in 1980—more than four years ago. Whatever discretion the Secretary may have had, a delay of more than four years is contrary to the purposes of the Act, and impermissibly abuses that discretion. Allegedly conflicting signals from Congress do not alter this conclusion....

The Secretary points out that, as recently as April 19, 1984, she has announced her formal intention to publish proposed regulations. As the district court notes, however, a notice of proposal to issue travel expense regulations is of little significance. The notice does not bind the Secretary to publish regulations, nor does it prevent her from later denying that she has a mandate to publish regulations. Indeed, the Secretary has announced such intentions several times before, but has yet to publish proposed regulations. Given this history of delay, we find it necessary to have a timetable established to ensure that the regulations mandated by the statute are, indeed, promulgated. Such timetables are an appropriate procedure for exercise of the court's equity powers to vindicate the public interest.

*Id.* at 507, 508 (internal citations, punctuation, and footnote omitted).[73]

---

**73.** *See also Environmental Defense Fund v. EPA,* 852 F.2d 1316, 1331 (D.C.Cir.1988) (establishing a schedule for EPA to fulfill statuto-

ry obligations); *Natural Resources Defense Council v. Ruckelshaus,* 14 Envtl. L. Rep. 20,-817 (D.D.C.1984), *available at* 1984 WL 6092

The 1994 Act was passed nine years ago. Both this Court and this D.C. Circuit have already concluded that Interior has unreasonably delayed in taking measures to comply with its fiduciary obligations, the existence of which were reaffirmed by the 1994 Act. The Plans submitted by Interior do contain a schedule for Interior's completion of specific tasks that form a part of either the historical accounting process or the process of bringing itself into compliance with its fiduciary duties. However, none of the Plans submitted by Interior create any legal obligation to take any steps to comply with its obligations. The provisions of Interior's Accounting Plan merely state that "Interior intends to" or "Interior plans to" take steps to implement them. And the other two Plans filed with this Court both contain carefully-worded disclaimers absolving Interior of any legal duty to actually implement any portion contained in them.[74] Given Interior's unreasonable delay in taking any substantive measures to comply with its fiduciary duties to the IIM beneficiaries, including its duty to account, the Court concludes that a timetable setting forth a definite schedule within which Interior must comply with its duties will be necessary to ensure that these duties are, in fact, complied with.

Therefore, the Court will include in its structural injunction a schedule for Interior to complete specific tasks, based on the anticipated dates of completion of such tasks provided in Interior's Plans. The Court will direct Interior to inform the Court immediately if it becomes aware of information that might affect its compliance with the timetable. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Donovan,* 756 F.2d 162, 165 (D.C.Cir.1985) ("Mindful of past delays, ... we order OSHA to inform this court immediately of any proposed action which might interfere with the timetable.").

The Court will also direct Interior to submit a detailed proposed timetable for its completion of the historical accounting process, together with dates for completion of important milestones, including the end of the collection process, accounting process, and reporting process, as explained above. The proposed timetable should include a detailed explanation as to why each of the selected dates were chosen. It is impossible to overstress the importance of providing detailed explanations of why

("Given the egregious delays encountered thus far, it is abundantly clear that a court order is necessary to make the EPA adhere to a definite regulatory schedule and execute its statutory duties."); *United States v. Yonkers Bd. of Educ.,* 611 F.Supp. at 741–42 (establishing a timetable of deadlines for HUD to comply with the provisions of a consent decree); *United States v. Yonkers Bd. of Educ.,* 635 F.Supp. 1577 (S.D.N.Y.1986) (requiring the city of Yonkers to develop a particular number of public housing units by a specified deadline); *Gautreaux v. Landrieu,* 523 F.Supp. at 672–82 (requiring HUD to undertake specific actions within a prescribed timeline).

**74.** Interior's Comprehensive Plan includes the following disclaimer: "This plan is in-

tended to be a DOI working document. It is not intended to, and does not, create any legal right or benefit, substantive or procedural, enforceable by a party against the United States, its agencies, or instrumentalities, its officers or employees, or any other person." Department of the Interior Comprehensive Trust Management Plan at iii n. 2. Interior's January 6 Compliance Plan includes virtually the same language: "This Plan is intended to comply with the Court's order. It is not intended to, and does not, create any legal right or benefit, substantive or procedural, enforceable by a party against the United States, its agencies, or instrumentalities, its officers or employees, or any other person." Department of the Interior Fiduciary Obligations Compliance Plan at 13 n. 7.

each of the selected dates were chosen, because the Court will review the proposed timetable to determine whether it represents a reasonable period of time for Interior to complete the entire historical accounting project, as well as whether its proposed dates for accomplishing specific subprojects within the historical accounting process represent reasonable periods of time in which to accomplish those subprojects. Following the submission of this timetable, the Court will invite plaintiffs to submit a brief in response to Interior's proposed timetable, and an alternative proposed timetable, if they wish. Recognizing that the Court's opinions issued this date may alter some of these proposed dates of completion, the Court will permit Interior to provide a new schedule for its accounting of the land-based accounts and for the historical accounting process as a whole.

### E. Retention of Jurisdiction

Following the Phase I trial in 1999, this Court issued an order that included the following provision: "To ensure that defendants are diligently taking steps to rectify the continuing breaches of trust declared today and to ensure that defendants take the other actions represented to the court upon which the court bases its decision today, the court will retain continuing jurisdiction over this matter for a period of five years, subject to any motion for an enlargement of time that may be made." *Cobell V,* 91 F.Supp.2d at 58–59. The Court explained its reasons for including this provision in its order:

> [G]iven the long and sorry history of the United States' trusteeship of the IIM trust, the defendants' recalcitrance toward remedying their mismanagement despite decades of congressional directives, and the consequences of allowing these enumerated breaches of trust to continue, the court will retain continuing jurisdiction over this matter. It

would be an abdication of duty for this court to do anything less.

*Id.* at 7. The D.C. Circuit affirmed this Court's retention of jurisdiction over the present case, noting:

> While a court's retaining of jurisdiction of five years may be unusual, federal courts regularly retain jurisdiction until a federal agency has complied with its legal obligations, and have the authority to compel regular progress reports in the meantime. Of course, nothing prohibits the appellants from moving for reconsideration should they be able to demonstrate at some time in the future that adequate compliance has been achieved.

*Cobell VI,* 240 F.3d at 1109 (internal citations omitted).

Interior has represented to the Court that its best guesstimate for completion of the historical accounting process is five more years. Therefore, in accordance with the D.C. Circuit's observation that "federal courts regularly retain jurisdiction until a federal agency has complied with its legal obligations," the Court will extend its retention of jurisdiction over the present matter for an additional five-year period, to expire on December 21, 2009. This retention of jurisdiction shall be subject to any motion for an enlargement of time that may be made.

In order to minimize the time in which the Court may relinquish its jurisdiction over the present case, the Court will not certify the structural injunction issued this date for interlocutory appeal. Such an appeal would delay even further this already-protracted litigation. Nor will this Court entertain a motion for a stay of the injunction pending appeal.

### VII. CONCLUSION

It may seem that the Court is of two minds in this opinion. On the one hand,

the Court has chosen to adopt a modified version of Interior's accounting plan, rather than plaintiffs', as the basis for the historical accounting of the IIM trust fund. On the other hand, the Court has ordered substantial injunctive relief to ensure that the accounting will be carried out. The apparent contradiction is explained simply. It is not that the Court believes Interior is incapable of formulating an adequate plan for an accounting; rather, it is that the Court has no confidence that Interior is willing to actually *implement* an adequate accounting.

This statement requires explanation, as well as some qualification. As noted by the Court during the Phase 1.5 trial, the Reports of the Special Master in this litigation have included the highest praise for Associate Deputy Interior Secretary James Cason, commending him for his willingness to cooperate with the Special Master in attempting to correct information technology (IT) security problems affecting IIM trust data. Moreover, it is indeed true that during the recent trial, one of plaintiffs' expert witnesses agreed that at least one of Interior's Plans would be workable if implemented. Richard Fitzgerald, Acting Director of the newly-formed Office of Trust Regulations, Policies and Procedures at Interior, testified: "I think that plan that has been put together [*i.e.*, Interior's Comprehensive Trust Management Plan] is a reasonable plan if it can be implemented." Tr., Day 6, PM session (May 8, 2003) at 41:9–10. However, Fitzgerald qualified his remarks by noting: "I think that we have moved in a good direction, but it has taken an awfully long time. And, you know, the old bank examiner in me, the old banker—keep[s] thinking about *Pygmalion*, you know, in this sense. Words, words, words. Show me. I don't see the performance yet. I see words." *Id.* at 64:11–16. Later, Fitzgerald also testified:

You know, I'm a person that believes that decisive leadership is leadership that will make decisions, and if they turn out not to be the best decisions, they then can be modified. What really—to me, what is really annoying and is characteristic of government, I think, more than other places is not making the decisions.

I think it was Dean Rusk or somebody many, many, many years ago who said that the government game is to keep the conversation going because as long as you keep the conversation going, nobody has to make a decision. You see that a lot. So I would rather make a less-than-perfect decision because once you implement it, you know where the weaknesses are and you can strengthen the weaknesses rather than making no decision.

Tr., Day 8, AM session (May 12, 2003) at 37:6–19.

Interior has kept the conversation about historical accounting going for as long as possible. Over the decades, the Indians have heard plenty of words, words, words. As noted by the National Congress of American Indians:

Since 1929, Congress, the General Accounting Office, the Inspector General and agency reports have been identifying problems with the Department's trust fund accounting processes.

[From] 1929 until today, DOI has engaged in the development of myriad trust reform "plans." This issue then is not about leadership or Administrations, or the lack of plans or the need for organization. The issue is the lack of will to implement true reforms, and speaks directly to the inability of a federal agency to focus its efforts on legal obligations to a group which the United States has promised to protect. The only time that the DOI has made any

progress on trust reform has been under the direct prodding of Congressional committees or this Court.

Br. for *Amicus Curiae* National Congress of American Indians at 30–31 (internal citations omitted). Actually, reports of Interior's defective accounting procedures date back to at least 1915. In that year, the Joint Commission of the Congress of the United States to Investigate Indian Affairs received a report regarding "Business and Accounting Methods Employed in the Administration of the Office of Indian Affairs" (Defs.' Ex. 255) ("1915 Report"). Under the heading "Defects in Methods of Accounting and Reporting," the Joint Commission reported:

> The Office of Indian Affairs, whose volume of business runs to many millions of dollars each year and whose trusteeship includes the custody and control of approximately a thousand million dollars['] worth of property, is equipped with records so inadequate as not only to imperil the rights of those for whose benefit these funds and properties are held, but to leave the administrator himself without protection. An accounting system is maintained which is single entry in principle. The accounts are partial and inaccurate in many particulars.

> \* \* \* \* \* \*

> It goes without saying that the accounting system as it is maintained today in the central office is totally inadequate. . . . Some innovations have been made in recent years, but what is needed is a systematic overhauling.

1915 Report at 78, 79.

On February 25, 1929, the Comptroller General of the United States transmitted to the U.S. Senate "A Report of the Amount of Funds of the Indians, the Investment Thereof, the Rate of Interest Thereon Together With Comments Pertinent to the Uses Made of Such Funds"

(Defs.' Ex. 256) ("1929 Report"). Under the heading "Accounting System," the Comptroller General reported:

> As will be seen from the statements of tribal funds, etc., as of June 30, 1928, the Indian Office maintains about 470 separate subaccounts with the fund "Indian moneys, proceeds of labor," in which are reflected the balances pertaining to the various agencies, schools, and hospitals and available for specific purposes. On the books of the Treasury and of the General Accounting Office the fund is carried in one account. Although the aggregate balances in the separate accounts should reconcile with that shown in the Treasury account, a net difference of approximately $40,000 was found to exist as of June 30, 1928. It was stated that differences in the accounts, in varying amounts, have existed for the past 10 years.

1929 Report at 116. In December of 1956, the Comptroller General submitted a report to the House Appropriations Committee entitled "Significant Findings Developed by the General Accounting Office During the Course of Audits and Other Examinations" (Defs.' Ex. 276) ("1956 Report"). Under the heading "Deficiencies in administration of individual Indian moneys," the Comptroller General reported:

> In our report on [our] audit of the Bureau of Indian Affairs, submitted to the Congress on March 9, 1955, and in reports to the Commissioner of Indian Affairs, we pointed out a number of deficiencies in the administration of individual Indian moneys and recommended that the Bureau take action to insure that regulations set forth in the Indian Affairs Manual be followed closely. The Bureau maintains about 88,000 individual Indian money accounts. Disbursements from these accounts totaled over $66,000,000 in fiscal

year 1955. Our audit in 1955 disclosed that some progress had been made in correcting the deficiencies, but serious weaknesses still existed in varying degrees at the locations visited. These included disbursements of individual Indian moneys without adequate support, deficiencies in accounting for cash and bonds and in the computation and distribution of interest income, and other weaknesses in internal procedures.

Because of these and the other accounting deficiencies noted during the audit, the accounts do not adequately serve the purposes normally intended, such as establishing adequate controls over cash and securities. To account properly for cash held in trust and to protect the Government against possible losses due to payments in excess of amounts available in the individual accounts, we have recommended that the Commissioner take action to insure that these deficiencies are corrected.

1956 Report at 28.

In March of 1966, the Comptroller General issued a report to Congress entitled "Need for Improvements in the Management of Moneys Held in Trust for Indians." (Defs.' Ex. 277) ("1966 Report"). In a cover letter, the Comptroller General summarized his findings:

Our review showed that trust funds substantially in excess of current disbursement needs were not invested by the Bureau of Indian Affairs, thereby resulting in significant losses of interest income to Indian peoples. Uninvested cash deposited with the Treasury Department exceeded $11.1 million at the end of each month during fiscal year 1964. We also found that income from investments was inequitably distributed at two area offices. We estimate that, during fiscal years 1963 and 1964, $38,700 of interest income was inequit-

ably distributed to 7 agencies, with the result that 11 agencies and two miscellaneous accounts received less than their equitable share of the earnings, because two area offices misclassified the beneficial ownership of securities after the Bureau reorganized its administration of Indian trust moneys in 1950. Also, two Indian Service Special Disbursing Agents were not properly recording interest income, and at one area office not all interest earned on investments was collected. In regard to these findings, the Department advised us that the Bureau had taken or would take actions that should correct the deficiencies noted.

Our review also disclosed that an Indian Service Special Disbursing Agent withheld funds from certain depositors to avoid recording overdrafts after erroneous payments have been made to other persons. The Agent believed that he would incur personal liability by creating such overdrafts . . . .

We are bringing the results of our review to the attention of the Congress because of the special fiduciary relationship that the Congress has placed on the Secretary of the Interior and the Commissioner of Indian Affairs in carrying out the Government's guardianship obligations to Indian peoples relating to trust funds.

Letter from Frank H. Weitzel, Acting Comptroller General of the United States, to the President of the Senate and the Speaker of the House of Representatives (March 11, 1966) at 1, 2.

In 1982, the Comptroller General submitted a report to Congress entitled "Major Improvements Needed in the Bureau of Indian Affairs' Accounting System" (Defs.' Ex. 258) ("1982 Report"). On the first page of the report, the Comptroller General states:

Design and operating deficiencies in the Bureau of Indian Affairs' (the Bureau's) automated accounting and finance system have caused the Bureau to lose accountability for hundreds of millions of dollars of grant, contract, and trust funds. GAO believes these system deficiencies to be so serious that they present opportunities for improper use of funds and other resources. Bureau managers have not acted to correct these system deficiencies even though these matters have been repeatedly brought to their attention by GAO, internal auditors, and special study groups.

1982 Report at i.

It is not just the legislative branch that has called attention to Interior's repeated failures, but also the judicial branch. As the D.C. Circuit noted in 2001,

Concern over federal mismanagement of the IIM trust funds is not new. The General Accounting Office, Interior Department Inspector General, and Office of Management and Budget, among others, have all condemned the mismanagement of the IIM trust accounts over the past twenty years. Time and again Interior Department officials pledged to address these concerns. Yet, as Interior officials readily acknowledge, there has been little progress at reforming the management of IIM trust accounts.

Beginning in 1988, Congress held oversight hearings on Interior's management of the Indian trust accounts. These hearings led to a report, MIS-PLACED TRUST: THE BUREAU OF INDIAN AFFAIRS' MISMANAGEMENT OF THE INDIAN TRUST FUND, H.R. REP. NO. 102–499 (1992), which harshly criticized the Interior Department's mishandling of the trust accounts. Consistent with prior analyses, the report found, "significant, habitual problems in BIA's

ability to fully and accurately account for trust fund moneys, to properly discharge its fiduciary responsibilities, and to prudently manage the trust funds." Interior's persistent failure to meet its obligations led the congressional investigators to conclude that top officials "have utterly failed to grasp the human impact of its financial management of the Indian trust fund."

*Cobell VI*, 240 F.3d at 1089–90 (citations omitted).

Yet, decade after decade, Interior's response to these concerns has been consistent—it has kept the conversation going with its critics in order to maximize the amount of time that would elapse before it would be obliged to take any real action. Even after the publication of the *Misplaced Trust* report in 1992, "[o]nce again the Interior Department pledged reforms; once again there was little improvement." *Id.* at 1090. This particular failure to take any action led Congress to conclude that legislative action would be necessary to compel Interior to comply with its fiduciary obligations to the American Indians. The Members who proposed the bill that became the 1994 Act specifically described Interior's modus operandi as forestalling action by pledging reform, then consistently failing to honor its pledges. For example, then-Congressman Craig Thomas (R–Wyo.) declared to the House Subcommittee on Environment, Energy, and Natural Resources:

Since the Government Operations Committee released its report, "Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund" [in 1992,] I have seen precious little change in this sad state of affairs. Instead, I have seen promised deadlines come and go; I have seen promises to reform go unfulfilled. Despite state-

ments made in the early days of the Clinton administration, two years later neither [Interior] nor the BIA has brought us one step closer to resolving the trust fund problem. All we have seen is a continuation of the BIA's one unchallenged specialty: *inertia.*

We have seen the pattern repeated over and over. The Department and BIA promise to act, fail to, we are forced to introduce legislation to deal with the issue, and then when passage of the legislation seems imminent they come to us and ask for more time, quote, "because we're working on the problem, really we are," unquote, or they offer their own, watered-down, legislative proposal in the hope of heading ours off. . . .

I am sure that this morning we will hear more of the same excuses and promises, more requests to just give it a little more time, from the Department that we have been hearing for the last six years. But, Mr. Chairman, shame on us, shame on this Congress, if we delay any further.

The Department told us in August, and I am sure will repeat this morning, that they have everything under control. Well, Mr. Chairman, my response to that is an explicative which decorum prevents me from using here but which I will paraphrase: cow manure!

140 Cong. Rec. 27,243 (1994) (emphasis in original). The same year, Congressman Mike Synar (D–Okla.) informed the full House:

Mr. Speaker, my Subcommittee on Environment, Energy and Natural Resources has held five separate oversight hearings on this subject since 1989. Mr. Richardson's subcommittee has also held several hearings in the last two years. Regrettably, year after year we get the same worn-out response from the Interior Department. They tell us they're

really on top of this now. They tell us they're really going to move on needed reforms now. Year after year, on and on with the same commitments. Year after year, those commitments are largely forgotten when the hearings are over.

I understand the Interior Department opposes this legislation. That is too bad; we have tried to work in good faith with the Department on correcting these problems and, failing that, on crafting an appropriate legislative measure. I want to assure my colleagues that the Department's vague last-minute arguments over the bill have no merit whatsoever. And, sadly, their promises of reform are no different, and no better, than those of their predecessors.

40 Cong. Rec. 24,244 (1994).

Almost a decade later, little has changed. Interior continues to pile it on; the only difference is that instead of Congress, this Court is now its chosen receptacle. As demonstrated by the above-quoted statements, at every opportunity where Interior had to decide whether to honor the IIM beneficiaries' interests, it has decided that its own interests in administrative convenience took precedence. As testified by former Special Trustee Paul Homan:

[T]here is some evidence to suggest that not only the last administration, but the administration before that, they had an expression up until the time I left [—] that they would ["]work toward["] trust reform. If you look at the Secretary's 1994 plan, their 1996 plan, and up until the time I left, other than that which was compelled by the Reform Act, which they didn't accept, my plan, which they didn't accept, they were working toward reform.

I looked back for 30 years and each successive secretary, each successive administration seemed to form their plans

to put off the real reform until after they left office. This is a political loser. It's a political loser for any secretary. It's small. The Indians really do not control any national election. It's a loser for the Congress; the same thing. And [the Indians] are not big contributors to political causes other than perhaps through the gambling tribes, which are not part of the trust.

Tr., Day 4, AM session (May 6, 2003) at 12:20—13:11. And as explained by Homan, the creation of an Office of the Special Trustee within Interior did little to compel the agency to take any real action to satisfy its trust responsibilities:

> I testified just last September, along with the second special trustee [Thomas Slonaker], that this—the ability to monitor is one thing; the ability to direct a reform effort is another; so all you end up doing is being another critic. So no power. The law may say that. And I did an earnest job, and I presume Mr. Slonaker did, in trying to monitor this situation, and we made suggestions and they were unacceptable to the secretaries at the time of our jurisdictions.

Tr., Day 6, AM session (May 8, 2003) at 12:23—13:6.

The results of Interior's failure to take its trust responsibilities seriously are plain today. Although they are citizens of the greatest and most prosperous nation in the world today, the beneficiaries of the IIM trust live under conditions that would not be alien to citizens of the poorest Third World nations. Many of them live in abject poverty.

On October 25 of this year, they will observe the ninth anniversary of the passage of the 1994 Act. One cannot say that the anniversary will be celebrated, for there is little to celebrate. In nine years, although Interior has paid lip service to the importance of trust management reform, it has taken barely any steps towards the performance of an historical accounting. Interior's promises that its implementation of the TAAMS computer system would allow it to satisfy its fiduciary obligations to the IIM beneficiaries have proven to be just as reliable as all of its other promises. Yet despite all of its broken promises that "we're working on the problem, really we are" and "[we're] really on top of this now," Interior presently insists that it really means it this time, now that it has filed its Plans with the Court, and therefore the Court should simply remand back to the agency. As noted above, however, the mere submission of Plans provides no assurance that Interior will actually abide by them. Indeed, the Plans have been very carefully drafted so that they create no legal obligation whatsoever on the part of Interior to do anything. Either they contain well-crafted legal disclaimers or they consistently employ the phrase "Interior plans to" or "Interior intends to" whenever actual measures are discussed.

In sum, Interior has cried wolf over and over and over again to the Indians, to Congress, and to the courts. To be sure, there has been some activity—most notably, the creation of a new alphabet soup of bureaucracies. But *activity* is not the same thing as *progress*. And Interior has not demonstrated that it has made any progress, either in complying with its obligation to conduct an accounting for the IIM beneficiaries or in complying with its other fiduciary obligations.[75] On the sub-

---

**75.** One of Interior's stock responses to the charge that it has made no progress is to claim that in one of his reports, the Court Monitor stated that OHTA had done more in the past six months than the past administration had done in the past six years. Such a misleading claim can only be made if one strips away a single sentence made by the

ject of Interior's unjustified delay in achieving such progress, the D.C. Circuit has observed:

> [N]either a lack of sufficient funds nor administrative complexity, in and of themselves, justify extensive delay, nor

Court Monitor in his Fifth Report away from its surrounding context, as Interior has done. To dispel this misleading claim, the Court will quote the concluding remarks of the Court Monitor's Fifth Report, filed on February 1, 2002, in their entirety:

> This Report has reviewed the development and status of the Historical Accounting project since submission of the First Report on July 11, 2001. Its review of OHTA's planning for preparing a Comprehensive Plan is in tone different from that First Report. The First Report addressed the Court Monitor's conclusions concerning the past administration's intentional deception of this Court and the Circuit Court by alleging they were conducting a fact-gathering process on which to base a decision on the method for an historical accounting when they had, in the Court Monitor's opinion, no intention of attempting more [than] a statistical sampling historical accounting.
>
> The present administration, although implicated in the past administration's decision to do a statistical sampling historical accounting by the present Secretary's initial concurrence with that decision, has lately, at her direction, begun a process to establish a means for researching and deciding on the proper method to carry out the historical accounting pursuant to this Court's December 21, 1999 ruling. There is no doubt [that] OHTA has made more progress in that effort in six months than the past administration did in six years. However, that process is not much further along than the plaintiffs' description of it as a "plan for a plan." The Court Monitor cannot evaluate the Comprehensive Plan because, four months before its planned submission to Congress, there still is no Plan.
>
> The Executive Director's statements to the Court Monitor about the "temporal scope of the accounting" and the "administrative process" that will have to be engaged to have the Secretary make a "final decision" on the scope of the accounting would seem to indicate that someone—perhaps Defendants' attorneys—believe that

can the government claim that it has become subject to unreasonable expectations. Federal officials were aware of their fiduciary obligations long before the passage of the 1994 Act—let alone the initiation of this action—and yet lit-

> the Court-defined scope of the historical accounting can be properly limited by an administrative decision by the Secretary. They may be wrong. If Defendants have a serious question about the possible legal limitations on the scope of the historical accounting, it should be quickly brought before this Court for resolution. Pending that decision, there is no historical accounting process that can be properly begun by the Defendants unless it takes into account "all funds, whenever deposited."

Fifth Report of the Court Monitor at 18–19 (footnote omitted). In short, the Court Monitor's primary point was that by February of 2002, OHTA had progressed no further in deciding on the proper method to implement an historical accounting than coming up with "a plan to make a plan." Indeed, the Comprehensive Plan was not filed with this Court until March of 2003, more than a year later. In passing, the Court Monitor remarked that despite this *lack* of progress, it was nevertheless true that OHTA's efforts were still more than Secretary Babbitt's administration had achieved during his tenure. The point of the remark, however, was not to praise the present administration for making substantial progress, but to disparage the previous administration for its *complete* lack of progress. Nor has the Court Monitor been the only person to observe that, by 2000, Interior had achieved nothing in the way of an historical accounting. *See Cobell VI*, 240 F.3d at 1095–96 ("The district court's judgment came down over six years after passage of the 1994 Act. During that time, deadlines were missed, documents destroyed, and, in the words of the district court, appellants had yet to progress much beyond planting the 'seed' for discharging their fiduciary obligations.") (citation omitted).

In short, the Court Monitor's remark was akin to an observation that "The Baltimore Orioles scored more runs in the ninth inning than it scored in the past eight innings combined," when the game was scoreless until the Orioles scored a single run in the ninth.

tle progress has been made in discharging those duties. What little progress the government has made appears more due to the litigation than diligence in discharging its fiduciary obligations. *See* MISPLACED TRUST[,] H.R. REP. No. 102–499, at 5 (noting that "the only thing that seems to stimulate a flurry of activity at the Bureau [of Indian Affairs] is an impending appearance ... before a congressional committee"). *See also Cobell V*, 91 F.Supp.2d at 20 n. 15 (noting that the "positive steps taken by defendants toward bringing themselves into compliance with the law" have "not come easily").

*Cobell VI*, 240 F.3d at 1097. Although nine years have elapsed since the passage of the 1994 Act, virtually all that Interior has to show are broken promises and plans that have never been implemented. At some point during a confidence game, all but the most credulous individuals realize that they are being duped, and stop playing. For the Court, that point has been reached.

What has become clear from Interior's repeated placement of its own interests ahead of the responsibilities that accompany its status as trustee-delegate is that it has failed to recognize a crucial fact about the IIM trust fund. The fund is *not* the government's money. It belongs to the beneficiaries. The trust fund is supposed to be administered in their best interest, and not simply in a manner that is most convenient to the government. Instead, throughout its management of the IIM trust fund, Interior has chosen to behave almost as though the IIM trust fund were a toy, one that it need not share with anyone else, one that it can abuse and mistreat if it wants to, and no one can tell it differently. The United States was founded upon the principle that its government derives its powers from the consent of the governed. But Interior has stood this proposition on its head. In its collective mind, its powers over the IIM trust fund are something to be assumed, and therefore it deems the beneficiaries to possess only the rights that Interior believes that they should have, and no more. When a government agency continually places its own interests ahead of the rights of the American citizens that it is entrusted to protect, something is gravely wrong.[76]

Yet even in the face of its continued refusal to comply with the clear directives of Congress and the courts to perform an adequate accounting and to bring its management of the IIM trust into compliance with its fiduciary duties, Interior insists that the sole remedial measure within the authority of this Court is to remand back to Interior. But Interior has directed this Court to no case law supporting the propo-

---

**76.** In sum, what this Court said in 1999 during the first contempt trial remains true today:

Contrary to the impression some would seek to create, I do not relish holding these cabinet officials in contempt. And I do so today more out of sadness than anger. But *courts have a duty to hold government officials responsible for their conduct when they infringe on the legitimate rights of others.* These officials are responsible for seeing that the laws of the United States are faithfully executed. In this case, the laws—the orders of this court—were either ig-

nored or thwarted at every turn by these officials and their subordinates. The court must hold such government officials accountable; otherwise, our citizens—as litigants—are reduced to mere supplicants of the government, taking whatever is dished out to them. That is not our system of government, *as established by the Constitution.* We have a government of law, and government officials must be held accountable under the law.

*Cobell v. Babbitt*, 37 F.Supp.2d 6, 14 (D.D.C. 1999).

sition that, having repeatedly refused to take measures to satisfy its fiduciary obligations to the IIM beneficiaries, this Court is impotent to afford any relief other than remanding to Interior, to give them yet another chance. Moreover, such a proposition flies in the face of the D.C. Circuit's instructions in this case:

If a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order any appropriate relief. As this court has concluded in other contexts, courts are presumed to possess the full range of remedial powers—legal as well as equitable—unless Congress has expressly restricted their exercise. This means that the district court has substantial ability to order that relief which is necessary to cure the appellants' legal transgressions. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. Because the agencies involved delayed performance of their legal obligations, the court was justified in fashioning equitable relief that would ensure the vindication of plaintiffs' rights. That this case involves decades-old Indian trust funds rather than segregated schools does not change the nature of the court's remedial powers.

*Cobell VI*, 240 F.3d at 1108 (citations and internal punctuation omitted).

The remedial power of the federal courts is an aspect of the "judicial power" bestowed upon them by the Framers in Article III of the Constitution. Remedies are the means by which substantive rights are given effect. Precisely two hundred years ago, the Supreme Court affirmed:

The government of the United States has been emphatically termed a government of laws, and not of men. It will

certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.... [W]here a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy.

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 166, 2 L.Ed. 60 (1803). Put more bluntly, a court judgment lacking a remedy to enforce it "nothing but a handsome piece of paper suitable for framing." DOUGLAS LAYCOCK, MODERN AMERICAN REMEDIES 775 (2002).

■ At the present juncture, the sole appropriate remedy for Interior's repeated violations of plaintiffs' vested legal rights is a structural injunction. If the Court were instead to remand to Interior, it will be easy to predict what the result would be. It was only two short years ago that Interior was repeatedly insisting to the D.C. Circuit that plaintiffs possessed no judicially-enforceable right to a historical accounting. *See Cobell VI*, 240 F.3d at 1094 ("Specifically, appellants take issue with the district courts finding of specific trust obligations, including a judicially enforceable duty to account..."), 1102 ("While appellants concede that some type of review of past transactions may indeed be necessary to accurately state opening balances, [they argue that] this does not mean that the plaintiffs have a judicially enforceable right to a complete historical accounting. Even were the plaintiffs entitled to such an accounting, appellants contend that the Interior Department, and not the court, would have the authority to determine the nature and scope of the accounting."), 1104 ("Appellants also argue that whatever right to an accounting plaintiffs may have, the district court erred

insofar as it determined that such a right was judicially enforceable.") (citations and internal punctuation omitted).

What lies in store if this Court merely remands to Interior was foreshadowed in a recent statement by Interior's appellate counsel:

CHIEF JUDGE GINSBURG: Well, you're past the liability phase. There has to be some reform of the trust, right? So, the Court says submit a plan. I mean, it's—you said you wouldn't be here if that's all there were. So tell me again what it is that is in the order.

MR. STERN: Your Honor ... could I just address one premise of that question, *which is that we're past the liability phase and there now has to be trust reform. Because that's a framework of analysis that the District Court has employed that we think is fundamentally wrong.* I think this case came to this Court, the Court reviewed it under the APA, it reviewed it as a case of unreasonable delay. What happens in a case of unreasonable delay is that it gets remanded to the agency and then at a subsequent point, if it turns out that the agency has [still] stalled in its tracks and isn't moving, maybe at that point based on further evidence, a District Court could order deadlines. But it could also only order deadlines about things that are actually within its jurisdiction, which would be the performance of an accounting.

Tr. of Proceedings, *Cobell v. Norton,* U.S. Court of Appeals for the District of Columbia Circuit, April 24, 2003, Cir. No. 02–5374, at 8–9 (emphasis added).

In other words, if this Court simply remands to Interior, there will be no attempt to reform the trust, no attempt to "fix the system," only the performance of a so-called "accounting," the scope and nature of which have already been determined by Interior. At best—at the very best—in five years or so, Interior will send out statements to IIM account holders entitled "Historical Statements of Account." That is, to *present* account holders—Interior will ignore all accounts closed on or before October 25, 1994. The statements will not include transactions in any account that occurred between 1887–1934. Nor, except for a limited sample, will Interior verify any transactions with a value of less than $5000 by matching them against supporting documentation. Instead, the statements will inform account holders that a paid contractor of Interior—no representatives of which have ever testified as witnesses in this litigation—utilized a statistical sampling procedure with respect to these accounts. The statements will proudly report that after utilizing this procedure, Interior's paid contractor determined that all transactions in the IIM trust fund with a value of less than $5000 were 99% accurate. Interior will then inform this Court that it has fully satisfied its duty to account to the IIM beneficiaries for the years 1887–2000.

In sum, if the sole remedy possessed by this Court is to remand to Interior, it may as well dismiss this case with prejudice. The end result will be essentially the same. For Interior's insistence that the only avenue available to this Court is to remand to Interior is tantamount to an assertion that Interior, and only Interior, possesses the authority to determine whether its proposed accounting complies with existing law. But this has never been the manner in which our constitutional government works. Aside from the rare case involving a "political question," it is the task of the judicial branch to say what the law is, as affirmed by the Supreme Court in *United States v. Nixon:*

Our system of government requires that federal courts on occasion interpret the

Constitution in a manner at variance with the construction given the document by another branch. And in *Baker v. Carr*, the Court stated: "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." Notwithstanding the deference each branch must accord the others, the "judicial Power of the United States" vested in the federal courts by Art. III, § 1, of the Constitution can no more be shared with the Executive Branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto. Any other conclusion would be contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government. We therefore reaffirm that it is the province and duty of this Court "to say what the law is" with respect to the claim of privilege presented in this case.

*Nixon*, 418 U.S. at 704–05, 94 S.Ct. 3090 (citations and internal punctuation omitted). The executive branch has the ability to decide, in the first instance, whether a course of action by one of its agencies complies with the law. But then, unless the action involves one of those rare issues whose legality is solely committed to the discretion of the executive branch (a "political question") or the challenge to the action is otherwise non-justiciable (*e.g.*, because the parties lack standing or seek an advisory opinion), then it is the task of the courts to say what the law is. Nor are the courts limited to issuing declaratory judg-

ments; rather, they possess the authority to take remedial steps that are necessary to give effect to their judgments. This is true even when an executive official claims, as in *Nixon*, that the matter is as sensitive or "internal" as the privileged status of private communications between the President and his subordinates. Moreover, the D.C. Circuit has recognized that, in the present case, the administrative discretion of Interior is particularly limited:

> The Secretary has an overriding duty to deal fairly with Indians. This duty necessarily constrains the Secretary's discretion. When faced with several policy choices, an administrator is generally allowed to select any reasonable option. Yet this is not the case when acting as a fiduciary for Indian beneficiaries[,] as stricter standards apply to federal agencies when administering Indian programs. Summarizing federal case law on fiduciary obligations owed to Indian tribes, the Tenth Circuit concluded that where the Secretary is obligated to act as a fiduciary his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary. The federal government has charged itself with moral obligations of the highest responsibility and trust in its relationships with Indians, and its conduct should therefore be judged by the most exacting fiduciary standards.

*Cobell VI*, 240 F.3d at 1099 (internal citations and punctuation omitted).

If this Court were to refuse to issue an appropriate remedy, one that is necessary to give effect to its legal judgments, it would be abdicating its judicial responsibilities. History has previously demonstrated the consequences of the courts' failure to take remedial measures necessary to prevent the executive branch from violat-

ing the fundamental rights enjoyed by American Indians. As noted above, in 1832, Chief Justice John Marshall held that the Cherokee nation was "a distinct community, occupying its own territory, ... in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves...." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832). But when President Andrew Jackson learned of the decision, he is said to have retorted: "Well, John Marshall has made his decision—now let him enforce it." Jackson's response proved prophetic: Marshall failed to provide any relief to enforce the rights of the Cherokee nation, and the decision was ignored. The consequences of the Court's failure to take remedial steps to give effect to the Tribe's rights were soon and swift: the Cherokees were forcibly removed from their native lands, soon to be followed by the rest of the Tribes dwelling east of the Mississippi River.

The IIM beneficiaries are not faced with the prospect of removal from their lands. But if this Court fails to provide an adequate remedy to enforce the rights that both Congress and the courts have determined them to possess, those rights will be ignored. And in a larger sense, if the federal courts refuse to afford relief necessary to give effect to their judgments, they undermine the integrity of the judicial branch. A half-century ago, Justice Robert Jackson observed: "If not good law, there was worldly wisdom in the maxim attributed to Napoleon that 'The tools belong to the man who can use them.' We may say that power to legislate for emergencies belongs in the hands of Congress, but only Congress itself can prevent power

from slipping through its fingers." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 654, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). As with Congress, so with the courts: if the judicial branch fails to take steps to preserve the power entrusted to it by the Framers of the Constitution, that power will slip through its fingers.

That the Framers understood this is clear from Alexander Hamilton's declaration that an "independent spirit in the judges" was "requisite to guard the Constitution and the rights of individuals from ... dangerous innovations in the government, and serious oppressions of the minor party in the community." THE FEDERALIST No. 78, at 469 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The rise of the modern administrative state has only affirmed Hamilton's words. Regarding the necessity of judicial checks on executive agency actions, the D.C. Circuit has observed: "Congress has been willing to delegate its legislative powers broadly—and courts have upheld such delegation—because there is court review to assure that the agency exercises the delegated power within statutory limits." *Farmers Union Cent. Exchange, Inc. v. FERC*, 734 F.2d 1486, 1501 (D.C.Cir.1984) (citation omitted).[77]

The Court will therefore not simply remand to Interior, hoping beyond hope that the agency has mended its ways and will give full effect to the judgments of this Court. As the D.C. Circuit has stated in another institutional reform case, "[w]hen defendants are shown to have settled into a continuing practice ... courts will not assume that it has been abandoned without

---

**77.** Of course, the death of the non-delegation doctrine—the principle that there exist judicially-enforceable limits to the power that Congress can delegate to executive agencies in the first instance—only strengthens this observation. *See Whitman v. Am. Trucking Ass'n.*, 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001).

clear proof. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *Campbell v. McGruder,* 580 F.2d 521, 541 (D.C.Cir.1978) (citing *Local 167 of Int'l Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America v. United States,* 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804 (1934) and *United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952)). The recent flurry of activity at Interior with respect to the IIM trust may be ascribed to the simple fact that its management of the trust is presently under a great deal of public scrutiny. Once that scrutiny wanes, however, and the public's attention is focused elsewhere, Interior will be free to resume its continuing practice of evading its fiduciary obligations to the IIM beneficiaries. There is no evidence that it has abandoned this practice. A June 2002 report issued by Interior's Inspector General regarding the present litigation concluded:

> While we found no criminal behavior or administrative misconduct on the part of any current DOI employees, we uncovered bad judgment, unfocused management, a myriad of definitional issues, and extreme hostility among the players and entities, all fueled by a multitude of motivations, many of which were well-intentioned but among the least of which was to protect and advance the interests of Individual Indian Trust account holders.

$$* \quad * \quad * \quad * \quad * \quad *$$

Having had oversight responsibility for more than two decades, the Office of Inspector General benefits from having a unique historical perspective of the [Interior] Department as an institution. During our years of oversight, we have often observed that the components of the Department have no history of, and no particular incentive to, work together. From this vantage point, we are convinced that in a Department whose components are blinded by clouded judgment and crippled by distrust, a singular sinister or conspiratorial plan is impossible to construct.

The Office of Inspector General has seen this "bunker mentality" display itself time and again. The pattern here is the same—begin by protecting one's own Bureau or office, to the detriment of other Bureaus or offices if necessary; then protect the Department and/or the institution or position it has advanced; finally, protect the public interests for which the Department is responsible, in this case those of Individual Indian Trust account holders.

The historical management failures of this endeavor are profound. DOI has attempted to address its trust responsibilities by assigning collateral duties to individuals who are otherwise preoccupied with their full-time work responsibilities. The effort is further hampered by the lack of a single, dedicated senior-manager, and by a communication system in which critical input from the field rarely reaches the right people.

Finally, the friction between BIA and OST is particularly noteworthy. So long as it continues, we fear little meaningful progress will be made in the arena of Indian Trust reform.

U.S. Dep't of Interior, Office of Inspector General, *Report: Allegations Concerning Conduct of Department of the Interior Employees Involved in Various Aspects of the Cobell Litigation,* June 2002, at 2, 6.

The "bunker mentality" identified by Interior's Inspector General—protect one's own bureau first; then Interior as a whole; protect the public interest last of

all—was clearly demonstrated only recently. Less than two months before Interior's Deputy Secretary was telling Congress that the IIM beneficiaries' claims were wholly meritless, and that the sole reason that this litigation was brought was to enrich lawyers and accountants, Interior filed a summary judgment motion with this Court arguing that, in fact, plaintiffs' claims should have been filed long ago. Interior urged this Court to conclude that plaintiffs were on notice of Interior's mismanagement of their trust funds decades ago, and to conclude that Interior should thereby be relieved of any obligation to account for IIM account transactions that occurred before October 1, 1984, on statute of limitations and laches grounds. Interior declined to explain how permitting it to ignore all transactions before 1984 could be reconciled with the following determination by the D.C. Circuit: "Appellants never explain how one can give a *fair* and *accurate* accounting of *all* accounts without first reconciling the accounts, taking into account past deposits, withdrawals, and accruals. Indeed, the government's own expert acknowledged that one could not determine an accurate account balance without confirming historical account balances." *Cobell VI*, 240 F.3d at 1102 (emphasis in original). Nor did Interior deign to mention the fact that in July of 2002, by a vote of 281–144, Congress overwhelmingly rejected a bill limiting Interior's obligation to perform an accounting of the IIM trust fund to transactions occurring after the year 1985. But the

message to this Court was clear: Interior will continue to employ any measure at its disposal that might possibly allow it to shirk its fiduciary obligations to the IIM beneficiaries.[78]

How very different the Department of the Treasury. Because it is also a trustee-delegate for the IIM trust fund, the Secretary of the Treasury is a co-defendant in this litigation. When plaintiffs initiated this suit in 1996, Treasury fought hard to defend itself against their claims. In 1999, this Court held Treasury Secretary Rubin in contempt for Treasury's failure to comply with discovery orders. But when this Court issued its opinion on liability in 1999, Treasury decided that instead of defying the orders of this Court, it would honor its obligations to the IIM beneficiaries. Since then, Treasury has been outstanding in taking steps to purge itself of its contempt citation, so much so that it has been easy for this Court to forget that Treasury is a defendant in this action. Even plaintiffs' lead counsel, who is hardly renowned for complimenting defendants, acknowledged during his closing argument in the Phase 1.5 trial: "Treasury has distinguished itself. At the outset, Treasury fought very hard about being a true defendant in this case. They took rational positions, they made the best arguments they could, they lost, and then they took what this Court ordered to heart. They made the changes. . . . [Assistant Treasury Secretary Donald Hammond] also stated whatever this Court expects Treasury to do,

---

**78.** This Court denied Interior's motion for summary judgment on statute of limitations and laches grounds on March 28, 2003. Nevertheless, Interior has informed this Court that it "wish[es] to preserve the issue for appeal." Defs.' Prop. Findings and Conclusions at 89 n. 17. Therefore, Interior's proposed findings of fact and conclusions of law in conjunction with the Phase 1.5 trial devotes thirty pages to advancing the argument

that "[p]apers filed and submitted by Plaintiffs in this case relied upon a plethora of Government reports and documents that, according to Plaintiffs, demonstrate that the Government violated its IIM obligations that are at issue in this case. Many of those reports were issued publicly prior to October 1, 1984, thus putting the public—including Plaintiff class members—on notice of their claims." *Id.* at 90.

Treasury will do it." Tr., Day 44, AM session (July 8, 2003) at 12:19–24, 13:19–20 (statement of Dennis Gingold).[79]

Treasury's success in satisfying its legal obligations to the IIM beneficiaries demonstrates to this Court that the past failures of Interior cannot simply be ascribed to the bureaucratic inertia that affects all administrative agencies. The past is gone, however, and this Court recognizes that Interior can no more undo its past actions than this Court can unwrite its past opinions.[80] But Interior has an unprecedented opportunity within its grasp: to take real steps *now* to redress some of the harm that has been inflicted against some of this nation's most impoverished citizens, and to take real measures that will improve the quality of their lives. Its choice is clear. It can decide to comply with the mandates of Congress and the courts that spell out its fiduciary obligations to the individual Indian beneficiaries, and take real action to mend the breaches of trust that have marred the past management of the IIM trust fund. Or it can continue along its present path. The choice is completely within Interior's hands.

An order will issue this date consistent with the foregoing memorandum opinion.

### *MEMORANDUM OPINION*

### ("Fixing the System")

*Table of Contents*

I. Procedural Introduction .................................................240

II. Interior's Comprehensive Plan ...........................................245
 A. Introduction .........................................................245
 B. Strategic Direction ..................................................245
 C. Business Objectives and Business Profile .............................246
 D. Organizational Realignment ...........................................248
 E. Transformation Activities ............................................249
 F. Trust Reengineering ..................................................250
 G. Conclusion ...........................................................252

III. Plaintiffs' Response ...................................................252
 A. Plaintiffs' Opposition Brief .........................................252
 B. Plaintiffs' Proposed Alternative Plan ................................252

IV. The Interests of the American Indian Tribes ............................256
 A. Introduction .........................................................256
 B. Clear and Enforceable Standards for Trust Management .................257
 1. Testimony of Professor Langbein ..................................258
 2. The Fiduciary Duties Owed to the IIM Beneficiaries ...............267
 a. Duty to Administer the Trust .................................267
 b. Duty of Loyalty ..............................................268
 c. Duty Not to Delegate .........................................268
 d. Duty to Keep and Render Accounts .............................268
 e. Duty to Furnish Information ..................................268

**79.** The Court is mindful that Defendants' Proposed Findings of Fact and Conclusions of Law includes a series of proposed findings and conclusions relating to Treasury's compliance with stipulations that it entered into in 1999. In a subsequent opinion, the Court will analyze each of these proposed findings and conclusions.

**80.** As the poet observed, "The Moving Finger writes; and, having writ, / Moves on: nor all your Piety nor Wit / Shall lure it back to cancel half a Line, / Nor all your Tears wash out a Word of it."

 f. Duty to Exercise Reasonable Care and Skill ..................... 269
 g. Duty to Take and Keep Control ................................ 270
 h. Duty to Preserve the Trust Property ........................... 270
 i. Duty to Enforce Claims and Defend Actions .................... 270
 j. Duty to Keep Trust Property Separate ......................... 271
 k. Duty with Respect to Bank Deposits ........................... 271
 l. Duty to Make the Trust Property Productive .................... 271
 m. Duty to Pay Income to Beneficiaries ........................... 271
 n. Duty to Deal Impartially with Beneficiaries .................... 271
 o. Duty with Respect to Co–Trustees ............................. 271
 p. Duty with Respect to Person Holding Power of Control ............ 271
 3. Recommendations ............................................. 271
 C. Protection of Tribal Authority and Sovereignty ........................... 273
 D. No Redirection of Funds for BIA Services ............................... 275
 E. Increased Tribal Control over Land and Resources ...................... 276
 F. Involvement of Tribal Governments .................................... 277
 G. Core Systems ....................................................... 278

V. Conclusion ................................................................ 280

This is the second of two memorandum opinions issued this date following a forty-four day bench trial. The first opinion dealt with the further relief ordered by this Court relating to the historical accounting owed by defendants to plaintiffs. The present opinion discusses the further relief ordered by the Court relating to the obligation of the Interior defendants to bring themselves into compliance with the fiduciary duties owed to plaintiffs as the trustee-delegate of the United States for the individual Indian money (IIM) trust.

## I. PROCEDURAL INTRODUCTION [1]

On October 25, 1994, Congress passed the American Indian Trust Management Reform Act ("the 1994 Act"). The Act established the Office of the Special Trustee for American Indians within the U.S. Department of the Interior. 25 U.S.C. § 4042. It also directed the Special Trustee to

prepare and, after consultation with Indian tribes and appropriate Indian or-

ganizations, submit to the [Interior] Secretary and the Committee on Natural Resources of the House of Representatives and the Committee on Indian Affairs of the Senate, within one year after the initial appointment is made under section 4042(b) of this title, a comprehensive strategic plan for all phases of the trust management business cycle that will ensure proper and efficient discharge of the Secretary's trust responsibilities to Indian tribes and individual Indians in compliance with this chapter.

25 U.S.C. § 4043(a)(1).

In accordance with this provision, the Special Trustee submitted a strategic plan to Interior Secretary Bruce Babbitt and Congress in April of 1997. After reviewing the Special Trustee's strategic plan, Secretary Babbitt issued his own plan in July of 1998, which is known as the High Level Implementation Plan ("HLIP"). The HLIP consisted of twelve subprojects, with a focus on ensuring the accuracy of data retained by Interior regarding the

---

**1.** The companion memorandum opinion issued this date provides a more complete introduction to the present phase of this litigation. The following procedural introduction is intended only to discuss the events relevant

to the issuance of relief to bring the Interior defendants into compliance with their fiduciary duties to the beneficiaries of the IIM trust, apart from their duty to account for past activities.

IIM trust fund and developing uniform policies and procedures to guide trust management in the future.[2]

Meanwhile, on June 10, 1996, the named plaintiffs commenced the present action against the Secretary of the Interior and other federal officials, alleging that the mismanagement of the IIM trust by the Interior and Treasury departments constituted a breach of their fiduciary duties to plaintiffs. On May 5, 1998, the Court bifurcated this action into two distinct phases. Phase I of the litigation, also known as the "fixing the system" phase, would focus on the reforms instigated by defendants to bring the management of the IIM trust into compliance with their fiduciary obligations. This phase is forward-looking, in that it attempts to discern whether defendants have reformed the management of the IIM trust in such a way that will ensure that the United States will honor its fiduciary obligations to the Indian beneficiaries in the future. Phase II, also known as the "historical accounting phase," would focus on the performance of a formal accounting of the IIM trust, as required by the 1994 Act. This phase is backward-looking, in that it attempts to discern whether and to what extent the United States has honored its fiduciary obligations to the Indian beneficiaries from the inception of the trust until the present date.

In 1999, the Court conducted a six-week bench trial addressing plaintiffs' Phase I claims. During the trial, Interior introduced the HLIP into evidence in order to demonstrate that it was taking steps to bring itself into compliance with its fiduciary obligations to the IIM beneficiaries. On December 21, 1999, the Court issued a memorandum opinion containing detailed factual findings and conclusions of law. *Cobell v. Babbitt,* 91 F.Supp.2d 1 (D.D.C. 1999) (*"Cobell V"*). The Court determined that

defendants have the type of historical record of recalcitrance that troubles the court. The court is aware that defendants, especially Interior, [have] made promises similar to those relied upon today each time that it has come up for review on the IIM trust. Indeed, these broken promises are what necessitated the passage of the Trust Fund Management Reform Act. Promises made in court, however, are different than the puffing to Congress that Interior has done over the past few decades. The court can ensure that these promises are kept, and it has the contempt power that will allow it to do so when appropriate.

Despite defendants' history, the court has decided to give defendants one last opportunity to carry through on their promises. The HLIP, defendants' most comprehensive plan to eventually bring themselves into compliance with their duty to render an accurate accounting, is a substantial step in the right direction, as even plaintiffs admit. This time, there is substance to support defendants' promises. The court feels that it is therefore its constitutional duty to allow defendants the opportunity to cure the breaches of trust declared in this Memorandum Opinion. Given separation of powers concerns, the court will deny for the time being plaintiffs' request to appoint a receiver or Special Master over the IIM trust. Should the court find in the future upon proper motion by plaintiffs that defendants have been less than truthful in their representations or that defendants'

**2.** On March 1, 2000, Interior filed a Revised and Updated High Level Implementation Plan with the Court. Since the Revised HLIP supplanted the original, it will be designated "the HLIP" for the remainder of this opinion.

adherence to prompt remedial action turns out to have been feigned, then the court may well decide to exercise its authority to ensure that its orders are carried out.

*Id.* at 54.

On September 17, 2002, following a twenty-nine day bench trial, this Court issued a memorandum opinion finding Interior Secretary Gale Norton and Assistant Interior Secretary of Indian Affairs Neal McCaleb to be in civil contempt of court, in their official capacities, with respect to five specifications.[3] The opinion also explained the necessity for considering further injunctive relief beyond that imposed in the Court's December 21, 1999 opinion:

> It is ... apparent to the Court that the defendants are no closer today to discharging their fiduciary responsibilities properly than they were during the Phase I trial back in the summer of 1999. At the conclusion of that trial, after the plaintiffs proved that the defendants were in breach of the fiduciary duties that they owe to the 300,000 individual Indian trust beneficiaries, the plaintiffs requested that this Court put the IIM trust under court supervision. The Court declined to grant such relief at that time because it felt that it was its constitutional duty to allow the defendants to correct the breaches declared by the Court and those found in the 1994 Act. Thus, by declaring the trust duties of the defendants and remanding the matter back to the agency, the Court granted the least intrusive form of relief that it could fashion.
>
> In light of the current posture of this case, it is now obvious that this relief

was and is insufficient. The recalcitrance exhibited by the Department of Interior in complying with the orders of this Court is only surpassed by the incompetence that the agency has shown in administering the IIM trust. Accordingly, the Court concludes that while its factual findings and legal conclusions in the Phase I trial ruling were correct (and will therefore not be disturbed), the relief granted by the Court at that time is no longer adequate. Consistent with this conclusion, the Court has determined that it must now consider granting further injunctive relief with respect to the fixing the system portion of the case and the historical accounting project. The Court's conclusion in this regard is in full accord with the principle that courts should exercise the least possible power adequate to the end proposed. The reason is that there is an equally established axiom that when the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable. Moreover, the D.C. Circuit even explicitly stated that "while th[is] court should (and did) remand to the agency for the proper discharge of its obligations, the court should not abdicate its responsibility to ensure that its instructions are followed. This would seem particularly appropriate where, as here, there is a record of agency recalcitrance and resistance to the fulfillment of its legal duties." At this juncture, it is crystal clear that more than a declaratory judgment is necessary to ensure that the defendants discharge their fiduciary obligations properly.

*Cobell v. Norton,* 226 F.Supp.2d 1, 147–48 (*"Cobell VII"*) (internal citations and quotation marks omitted).

---

3. On July 18, 2003, the D.C. Circuit vacated the order of this Court finding defendants Norton and McCaleb to be in civil contempt of court, and directing these defendants to bear the cost of the expenses and fees incurred by plaintiffs in litigating the second contempt trial. *Cobell v. Norton,* 334 F.3d 1128, 1150 (D.C.Cir.2003) (*"Cobell VIII"*).

In light of its conclusion to consider further injunctive relief, the Court scheduled further proceedings to determine whether such additional relief was warranted and, if so, to determine the nature and extent of such relief. Because the Court had already conducted a Phase I trial, and because the time was not ripe to conduct a hearing on Phase II of the litigation, the Court designated these proceedings "the Phase 1.5 Trial," in order to stress their nature as an interim stage of this litigation. It explained that this trial would "encompass additional remedies with respect to the fixing the system portion of this case and approving an approach to conducting a historical accounting of the IIM trust accounts." *Id.* at 162. Specifically, the Court explained that it planned to enter a structural injunction in this case. *Id.* at 147 n. 154.

The Court directed the Interior defendants to submit two plans to the Court: (1) a plan for conducting a historical accounting of the IIM trust accounts, and (2) a plan for bringing themselves into compliance with the fiduciary obligations owed to the IIM trust beneficiaries. It stressed that these plans should "describe, in detail, the standards by which they intend to administer the IIM trust accounts, and how their proposed actions would bring them into compliance with those standards." *Id.* at 148–49. The Court also granted the Treasury Department and plaintiffs leave to file any plan or plans of their own regarding these matters.

On January 6, 2003, the Interior defendants and plaintiffs each submitted two plans to this Court. Interior's Plan for bringing itself into compliance with its fiduciary obligations to the IIM beneficiaries was entitled "Department of the Inte-

rior Fiduciary Obligations Compliance Plan" (Defs.' Ex. 1). The plaintiffs' alternative plan was entitled "Plaintiffs' Compliance Action Plan Together with Applicable Trust Standards" (Pls.' Ex. 51).

Interior submitted an additional Plan on March 28, 2003 entitled "Department of the Interior Comprehensive Trust Management Plan" ("the Comprehensive Plan") (Defs.' Ex. 27).[4] As explained by Special Trustee Ross Swimmer during the Phase 1.5 trial, the Comprehensive Plan is intended to replace the HLIP as Interior's comprehensive plan for bringing its management of both the IIM trust and Tribal trusts into compliance with its fiduciary obligations to the beneficiaries of those trusts:

Q. Now did going to [the Comprehensive Plan] in effect mean starting all over again from square one?

A. Oh, not at all. In fact you will find in the plan the—all of the things that are described in the HLIP are in the business processes or incorporated into the goals and objectives. Obviously what was accomplished at that time in the HLIP also carries through to this plan and to the implementation of it. . . .

THE COURT: Does this replace the HLIP then?

THE WITNESS: It really does. It incorporates those items in the HLIP into this plan, Your Honor.

THE COURT: And what does the January 6th plan do?

THE WITNESS: What the January 6th plan essentially does is to pull out of the Comprehensive Plan the portion of that plan that deals with

---

4. The Comprehensive Plan is available online at http://www.doi.gov/indian-trust/pdf/doi_trust_management_plan.pdf.

funds, with just the funds accounting—the collection of the funds, the investment, disbursement of the funds. The Comprehensive Plan includes not only, for instance, the IIM account business but also tribal trust accounts that we have to manage.

Tr., Day 36, PM session (June 25, 2003) at 31:23—32:19. At the Court's request, Special Trustee Swimmer demonstrated for the Court the portions of the Comprehensive Plan that corresponded to the twelve subprojects of the HLIP. *See* Defs.' Ex. 316.

When asked why the Comprehensive Plan had not been filed on January 6, 2003, Special Trustee Swimmer explained: "We were well along on the Comprehensive Trust Management Plan when we were asked by the court to file a fiduciary compliance plan. We more or less broke off from the Comprehensive Trust Management Plan to complete that portion of the work that would deal with the trust funds, which is what we felt our responsibility to report to the court on how we would bring our trust fund management into compliance." Tr., Day 25, PM session (June 25, 2003) at 48:12–19. Once again, Interior did not follow the Court's instructions. The Court's order of September 17, 2002 included the following provision:

> It is further ORDERED that the Interior defendants shall file with the Court and serve upon plaintiffs a plan for bringing themselves into compliance with the fiduciary obligations that they owe to the IIM beneficiaries. As part of this plan, defendants shall describe, in detail, the standards by which they intend to administer the IIM trust accounts, and how their proposed actions would bring them into compliance with

those standards. This plan should be filed and served upon completion but no later than January 6, 2003.

*Cobell VII*, 226 F.Supp.2d at 162. Interior was thus ordered to submit a plan "for bringing themselves into compliance with the fiduciary obligations that they owe to the IIM beneficiaries." The order was not restricted to the submission of a plan for Interior to bring itself into compliance with the fiduciary obligations owed to the IIM beneficiaries merely with respect to the funds in the IIM trust or the accounts in the IIM trust, as opposed to the assets of the IIM trust. Instead, the Court directed Interior to submit a plan to bring itself into compliance with the fiduciary obligations it owes, as the trustee-delegate of the United States, to the beneficiaries of the IIM trust. Indeed, the Court specifically noted that a description of the standards by which Interior intended to administer the IIM *accounts*, and of how its proposed actions would bring itself into compliance with those standards was merely a *"part* of this plan," not the plan itself. If Interior considered the order to be unclear or ambiguous, it should have sought clarification from the Court. Instead, in an arrogant and contemptuous manner, Interior improperly misconstrued the Court's order of September 17, 2002.

Nevertheless, the issue has been effectively mooted by Interior's subsequent filing of the Comprehensive Plan, which purports to be a plan for Interior to bring itself into compliance with *all* of the fiduciary obligations it owes to the beneficiaries of the IIM trust. Accordingly, the Court will treat the Comprehensive Plan as Interior's plan to bring itself into compliance with its fiduciary obligations to the IIM beneficiaries.[5]

---

5. As noted above, portions of the Comprehensive Plan deal with issues relating to Tribal trusts, as opposed to the IIM trust. It should thus be understood that, in the remainder of

On March 3, 2003, the Court granted leave for the National Congress of American Indians ("NCAI") to file an amicus curiae brief with this Court. The NCAI, which represents the interests of over 250 American Indian tribes and Alaska Native villages, filed its brief the same day.[6]

The Phase 1.5 Trial began on May 1, 2003 and ended on July 8, 2003. The Court heard forty-four days of testimony and received over 500 exhibits into evidence from both parties. Proposed findings of fact and conclusions of law were submitted by both parties on August 4, 2003. On August 27, 2003, the Court granted leave for NCAI to file a second amicus brief with this Court, which was filed the same day. Interior filed a brief in response to the second amicus brief on September 8, 2003.

The Court has weighed all of the evidence presented and fully reviewed the arguments presented by the parties. After analyzing the Plans submitted by the parties and the amici curiae briefs submitted by NCAI, the Court hereby enters these findings of fact and conclusions of law.

## II. INTERIOR'S COMPREHENSIVE PLAN

### A. Introduction

Interior's Comprehensive Plan is divided into seven chapters: Introduction, Strategic Direction, Business Objectives and Business Profile, Organizational Realignment, Transformation Activities, Trust Reengineering, and Conclusion. The Court will examine each of these chapters separately.

The introductory chapter notes that Interior is "committed to implementing the actions described in this *Comprehensive Trust Management Plan*." Interior's Comprehensive Plan at 1–1. It provides a brief overview of the history of the IIM trust. It notes that in 1975, Congress passed the Indian Self–Determination and Assistance Act of 1975, Public Law 93–638, *codified as amended at* 25 U.S.C. §§ 450–458bbb–2 ("Self–Determination Act"). The Self–Determination Act directed the federal government to ensure "maximum Indian participation in the direction, planning, conduct, and administration of educational as well as other federal programs and services to Indian communities so as to render such programs and services more responsive to the needs and desires of those communities." Interior's Comprehensive Plan at 1–5. Interior also notes that Congress subsequently enacted additional laws affording Tribes an even greater degree of autonomy in the management of Tribal trust assets and federal funds spent on behalf of the Tribes.

### B. Strategic Direction

The second chapter of Interior's Comprehensive Plan is described as presenting a "strategic direction and goals for Indian trust management... emphasiz[ing] achievement of results and set[ting] the strategy for achieving improvements in comprehensive trust management." *Id.* at 1–2. It opens with Interior's mission statement for Indian trust management: "To perform our fiduciary trust responsi-

the opinion, the Court's reference to "the Comprehensive Plan" should be understood as a reference to the Comprehensive Plan, minus any provisions dealing solely with tribal trust issues, and not with IIM trust issues.

**6.** Interior filed a brief in response on March 14, 2003. The Court also granted leave to the InterTribal Monitoring Association for Indian Trust Funds to file an amicus brief in this case regarding the appointment of a receiver on October 18, 2002.

bilities to American Indian tribes, individual Indians, and Alaska Natives by incorporating a beneficiary focus and beneficiary participation while providing effective, competent stewardship and management of trust assets." *Id.* at 2–2. After listing thirteen principles of guidance for discharging Interior's trust responsibilities, the Plan lists six "strategic goals":

1. Beneficiary services that are trusted, accurate, and responsive
2. Tribal self-governance and self-determination that increase participation in managing assets
3. Ownership information that is accurate, timely, and reliable
4. Land and natural resources management that maximizes return while meeting beneficiary desires.
5. Trust fund assets management that meets fiduciary standards
6. Administrative services that
 A. enable and empower the organization and workforce to be an effective fiduciary trustee, and
 B. provide modern, appropriate systems and tools to manage the fiduciary trust.

*Id.* at 2–6 (footnotes omitted).

C. Business Objectives and Business Profile

The third chapter of Interior's Plan "examines trust management as a business." *Id.* at 1–2. It begins by listing twenty-six "business objectives" intended to achieve the strategic goals identified in the previous chapter. The Plan then "summarizes the business profile, identifies the business lines, and lays the foundation for the new mode of operations as defined by the business environment model and the service delivery model." *Id.* at 3–1.

The Plan's "business profile" consists of a list of "key stakeholders involved in producing trust management services." *Id.* at 3–12. In a table reproduced below, the Plan "further defines the future relationship of each stakeholder to trust management":

| Stakeholder | Role as identified in the business environment model |
| --- | --- |
| Trustee: Congress [7] | Congress enacts statutes and provides funding. Through the 1994 Reform Act, it established standards for trust management. It receives periodic reports on the implementation of trust management programs. |
| Trustee Designate: Office of the Secretary | The Secretary provides overall trust direction and principles. The Secretary receives status updates on reform efforts and reports on implementation of programs. |
| Beneficiaries | Beneficiaries request fiduciary trust services and receive fiduciary trust representation, advice and counsel, information, and payments. They provide lease approvals and information, such as address changes, ownership changes, and family updates. |
| Custodians | Custodians are financial institutions that settle trades, collect income, and hold securities. |
| Department of the Treasury | Treasury provides financial services. Lease revenues are submitted to Treasury through various DOI agencies, including MMS, BIA, OST, and tribes under compact and contract. |
| Lessees | Lessees lease Indian lands. BIA executes and manages the leases. OST accounts for, invests, and disburses income from leases. Funds are held in Treasury. |

**7.** As explained below, the United States, not Congress, is the trustee of the IIM trust.

| Office of the Solicitor | Office of the Solicitor provides legal counsel to DOI agencies and participates in probate for members of the Five Civilized Tribes. |
|---|---|
| Office of the Special Trustee for American Indians (OST) | OST provides financial management and disbursement, beneficiary trust services, and representation for individual Indians and Indian tribes. OST oversees DOI performance of trust management. |
| Bureau of Indian Affairs (BIA) | BIA provides stewardship and management of land and natural resources for individual Indians and Indian tribes. BIA handles small, noncomplex probate cases internally. BIA also maintains land title ownership information. |
| Minerals Management Service (MMS) | MMS collects and verifies mineral lease revenue and performs mineral compliance audits. It deposits revenue with the Federal Reserve Bank and posts the data with Treasury, notifies OST for investment purposes, and provides lease-level data to BIA to convert to individual and/or tribal ownership information and ultimate disbursement to beneficiaries. |
| Bureau of Land Management (BLM) | BLM conducts and submits mineral appraisals, leasing compliance, and contracts for cadastral surveys to BIA as required by law. |
| Office of Hearings and Appeals (OHA) | Complex probate cases go to OHA for an order determining heirs and distribution. When a decision is final, estate distribution involving ownership information is forwarded to BIA. |
| Office of Surface Mining (OSM) | OSM directly regulates all coal mining and reclamation operations on Indian lands under the Indian Land Program Regulations. As the regulatory authority, OSM reviews and approves mining permits and conducts inspection and enforcement activities on Indian lands. |
| State Counties Cities Taxpayers | State, counties, and cities review and comment on trust land acquisition. Trust land within their jurisdictions impacts them through changes to the tax base and law enforcement jurisdiction. |
| Individual and tribal Indian associations and interest groups | The associations and interest groups provide insight to Indian requirements, needs, and expectations. DOI maintains public relations with associations, interest groups, and lobbyists to foster communication with the beneficiaries. |

*Id.* at 3–17 to 3–18 (footnote added). The Plan next identifies three "distinct business lines," each representing "a distinct group of products or services for comprehensive trust management and encompass[ing] related processes, products, and services within its scope," and consisting of "common business processes focused on a particular activity." *Id.* at 3–18. The three business lines are defined as follows:

1. *Beneficiary trust representation.* Representing the beneficiaries in all matters related to the trust, which requires independent representation on behalf of the beneficiaries.

2. *Trust financial management.* Managing the receipt, investment, and disbursement of funds generated by Indian assets, as well as record keeping and reporting on fiduciary trust management activities and accounts.

3. *Stewardship and management of land and natural resources.* Managing the land and natural resource assets of the trust.

*Id.* After describing the products and services provided through each business line, the Plan next provides a "future service delivery model." This model "identifies

the new mode of comprehensive trust management business operations," and describes the respective roles of the Office of the Special Trustee (OST) and the Bureau of Indian Affairs in such operations. *Id.* at 3–22.

Section 3.6 of the Plan is entitled "Fiduciary Obligations and Requirements." The Plan asserts that "Interior has examined the requirements applicable to administration of the Individual Indian Monies (IIM) accounts. The primary accounting requirements that Interior must meet is set by the 1994 Act. The Act specifically describes the accounting duties owed by DOI to tribes and individual Indians." *Id.* at 3–27. After listing the relevant portions of the 1994 Act, the Plan states that

> the 1994 Act requires that certain systems or programs be implemented to achieve the 1994 Act's standards for beneficiary service. It uses terms such as "adequate" and "timely," but the Act generally does not specify the manner in which Interior must structure or operate its accounting programs. Instead, Interior must exercise its best judgment in determining which of myriad ways to operate an accounting program that effectively fulfills the statutory obligations.

*Id.* at 3–28. In subsection 3.6.2, which is entitled "Fiduciary Trust Management Requirements," the Plan explains that

> Interior looks to a number of sources as guidance to inform its judgment and assess its performance in meeting the 1994 Act's requirements: applicable federal statutes, Interior regulations, the *Departmental Manual,* [Office of Management and Budget] circulars, Department of the Treasury guidelines, generally accepted accounting and auditing standards, its employees' and consultants' experience and expertise, as well as other sources of relevant fiduciary practices.

*Id.* The Plan then provides a three-page table listing "some of [the] requirements that may contain provisions affecting the trust management business lines." *Id.* The reader is then directed to Appendix C of the Plan, which groups the various requirements listed in the table under the business line that they potentially affect.

D. Organizational Realignment

The fourth chapter of the Plan "presents the organizational redesign needed to support the new service delivery model." *Id.* at 1–3. This chapter sets forth a proposed reorganization of Interior that is described as "vital to [Interior's] multifaceted approach to trust reform." *Id.* at 4–2. The Plan represents that the result of this reorganization will be to "enhance benefits to trust beneficiaries in the following ways":

- Dedicating personnel to provide consolidated beneficiary services
- Increasing the emphasis on tribal contracting and compacting
- Maintaining staff and conserving monetary resources within BIA and OST
- Improving organizational accountability
- Elevating the profile of Indian economic development
- Grouping organizational functions more efficiently.

*Id.* at 4–2 to 4–3.

The decision to reorganize was apparently prompted by the recommendations of a "Joint DOI/Tribal Leaders Task Force" in December of 2002. This task force ultimately agreed to recommend that Congress establish the position of Undersecretary for Indian Affairs, appointed by the President, confirmed by the Senate, and reporting directly to the Secretary. The Undersecretary would have direct-line authority over all as-

pects of Indian affairs within DOI. This authority would include coordination of trust reform efforts across the relevant agencies and programs within DOI to ensure these functions are performed in a manner consistent with its trust responsibility. The Office of the Special Trustee for American Indians would be phased out.

The task force also agreed that the Office of Self–Governance and Self–Determination should report directly to the new Undersecretary for Indian Affairs. This arrangement would enhance the ability of tribes interested in moving toward more compacting and contracting to directly provide the services due to Indian beneficiaries. Similarly, the task force agreed that any authorizing legislation would also include the creation of a Director of Trust Accountability, reporting directly to the Undersecretary, who would have day-to-day responsibility for overseeing the trust programs of DOI.

Members of the task force also recommended a restructuring of BIA.

*Id.* at 4–3. The remainder of the chapter describes the proposed reorganization in greater detail. The primary focus of the reorganization is upon "four primary offices within [Interior that] are critical to reforming comprehensive trust management," the Office of the Assistant Secretary of Indian Affairs; the Office of the Assistant Secretary of Land and Minerals Management; the Office of the Assistant Secretary for Policy, Management and Budget; and the Office of the Special Trustee. *Id.* at 4–5. The reader is also directed to Appendix D, which provides a table identifying the key roles and responsibilities of bureaus and offices within Interior following the proposed reorganization.

### E. Transformation Activities

The fifth chapter "describes the transformation activities required to achieve comprehensive trust management as defined in the previous chapters." *Id.* at 5–1. Specifically, it lists six "major project components" under which each of the individual activities may be grouped, provides a "project schedule," and lists eight "major risks" anticipated to arise during the implementation process.

The six project components are (1) project planning and management, (2) change/risk management, (3) creation of a vision and strategic plan, (4) organizational development and realignment, (5) trust reengineering, and (6) establishment of a performance management program. *Id.* at 5–2 to 5–3. Each of these six components are defined, and individual tasks are listed as falling within the purview of each component. The fifth component, trust reengineering, is described at greater length in the Plan's sixth chapter, discussed *infra.*

The Plan provides a "project schedule" for each of the tasks falling under the purview of the six components. However, this schedule contains no deadlines; instead, it simply describes the status of various tasks as either "completed," "ongoing," or "in-process." Moreover, approximately half of the enumerated tasks are not accompanied by one of these three status designations.

Finally, the chapter lists eight major risks expected to be encountered during the implementation process of the "modernization plan":

1. The strategic and business directors for [comprehensive trust management, or "CTM"] lack sufficient definition and clarity to create the understanding and acceptance of the modernization project.

2. Beneficiaries do not accept the DOI modernization plan.

3. Various major stakeholders disagree on the CTM mission and implied boundaries.

4. Sufficient resources are not available to complete the modernization effort.

5. Organizational revisions do not effectively align with the service delivery model or support achievement of the business objectives, limiting the degree to which service delivery can be improved.

6. Reengineering efforts do not generate the degree of improvement nor integration needed.

7. Information systems do not support the process improvements or the data and record accuracy needed.

8. Desired BIA cultural shift does not occur, hampering efforts to complete the modernization.

Id. at 5–13 to 5–14. A table identifies the potential impact and likelihood of occurrence of each of these eight risks as "low," "medium," or "high." The table also provides a paragraph-length "mitigation strategy" and "project action" for coping with each of the eight identified risks.

F. Trust Reengineering

The Plan's sixth chapter describes in further detail one of the six major project components identified in the previous chapter: trust reengineering. The chapter describes the creation of two models for trust management: the "As–Is Model" and the "To–Be Model."

The As–Is Model is a massive document that was filed with the Court on May 1, 2003. The Plan describes the purpose of the As–Is Model as "establish[ing] a comprehensive understanding of how trust operations are conducted currently." *Id.* at

6–3. The As–Is Model identifies and analyzes "eight core processes" of trust management: (1) Probate, (2) Title Services, Acquisition & Disposal, (3) Beneficiary Services, (4) Appraisal, (5) Surface Asset Management, (6) Subsurface Asset Management, (7) Accounting Management, and (8) Cadastral Survey Services. *See* As–Is Trust Business Model Report at ii-v. The Plan states that the As–Is Model is the result of a yearlong effort beginning in February 2002 and ending in February 2003. Interior's Comprehensive Plan at 6–3.

Unlike the As–Is Model, which is intended to describe how trust management is currently conducted, the stated purpose of the To–Be Model is to provide a comprehensive statement of the manner in which trust management will be conducted after Interior's proposed internal changes. As described by the Plan, the To–Be Model represents "the new integrated transformational design for trust management within DOI. The To–Be model will not only encompass reengineering and designing new Trust business processes; it will also include coordinated improvements and requirements in supporting systems, organizations, training, and personnel requirements, combined with an internal and external communication plan." *Id.* During the Phase 1.5 trial, Special Trustee Swimmer provided an approximate timeline for implementation of the To–Be Model:

Q. Now what is the expected time frame for the implementation of these plans?

A. We are expecting to have the "to-be" model for all of the processes completed around March or April of '04 . . . .

We will then begin to introduce those. We will actually begin introducing some of this much earlier, but as far as the basic model is concerned,

we will start implementing that at each agency, what we call the pilot agencies that we actually start with this year in introducing the trust officer.

We will introduce the models there, and then bring each agency up, literally one at a time, until they are—everything is current, everything is working the way that it should, and then expand it out to the other agencies. And by the time that we have implemented the model, we are looking at probably the end of '04, the beginning of '05.

Tr., Day 36, PM session (June 25, 2003) at 47:11–14, 47:17—48:3.[8]

Swimmer also testified that the completed To–Be Model would include deadlines for "milestones" to be achieved in the implementation of the To–Be Model:

> THE WITNESS: Your Honor, I hope—I hope that this [To–Be] plan that has been put together . . . as you

---

8. *Cf.* Swimmer's testimony during cross-examination:

> Q. And when will the to-be plan be completed?
> A. The contract with EDS is scheduled to be completed in early 2004—I think it may be March—following the model and the models for the eight different business processes that would come out of that. During that period of time, from now until then, as those models, business models come out, there is a comparison with the as-is, and then the models are refined to take into consideration those areas that have to have modification because of local anomalies.
> So the to-be model should be available to us for the eight business processes sometime before mid–2004. They will be incorporated as they come out. . . .
> So it's an ongoing project. There is not a—I cannot give you a completion date. I can say that the modeling will be done, we still start implementing those model practices. Once they are established, we have to develop the—write the policies,

can see from these eight business processes, pretty well incorporates the items of the HLIP, [but] it also gives us a complete road map to the future, and it would be adaptable, hopefully again, to any new secretary that comes in.

It will have included with it mile stones, benchmarks, you know, and a pathway, a road map, if you will, towards success, and that, I think, is what is needed.

THE COURT: When do those come?

THE WITNESS: Those will be developed—they are being developed right now, in fact, and they will be more fully developed as we get to the "to-be" process, because each one of these processes that gets changed carries with it the responsibility for the managers to give us the time lines, and the responsible parties to implement,

procedures, may have some regulatory changes, and, you know, hopefully the process then continues through '04 and we have all of the agencies converted and using the new processes within that year.
> Q. So you expect that once the to-be process is established, you will implement it within a year's time?
> A. I would say that's ambitious, but it's possible.
> Q. And when are—for what fiscal year are you asking for appropriations for the actual implementation of the to-be plan?
> A. For the actual implementation of to-be, I believe we have money in the request for the '04 budget, and would anticipate seeing money in there for the '05 budget. Now, there's actually—well, we're actually spending money now, so there's obviously money in the '03 budget.
> Q. But that's for the to-be planning, correct?
> A. Right. Yes. You said for the implementation. It would be '04 and '05.
> Tr., Day 38, AM session (June 27, 2003) at 80:8–19, 81:1–22.

and the work that has to be done to get there.

THE COURT: So by the end of this administration they will be ready?

THE WITNESS: They will be accountable. I believe they will be accountable, and I believe it will be before the end of the administration.

Tr., Day 36, PM session (June 25, 2003) at 39:2–24.

## G. Conclusion

The final chapter of the Plan provides a one-page synopsis of the Plan's goals. It also states that the implementation of the Plan will take approximately fourteen months after the To–Be Model is completed. Interior's Comprehensive Plan at 7–3. After the Plan is implemented, "the reengineered processes will take effect and the applicable technology, policies and procedures, guidelines and handbooks will be developed. At that time it may become reasonable to forecast a date for the termination of the Office of the Special Trustee." *Id.*

Before determining whether to adopt Interior's Comprehensive Plan, the Court will analyze both plaintiffs' responses and the critique of the Plan contained in NCAI's amici briefs.[9]

## III. PLAINTIFFS' RESPONSE

### A. Plaintiffs' Opposition Brief

On January 31, 2003, plaintiffs submitted a brief in opposition to Interior's January 6, 2003 Compliance Plan. Plaintiffs first observed that Interior's Plan purported only to state how Interior intended to bring itself into compliance "with *certain*

fiduciary obligations" to the IIM beneficiaries. Pls.' Opp. to the "Fiduciary Obligations Compliance Plan" of Interior Secretary Gale Norton and Acting Assistant Secretary Aureen [sic] Martin at 2–3 ("Pls.' Opp. Br."). As noted above, however, this problem has been effectively remedied by the subsequent filing of Interior's Comprehensive Plan, which purports to be a plan for Interior to bring itself into compliance with *all* of the fiduciary obligations it owes to the beneficiaries of the IIM trust.

Plaintiffs also observe that "[n]owhere in [Interior's] Plan are common law standards and duties addressed." *Id.* at 6. They note that this omission appears to run counter to the admonition of the D.C. Circuit that "[c]ourts must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary. Much as the Supreme Court has regularly turned to the Restatement and other authorities to construe trust responsibilities, it is appropriate for the district court to consult similar sources." *Cobell v. Norton,* 240 F.3d 1081, 1099 (D.C.Cir.2001) (*"Cobell VI"*) (internal citation and punctuation omitted).

### B. Plaintiffs' Proposed Alternative Plan

As noted above, on September 17, 2002, this Court granted plaintiffs leave to file a plan of their own to bring Interior into compliance with the fiduciary obligations it owes to the IIM beneficiaries. The plaintiffs' plan, filed on January 6, 2003, begins by identifying eight duties traditionally imposed upon trustees at common law. Plaintiffs' Compliance Action Plan Togeth-

9. It should be noted that both plaintiffs' responses and the first NCAI amicus brief were filed prior to the issuance of Interior's Comprehensive Plan. Therefore, the critique contained in both plaintiffs' responses and in the amicus brief is of the January 6, 2003 Plan submitted by Interior, not the Comprehensive Plan.

er with Applicable Trust Standards ("Plaintiffs' Compliance Plan") at 16–26. These are the duties of loyalty, administration, impartiality, prudent investment, control and protection of the trust property, keeping property separate and maintaining adequate records, enforcing and defending claims against the trust, and furnishing information. Plaintiffs observe that the provisions of the 1994 Act are not inconsistent with these duties. *Id.* at 26–29.

Additionally, plaintiffs cite Secretarial Order No. 3215, which was issued by former Interior Secretary Bruce Babbitt on April 28, 2000. Secretary Babbitt explained that the purpose of the order, which is entitled "Principles for the Discharge of the Secretary's Trust Responsibility," was

> to provide guidance to the employees of the Department of the Interior who are responsible for carrying out the Secretary's trust responsibility as it pertains to Indian trust assets. All Departmental regulations, policy statements, instructions, or manuals regarding the discharge of the Secretary's trust responsibility shall be interpreted or developed using these trust principles. In addition, these principles provide guidance to all persons who manage Indian trust assets.

U.S. Dep't of Interior, Office of the Sec'y, Order No. 3215 (April 28, 2000), *available at* http://elips.doi.gov/elips/sec_orders/html_orders/3215.htm. While noting that the 1994 Act had provided "[t]he most comprehensive and informative legislative statement of Secretarial duties in regard to the trust responsibility of the United

States," the order nevertheless acknowledged:

> As stated in the Reform Act, this list of duties is not exhaustive. Therefore, to understand the nature of the Department's duties, we must look to a variety of other sources for guidance. One internal Departmental source of guidance is legal advice from the Solicitor's Office. The Solicitor's Office continues to provide the Department with guidance through formal and informal legal advice regarding its trust responsibility. The most comprehensive document available on this subject is a letter by Solicitor Krulitz dated November 21, 1978, analyzing the federal government's responsibility concerning Indian property interests. This legal guidance from the Solicitor's Office informs our interpretation of the duties required by treaties, statutes, and Executive orders.

*Id.* (quoted in Plaintiffs' Compliance Plan at 29).[10]

The November 21, 1978 letter referred to is addressed to Assistant Attorney General James Moorman from Interior Solicitor Leo Krulitz. Solicitor Krulitz explained to the assistant attorney general that the purpose of the letter was to "set forth ... this Department's view of the legal obligations of the United States, as defined by the courts, with respect to Indian property interests." Letter from Interior Solicitor Leo Krulitz to Assistant Attorney General James Moorman 1 (Nov. 21, 1978) ("Krulitz Letter") (Pls.' Ex. 88). He then summarized his legal conclusions:

> 1. There is a legally enforceable trust obligation owed by the United States Government to American

---

10. A manual used by the Office of the Special Trustee incorporates this paragraph from Secretary Babbitt's order in its entirety, with some minor stylistic modifications. *See* Office of the Special Trustee for American Indi-

ans, *Risk Management Handbook for Indian Trust Operations* 6 (Jan. 5, 2001), *available at* http://www.ost.doi.gov/riskmanagement.pdf. An appendix quotes the order in its entirety. *See id.* at 158–60.

Indian tribes. *This obligation originated in the course of dealings between the government and the Indians and is reflected in the treaties, agreements, and statutes pertaining to Indians.*

2. While Congress has broad authority over Indian affairs, its actions on behalf of Indians are subject to Constitutional limitations (such as the Fifth Amendment), and must be "tied rationally" to the government's trust obligation; however, in its exercise of other powers, Congress may act contrary to the Indians' best interests.

3. *The trust responsibility doctrine imposes fiduciary standards on the conduct of the executive. The government has fiduciary duties of care and loyalty, to make trust property income productive, to enforce reasonable claims on behalf of Indians, and to take affirmative action to preserve trust property.*

4. Executive branch officials have discretion to determine the best means to carry out their responsibilities to the Indians, but only Congress has the power to set policy objectives contrary to the best interests of the Indians.

5. *These standards operate to limit the discretion not only of the Secretary of the Interior but also of the Attorney General and other executive branch officials.*

*Id.* at 2 (emphasis added). Notably, Solicitor Krulitz observed that "the decided cases strongly suggest that the trust obligation of the United States exists apart from specific statutes, treaties or agreements." *Id.* at 9 (citing cases).

Plaintiffs also cite an April 3, 1996 memorandum from Associate Interior Solicitor Robert Anderson to Special Trustee Paul Homan regarding "Legal Issues Pertaining to DOI's Trust Fund Management Responsibilities and OST Reform Efforts." Memorandum from Associate Interior Solicitor Robert Anderson to Special Trustee Paul Homan 1 (April 3, 1996) ("Anderson Memorandum") (Pls.' Ex. 60). Anderson explained that his purpose in drafting the memorandum was to respond to three questions that Special Trustee Homan had directed to the Solicitor's Office. Homan's third question was: "Please provide me with a list of the Secretary's trust responsibilities to Indian tribes and individual Indians with cites to relevant statutes, regulations, rulings and any other information that may be useful on this subject. In answering this please summarize what the [Office of the Solicitor] considers the specific applicable fiduciary standard to be in each circumstance." *Id.* at 9 (internal citation omitted). Anderson began his response by observing:

It is unquestioned that the United States has a trust responsibility with respect to the administration of Indian trust money and assets, and that this responsibility carries with it the fiduciary duties attendant to a trust relationship. The Government's trust obligations arise whenever the United States exercises sufficient control over, or management of trust property or trust money of Indian tribes or individual Indians that the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the tribe or individual Indian), and a trust corpus (timber, lands, funds, etc.).

*Id.* (citation omitted). Anderson continued:

The courts have also applied common law standards to supplement the various statutes and regulations in defining the United States' fiduciary obligations; as stated by the Claims Court in [*Menomi-*

*nee Tribe of Indians v. United States,* 101 Ct.Cl. 10, 21 (1944) ], the Secretary, "under a duty to act in harmony with the Government's position as a fiduciary," was not limited in his duty by the statutes under which he acted. The courts have also stated that "where the United States holds trust funds in the United States Treasury, the United States, in effect, borrows those funds from the tribal or individual Indian trust beneficiary, imposing a "doubly strict" fiduciary standard prohibiting the United States from profiting at the expense of the trust beneficiaries."

*Id.* at 13 (citations omitted). Anderson then concluded:

Applying general trust principles in the context of the duties imposed by statutes, treaties, and regulations, the courts have held that the Government's trust obligations include the following affirmative duties:

- to exercise such care, diligence and skill in managing and dealing with the trust property as a man of ordinary prudence would exercise in dealing with his own property.

- to administer trust resources solely in the interest of the beneficiary, so that any profits gained through administration of the trust accrue to the beneficiary.

- to avoid making expenditures from an account bearing a high rate of interest when money is available for such expenditures from accounts bearing a lesser rate of interest, and also, to avoid repaying expenditures from an account bearing a high rate of interest into an account bearing a lesser rate.

- to promptly place trust income into interest-bearing accounts.

- to maximize trust income by prudent investment. This includes a duty to invest tribal funds in equally safe Government securities yielding a rate of return higher than the Treasury rate, as opposed to simply depositing the funds in the Treasury where they earn the statutorily-mandated four percent interest rate.

- to keep informed so that when a previously proper investment becomes improper, perhaps because of the opportunity for better (and equally safe) investment elsewhere, funds can be re-invested.

- to make expenditures from trust funds only as authorized by law, and then, only for the direct and exclusive benefit of the Indian or tribal owner.

*Id.* at 14 (citations omitted).

Plaintiffs conclude their Plan by presenting a list of proposed measures for Interior to undertake that (plaintiffs assert) would bring Interior into compliance with the duties plaintiffs have identified. Chief among these measures is the "appoint[ment of a] new and independent trust administration management solely to administer the Individual Indian Trust." Plaintiffs' Compliance Plan at 33. Plaintiffs enumerate a list of recommended personnel to serve in their proposed management scheme, and provide a description of recommended tasks to be undertaken by these new personnel in order to bring Interior into compliance with its fiduciary duties to the IIM beneficiaries.

Plaintiffs' recommendations overlap to some degree with the recommendation contained in the amici briefs submitted by the National Congress of American Indians. Accordingly, before discussing plaintiffs' recommendations, the Court will analyze the recommendations contained in those amici briefs.

## IV. THE INTERESTS OF THE AMERICAN INDIAN TRIBES

### A. Introduction

The National Congress of American Indians (NCAI), established in 1944, is the oldest and largest national organization of American Indian and Alaska Native tribal governments, and includes among its members most of the major tribes of the United States. Br. for *Amicus Curiae* National Congress of American Indians ("First Amicus Brief") at 1, 3. In its March 3, 2003 amicus brief, NCAI explains its reasons for proceeding as *amicus curiae* in the present case:

> The *Cobell* case involves two parties— the federal government and a class of individual Indians. The individual Indians have grievances with respect to how their money in IIM accounts has been handled by the BIA. Indian *tribes* are not represented in this litigation, yet are key participants in and beneficiaries of the federal trust system. They have governmental authority on trust lands, a unique trust and treaty relationship with the federal government, and a primary management role over land and natural resources and other programs under federal law. Our purpose in this brief is to inform the Court of tribal interests not represented by the parties, and to ask the Court to avoid any unintended harm to these interests that may occur in the process of fashioning remedies to ensure DOI compliance with its responsibilities to the individual beneficiaries.

*Id.* at 1–2 (emphasis in original). The Court concludes that although NCAI is not a party to the present litigation, the Indian Tribes possess a substantial interest in avoiding unintended harm that could arise from the issuance of structural injunctive relief in the present case. As NCAI points out:

> In addition to trust money accounts, the tribal interests in trust land and natural resources ... are physically intermingled and recorded in the same title and ownership systems as the individual interests. In fact, in many instances, tribes and individuals hold undivided property interests in the same parcel of land. Sometimes individuals own the surface rights, and tribes own the subsurface rights under the same parcel. Additionally, tribal and individual resources are often managed and leased in large units under the same leasing and contractual agreements. In short, with respect to land and natural resources, tribal governments have a keen financial and management interest in the decisions of this Court that may affect the functioning of the common Indian trust systems.

*Id.* at 5. It is routine for trial courts to take into account the rights of third parties to a proceeding before issuing injunctive relief. Indeed, one of the factors to be weighed in determining whether to issue such relief is whether the injury to the plaintiff if the injunction is not granted outweighs the injury to other interested parties who will be affected by the injunction. *See Al–Fayed v. CIA*, 254 F.3d 300, 303 (D.C.Cir.2001); *George Washington Univ. v. District of Columbia*, 148 F.Supp.2d 15, 17 (D.D.C.2001). It has been well-observed that "[f]or a party in our legal system to be bound by a judicial decree without ever having a chance to be heard is obviously an anomaly." Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U. CHI. L.F. 103, 153. Additionally, one of the seminal articles on institutional reform litigation notes:

> Remedies in institutional relief cases necessarily affect the interests of persons who are neither plaintiffs nor de-

fendants, but who are related in some way to the defendant institution. Since the institution functions through a complex interrelationship of individuals, modification of any practice for the benefit of one deprived group cannot be accomplished without changing the duties or benefits of various other groups.... The task of assuring adequate representation of other affected parties... is committed largely to the initiative of the court.

Robert E. Buckholz, Jr., *et al., Special Project: The Remedial Process in Institutional Reform Litigation,* 78 COLUM. L. REV. 784 (1978) (footnote omitted). Therefore, the Court will analyze carefully the assertions and recommendations contained in NCAI's amicus brief.

NCAI explains that

[o]n November 15, 2002, NCAI member tribes passed a resolution supporting the filing of an *amicus* brief herein to present five fundamental trust reform principles to assist this Court in fashioning relief that will not infringe upon tribal sovereign authority or diminish the broad federal trust responsibility to the tribes. *Amicus* NCAI respectfully calls upon the Court to allow the plaintiffs relief consistent with the following five fundamental trust reform principles:

(1) that the Indian trust fund management be governed by clear and enforceable standards, with an express right of compensation for trust mismanagement, and independent review of trust management activity;

(2) that a primary trust responsibility of the United States is to protect the governing authority of Indian tribes, including the ability of tribes to regulate land use and resource management within their own reservations as well as the right to manage trust assets and accounts through self-determination contracts and compacts;

(3) that reform of the United States' Indian trust fund management not reprogram funds from vitally needed BIA services and not create new levels of bureaucracy that would impede the delivery of trust services to local needs;

(4) that trust reform provide for increased tribal control over land and resources along with a federal system that provides oversight and technical assistance in flexible arrangements driven by the unique circumstances of each reservation; and,

(5) that tribal governments be intimately involved in developing new systems and policies for trust management, with consultation taking place in a manner that ensures that tribal issues are actively addressed.

Id. at 6–7 (internal citation omitted). The Court will separately analyze each of these principles, together with NCAI's recommended actions for compliance with each of them.

## B. Clear and Enforceable Standards for Trust Management

The first fundamental trust reform principle identified by NCAI is that "Indian trust fund management be governed by clear and enforceable standards, with an express right of compensation for trust mismanagement, and independent review of trust management activity." *Id.* at 10. NCAI explains the reasoning behind this principle:

Even though the courts have held that the United States' fiduciary duty to tribal and individual beneficiaries is subject to the most exacting fiduciary standards, the Government's mismanagement of

trust funds and assets has suffered from substantial lack of proper management and accountability. Establishing accountability lies at the heart of trust reform. Defining a comprehensive set of meaningful standards that can be used to hold the trustee accountable and measure performance will be essential for trust reform.

*Id.* at 11 (internal citations omitted). NCAI agrees with plaintiffs that the fiduciary duties of trustees defined at common law govern the administration of the IIM trust:

Establishing standards is not difficult, in principle, because there already exists a large body of statutory and court-made law defining the standards for performance of trust management and accounting. Of course, in general, fiduciary trust duties and applicable trust standards apply as defined by the trust instrument and relevant statutory environment. But to the extent such duties are not spelled out or negated within the trust instrument or relevant statutes, the well-established equitable principles of court-made trust law apply.

*Id.* (citations omitted). Interior, however, disagrees that these common-law standards govern the administration of the IIM trust. Inasmuch as this Court directed Interior to submit a plan to bring itself into compliance with the fiduciary obligations it owes to the beneficiaries of the IIM trust, it will be necessary first to determine the precise nature of those fiduciary obligations. Therefore, before proceeding to examine NCAI's recommendations for actions to be adopted in accordance with its first principle, the Court must address the applicability of common-law trust standards to the IIM trust.

### 1. Testimony of Professor Langbein

In support of its argument that the duties imposed upon trustees at common law do not apply to Interior, in its capacity as trustee-delegate of the IIM trust, Interior presented the testimony of Professor John Langbein of Yale Law School. Professor Langbein testified that the various Restatements of the law of trusts represent the culmination of

an effort on the part of the [R]estatement writers, the reporter, the advisors, and the members of the [American Law Institute] who deliberate and vote on it, to capture the background law of trust, most of which is default law in the sense that the particular trust instrument can alter it. Therefore, it is a body of law that applies in the absence of more particular direction from the [settlor] in the trust instrument.

Tr., Day 19, PM session (June 2, 2003) at 41:7–15. He further observed that "there are a large number of important points of difference" between the IIM trust and a privately-run trust. *Id.* at 58:9–10. Professor Langbein enumerated at least nine differences that the IIM trust has from a private trust, including: Congress is the settlor of the IIM trust and therefore, there is no ordinary trust instrument for the IIM trust—rather, the trust terms are contained in statutes; a government agency serves as the trustee; the IIM trust is massively underdiversified, in that the trust corpus is virtually all real estate; congressional appropriations fund the trust's administration, rather than a fee charged to the trust beneficiaries; the IIM trust has had exceptional longevity; no outside regulatory agency regulates the IIM trust; the trustee of the IIM trust may not resign; some assets of the trust may be directly managed by IIM beneficiaries through "direct pay" agreements; and Indian Tribes administer certain aspects of trust operation at the local level. *See id.* at 58:7—76:25.

Professor Langbein also stated that, in his opinion, the terms of the "trust instrument" of the IIM trust were also to be contained in appropriations legislation:

Q. [When you say that the IIM trust terms are contained in statutes,] [w]hat statute[s] are you referring to?

A. There is a series of enactments of one or another of the—of this court's opinions and the Court of Appeals opinions, both trace these back quite some distance. [The] Dawes Act and so forth, and then trace them forward. And, of course, most prominently with respect to these accounting issues includes the '94 statute.

Q. Okay.

A. I would also say, however, that it includes appropriation legislation, or budget legislation, which has the terms of altering the terms of the trust. That is to say, if Congress passes a budget appropriation that gives you inadequate funds to carry out something that Congress has earlier said you should carry out, that is the same thing as if Congress says, we hereby amend the trust to order you not to carry out the earlier duty.

So I treat—I treat funding decision[s] as trust terms when applied to a governmentally funded trustee.

*Id.* at 59:13—60:6.

Interior relies almost solely on the testimony of Professor Langbein for its conclusion that the traditional common-law trustee duties do not govern the administration of the IIM trust. However, with a single exception, it is not Professor Langbein's testimony that the Court finds fault with, but with the idiosyncratic conclusions that

Interior purports to have deduced from his testimony.

 First, the Court agrees with Professor Langbein's conclusion that the law of trusts, the most authoritative statement of which is contained in the *Restatement of Trusts, Second* and the third *Restatement of the Law of Trusts*, constitutes default law.[11] However, the *Restatement, Third* makes clear that this default law governs trusts created by statutes, where the statutes are silent:

g. *Trusts created by statute.* Some forms of trusts that are created by statute, especially public retirement systems or pension funds, and sometimes public land trusts, school land trusts, *or trusts for benefit of native populations*, are administered as express trusts, the terms of which are either set forth in the statute *or are supplied by the default rules of general trust law.*

*Restatement, Third* § 4 cmt. g (emphasis added) (internal citation omitted). Moreover, as the D.C. Circuit recognized in *Cobell VI*, a trustee must satisfy a heavy burden to overcome the application of that default law:

While the government's obligations are rooted in and outlined by the relevant statutes and treaties, *they are largely defined in traditional equitable terms.* Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms. Courts must infer that Congress intended to impose on trustees tradition-

---

**11.** In 1957, the Restatement of Trusts, Second (*"Restatement, Second"*) was completed, superseding The Restatement of the American Law of Trusts, which had been published in 1935. In 2003, the first two volumes of the

third Restatement of the Law of Trusts (*"Restatement, Third"*) were issued. At the time that this opinion was issued, the remaining volumes of the Restatement, Third had not yet been published.

al fiduciary duties *unless Congress has unequivocally expressed an intent to the contrary.* Much as the Supreme Court has regularly turned to the Restatement and other authorities to construe trust responsibilities, it is appropriate for the district court to consult similar sources. *Cobell VI,* 240 F.3d at 1099 (emphasis added) (internal citations and punctuation omitted).[12] In other words, in order to overcome the inference that Congress intended to impose upon Interior, as the trustee-delegate of the United States, the traditional fiduciary duties of a trustee as defined in the law of trusts, Interior must demonstrate that "Congress has unequivocally expressed an intent to the contrary."

But Interior has not directed this Court to any unequivocal expression by Congress that it did not intend to impose upon the United States, as the trustee of the IIM trust, the traditional fiduciary duties defined at common law. Indeed, on October 3, 1994, just as Congress was preparing to vote on the 1994 Act, Congressman Mike Synar (D–Okla.), one of the principal proponents of the Act, informed the full House:

> It is time for Congress to take matters into its own hands, and to require by statute that the Secretary and the Department do what needs to be done to fix these problems and meet the Government's trust responsibilities to the account holders. . . .

> There is an understanding that, after [seven subcommittee hearings], we have been unable to get the responsiveness that we need out of the BIA to perform *the basic fiduciary responsibilities*

which we would expect out of any trustee. If this was done in the Social Security system, my colleagues, we would have had a war.

140 CONG. REC. 24,244 (1994) (emphasis added). Congressman Synar thus expressly stated what Congress had tacitly assumed: that what was expected from Interior in its administration of the IIM trust was nothing less than the basic fiduciary responsibilities expected of *any* trustee. Additionally, during an oversight hearing on the bill that became the 1994 Act, Congressman Bill Richardson (D–N.M.), the primary sponsor of the bill, declared:

> Let us not forget that the United States as a trustee for the Indian nations has solemn fiduciary duties. *These duties include the duty of loyalty and the duty to make the corpus productive.*

> *We should hold the Federal Government to the same standard as any other trustee. This includes the principle that a trustee should subordinate its own interests to those of the beneficiary.* Hence, the status of these funds should be of paramount importance to the Department of Interior, *and the needs of the Indian nations with regard to these funds should supersede other obligations the Department may have.*

*Hearing Before the Subcomm. on Native American Affairs of the Comm. on Natural Resources on H.R. 1846 and 4833,* 103d Cong. 2 (Aug. 11, 1994) (emphasis added).

The Court agrees that, in some respects, the IIM trust differs from a pri-

---

12. Obviously, this holding by the D.C. Circuit supercedes the statement made by this Court in its 1999 opinion expressing doubt that "plaintiffs may simply claim that they are the beneficiaries of a trust relationship with the United States and therefore invoke all of the rights that a common law trust entails." *Co-*

*bell V,* 91 F.Supp.2d at 29. This Court had qualified its conclusions in this regard by noting that this issue had "not been squarely addressed before by any court." *Id.* at 28. Clearly, it has now been addressed and resolved by the D.C. Circuit.

vate trust. From that premise, however, it does not follow that "[b]ecause of these many differences, one cannot simply graft private standards onto the individual Indian trust." Defs.' Proposed Findings of Fact and Conclusions of Law at 223 (footnote omitted) ("Defs.' Prop. Findings and Conclusions"). The suggestion that the Court is attempting to "graft" standards onto the IIM trust implies that traditional common-law trustee duties represent a foreign concept that the Court is attempting to apply in an area where they do not belong. But "[i]t is well established that conduct of the Government as a trustee is measured by the same standards applicable to private trustees." *Manchester Band of Pomo Indians v. United States,* 363 F.Supp. 1238, 1245 (N.D.Cal.1973) (citation omitted). Moreover, it is not plaintiffs' burden to demonstrate that the traditional common-law trustee duties apply to Interior; rather, as explained above, it is Interior's burden to show that Congress has unequivocally expressed an intent to the contrary. Additionally, the fact that the IIM trust possesses some qualities that distinguish it from a typical private trust does not mean that trust law does not govern its operations. To argue this is akin to arguing that because a particular contract differs in some aspects from a "typical" contract, it is not governed by contract law. Interior has directed the Court to no case law suggesting that a trust that is massively underdiversified, has had exceptional longevity, is not regulated by an outside regulatory agency or shareholders—or that possesses any of the distinctive qualities identified by Professor Langbein—thereby loses its status as a "trust" and is no longer governed by trust law. But this is precisely what Interior is implying when it alleges that because the IIM trust is different in some aspects from a typical commercial trust, it is not governed by traditional common-law standards.

Moreover, Interior's conclusions are seriously undermined by the testimony of Richard Fitzgerald, Acting Director of the newly-formed Office of Trust Regulations, Policies and Procedures at Interior:

> THE COURT: From your experience, is there a reason why this trust should be treated differently than any other trust in any bank?
>
> THE WITNESS: No, Your Honor. I have always believed that when the Congress said it was a trust, it knew what it was talking about. You know, words—and I did a thing when we were doing records one time about words have got meaning and, you know, we know what a trust is. So I have always considered that this was a traditional trust for identifiable beneficiaries. I have said that any number of times. The government holds identifiable assets in trust for identifiable American citizens and communities of American citizens. Now, the Congress does modify the trust in certain areas—the Navajo case is a case right on point, but the Apache case is also a case right smack on point.
>
> So yes, I do believe it is a trust, and I do believe that the principles that have been developed over 800 years are appropriate sources for the trustee to consult as the trustee discharges those responsibilities.

Tr., Day 8, AM session (May 12, 2003) at 20:18—21:12.

Finally, the Court must disagree with Professor Langbein's assertion that "if Congress passes a budget appropriation that gives you inadequate funds to carry out something that Congress has earlier said you should carry out, that is the same thing as if Congress says, we hereby amend the trust to order you not to carry

**262**

out the earlier duty." First, Professor Langbein acknowledged that he was not aware of any case law supporting such a proposition:

Q. Are you aware of any case law that deals with that issue [*i.e.*, the relevance of an appropriations provision upon a trustee's fiduciary obligations to beneficiaries]?

A. I'm not aware of case law bearing on these matters.

Q. Okay.

A. I think in general, the courts have stayed very far away from appropriations, interpretation questions.

\* \* \* \* \* \*

■ THE COURT: Well, I take it, then, you're not aware of any court that has ever held that an appropriation like this could modify an underlying statute?

THE WITNESS: No, but again, I have never seen a trust whose terms are embodied in statute and whose financing must be extrinsic to the trust. That's the astonishingly unique feature of this trust. That's why we're groping to apply unusual categories over in the world of trust.

Tr., Day 20, AM session (June 3, 2002) at 79:18—23, 80:1–9. Professor Langbein's remarks, however, miss the point. In the absence of controlling precedent that insufficient appropriations legislation can modify the underlying substantive obligations owed by a trustee, the Court must conclude that such legislation does *not* modify such obligations. In other words, the burden is on Interior to prove that an insufficient appropriations act will excuse or modify the discharge of a trustee's obligations, not on plaintiffs to disprove it. This is in keeping with the D.C. Circuit's holding that "[c]ourts must infer that Congress intended to impose on trustees tradi-

tional fiduciary duties unless Congress has *unequivocally* expressed an intent to the contrary."

■ Moreover, this Court has previously rejected Interior's arguments that a lack of funding would excuse its failure to comply with its fiduciary duties. In *Cobell V*, this Court stated:

Interior constantly emphasizes that its success is dependent upon proper budgeting. This argument, as discussed below, seems disingenuous given the lack of requests for proper funding until the institution of this lawsuit. More importantly, however, claims of lack of funding cannot be allowed to legally impair the United States' trustee-delegates' exacting fiduciary duties toward management of this trust. As Chief Judge Arnold of the Court of Appeals for the Eighth Circuit has stated:

[T]he government may not avoid its trust duties on the grounds that the budget and staff of the Department of Interior are inadequate. This circumstance may well excuse any delay on the part of individual employees of the [BIA]. But the United States may not evade the law simply by failing to appropriate enough money to comply with it.

*See Loudner v. United States,* 108 F.3d 896, 903 n. 7 (8th Cir.1997); *see also* [*Forest Guardians v. Babbitt,* 174 F.3d 1178, 1188 & n. 14 (10th Cir.1999) ] (holding that it would not accept defendant Babbitt's argument regarding unreasonable delay due to budgetary constraints in terms of breach of statutory duty but that, instead, "the agency defense of unavailable resources must be reserved as a defense against contempt if an injunction issues"). For these reasons, the court gives little weight to Interior's budgetary-constraints justification.

*Cobell V,* 91 F.Supp.2d at 48. This conclusion is consistent with the foremost treatise on the law of trusts, which provides that "[t]he trustee, having accepted [its appointment as trustee], is not relieved of liability merely because by the terms of the trust he is to receive no compensation. His duty to administer the trust is not a contractual duty, and it is immaterial that he receives no consideration for his undertaking to administer the trust." 2A Austin W. Scott & William F. Fratcher, The Law of Trusts § 169, at 311 (4th ed. 1987) ("*Scott on Trusts*"); *cf. Caswell v. Califano,* 435 F.Supp. 127, 135 (D.Me.1977) ("Moreover, defendant's claim of inadequate resources does not justify violation of a federal statute.") (citing cases). Therefore, although the defense of unreasonable resources might be available as a defense in a contempt proceeding, it does not relieve a trustee of liability for its failure to administer the trust.

The Supreme Court has also rejected the assertion that appropriations measures may be read as implicitly repealing previous law:

The doctrine disfavoring repeals by implication applies with full vigor when the subsequent legislation is an *appropriations* measure. This is perhaps an understatement since it would be more accurate to say that the policy applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act. We recognize that both substantive enactments and appropriations measures are "Acts of Congress," but the latter have the limited and specific purpose of providing funds for authorized programs. When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure. Not only would this lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation, but it would flout the very rules the Congress carefully adopted to avoid this need. House Rule XXI(2), for instance, specifically provides:

"No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless in continuation of appropriations for such public works as are already in progress. *Nor shall any provision in any such bill or amendment thereto changing existing law be in order.*"

(Emphasis added.)

*See also* Standing Rules of the Senate, Rule 16.4. Thus, to sustain petitioner's position, we would be obliged to assume that Congress meant to repeal *pro tanto* § 7 of the Act by means of a procedure expressly prohibited under the rules of Congress.

*Tennessee Valley Authority v. Hill,* 437 U.S. 153, 190–91, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (emphasis in original) (internal citations and punctuation omitted); *see also New York Airways v. United States,* 177 Ct.Cl. 800, 369 F.2d 743, 748 (1966) ("It has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute.") (citations omitted).

Nor has Interior's Office of the Solicitor endorsed the notion that appropriations

legislation modifies Interior's substantive fiduciary obligations to the IIM beneficiaries. Regarding this issue, former Solicitor Krulitz prefaced his discussion by noting that

> [e]ven if the imposition of the trust responsibility doctrine is assumed to be completely consistent with present policy and administrative practice, the doctrine clearly places constraints on the future policy formulation and administrative discretion. *Executive branch officials have some discretion in the discharge of the trust, but it is limited.* For example, they may make a good faith determination that the compromise of an Indian claim is in the long term best interests of the Indian, but they are not free to abandon Indian interests *or to subordinate those interests to competing policy considerations.* Flexibility in setting policy objectives rests with Congress which alone is free to direct a taking or subordination of the otherwise paramount Indian interests.

Krulitz Letter at 14 (emphasis added). He then explained:

> Instances will surely arise where the discharge of trust responsibilities to the Indians raises unmanageable, practical or political difficulties for executive branch officials. *It may be that congressional appropriations are inadequate to carry out a perceived duty*—say, the quantification of Indian water entitlements—or that the enforcement of trust responsibilities results in an extraordinarily intense political backlash against the administration. *Under such circumstances, it would seem that the responsibility of executive branch officials would be to seek express direction from the Congress. The existence of this congressional safety valve assures that the legal trust responsibility to American Indians is a viable doctrine not only now but in the future as well.*

Id. (emphasis added). In short, when faced with this very issue, the highest legal official at Interior never advanced any notion that, in and of themselves, the passage of insufficient appropriations measures might modify or repeal Interior's trustee obligations. Instead, Solicitor Krulitz made it clear that faced with such a circumstance, it would be "the responsibility of executive branch officials ... to seek express direction from the Congress" as to how they should proceed.

And Congress, to its credit, has consistently provided funding to Interior to carry out its substantive trust responsibilities. Congress's intent that sufficient future funding should be made available to enable Interior to comply with its trustee duties is plain in its inclusion of section 303 of the 1994 Act. That section requires the Special Trustee to

> develop for each fiscal year, with the advice of program managers of each office within the Bureau of Indian Affairs, Bureau of Land Management and Minerals Management Service that participates in trust management, including the management of trust funds or natural resources, or which is charged with any responsibility under the comprehensive strategic plan prepared under subsection (a) of this section, a consolidated Trust Management program budget proposal that would enable the Secretary to efficiently and effectively discharge his trust responsibilities and to implement the comprehensive strategic plan, and [to] submit such budget proposal to the Secretary, the Director of the Office of Management and Budget, and to the Congress.

25 U.S.C. § 4043(c)(5)(A). Additionally, subsection (c)(5)(B) requires "[e]ach program manager participating in trust man-

agement or charged with responsibilities under the comprehensive strategic plans [to] transmit his office's budget request to the Special Trustee at the same time as such request is submitted to his superiors (and before submission to the Office of Management and Budget) in the preparation of the budget of the President submitted to the Congress." The Special Trustee is then required to "review each budget request submitted under subparagraph (B); certify in writing as to the adequacy of such request to discharge, effectively and efficiently, the Secretary's trust responsibilities and to implement the comprehensive strategic plan; and notify the program manager of the Special Trustee's certification." 25 U.S.C. § 4043(c)(5)(C).

Congress's inclusion of section 303 in the 1994 Act demonstrates its intent to ensure that Interior received appropriate funding to discharge its fiduciary obligations to the IIM beneficiaries. In the House Report accompanying the 1994 Act, the House Committee on Natural Resources explained that

> Section 303(c) requires the Special Trustee to assure that all policies and practices regarding trust fund management be coordinated among the BIA, BLM, and MMS and that the Department prepare comprehensive written policies to address all aspects of trust management including collections, accounting and timely reporting of transactions to account holders. Included within the Special Trustee's duties is the development of a consolidated Trust Management program budget proposal through consultation with program managers from BIA, BLM, MMS, and any other agency charged with any responsibility for the Special Trustee's comprehensive strategic plan. To achieve this program budget proposal, each program manager shall transmit the manager's office's budget proposal to the Special Trustee

at the same time as such request is made to the manager's superiors.

H.R. REP. No. 103–778, at 19 (1994), reprinted in 1994 U.S.C.C.A.N. 3467, 3478. As demonstrated by the testimony of Special Trustee Swimmer during the Phase 1.5 trial, the mechanism set in place by Congress appears to be generating sufficient funding requests:

> THE COURT: Well, I think that the money does make a difference, and the commitment to the money does make a difference, so I was disappointed to hear [this] morning about going the other direction on money, because I thought that that was a good sign, that the administration was willing to spend more money. That usually is a sign that things are going to happen.

> THE WITNESS: Well, I don't know what is in the appropriations, but I will tell you that the requests that have gone out from this particular administration, this Secretary, have been far, far above.

> In fact just as a level of magnitude, I am aware that when the first trustee came in I think we were dealing with 15 to 20 million dollars. Today, the special trustee's budget is in excess of 200 million. *So you also have the Congress looking over our shoulder. They want to see performance as well, and they want to see this trust reformed.*

Tr., Day 36, PM session (June 25, 2003) at 40:17—41:9 (emphasis added).

Additionally, apart from the testimony of Professor Langbein, Interior cites only two cases in support of its assertion that the traditional common-law fiduciary duties do not govern IIM trust administration. First, Interior cites a recent Supreme Court case in support of its asser-

tion that this Court "must look to the statute or regulation establishing the trust relationship to determine the nature of the specific obligations owed, rather than simply applying all of the common-law trust duties." Defs.' Proposed Findings and Conclusions at 226. But *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), actually supports rather than undermines the conclusion that the traditional common-law duties of a trustee govern the administration of the IIM trust. The issue to be determined in *White Mountain Apache* was whether the Court of Federal Claims "[possessed] jurisdiction over the White Mountain Apache Tribe's suit against the United States for breach of fiduciary duty to manage land and improvements held in trust for the Tribe but occupied by the Government." *White Mountain Apache*, 123 S.Ct. at 1130. In concluding that it did, the Court explained that a statute passed in 1960 providing that the former Fort Apache Military Reservation would be held by the United States in trust for the White Mountain Apache Tribe

> goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee and liable in damages for breach. The statutory language, of course, expressly defines a fiduciary relationship in the provision that Fort Apache be "held by the United States in trust for the White Mountain Apache Tribe." .... As to the property subject to the Government's actual use, then, the United States has not merely exercised daily supervision but has enjoyed daily occupation, and so has obtained control at least as plenary as its authority over the timber in [*United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II.*")]. While it is true that the 1960 Act does not, like the statutes

cited in that case, expressly subject the Government to duties of management and conservation, the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee. This is so because elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch. "One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets," *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 572, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985) (citing G. Bogert & G. Bogert, Law of Trusts and Trustees § 582, p. 346 (rev.2d ed.1980)); see *United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973) (standard of responsibility is "such care and skill as a man of ordinary prudence would exercise in dealing with his own property") (quoting 2 A. Scott, Trusts 1408 (3d ed.1967) (internal quotation marks omitted)); Restatement (Second) of Trusts § 176 (1957) ("The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property"). Given this duty on the part of the trustee to preserve corpus, "it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *Mitchell II, supra,* at 226, 103 S.Ct. 2961.

*Id.* at 1133–34 (emphasis added) (footnotes and internal citation omitted).

In other words, the fact that the statute establishing the trust did not "expressly subject the Government to duties of management and conservation" did not lead

the Court to conclude that such a duty did not exist. Instead, the Court deduced from "the fact that the property occupied by the United States is expressly subject to a trust" the conclusion that the common-law fiduciary duty of prudence and duty to preserve and maintain trust assets applied to the United States as a trustee. In short, the Court did not stop at the language of the statute in determining the scope of the United States's obligations as trustee, but instead looked to "elementary trust law" to provide the governing trust duties. Indeed, the Federal Circuit opinion affirmed by the Court explicitly stated that "[a]lthough neither the 1960 Act nor any pertinent regulation sets forth clear guidelines as to how the government must manage the trust property, we think it is reasonable to infer that the government's use of any part of the property requires the government to act in accordance with the duties of a common law trustee." *White Mountain Apache Tribe v. United States,* 249 F.3d 1364, 1377 (Fed.Cir.2001).

Second, Interior cites *Cherokee Nation of Oklahoma v. United States,* 21 Cl.Ct. 565 (1990), for the proposition that "the relationship between the United States and Indians is not comparable to a private trust relationship." Defs.' Prop. Findings and Conclusions at 226. That is not, however, what the U.S. Court of Claims said in *Cherokee Nation.* Instead, it merely observed that "[t]he *general* relationship between the United States and the Indian *tribes* is not comparable to a private trust relationship." *Id.* at 573 (emphasis added). But the IIM trust is not merely a "general relationship" with the United States, nor is it a relationship with Indian Tribes, as opposed to individual Indians. Accordingly, the precedential value of

*Cherokee Nation* for the present case is, at best, extremely limited.

 In sum, the D.C. Circuit has instructed this Court that it "must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary." Interior is the trustee-delegate for the United States with respect to the IIM trust. Interior has directed this Court to no statute demonstrating that Congress has unequivocally expressed an intent not to impose upon Interior traditional fiduciary duties. Accordingly, this Court holds that Congress intended to impose upon Interior the traditional fiduciary duties of a trustee, and that the scope and nature of those duties are coextensive with the duties imposed upon trustees at common law.

### 2. The Fiduciary Duties Owed to the IIM Beneficiaries

Having reached the conclusion that the duties imposed at common law upon trustees govern the administration of the IIM trust, it will be necessary for the Court to enumerate these duties, together with their basic *Restatement* definition. The common-law duties that govern Interior's administration of the IIM trust are as follows: [13]

#### a. *Duty to Administer the Trust*

"Upon acceptance of the trust by the trustee, he is under a duty to the beneficiary to administer the trust." *Restatement, Second* § 169. As noted above, it follows from this duty that "[t]he trustee, having accepted, is not relieved of liability merely because by the terms of the trust he is to receive no compensation. His

---

**13.** The volumes of the *Restatement, Third* dealing with the duties of a trustee have not yet been published. When these volumes are

published, their provisions dealing with the duties of a trustee will supersede the analogous provisions in the *Restatement, Second.*

duty to administer the trust is not a contractual duty, and it is immaterial that he receives no consideration for his undertaking to administer the trust." 2A *Scott on Trusts* § 169, at 311.

### b. *Duty of Loyalty*

"The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary. The trustee in dealing with the beneficiary on the trustee's own account is under a duty to the beneficiary to deal fairly with him and to communicate to him all material facts in connection with the transaction which the trustee knows or should know." *Restatement, Second* § 170. As stated by former Interior Solicitor Anderson, this duty requires the government "to administer trust resources solely in the interest of the beneficiary, so that any profits gained through administration of the trust accrue to the beneficiary." Anderson Memorandum at 14 (citing *Manchester Band of Pomo Indians*, 363 F.Supp. at 1245; *Navajo Tribe of Indians v. United States*, 176 Ct.Cl. 502, 364 F.2d 320, 324 (1966); and *Menominee Tribe of Indians v. United States*, 102 Ct.Cl. 555, 59 F.Supp. 137, 141 (1944)).

### c. *Duty Not to Delegate*

"The trustee is under a duty to the beneficiary not to delegate to others the doing of acts which the trustee can reasonably be required personally to perform." *Restatement, Second* § 171. Congress, the settlor of the IIM trust, partly overrode this duty in the General Allotment Act, 24 Stat. 388, and the Indian Reorganization Act, 48 Stat. 984, by expressly delegating the United States's administration of the IIM trust to the Interior and Treasury Departments. Additionally, with the passage of the Indian Self–Determination and Education Act of 1975, Pub.L. No. 93–638 ("Self–Determination Act"), Congress further overrode this duty by authorizing federal agencies, including Interior, to transfer local control over the administration of federal programs such as the IIM trust to Indian Tribes.

### d. *Duty to Keep and Render Accounts*

"The trustee is under a duty to the beneficiary to keep and render clear and accurate accounts with respect to the administration of the trust." *Restatement, Second* § 172. The nature and scope of this duty is discussed at length in the companion memorandum opinion issued this date. It will suffice here to note that, as affirmed in that opinion, the scope of Interior's duty to account is far broader than the specific provisions contained in the 1994 Act, which merely "sought to remedy the government's long-standing failure to discharge its trust obligations; it did not define and limit the extent of [Interior's] obligations." *Cobell VI*, 240 F.3d at 1100; *see also id.* at 1098 ("[T]he government is incorrect to the extent that it assumes that the 1994 Act forms the basis for its fiduciary obligations. The 1994 Act did not create these obligations any more than it created the IIM trust accounts. As noted above, the 1994 Act was a remedial statute designed to ensure more diligent fulfillment of the government's obligations. It recognized and reaffirmed what should be beyond dispute—that the government has longstanding and substantial trust obligations to Indians, particularly to IIM trust beneficiaries, not the least of which is a duty to account."). Interior's duty to keep and render accounts includes the duty to retain records that are necessary to the performance of an accounting

### e. *Duty to Furnish Information*

"The trustee is under a duty to the beneficiary to give him upon his request at

reasonable times complete and accurate information as to the nature and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust." *Restatement, Second* § 173. As noted by the Southern District of New York, "[t]he common law recognizes an obligation on the part of the trustee to provide full and accurate information to the beneficiary on his management of the trust." *Martin v. Valley Nat'l Bank of Arizona,* 140 F.R.D. 291, 322 (S.D.N.Y.1991).

### f. *Duty to Exercise Reasonable Care and Skill*

"The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; and if the trustee has or procures his appointment as trustee by representing that he has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill." *Restatement, Second* § 174.

With respect to this duty, Interior claims that "the applicable standard is that of a reasonable person similarly situated. Thus, the prudence standard applicable to Interior would be that of similarly situated federal agencies facing similar congressional restraints and co-existing statutory obligations." Defs.' Prop. Findings and Conclusions at 118 n. 25. But the only authority cited by Interior in support of this assertion is the trial testimony and expert report of Professor Langbein. In turn, Professor Langbein does not direct this Court to any case law that would support the proposition advanced by Interior. Instead, Professor Langbein points to the official comment to the Uniform Prudent Investor Act, which explains that

its standard is "the standard of the prudent investor similarly situated," and a subsection of the Employee Retirement Income Security Act ("ERISA"), which directs a plan fiduciary to behave as "a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). However, both the "prudent investor" and "prudent man" standards are workable standards precisely because, under a given set of circumstances, there will be other similarly-situated prudent investors or prudent persons against whose conduct a court may measure a defendant's conduct. By contrast, the standard of a "similarly situated federal agenc[y] facing similar congressional restraints and co-existing statutory obligations" is virtually meaningless. It lacks any precise meaning because, to the Court's knowledge, there *are* no similarly-situated federal agencies charged with fiduciary responsibilities that face similar congressional restraints and co-existing statutory obligations. Therefore, the "similarly-situated federal agency" standard would simply mean whatever Interior wants it to mean.

However, the available case law does not suggest that the duty to exercise reasonable care and skill is meaningless, even when it is the United States that is charged with such a duty. Thus, the Supreme Court has stated: "There is no doubt that the United States serves in a fiduciary capacity with respect to these Indians and that, as such, it is duty bound to exercise great care in administering its trust.... As Professor Scott has written, 'A trustee is under a duty in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property.' 2 A. Scott, Trusts 1408 (3d ed.1967)." *United States v. Mason,* 412 U.S. 391, 398, 93

S.Ct. 2202, 37 L.Ed.2d 22 (1973) (internal citation omitted). In *Manchester Band,* the district court, having observed that "conduct of the Government as a trustee is measured by the same standards applicable to private trustees," did not utilize a "similarly-situated government agency" standard, but instead stated only that "[w]hile the normal standard of care and skill required of a trustee is that of a man of ordinary prudence in dealing with his own property, if the particular trustee has a greater degree of skill than that of a man of ordinary prudence, he will be held liable for any loss resulting from the failure to use such skill as he has." *Manchester Band,* 363 F.Supp. at 1244 (citing *Restatement, Second* § 174 cmt. a); *see also Menominee Tribe of Indians v. United States,* 101 Ct.Cl. 10 (1944) (concluding that "to whatever extent the Secretary of the Interior could have, in the course of prudent management of the affairs of the Indians, and without impairing funds which he reasonably thought it was necessary to keep supplied for the purpose of meeting authorized expenditures, used the noninterest-bearing funds or those bearing the lower rate of interest, and instead used funds bearing interest, or a higher rate of interest, the Government is under a duty to pay to the plaintiffs the interest thereby lost by them.").

Accordingly, the Court rejects Interior's assertion that its duty to exercise reasonable care and skill with respect to the administration of the IIM trust merely requires it to behave as a "similarly situated federal agenc[y] facing similar congressional restraints and co-existing statutory obligations" would. Instead, the scope and nature of its duty is coextensive with the traditional common-law duty of a trustee to exercise reasonable care and skill in its administration of the trust.

g. *Duty to Take and Keep Control*

"The trustee is under a duty to the beneficiary to take reasonable steps to take and keep control of the trust property." *Restatement, Second* § 175. In the Indian Self–Determination Act, Congress allowed for federal agencies, including Interior, to transfer local control over the administration of federal programs to Indian Tribes, including the administration of trust assets in the IIM trust. However, although Interior may transfer local control over the administration of assets in the IIM trust to Indian Tribes, Interior is not thereby wholly relieved of its duty to take and keep control of such assets. Rather, such a transfer is akin to a transfer of possession of portions of the trust property to an attorney, banker, or other agent. *See id.* § 175 cmt. e ("To the extent to which it is reasonable for the trustee to entrust the possession of the subject matter of the trust to his attorney, broker, banker or other agent, the trustee can properly do so.").

h. *Duty to Preserve the Trust Property*

"The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property." *Id.* § 176. This includes a duty on the part of Interior "to use reasonable care to protect the trust property from loss or damage." *Id.* § 176 cmt. b.

i. *Duty to Enforce Claims and to Defend Actions*

"The trustee is under a duty to the beneficiary to take reasonable steps to realize on claims which he holds in trust." *Id.* § 177. "The trustee is under a duty to the beneficiary to defend actions which may result in a loss to the trust estate, unless under all the circumstances it is reasonable not to make such defense." *Id.* § 178.

j. *Duty To Keep Trust Property Separate*

"The trustee is under a duty to the beneficiary to keep the trust property separate from his individual property, and, so far as it is reasonable that he should do so, to keep it separate from other property not subject to the trust, and to see that the property is designated as property of the trust." *Id.* § 179.

k. *Duty with Respect to Bank Deposits*

"While a trustee can properly make general deposits of trust money in a bank, it is his duty to the beneficiary in making such a deposit to use reasonable care in selecting the bank, and properly to earmark the deposit as a deposit by him as trustee." *Id.* § 180. Congress has largely overridden the duty to use reasonable care in selecting a bank in which to make deposits by mandating that deposits of IIM trust funds are to be made to Treasury. However, the Court is not aware of any congressional provision overriding Interior's duty to earmark.

l. *Duty to Make the Trust Property Productive*

"The trustee is under a duty to the beneficiary to use reasonable care and skill to make the trust property productive." *Id.* § 181. Additionally, "[a] trustee of land is normally under a duty to lease it or to manage it so that it will produce income." *Id.* § 181 cmt. a.

m. *Duty to Pay Income to Beneficiaries*

"Where a trust is created to pay the income to a beneficiary for a designated period, the trustee is under a duty to the beneficiary to pay to him at reasonable intervals the net income of the trust property." *Id.* § 182.

n. *Duty to Deal Impartially With Beneficiaries*

"When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them." *Id.* § 183.

o. *Duty with Respect to Co–Trustees*

"If there are several trustees, each trustee is under a duty to the beneficiary to participate in the administration of the trust and to use reasonable care to prevent a co-trustee from committing a breach of trust or to compel a co-trustee to redress a breach of trust." *Id.* § 184. It is therefore the duty of each of the two trustee-delegates (Interior and Treasury) to use reasonable care to prevent the other from committing a breach of the other's trust duties or to compel the other to redress a breach of trust.

p. *Duty with Respect to Person Holding Power of Control*

"If under the terms of the trust a person has power to control the action of the trustee in certain respects, the trustee is under a duty to act in accordance with the exercise of such power, unless the attempted exercise of the power violates the terms of the trust or is a violation of a fiduciary duty to which such person is subject in the exercise of the power." *Id.* § 185.

3. Recommendations

The Court having held that the administration of the IIM trust is governed, *inter alia,* by the traditional duties imposed at common law upon trustees, it must now look to plaintiffs' and NCAI's recommendations for ensuring Interior's compliance with these duties.

As noted above, plaintiffs recommend that the Court "appoint [a] new and independent trust administration management solely to administer the Individual Indian

Trust." Plaintiffs' Compliance Plan at 33. However, if this Court were to direct Interior to hire new executive officials to assist it in the administration of its trust duties, it would be treading on dangerous constitutional waters indeed. Therefore, although plaintiffs' recommendation is well-intentioned, the Court nevertheless must decline.[14]

NCAI informs the Court that the Indian Tribes seek "a meaningful role in a trust management oversight body that would be independent of the DOI, and would monitor and audit the Government's implementation of [policies] and procedures to ensure the proper discharge of the Secretary's trust responsibilities." First Amicus Brief at 13. As stated in the companion memorandum opinion issued this date, the Court has decided to appoint a monitor to report upon Interior's efforts to implement the structural injunction that this Court has issued. The Court certainly considers it appropriate for the monitor to keep well-informed as to the interests of the Tribes regarding the implementation of the structural injunction in this case. Therefore, the Court will direct the monitor to meet with a representative or representatives of NCAI on a quarterly basis, and to file with this Court a complete report of the discussions that take place at such meetings. The Court will thereby be informed as to any concerns of the Tribes regarding the implementation of the structural injunction. Additionally, in order to keep the Tribes well-informed as to the injunction's ongoing implementation, the Court will direct the monitor to serve upon NCAI a copy of every report that the monitor files, at the same time that it is filed with the Court and served upon the parties.

 NCAI further "encourage[s] this Court to continue its efforts to ensure that the DOI implements policies and procedures to properly discharge its trust responsibilities. Such policies and procedures should include judicially enforceable rights in the federal courts for equitable relief to enforce the failure to perform or the negligent performance of trust duties." *Id.* In clarifying that the duties imposed upon trustees at common law, in addition to the specific duties in the 1994 Act, govern the administration of the IIM trust, the Court has done all within its power to ensure that future breaches of those duties will be able to be redressed by the courts. However, there is an important element that could potentially impede the enforcement of such rights—namely, the existence of federal sovereign immunity. As the Supreme Court reaffirmed only a few months ago, "[j]urisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver. The terms of consent to be sued may not be inferred, but must be unequivocally expressed, in order to define a court's jurisdiction." *White Mountain Apache*, 123 S.Ct. at 1131–32 (citations and internal punctuation omitted). The decision to waive sovereign immunity rests solely with Congress, not with the courts. The Court is aware that Congress is presently considering legislation relating to the administration of the IIM trust.

Finally, having determined that the common-law fiduciary duties govern the administration of the IIM trust, the Court deems it appropriate to allow Interior, in

14. Of course, the Court's appointment of a monitor in this case does not raise such separation-of-powers concerns because the monitor is a judicial official, not an official of the executive branch.

the first instance, to determine how it will bring itself into compliance with these duties. Therefore, it will direct Interior to file a statement identifying the steps it intends to take as part of its To–Be Plan to bring itself into compliance with each of these common-law duties. Additionally, if the measures it plans to undertake as part of its To–Be Plan might be deemed to be inconsistent with any of these duties, Interior should provide a description of such measures, together with a full explanation of why the proposed action should not be considered to be inconsistent with its common-law duties.

### C. Protection of Tribal Authority and Sovereignty

■ The second fundamental trust reform principle identified by NCAI is that "[a] primary trust responsibility of the United States is to protect the governing authority of Indian tribes, including the ability of tribes to regulate land use and resource management within their own reservations as well as the right to manage trust assets and accounts through self-determination contracts and compacts." First Amicus Brief at 13.

As the Supreme Court has observed,

our cases recognize that the Indian tribes have not given up their full sovereignty. We have recently said that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory. They are a good deal more than private, voluntary organizations. The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

*United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (citations and internal punctuation omitted).

In an earlier case, the Court noted that the tribal sovereignty doctrine

provides a backdrop against which the applicable treaties and federal statutes must be read. It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government. Indians today are American citizens. They have the right to vote, to use state courts, and they receive some state services. But it is nonetheless still true, as it was in the last century, that the relation of the Indian tribes living within the borders of the United States is an anomalous one and of a complex character. They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.

*McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 172–73, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (internal citations and punctuation omitted); *see also United States v. Mitchell*, 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II*") ("Our construction of … statutes and regulations [relating to a fiduciary relationship between the United States and Indian allottees] is reinforced by the undisputed existence of a general trust relation-

ship between the United States and the Indian people."). The passage of the Self–Determination Act reinforced the importance of the principle of tribal sovereignty. Included in the act is a declaration of congressional policy that expressly "recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities." 25 U.S.C. § 450a(a). The declaration further stated:

> Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 450a(b). As NCAI notes, since the inception of the Tribal Self–Governance Program in 1990, no delegation of trust programs to the administration of a Tribe has ever been revoked on account of a Tribe's failure of administration. First Amicus Brief at 14 n. 8.

NCAI has "urge[d] this Court, as it considers the appropriate remedies to en-sure the Department's compliance with its trust responsibility, to fully recognize that the trustee's duties must be administered in compliance with tribal law and ordinances, and to recognize and protect the important interests that the [Tribes] have in trust management under the [Self–Determination Act]." Id. at 14–15. Plaintiffs have also noted that "[i]t is axiomatic that a trustee must abide by and administer the trust in compliance with governing law. In Indian Country, governing law includes tribal law." Pls.' Compliance Plan at 18 n. 24 (citations omitted).

In *Cobell VI,* the D.C. Circuit noted that "[i]t is well understood that the extent of a trustee's duties and powers is determined by the trust instrument and the rules of law which are applicable." *Cobell VI,* 240 F.3d at 1099 (quoting *Restatement, Second* § 201, at 442) (punctuation omitted). The Court concludes that the rules of law applicable to the administration of the IIM trust include tribal law and ordinances.

However, although Interior acknowledges that NCAI's second fundamental principle "accord[s] with general terms of existing policies of Interior concerning trust management," Interior's Plan does not expressly state that its administration of the IIM trust must be governed in compliance with applicable tribal law and ordinances. Interior Defs.' Resp. to NCAI's Second Amicus Br. at 2–3. Instead, its Plan states only that the sources it looks to for guidance in administering its trust duties include "applicable federal statutes, Interior regulations, the *Departmental Manual,* OMB circulars, Department of the Treasury guidelines, generally accepted accounting and auditing standards, its employees' and consultants' experience and expertise, as well as other sources of relevant fiduciary practices." Interior's Comprehensive Plan at 3–28. This list nowhere mentions applicable trib-

al law and ordinances. This is a serious omission, given that one of the major risks that Interior has identified as potentially interfering with the successful implementation of its Plan is if "[v]arious major stakeholders [were to] disagree on the [Comprehensive Plan's] mission and implied boundaries." *Id.* at 5–13. Moreover, Interior has assessed the potential impact of this risk as "high," explaining that "[i]f the major stakeholders cannot agree on what [the Comprehensive Plan] is and what it isn't, then service and performance expectations will always be misaligned and dissatisfaction always prevalent." *Id.*

It is manifest that the Indian Tribes are major stakeholders in the administration of the IIM trust. As noted above, tribal interests in trust land and natural resources are physically intermingled and recorded in the same title and ownership systems as the individual interests, and tribal and individual resources are often managed and leased in large units under the same leasing and contractual agreements. Additionally, in many instances, Indian Tribes are responsible for local administration of various aspects of the IIM trust, pursuant to the authority granted to them under the Self–Determination Act. Therefore, the Court concludes that Interior's omission of an express statement that it will manage the administration of the IIM trust in compliance with applicable tribal law and ordinances is an omission that is so defective that it will necessarily delay rather than accelerate its ability to comply fully with its fiduciary obligations to the IIM beneficiaries. Accordingly, the Court will include in its structural injunction a clarification that Interior must administer the IIM trust in compliance with applicable tribal law and ordinances.

In order to facilitate its compliance with applicable tribal law and ordinances, the Court will direct Interior to submit a list of tribal law and ordinances that it deems applicable to its administration of the IIM trust, together with a full statement of the manner in which it considers these laws and ordinances to affect such administration. Following Interior's submission of this list, the Court will permit plaintiffs to submit a brief in response to Interior's submission, which may include a supplemental list of tribal law and ordinances that plaintiffs deem applicable to Interior's administration of the IIM trust. The Court will also grant NCAI leave to submit an amicus curiae brief in response to Interior's submission, which may include a supplemental list of tribal law and ordinances that NCAI deems applicable to Interior's administration of the IIM trust. After these briefs have been filed, either party may file a motion for clarification of the Court's provision in its structural injunction that Interior must administer the IIM trust in compliance with applicable tribal law and ordinances.

### D. No Redirection of Funds for BIA Services

The third fundamental trust principle identified by NCAI is that "reform of the United States' Indian trust fund management not reprogram funds from vitally needed BIA services and must not create new levels of bureaucracy that would impede the delivery of trust services to local needs." First Amicus Brief at 15. NCAI explains that "[m]any individual Indians lack access to basic resources and depend on BIA and tribal administered programs for their very survival. Many others rely on such services as education to provide the opportunities for self-sufficiency and advancement. Diverting resources from these programs to correct the DOI's historical or current failures in trust administration is not trust reform, but another breach of trust." *Id.* at 16.

NCAI further notes that in the 1994 Act,

Congress provided a mechanism intended to remedy the Department's failure to request adequate appropriations for Indian trust programs. The Special Trustee is charged with the duty of certifying the adequacy of the BIA budget to meet its trust reform and other obligations.... This provision of the 1994 Act should be properly implemented as a mechanism to communicate to Congress whether the DOI has requested sufficient funding to carry out the obligations due Indians under its trust responsibility. The DOI's duty is to request adequate funding for trust programs. It is for Congress, not the DOI, to decide whether adequate funding will be provided.

*Id.* at 16–17 (footnote and citation omitted). The Court agrees that this provision should be properly implemented, and that any claims that the Office of the Special Trustee has not complied with this statutory requirement should be brought before this Court. However, NCAI further requests that this Court require such certifications to "include detailed identification of any additional funding for trust reform that must come from new appropriations, and a signed statement that funding and personnel for BIA program services have not been diminished by, or reallocated to, the DOI's trust reform activities." *Id.* at 41.

But the Court can find no provision in the 1994 Act that would permit it to order such requirements. The Court is sympathetic to the concerns of the Tribes regarding the adequacy of funding for Indian education, social services, and law-enforcement programs administered by the BIA, and it agrees that Congress should adequately fund those programs. But to paraphrase NCAI's amicus brief, "it is for Congress, not the DOI, to decide whether adequate funding will be provided" for such programs. Of course, if any of the Tribes possess a justiciable claim that Congress has inadequately funded Indian education, social services, and law-enforcement programs in violation of applicable federal statutes, they may file such a claim in the proper court. But such a claim has not been raised in the present case, and thus, it is not a legal question that is presently within the purview of this Court.

The Court stresses that it is in no way either stating or implying that Interior should transfer or reprogram funds allocated by Congress to fund education, social services, and law-enforcement programs for Indians, and use them to fund its historical accounting of the IIM trust fund. Nor does the Court have any reason to believe that it will be necessary for Congress to do so. To this Court's knowledge, Congress has made no representation that it will be necessary to reallocate funds intended for these BIA-administered programs in order to adequately fund Interior's administration of the IIM trust, or that it intends to make such a reallocation.[15]

## E. Increased Tribal Control over Land and Resources

The fourth fundamental trust principle identified by NCAI is that "trust reform must provide for increased tribal control over land and resources along with a federal system that provides oversight and technical assistance in flexible arrangements driven by the unique circumstances of each reservation." *Id.* at 17. NCAI explains that

---

**15.** The Court is, of course, aware that some staff members and Interior officials have, on occasion, expressed their views that Congress will never fund a transaction-by-transaction historical accounting. But Congress has said no such thing.

the effective administration of the Indian trust will not be accomplished with a uniform, one size fits all solution. Prospective reform requires reservation-specific approaches.... Also, trust assets can be managed prudently and effectively where the trustee gives appropriate deference to tribal law in its administration of the trust and where the federal government responds to tribal needs, including technical assistance to improve the tribes' resource management capacity. This level of flexibility and sensitivity to local tribal concerns has important implications for the regional and local level structure of the DOI bureaucracy administering trust resources, services and accounts.

*Id.* As explained above, the Court agrees that Interior must give appropriate deference to tribal law in its administration of the IIM trust, and it has directed Interior to submit a list of tribal laws and ordinances that it deems applicable to its management of the trust. NCAI also suggests that "any trust reform restructuring assure that at the regional/local level, each tribe interacts with a single governmental decision-maker ... who has authority over the entire range of Indian programs (uniting trust resources, services and accounts)." *Id.* at 17–18. Although the Court agrees with this suggestion, NCAI has not directed this Court to any provision in the 1994 Act or other applicable law (including common-law trust duties) that would mandate such interaction. Accordingly, the Court must conclude that, unfortunately, this issue is beyond the purview of the Court in the present case.

### F. Involvement of Tribal Governments

The fifth fundamental trust principle identified by NCAI is that "tribal governments must be intimately involved in developing new systems and policies for trust management, with consultation taking place in a manner that ensures that tribal issues are actively addressed." *Id.* at 18. NCAI explains that

> [w]hen the management of trust assets are at stake, Congress has spoken clearly to provide Indian tribes the opportunity to directly manage and administer those resources. Congress has also made clear that when policies and procedures governing the management of trust assets are involved, Indian tribes must be consulted and given the opportunity to participate in the development of those policies and procedures in a manner that considers their concerns.

*Id.* at 19 (citations omitted). NCAI identifies a number of congressional acts, including the Self–Determination Act, that make clear Congress's intent in these respects. It also points to an executive order issued by President Clinton entitled "Consultation and Coordination with Indian Tribal Governments" that expresses the executive branch's agreement with Congress upon such issues. *See* Exec. Order No. 13,175, 65 Fed.Reg. 67249 (Nov. 6, 2000).

In support of this fifth principle, NCAI recommends in its first and second amicus briefs that this Court "direct the DOI to halt its ongoing reorganization of the BIA and expansion of OST, pending the Court's rulings in this litigation." Br. for *Amicus Curiae* National Congress of American Indians, Aug. 4, 2003 ("Second Amicus Brief") at 22. NCAI points out that Interior's proposed reorganization efforts have been criticized by tribal leaders and that Interior failed to consult with the Indian Tribes prior to making its decision to reorganize.

Unfortunately, the Court must decline NCAI's recommendation, not because it deems it to be without merit, but because it is a matter beyond the purview of the Court in the present litigation. First, as tacitly acknowledged by NCAI in its June

18; 2003 resolution, this is a matter for congressional decision, not for the courts. *See* Second Amicus Br. at attach. B (resolving to "call[ ] upon Congress to immediately halt the reorganization of the Bureau of Indian Affairs until the concerns of Tribal Leaders are fully addressed by a workable and effective reorganization plan, and until the 'To Be' process, developed through true and meaningful consultation with Indian Tribes, is completed" and requesting "a series of hearings before the Senate Committee on Indian Affairs and the House Resources Committee on the BIA reorganization"). Second, if NCAI possessed a judicially-cognizable claim that Interior's planned reorganization violated established law—an issue as to which the Court makes no finding one way or the other—it would need to file a complaint seeking injunctive relief against Interior in order to halt the reorganization process. Because NCAI is not a party to the present litigation, the Court is precluded by the standing doctrine from entertaining such a request in the present case.

The Court recognizes that NCAI will doubtlessly be disappointed by this Court's decision to decline its recommendation, and it regrets that it must do so. But as explained above, this Court has no other choice in the matter because the issue is beyond its purview in the present case.

### G. Core Systems

 Finally, NCAI asserts that "[a]t its heart, Indian trust fund administration requires accountability in three core systems that comprise the trust business cycle: 1) Title; 2) Leases/Sales; and 3) Accounting. These core systems must be accurate and integrated, timely, and be subject to credible standards and oversight." First Amicus Brief at 25 (footnote omitted). NCAI critiques Interior's Compliance Plan for failing to include any spe-

cific plans to fix the existing problems with these three core systems. The Court will analyze NCAI's critique and recommendations.

First, NCAI describes the title and ownership system of the IIM trust as "the most fundamental aspect of the trust system. DOI cannot accurately collect and distribute trust funds if it does not have correct information about the beneficial owners of the trust assets. This is the starting point for any effort to fix the trust system." *Id.* at 25–26 (footnote omitted). It explains the problems with the current title and ownership system:

> Currently, the BIA is using ten different title systems in the various Land Title Record Offices around the country, both manual and electronic. These systems contain overlapping and inconsistent information. The systems are largely "stand alone" in that they do not automatically reconcile the ownership information in the agency offices, in tribal records, or in the lease distribution records that are used for daily operations. Because records management standards and quality control procedures are lacking, there is no assurance that title records are accurate. These inaccuracies result in [the] incorrect distribution of proceeds from trust resources, questions regarding the validity of trust resource transactions, and the necessity to repeatedly perform administrative problems such as probate. Consequently, a large backlog of corrections has developed in many of the title offices, and this has compounded the delays in probate, leasing, mortgages, and other trust transactions that rely on title and ownership information. In turn, each of these delays compounds the errors in the distribution of trust funds.

*Id.* at 26 (footnote omitted). Because "[c]leaning up the ownership information

and implementing an effective title system that is integrated with the leasing and accounting systems is a primary need for the Indian trust system," NCAI encourages this Court "to ensure that expeditious reforms are made to the title system, including particularly the probate process." *Id.* at 26, 27.

Second, NCAI notes the importance of the leasing system of the IIM trust: "Most Indian trust transactions take the form of a lease of the surface or subsurface of an allotment, permits to allow the lessee to conduct certain activities in return for a fee, or a contract for the sale of natural resources such as timber." *Id.* at 27. It then identifies current problems with the leasing system:

> Although leasing records are vital to ensure accurate collection of rents or royalties there are no consistent procedures or fully integrated systems for capturing this information or for accurately identifying an inventory of trust assets. Currently, BIA has no standard accounts receivable system and many offices have no systems to monitor compliance, or to verify the quantity and value of natural resources extracted. The accounting system most often begins with the receipt of a check that is assumed to be accurate and timely. Implementing an effective lease recording system that is integrated with the title and accounting systems is a primary need for the Indian trust system, but the BIA has only recently begun to investigate possible technologies for this effort.

*Id.* Given the problems with BIA's leasing system, NCAI encourages this Court to "ensure that [Interior's] management information and administrative systems provide accurate and timely information regarding the trust resource transactions that produce income that is deposited into trust accounts." *Id.*

Third, NCAI critiques the IIM accounting system:

> The Government acknowledges that it operates multiple systems to track beneficiary information, title information, ownership and real property information, and accounting information. It further clarifies that these systems are not standardized and that important information in different sectors of those systems do not agree.
>
> The DOI Plan needs to set out how its systems will integrate information from one function into another (from title to leasing to accounting) and how the systems can be used to verify data. The DOI should also set out what oversight capabilities are planned into the system (verification and audit). Any proposal should include a plan for document retention and ease of access to facilitate audit and internal verification procedures. For example, databases should all include a field for identifying source documents. Furthermore, the DOI system needs a built-in cross-check between BIA entries to its control account and Treasury's entries to its control account. This system should automatically produce a daily exception list to be examined immediately.

*Id.* at 28.

Fourth, NCAI points out that Interior's Plan "further omits discussion of at least one essential element that must be implemented to effectively preserve the trust corpus—properly distinguishing trust principal and trust income." *Id.* at 29. It asserts that without a plan to distinguish principal from income during the accounting process, "the trust corpus will continue to erode to the detriment of tribes and individual Indians." *Id.* at 29–30.

NCAI thus recommends that Court "focus its oversight efforts on the core trust systems essential to trust fund accounting and trust asset management... title, leasing and accounting systems. These core systems must be functional, accurate, integrated, timely and subject to credible oversight." *Id.* at 39. Specifically, NCAI recommends that this Court direct Interior to "complete detailed plans, policies and procedures for correcting those systems that can be implemented within six months of the date of the Court's order." *Id.* at 40.

The Court is concerned that Interior's Comprehensive Plan lacks any specific proposals to ensure that its title, leasing, and accounting systems are integrated and functional, and can be depended on in the future to generate accurate information. Without these systems operating correctly, it does not seem possible that Interior will be able to comply with the 1994 Act's requirement that

> [n]ot later than 20 business days after the close of a calendar quarter, the [Interior] Secretary shall provide a statement of performance to each Indian tribe and individual with respect to whom funds are deposited or invested pursuant to [25 U.S.C. § 162a]. The statement, for the period concerned, shall identify the source, type, and status of the funds; the beginning balance; the gains and losses; receipts and disbursements; and the ending balance.

25 U.S.C. § 4011(b). Nor does it appear that Interior will be able to comply with its pre-existing duty to account to the IIM beneficiaries without these systems operating correctly. It may be that Interior is planning efforts to address the problems with these systems, but the Court is unable to determine this from the vague language of Interior's Comprehensive Plan. Accordingly, the Court will include in its structural injunction a provision directing Interior to submit a detailed plan of measures it intends to take to correct the problems with the leasing, title, and accounting systems of the IIM trust fund that have been identified by NCAI in its amicus brief. This plan must include a detailed timetable for the implementation of specific measures that will correct these problems.

The Court also agrees that Interior's Comprehensive Plan contains no mention of any intent to distinguish income from principal during its historical accounting of the IIM trust fund. Although the Plan does include "[s]ections applicable to Indian Trust of the Uniformed [sic] Principal and Income Act" among a list of "requirements that may contain provisions affecting the trust management business lines," this reference is so vague as to be virtually meaningless. As affirmed above, Interior must administer the IIM trust in accordance with the traditional common-law duty to use reasonable care and skill to preserve the trust property. The Court will therefore include in its structural injunction a provision directing Interior to identify the steps it intends to take as part of its To–Be Plan to distinguish principal from income during its historical accounting of the IIM trust fund, in accordance with its duty to use reasonable care and skill to preserve the trust property.

## V. CONCLUSION

On September 17, 2002, the Court directed Interior to submit a plan for bringing itself into compliance with the fiduciary obligations it owes to the IIM trust beneficiaries. The Court must determine whether Interior's Comprehensive Plan, as modified by provisions in the structural injunction issued this date, represents a reasonable plan to bring Interior into compliance with its fiduciary obligations in a timely fashion.

During the Phase 1.5 trial, this Court qualified Richard Fitzgerald, Acting Director of Interior's Office of Trust Regulations, Policies and Procedures, as an expert on trust operations, trust asset management, trust standards, and trust systems. *See* Tr., Day 6, PM session (May 8, 2003) at 23:2–11; 34:5. Fitzgerald testified that, in his opinion, Interior's Comprehensive Plan was a reasonable plan for bringing Interior into compliance with its fiduciary duties, if it could be implemented:

Q. Do you believe presently that the Department of the Interior has individuals with the necessary experience and skills to bring the IIM Trust into compliance with the trust standards?

A. There are some people who know what needs to be done from an operational standpoint. Donna [Erwin], I think, is an outstanding person who understands what a trust is and what trust operations are.

*I think that plan that has been put together is a reasonable plan if it can be implemented. But from a management standpoint, you know, and I have a certain amount of experience with managing lawyers in particular, one of the most difficult things that the Department is going to face is the implementation of the plan that they have got.*

Once it is successfully implemented, like with any plan, we will find out where the weak points are, and the Department will find out where the weak points are, and like in any management process, good management will address those weak points and bring about the necessary change.

I think there are—to answer your question, yes, I think that there are some people there who have got a good sense of what needs to be done.

Donna [Erwin], Doug Lords, Margaret Williams—basically the OTFM people, because they have got, in my view, ... good experience with managing at least the money that comes out of the trust [assets].

*Id.* at 41:1–25 (emphasis added). NCAI has also offered a qualified positive assessment of the As–Is / To–Be process contained in Interior's Comprehensive Plan:

*Amicus* NCAI notes that the As–Is / To–Be business processing reengineering has the *potential for* squaring the DOI's trust reform implementation with the requirements set out by Congress and under review by this Court. Provided that tribes are actively involved in the reengineering and the Court retains oversight, the effort may offer system-wide solutions to the problems of trust mismanagement rather than simply responses to its symptoms. While not covering every trust activity, the As–Is study is the most comprehensive and current review documenting trust operations.

With tribal participation, this comprehensive study could serve as a powerful tool for reform by offering a more complete picture of the Government's structures, systems and processes to carry out its trust responsibility to tribes and individual Indian. Absent tribal involvement and Court oversight, however, the DOI will likely use the reengineering as a tool to justify directing trust reform in the agency's, not the beneficiaries' interest. Whether the Trust Reform Task Force is reconvened, reinvigorated, or another tribal participation mechanism is established, tribes must be included in the evaluation of the As–Is recommendations and the To–Be modeling.

First Amicus Brief at 36 (emphasis in original).

As explained in the companion memorandum opinion issued this date, controlling precedents such as *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*"Brown II "*) and *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), require this Court to allow an institutional defendant the first opportunity to propose a remedial plan designed to cure its violations of law. The Court concludes that Interior's Comprehensive Plan, as amended by the relevant provisions of the structural injunction issued this date, represents a reasonable next step in the process of bringing Interior into compliance with its fiduciary obligations to the IIM beneficiaries.

But a plan is merely ink on paper. Fitzgerald thus qualified his remarks by explaining that Interior's Comprehensive Plan represents a "reasonable plan *if it can be implemented,*" and NCAI similarly stressed that the As–Is / To–Be process possesses the *"potential for* squaring the DOI's trust reform implementation with the requirements set out by Congress and under review by this Court." In short, Fitzgerald's testimony on a slightly different topic is relevant to the present issue:

Q: [A]mong other things, the [Restatement of Trusts] has a list of some—of a number of duties—duty of loyalty, duty of care, duty of skill. Do you think that those duties govern this trust as well?

A. I believe they do. And I think that the Department believes that, too, and I will tell you why. The Secretary put out his trust principles back in 2000, I guess. And the memo that accompanied those had a paragraph about sources of guidance.

That paragraph references the Krulitz letter. It obviously references federal law, but it also references the Krulitz letter, and then a list of federal Indian trust cases.

If you go back and you read those Indian trust cases, you will see in, I think every one, the courts refer to and rely on the—to the restatement, and Scott, and [Bogert]. So the Secretary has already said that those things are valid sources of guidance, at least to my mind.

THE COURT: And you think that that is still outstanding as valid guidance?

THE WITNESS: Your Honor, it is still in the manual. *Now again, it is the implementation thing. You know, having it in the manual—we used to see this in bank regulations all of the time.*

*A good set of policies and procedures was absolutely wonderful to have on the books, but you had to check to see whether or not they were being followed, and most of the time, or often, when you would find a bank that was in trouble, you would find that the policies and procedures, which were pretty good, were just not being followed.*

*Id.* at 48:17—49:22 (emphasis added). It has frequently been observed that the Enron Corporation possessed an extensive, 65–page code of ethics. Obviously, the mere existence of this code did not prevent the corporation's officers and directors from behaving unethically. Interior's Comprehensive Plan will be similarly useless unless it is actually implemented. Again, the Court turns to Fitzgerald's testimony:

Q. Well, let me touch upon that for a moment. You say if [Interior] can implement it. What are some of the things that give you a concern regarding whether they can implement this plan?

A. Reading things like the legislative history for the Reform Act, you will

see there that the Department has attempted over many years to reform the trust systems and have not been able to do it.

Reading things like [Interior's Inspector General's] Report of a year ago. In the very, very beginning, the IG talks about the bunker mentality at the Department, something that he has observed for over 20 years, and where offices fight one another, and that sort of thing.

There was even a report on the front page of The New York Times about a year ago about—that the Secretary had brought in somebody from the FBI to find out how many policemen the Department has and that fellow has been, from what The Times report says, has been not successful because he has been fought by all of the various offices.

We hope that the Department can get beyond that, but that is always, again—and particularly in government, I've got to say, I don't think this has anything to do particularly with the BIA, but large departments are difficult to manage, and so there is going to be a challenge there, I believe, that the Department needs to solve if they are going to be able to implement what needs to be implemented, because I don't think everybody is—change is resisted, as we all know.

Tr., Day 8, AM session (May 12, 2003) at 17:14—18:16.

As the Court has explained in its companion memorandum opinion, it is very skeptical of the notion that Interior's extraordinary resistance to the clear mandates of Congress and the courts may be explained away simply as the slowness of government bureaucracy. The bunker mentality existing at Interior is not a typi-

cal characteristic of federal agencies. The Court will therefore not simply remand to Interior, as it did following the Phase I trial in 1999, but will instead include among the provisions of its structural injunction a requirement that Interior actually implement its Comprehensive Plan, as modified by the present opinion.

The reason that the Court has decided not to simply remand to Interior is that virtually nothing has been accomplished since 1999 to bring Interior into compliance with the fiduciary obligations it owes to the IIM beneficiaries. During the Phase I trial, Interior represented to the Court that its implementation of the Trust Asset and Accounting Management System ("TAAMS") would serve as the centerpiece of trust reform. Numerous witnesses testified that when implemented, TAAMS would allow BIA to "administer trust assets, generate timely bills, identify delinquent payments, track income from trust assets, and distribute proceeds to the appropriate account holders." *Cobell v. Norton*, 226 F.Supp.2d 1, 49 (D.D.C.2002) (citation omitted) (*"Cobell VII"*). Indeed, one of Interior's proposed findings of fact during the Phase I trial stated that "TAAMS is, at heart, a data management system that contains all the essential functions to enable BIA to meet the requirements of the 1994 Reform Act." *Id.* at 48 (citation omitted). Additionally, during the Phase I trial,

[Interior] argued, in large part based on the testimony regarding TAAMS, that injunctive relief was not appropriate [in the present case]. The Department specifically stated that "[t]he testimony at trial showed that Interior is making good faith efforts to come into compliance with all legal obligations through promulgation and implementation of the HLIP. Plaintiffs have not shown that an injunction is necessary to prevent viola-

tions from persisting. There is no reason to conclude that an injunction is required to bring about compliance with these duties."

*Id.* (citation omitted).

However, on February 23, 2001, the very same day that the D.C. Circuit issued its Opinion affirming the Court's Phase I opinion, then-Chief Information Officer for BIA Dominic Nessi issued a memorandum to the Special Trustee. Nessi, one of Interior's principal witnesses during the 1999 trial, informed the Special Trustee "that trust reform is slowly, but surely imploding at this point in time." *Id.* at 19. It has subsequently become clear to the Court that TAAMS will never function properly. During the Phase 1.5 trial, former Special Trustee Paul Homan presented uncontradicted testimony that after spending several years and several million dollars developing TAAMS, Interior abandoned the TAAMS project. *See* Tr., Day 1, PM session (May 1, 2003) at 97:6–8 (testimony of Paul Homan).

It remains the case, however, that for Interior to comply with its fiduciary obligations to the IIM beneficiaries, it is crucial that it be able to access trust data in electronic form, including ownership information. Yet Interior has presented no plan to this Court describing any definite measures to satisfy that need. Indeed, its "Comprehensive Plan" is a plan in name only—the actual plan for bringing Interior into compliance with its fiduciary obligations is the To–Be Plan, which is not

expected to be completed until March of 2004. Therefore, the Court views Interior's "Comprehensive Plan" merely as a next step in the process of Interior's bringing itself into compliance with its fiduciary obligations, because it is really only a plan to make a plan (namely, the To–Be Plan).

Thus, from the time that this Court remanded to Interior in 1999 until the anticipated completion of the To–Be Plan in 2004, five years will have elapsed in which Interior has demonstrated virtually no progress in complying with its fiduciary obligations to the IIM beneficiaries. Interior has not shown that any of the breaches of trust identified in the Court's 1999 opinion have been corrected.[16] Nor, until 2004, will many of these breaches even be addressed. In that year, when Interior expects to issue its To–Be Plan, it will have been almost ten years since Congress passed the 1994 Act requiring Interior to comply with its duties to the IIM beneficiaries, including its duty to account. Yet not a single statement of account has been issued to a beneficiary since the passage of the Act.

At the close of the Phase I trial, this Court stated that, "given the long and sorry history of the United States' trusteeship of the IIM trust, the defendants' recalcitrance toward remedying their mismanagement despite decades of congressional directives, and the consequences of allowing these enumerated breaches of trust to continue, the court will retain continuing jurisdiction over this matter. It

---

**16.** Indeed, in at least one aspect, the situation has gone from bad to worse. In 1999, BIA had a probate backlog of approximately 12,000 cases. *Cobell V*, 91 F.Supp.2d at 17. However, during the Phase 1.5 trial, Special Trustee Ross Swimmer that it was his "understanding that there are as many as 18,000 that are awaiting probate now." Tr., Day 41, AM session (July 2, 2003) at 71:13–14; *see also* Tr., Day 40, PM session (July 1, 2003) at 85:25—86:2 ("I believe that the number is around 18,000 that are either official or unofficial deaths, and they may or may not be at one phase or another of probate."). This represents an *increase* in the probate backlog by 50% since 1999. In at least one aspect, then, Interior's "trust reform" has actually resulted in further stagnation rather than reform.

would be an abdication of duty for this court to do anything less." *Cobell v. Babbitt,* 91 F.Supp.2d 1, 7 (D.D.C.1999) ("*Cobell V* "). At the present juncture, almost four years later, Interior has still failed to mend the breaches of trust enumerated in 1999. Additionally, Interior has informed the Court that it will not be able to submit to this Court its actual plan to bring itself into compliance with its fiduciary obligations until March of 2004, almost a full decade after the passage of the 1994 Act, and five years since this Court remanded to Interior after the Phase I trial. Given these circumstances, the Court concludes that it would be an abdication of this Court's duty to remand back to Interior once again. Given the history of Interior's intransigence in the face of clear mandates from Congress and the courts to take steps to comply with its fiduciary obligations, the only reasonable conclusion is that remanding to Interior at the present juncture would virtually guarantee that this Court's orders will not be carried out. Accordingly, the Court will not remand to Interior. Instead, it will direct Interior to comply with the provisions of its Comprehensive Plan, including the completion of its To–Be Plan.

To ensure Interior's compliance, it will be necessary for this Court to prescribe a timetable for the implementation of Interior's Plan. Although the Court has concluded that this Plan, as amended by the relevant provisions of the structural injunction issued this date, represents a reasonable next step in the process of bringing Interior into compliance with its fiduciary obligations to the IIM beneficiaries, that conclusion is founded upon the premise that the plan will be implemented within a reasonable amount of time. Without knowing whether Interior expects to implement the Plan in the course of two, three, five, ten, fifty, or a hundred years, it is impossible for the Court to verify that premise.

In its January 6 Compliance Plan, Interior listed several specific tasks it intends to accomplish to bring itself into compliance with its fiduciary obligations to the IIM beneficiaries, together with time frames for the completion of those tasks. *See* Department of the Interior Fiduciary Obligations Compliance Plan at 50–51, 54, 58, 62, 76, 77, 83, 84, 94 (Defs.' Ex. 1). In its proposed findings and conclusions, Interior represents that these time frames "were developed after taking into account Interior's experience, advice from outside experts, statutory constraints, existing budget and appropriation requirements, the need for consultation with Congress and tribes, and Interior's considered judgment of the time required to implement large-scale institutional changes." Defs.' Prop. Findings and Conclusions at 217. The Court will incorporate these time frames into a timetable to be included in the structural injunction issued this date. Additionally, the Court will incorporate into this timetable dates for the completion and implementation of the To–Be Plan, based on Special Trustee Swimmer's testimony during the Phase 1.5 trial that Interior plans to complete the To–Be Model in March or April of 2004, and Interior's representation in its Comprehensive Plan that its implementation of the To–Be Plan will take approximately fourteen months after the To–Be Model is completed.

The Court does not believe that it will take a great deal of time before the monitor's reports on Interior's efforts will demonstrate whether Interior is implementing the provisions of its Comprehensive Plan in good faith. This belief is based in part on the testimony of Fitzgerald during the Phase 1.5 trial:

Q: Is there the necessary expertise, management skills at the Bureau of Indian Affairs to do that part of the

reform[,] to bring themselves fully into compliance with their trust duties?

A. I don't know. I don't. I don't think I can answer that question yes or no. I think the best I can do with that is that within the next year, we will know that.

Q. If you were at the Office of the Comptroller of the Currency and you were evaluating this trust, and you were evaluating the management of the Bureau of Indian Affairs, what actions would you take?

A. Oh, I think I would—you know, that has been testified to before, I do believe. If this were a department in a national bank, we would have closed it a long time ago, the OCC would have closed it a long time ago.

Q. And would you have appointed a receiver or a different trustee?

A. Yes, we would certainly look for a different trustee, and the way you usually do that is you go to the courts and you say, "This trustee is not up to doing the job. The Court needs to find a—appoint another trustee."

Q. And if appointing another trustee for whatever reason was not an option, would you consider appointing a receiver in that instance?

A. Sure.

Tr., Day 8, AM session (May 12, 2003) at 19:16—20:15. The Court has decided not to appoint a receiver to manage the IIM trust at the present time. This decision is based on the Court's conclusion that controlling precedent in this case requires that at this stage of the present proceedings, the appropriate remedy is a structural injunction to bring the institutional defendant into compliance with its legal obligations, together with the appointment of a monitor to report on the defendant's progress in complying with the provisions of the injunction. Within a year or so after the injunction takes effect, it will doubtlessly become clear from the monitor's reports whether Interior is actually complying with the provisions of the injunction that are intended to bring it into compliance with its fiduciary obligations to the IIM beneficiaries.

One final word is in order. The Court is mindful that in some aspects, the interests of the plaintiffs in this action—individual Indian trust beneficiaries—and the interests of the tribal trust beneficiaries may diverge. But the Court is also mindful that, without the input and support of the Indian Tribes, any proposed reform of the IIM trust will likely be doomed to fail. Therefore, even though the Tribes are not parties to the present case, the Court will make every effort to shape its remedies in a way that will not harm the interests of the Tribes. The Court invites amicus NCAI to submit additional amicus briefs in order to bring any important issues that may arise in the future to the Court's attention. Additionally, once the Court has appointed its monitor, the Court will direct him or her to serve each of his or her reports upon NCAI in order to keep the Tribes informed as to the progress of Interior's implementation of the structural relief ordered this date. It will further direct the monitor to meet on a quarterly basis with representatives of NCAI in order to receive input from the Tribes in a timely manner, and to file a detailed report of all such meetings on the record in this case, in order that the Court may receive such input. It is the Court's sincere hope that these measures will minimize any tension that exists between the interests of the plaintiffs and the interests of the Tribes.

An order shall be issued this date consistent with the foregoing memorandum opinion.

## ORDER ISSUING STRUCTURAL INJUNCTION

For the reasons set forth in the accompanying memorandum opinions issued this date, the Court hereby issues the following structural injunction:

I. Definitions

For purposes of this structural injunction:

A. "Interior defendants" shall mean the Secretary of the Interior, and the Assistant Secretary of the Interior for Indian Affairs, who are defendants in the present action in their official capacities.

B. "Trust" shall mean the Individual Indian Money (IIM) Trust.

C. "Plaintiffs" shall mean all present and former beneficiaries of the Trust.

D. "The 1994 Act" shall mean the Indian Trust Fund Management Reform Act, Pub.L. No. 103–412, 108 Stat. 4239.

E. "Order" shall mean the present structural injunction.

F. "Accounting Plan" shall mean The Historical Accounting Plan for Individual Indian Money Accounts, which was filed by the Interior defendants with this Court on January 6, 2003.

G. "Comprehensive Plan" shall mean the Department of the Interior Comprehensive Trust Management Plan, which was filed by the Interior defendants with this Court on March 28, 2003, not including any provisions thereof dealing solely with tribal trust issues.

H. "Compliance Plan" shall mean the Department of the Interior Fiduciary Obligations Compliance Plan, which was filed by the Interior defendants with this Court on January 6, 2003.

I. "Accounting Standards Manual" shall mean the Accounting Standards Manual dated May 9, 2003, which the Interior defendants filed with the Court as Defendants' Exhibit 59 during the Phase 1.5 trial in the present action.

II. General Provisions

A. The Interior defendants, their agents, employees, successors in office, and any others acting in concert with them are hereby enjoined from failing to implement fully and within the times prescribed each of the provisions of this Order.

B. If at any time, the Interior defendants' implementation of this Order is affected by a provision in this Order that is susceptible to more than one reasonable interpretation, then the Interior defendants may file a motion requesting that the Court clarify the provision at issue. If the Interior defendants do not file such a motion, then the Interior defendants shall construe the provision at issue in accordance with the reasonable interpretation that is most consistent with the "most exacting fiduciary standards" demanded of a trustee.

C. If at any time, it appears to plaintiffs that the Interior defendants are interpreting any provision of this Order too narrowly or incorrectly, plaintiffs may file a motion requesting that the Court clarify the provision at issue.

D. The Interior defendants shall administer the Trust in compliance with applicable tribal law and ordinances.

E. The relief awarded in this Order is supplemental to any relief awarded

heretofore in the present litigation, including that awarded in the Court's memorandum opinion of December 21, 1999, as affirmed by the D.C. Circuit in *Cobell v. Norton*, 240 F.3d 1081 (D.C.Cir.2001).

III. Historical Accounting

A. Pursuant to the 1994 Act, the Interior defendants shall provide plaintiffs with an accurate accounting of all money in the Trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited. The Interior defendants shall conduct a historical accounting of the Trust, in accordance with the timetable provided in section IV of this Order. The historical accounting of the Trust shall be undertaken in accordance with the Accounting Plan, except to the extent that any portion of the Accounting Plan is inconsistent with any portion of this Order.

B. Pursuant to the 1994 Act, the Interior defendants shall retrieve and retain all information concerning the Trust that is necessary to render an accurate accounting of all money in the Trust held in trust for the benefit of plaintiffs. As affirmed by the D.C. Circuit, the Interior defendants possess an obligation to recover missing trust records where possible, and develop plans and procedures sufficient to ensure that all aspects of the accounting process are carried out. Accordingly, within sixty (60) days of the date of this Order, the Interior defendants shall file with this Court, and serve upon plaintiffs, a detailed plan (1) to determine which records related to the Trust are likely to be possessed by entities outside of the federal government, (2) to identify the records related to the Trust maintained by such entities, and (3) to issue subpoenas, where appropriate, to ensure that records related to the Trust will be preserved. Within thirty (30) days of the date that this plan is filed with the Court, plaintiffs may submit a brief in response to the plan, which brief may include an alternative or supplemental plan to the plan submitted by the Interior defendants.

C. Within ninety (90) days of the date of this Order, the Interior defendants shall file with this Court, and serve upon plaintiffs, a detailed plan containing a timetable for completion of its collection and indexing of all records related to the Trust. This plan shall include a complete explanation of whether the indexing methods proposed in the Accounting Plan for indexing records related to the Trust located in Albuquerque, New Mexico and in Lee's Summit, Missouri, shall be used for indexing the remaining records related to the Trust that are held by the federal government.

D. The historical accounting of the Trust conducted by the Interior defendants shall account for all funds in the Trust deposited or invested pursuant to the Indian Reorganization Act of 1938, 48 Stat. 984, regardless of whether such funds were deposited or invested before or after October 25, 1994.

E. The historical accounting of the Trust conducted by the Interior defendants shall account for all funds deposited or invested in the Trust since the passage of the General Allotment Act of 1887, 24 Stat. 388.

F. The historical accounting of the Trust conducted by the Interior defendants shall account for all funds deposited or invested in the Trust, regardless of whether such funds were deposited or invested during the

lives of beneficiaries of the Trust who are now deceased.

G. The historical accounting of the Trust conducted by the Interior defendants shall account for all assets held by the Trust since the passage of the General Allotment Act of 1887, 24 Stat. 388.

H. The historical accounting of the Trust conducted by the Interior defendants shall account for all monies paid to beneficiaries of the Trust in conjunction with direct-pay leases and contracts entered into by such beneficiaries.

I. The historical accounting of the Trust conducted by the Interior defendants shall account for all funds deposited or invested in the Trust, regardless of whether the assets generating such funds were or are administered or managed by one or more Indian Tribes pursuant to a contract, compact, or other cooperative agreement in accordance with the Indian Self–Determination Act and Education Assistance Act of 1975, Pub.L. No. 93–638, 88 Stat. 2203, *as amended.*

J. The historical accounting of the Trust conducted by the Interior defendants shall account for all property interests that escheated from beneficiaries of the Trust pursuant to the Indian Land Consolidation Act, 96 Stat. 2519, *as amended* ("ILCA"), and that reverted back to any beneficiary of the Trust prior to the completion of the historical accounting of the Trust. Additionally, all property interests that escheated from beneficiaries of the Trust pursuant to ILCA and that reverted back to any beneficiary of the Trust after the completion of the historical accounting of the Trust must be accounted for in one of the subsequent accounting reports to that beneficiary, the issuance of which has been mandated by the 1994 Act.

K. The historical accounting of the Trust conducted by the Interior defendants shall not make use of any statistical sampling procedure to verify the existence of any transactions that have occurred during the existence of the Trust, except as part of an audit of the historical accounting of the Trust.

L. The historical accounting of the Trust conducted by the Interior defendants shall include a verification process conducted by professional accountants using the representations in the Accounting Standards Manual to verify the existence of each individual transaction occurring during the existence of each presently-existing or previously-existing account within the Trust through the use of supporting documentation. The Interior defendants shall use only the version of the Accounting Standards Manual that the Interior defendants filed with the Court as Defendants' Exhibit 59 during the Phase 1.5 trial in the present action, unless changes to the Accounting Standards Manual have been approved by the Court.

M. The accounting statements that shall be transmitted by the Interior defendants to each living beneficiary of the Trust after the Interior defendants have completed their historical accounting of the Trust shall include a description of the assets belonging to each living beneficiary of the Trust or his or her predecessors in interest; a description of all changes to the assets belonging to each living beneficiary or his or her predecessors in interest during the existence of the Trust; and

a description of the assets belonging to each living beneficiary of the Trust.

N. Within ninety (90) days of the date of this Order, the Interior defendants shall file with the Court, and serve upon plaintiffs, a plan describing in detail each of the five system tests described on page III–18 of the Accounting Plan. If any of these five system tests will involve the usage of sampling techniques, the plan shall provide a detailed description of the specific technique to be utilized, including the sample size and sampling method. Within thirty (30) days after the filing of this plan, plaintiffs may submit a brief in response to the plan, which brief may include an alternative or supplemental plan to the plan submitted by the Interior defendants.

O. Within sixty (60) days of the date of this Order, the Interior defendants shall file with the Court, and serve upon plaintiffs, a plan describing in detail each of the quality control (QC) measures described in Appendix C of the Accounting Plan that have already been implemented. The plan shall also describe in detail each of the QC measures that the Interior defendants will undertake in conjunction with their historical accounting of the Trust. Within thirty (30) days after the filing of this plan, plaintiffs may submit a brief in response to the plan, which brief may include an alternative or supplemental plan to the plan submitted by the Interior defendants.

P. Within one hundred twenty (120) days of the date of this Order, the Interior defendants shall file with the Court, and serve upon plaintiffs, a plan that analyzes the use of industry production databases such as PI/Dwights and computer software such as Geographic Information System ("GIS") in conjunction with the histor-ical accounting of the Trust that will be performed by the Interior defendants. This plan shall include an analysis of the use of such production databases and software as a means of filling gaps in the records relating to the Trust, and an analysis of the potential usefulness of such production databases and software as a test or verification of the completeness of the historical accounting of the Trust that will be performed by the Interior defendants. If the Interior defendants decide not to use such production databases and software in conjunction with their historical accounting of the Trust, the plan shall explain, in detail, (1) which measures the Interior defendants have already implemented or will implement that will function as an adequate means of filling gaps in the records relating to the Trust and testing or verifying the completeness of the historical accounting of the Trust that will be performed by the Interior defendants and (2) why the use of such production databases and software will not serve as an appropriate supplement to such measures. Within thirty (30) days after the filing of this plan, plaintiffs may submit a brief in response to the plan, which brief may include an alternative or supplemental plan to the plan submitted by the Interior defendants.

III. Compliance with Fiduciary Obligations

A. The Interior defendants shall implement the Comprehensive Plan, except to the extent that any portion of the Comprehensive Plan is inconsistent with any portion of this Order.

B. Within ninety (90) days of the date of this Order, the Interior defendants shall file with the Court, and serve

upon plaintiffs, a detailed plan identifying the specific measures that Interior defendants will take as part of their To–Be Plan to bring themselves into compliance with the fiduciary duties imposed upon trustees at common law, as identified by this Court in its memorandum opinions issued this date. This detailed plan statement shall identify any portion of the To–Be Plan that might be deemed to be inconsistent with any of these fiduciary duties, and include a full explanation of why the identified portion or portions should not considered to be inconsistent with any of these fiduciary duties. Within thirty (30) days after the filing of this plan, plaintiffs may submit a brief in response to the plan, which brief may include an alternative or supplemental plan to the plan submitted by the Interior defendants.

C. Within one hundred twenty (120) days of the date of this Order, the Interior defendants shall file with the Court, and serve upon plaintiffs, a list of tribal laws and ordinances that the Interior defendants deem applicable to the administration of the Trust. The list shall include a full statement of the manner in which the Interior defendants consider these laws and ordinances to affect such administration. Within thirty (30) days after the filing of this list, plaintiffs may submit a brief in response to this list, which brief may include an alternative or supplemental list to the list submitted by the Interior defendants. The Court also grants leave for the National Congress of American Indians (NCAI) to submit an amicus curiae brief in response to this list within

thirty (30) days after the filing of this list, which brief may include an alternative or supplemental list to the list submitted by the Interior defendants.

D. Within ninety (90) days of the date of this Order, the Interior defendants shall file with the Court, and serve upon plaintiffs, a detailed plan of measures it will take to correct the problems with the leasing, title, and accounting systems of the Trust identified by NCAI in its amicus curiae brief that was filed with this Court on March 3, 2003. This plan shall include a detailed timetable for the implementation of specific measures to correct such problems. Within thirty (30) days after the filing of this plan, plaintiffs may submit a brief in response to this list, which brief may include an alternative or supplemental plan to the plan submitted by the Interior defendants.

E. Within one hundred twenty (120) days of the date of this Order, the Interior defendants shall file with the Court, and serve upon plaintiffs, a detailed plan identifying the specific measures that the Interior defendants will take as part of their To–Be Plan to distinguish principal from income during their historical accounting of the Trust.

IV. Timetable

A. Historical Accounting [1]

1. By September 30, 2004, the Interior defendants shall complete (1) their accounting of all judgment accounts and per capita accounts in the Trust, as described in the Accounting Plan, (2) their indexing of all Trust-related records located at

---

1. The dates presented in the following schedule for the historical accounting process are based on estimates presented by Interior in

the Accounting Plan for the completion of these tasks.

federal records facilities in Albuquerque, New Mexico, and Lee's Summit, Virginia, as described in the Accounting Plan, and (3) their system tests of the Trust relating to (a) electronic data gaps and (b) the system conversion from the Integrated Records Management System ("IRMS") to the Trust Funds Accounting System ("TFAS"), as described in the Accounting Plan

2. By September 30, 2005, the Interior defendants shall complete (1) their accounting of all transactions in all land-based accounts in the Trust from the Electronic Records Era (1985–present), as described in the Accounting Plan, and (2) their system test of the Trust relating to the system conversion from paper records to IRMS, as described in the Accounting Plan.

3. By September 30, 2006, the Interior defendants shall complete (1) their accounting of all transactions in all land-based accounts in the Trust from the Paper Records Era (1887–1985), as described in the Accounting Plan, and (2) their system tests of the Trust relating to interest calculations, postings, and ownership, as described in the Accounting Plan.

4. By September 30, 2007, the Interior defendants shall complete their cleanup of all special deposit accounts in the Trust, as described in the Accounting Plan.

B. Compliance with Fiduciary Obligations

1. Within ninety (90) days of the date of this Order, the Interior defendants shall (1) complete their identification of Trust-related documents necessary to render an accurate accounting of the Trust, as de-

scribed in the Compliance Plan; (2) establish and implement training programs for records custodians on the usage of the new records retention schedules for Trust records, as described in the Compliance Plan; (3) draft and implement policies and procedures regarding the retrieval of Trust records, as described in the Compliance Plan; (4) complete their departmental review of policy and procedures for their collection of missing Trust information from third parties; (5) add the status of funds in the Trust (*i.e.*, whether invested or not) to the quarterly statements of account distributed to the beneficiaries of the Trust; (6) add a gains and losses explanation to the quarterly statements of account distributed to the beneficiaries of the Trust, as described in the Compliance Plan; (7) transmit a letter relating to the fiscal year 2002 audit of the Trust to all account holders of the Trust, as required by the 1994 Act; (8) contract for third-party investment management of the Trust, as described in the Compliance Plan; (9) request legislation from Congress to satisfy part of its imbalance of Trust fund balances with the U.S. Department of the Treasury ("Treasury"), as described in the Compliance Plan; (10) determine their options for fully resolving the imbalance of Trust fund balances with Treasury, as described in the Compliance Plan; (11) request an expansion of the fiscal year 2004 annual audit to include all funds held in trust by the United States for the benefit of an individual Indian that are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. § 162a); and (12) review the records reten-

tions of Interior agencies other than the Bureau of Indian Affairs ("BIA") and the Office of the Special Trustee ("OST") to ensure that Trust-related documents necessary to render an accurate accounting of the Trust are properly retained.[2]

2. Additionally, by December 31, 2003, the Interior defendants shall (1) resolve the validation of documentation for automatic disbursement authorizations occurring prior to the installation of TFAS, as described in the Compliance Plan; and (2) establish and implement revised records retention schedules for non-electronic Trust records for BIA and OST, as described in the Compliance Plan.

3. By March 31, 2004, the Interior defendants shall (1) complete their To–Be Plan, as described in the Comprehensive Plan, and shall file the completed To–Be Plan with the Court; (2) establish and implement revised records retention schedules for electronic Trust records for BIA and OST, as described in the Compliance Plan; (3) index all identified documents under the control of the Office of Trust Records ("OTR") that are necessary to perform an accurate accounting of the Trust, as described in the Compliance Plan; and (4) establish and implement a Privacy Act program to ensure their compliance with federal and departmental Privacy Act regulations and directives, provide training to all of their employees concerning their employees' responsibilities for handling Privacy Act documents, and conduct an inspection of areas where records subject to the Privacy Act are maintained, as described in the Compliance Plan.

4. By June 30, 2004, and thereafter, the Interior defendants shall transmit a letter to all account holders of the Trust relating to the annual audit of the Trust for the previous year, as required by the 1994 Act.

5. By September 30, 2004, the Interior defendants shall fully resolve the imbalance of Trust fund balances with Treasury, as described in the Compliance Plan.

6. By May 31, 2005, the Interior defendants shall fully implement the completed To–Be Plan, as described in the Comprehensive Plan.

C. Amendment of the Timetable

1. Within ninety (90) days of the date of this Order, the Interior defendants shall file with this Court, and serve upon plaintiffs, a detailed proposed timetable for the completion of their historical accounting of the Trust. This timetable shall include specific dates for the Interior defendants' completion of important milestones in their historical accounting of the Trust, including the completion of the collection process, accounting process, and reporting process. The proposed timetable shall include a detailed explanation as to why each of the selected dates were chosen. Within thirty (30) days after the filing of this proposed timetable, plaintiffs may submit a brief in response, which brief may include an alternative or supplemental timetable to the timetable submitted by the Interior defendants.

---

**2.** The above-listed tasks are tasks that Interior estimated in the Compliance Plan that it would complete on or before September 30, 2003.

2. Within ninety (90) days of the date of this Order, the Interior defendants shall file with this Court, and serve upon plaintiffs, a timetable for the completion of the entire indexing process of Trust-related records to be undertaken as part of the Interior defendants' historical accounting of the Trust. This timetable shall include a detailed explanation of how the indexing methods proposed in the Accounting Plan for indexing the Trust-related records located at Albuquerque, New Mexico and Lee's Summit, Missouri differ, if at all, from the indexing methods that the Interior defendants will use to index the boxes of Trust-related records held by the federal government that are not located at Albuquerque, New Mexico and Lee's Summit, Missouri.

3. The Interior defendants may submit to this Court a motion to amend the portions of the above timetable relating to the Interior defendants' completion of the accounting of the land-based accounts in the Trust and for the historical accounting of the Trust as a whole. If the Interior defendants submit such a motion, it shall be served upon plaintiffs, and shall include specific dates for the completion of the Interior defendants' completion of their accounting of the land-based accounts in the Trust and of the historical accounting as a whole, as well as a detailed explanation of its reasons for selecting these specific dates. Within fifteen (15) days after the filing of this proposed timetable, plaintiffs may submit a brief in response to the timetable.

4. Any amendments to the above timetable at the behest of either of the parties shall only be made upon motion, for good cause shown.

5. The Interior defendants shall inform the Court immediately if they receive any information that might affect their compliance with the above timetable.

V. Judicial Monitor

A. The Court shall appoint a Judicial Monitor to report on the Interior defendants' compliance with the provisions of this Order. The Judicial Monitor shall be assisted by several subordinate officials ("agents").

B. The Judicial Monitor shall be appointed pursuant to Rule 53 of the Federal Rules of Civil Procedure, and shall possess all authority bestowed on special masters pursuant to Rule 53. The Judicial Monitor and his or her agents shall be compensated at the prevailing market rate for their services and shall be reimbursed for all expenses incurred in connection with their appointment. The Interior defendants shall bear these costs, as their unlawful actions necessitated these appointments.

C. The Interior defendants shall provide the Judicial Monitor and his or her agents with unlimited access to the Interior defendants' facilities and to all information relevant to the implementation of this Order, in order that the Judicial Monitor and his or her agents may be made cognizant of any failures to comply with the provisions of this Order.

D. The Judicial Monitor and his or her agents shall have the power to conduct confidential interviews with the Interior defendants and any of their subordinates.

E. Reports containing the Judicial Monitor's findings and conclusions

with respect to the Interior defendants' compliance with this Order, as well as recommendations regarding its modifications or enforcement, shall be submitted to this Court for evaluation on a periodic basis, and when specifically requested by this Court or deemed necessary by the Judicial Monitor. The Judicial Monitor's reports shall be served upon the parties and upon NCAI.

F. The Judicial Monitor shall meet with a representative or representatives of NCAI, as designated by NCAI, on a quarterly basis. The Judicial Monitor shall file with this Court, and serve upon the parties and NCAI, a complete report of any discussions that take place during these meetings.

G. The Judicial Monitor and his or her agents shall not intervene in the administrative management of the Interior defendants. The Judicial Monitor and his or her agents shall not direct the Interior defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance with this Order. The Judicial Monitor and his or her agents shall not consider matters that go beyond superintending or reporting upon compliance with this Order.

VI. Retention of Jurisdiction

This Court shall retain jurisdiction over the present matter until December 21, 2009. This retention of jurisdiction shall be subject to any motion for an enlargement of time that may be made.

SO ORDERED.